IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER

| | |
|---|---|
| NICOLE ALEQUIN, *et al.*, | ) |
| | ) |
|    Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DARDEN RESTAURANTS, INC., GMRI, INC., | ) |
| RARE HOSPITALITY INTERNATIONAL, INC., | ) |
| RARE HOSPITALITY MANAGEMENT, INC., | ) |
| N and D RESTAURANTS, INC., DARDEN SW LLC, | ) |
| and FLORIDA SE, INC., | ) |
| | ) |
|    Defendants. | ) |
| | ) |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' EXPEDITED MOTION TO COMPEL**

I.      INTRODUCTION

This case is a putative collective action against Darden Restaurants, Inc. and its subsidiaries alleging that Defendants violated the Fair Labor Standards Act in the manner that it pays its tipped employees. This action purports to be nation-wide in scope, implicates five distinct restaurant brands (Olive Garden, Red Lobster, LongHorn Steakhouse, Seasons 52, and Bahama Breeze), and involves a putative class that includes well over 100,000 individuals. Judge Rosenbaum ordered bifurcated discovery, and the present phase of discovery is limited to discovery of facts relating to whether notice should issue to similarly situated employees.

Less than seven days after receiving Defendants' timely responses to Plaintiffs' requests for production, and without having actually reviewed this production, Plaintiffs filed the instant motion to compel. Plaintiffs' demands are overly burdensome and are improper for this phase of discovery, which is limited to certification issues only. Moreover, Plaintiffs' motion extends to documents that were not actually encompassed within the requests they propounded.

"Discovery is not to be used as a weapon, nor must discovery on the merits be completed precedent to class certification." *National Organization of Women v. Sperry Rand Corp.*, 88 F.R.D. 272, 277 (D. Conn. 1980). By their conduct, and through the filing of their motion to compel, Plaintiffs attempt to do just that. As explained fully below, Plaintiffs disregard (1) the law, which forbids disproportionately burdensome discovery, (2) Judge Rosenbaum's order, which limited the present phase of discovery to certification issues only, and (3) Defendants' substantial production of 14,000 pages of documents that bear on issues related to certification. Plaintiffs insist that despite their own delay and lack of cooperation, they should immediately receive complete responses to their merits-based discovery requests. For these reasons, as explained fully below, Plaintiffs' motion should be denied.

## II.   STATEMENT OF RELEVANT FACTS

### A.   The Present Phase Of Discovery Is Limited To Certification Issues Only.

The parties filed their Rule 16 report (with separate sections for each side's proposed discovery plan) on November 14, 2012. (Dkt. 33.) The Parties then appeared before Judge Rosenbaum for a discovery conference on November 30, 2012, during which Plaintiffs' counsel opposed a separate certification phase of discovery, arguing that pre-certification discovery must not constitute "hijacking the notice stage into full blown discovery" or "merits discovery in the guise of discovery in the notice phase." (Dkt. 62, p. 10 & p. 11.)

On December 7, 2012, Judge Rosenbaum entered the scheduling order. (Dkt. 47.) Over Plaintiffs' objections, the order bifurcated discovery into certification discovery and merits discovery. *Id.* The order specified an April 5, 2013 deadline for "discovery on facts relating to whether to issue notice to similarly situated employees" and further provided that "discovery on the merits" would not begin until July 15, 2013, and would end on January 17, 2014. *Id.*

### B.   Plaintiffs Waited A Month After The Discovery Order To Serve Discovery.

Notwithstanding the impending deadline for certification discovery, Plaintiffs did not actually serve their "First Set of Requests" until January 7, 2013 (*see* Dkt. 89-3, p. 20) – <u>a full month</u> after Judge Rosenbaum issued the scheduling order. Those requests disregard the limitations set forth in Judge Rosenbaum's order, and seek documents far beyond issues of whether similarly situated employees exist or whether notice is proper, including, for example, requests for documents related to: corporate organization and control and other factors pertinent to the joint employer analysis; time-motion studies; DOL investigations of Defendants; Defendants' good faith and willfulness defenses; and Defendants' general business information and records. (*Id.* at Requests 4-7, 9, 25-26, 38-43, & 45-46) (Defendants served their discovery requests promptly on December 7th, 2013. (Exh. A.))

### C. Defendants Attempted To Reach Agreement On An ESI Protocol.

Anticipating that Plaintiffs would be seeking discovery of electronically stored information ("ESI"), Defendants proposed during a November 13, 2012 discovery conference that the parties enter into an ESI protocol, and meet and confer about relevant data sources, custodians, and search methodologies (including search terms). (Declaration of Aaron Crews ("Decl."), ¶2.) However, Plaintiffs were unwilling and unprepared to discuss data sources, custodians, or search methodologies at this conference, insisting that the meet and confer only cover issues related to format of production. (*Id.*, ¶3.) Accordingly, Defendants suggested that Plaintiffs prepare a first draft of a proposed ESI protocol, which Plaintiffs agreed to do, tendering it on November 29, 2012. (*Id.*, ¶¶2-3 & Decl. Exh. 1.) Defendants offered revisions to the first draft on December 21, 2012, seeking to narrow both sides' burdens and bolster technical and other details. (*Id.*, ¶5 & Decl. Exhs. 2 (clean version) and 3 (redline version).) Plaintiffs' response, sent on January 21, 2013, gutted Defendants' revisions and reinstated nearly all of Plaintiffs' original terms. (*Id.*, ¶6 and Decl. Exhs. 4 (clean version) and 5 (redline version).)

Plaintiffs also revised some of their own initial terms to minimize Plaintiffs' ESI obligations. For instance, Plaintiffs' revised version of their originally proposed language eliminated their obligation to: (a) provide the same data analysis to justify rejection of a search term; (b) make a reasonable and diligent effort to search for and collect responsive ESI; (c) inform Defendants of Rule 26 "not reasonably accessible" data that they were choosing not to search and produce, or describe the basis for this decision; or (d) adhere to any timeline or deadline to begin collecting any responsive ESI from each individual plaintiff. (*Cf* Decl. Exh. 1, §2(b)-(d) & Decl. Exh. 4, §2(b)-(d).)

Defendants attempted to salvage the ESI protocol. Having identified the few severable aspects on which parties appeared to agree (which related largely to format of production),

-3-

Defendants prepared a stripped-down version of the protocol with just those items, (Exh. B), but Plaintiffs rejected even these terms. (Decl., ¶7.)

### D. Defendants Attempted To Define A Reasonable Custodial Scope.

On January 29th, 2013, Defendants proposed that the ESI of 34 specific, class-appropriate custodians be searched and produced. (Decl., ¶8.) The 34 custodians were chosen with class-certification issues in mind. Because Plaintiffs' claims involve five restaurant brands, Defendants selected two restaurants from each brand, for a total of 10 restaurants. (*Id.*) Each restaurant selected is one where at least one named or opt-in plaintiff is currently employed. (*Id.*) Because Plaintiffs' claims are nationwide in scope, Defendants ensured that the restaurants were geographically diverse, including locations in Alabama, California, Illinois, New Jersey, and of course Florida. (*Id.*) For each restaurant, Defendants selected the entire reporting chain (from the general manager of the restaurant, up to the operations directors, the managing directors, and finally the senior vice-presidents). (*Id.*.) Defendants then added 11 high-level corporate personnel, including the personnel (directors, senior directors, and senior vice-presidents) in charge of both human resources and training functions for the five restaurant brands. (*Id.*.) Defendants repeatedly explained to Plaintiffs their basis for viewing this set of 34 custodians as <u>a reasonable starting point for iterative discovery</u>. (*Id.*, ¶11.)

Plaintiffs proposed, on January 31, 2013, that ESI scope be broadened to "all Directors of Operations and Managing Directors," and then to the full "reporting chain" from general manager to senior vice-president for every restaurant. (Exh. C, p. 2.) Plaintiffs further expanded their demand on February 6, 2013, to all of "Defendant's ESI without custodian-based limitations". (Exh. D, p.1.) Defendants promptly analyzed this proposed scope and on February 11, 2013, provided an estimate of the number of additional custodians implicated: 135, 275, and 5,800 custodians, respectively. (Exh. E, p.1.).

The 34 custodians proposed by Defendants alone have 885GB (gigabytes) of e-mail data. (Decl., ¶12.) Plaintiffs' narrowest proposed expansion to the custodian list (135 custodians) would require Defendants to search and review roughly 3,500 GB, or about 3.5 terabytes (TB) of e-mail data. (*Id.*, ¶14.) Similarly, the 275 "reporting chain" custodians Plaintiffs requested may be expected to have over 7,150 GB, or more than 7 TB, of e-mail data. (*Id.*) Finally, 5,800 custodians would likely have nearly 150 TB of data (not unsurprisingly, as that would include <u>all</u> of Defendants' e-mail). (*Id.*) The estimated burden of each proposal is as follows:

| Proposed Custodian Size | # of E-mails | E-mail Review Cost |
|---|---|---|
| 34 custodians (885GB) | 6,356,967 | $393,825.00 |
| 135 custodians (3,500GB) | 25,240,898 | $1,563,717.91 |
| 275 custodians (7,150GB) | 51,416, 645 | $3,185,349.26 |
| 5,800 custodians (150,000GB) | 1,084,423,782 | $67,181,911.76 |

(*Id.*, ¶¶12-15.)

      **E.**    **The Parties Only Recently Began Defining Proper Search Terms.**

Plaintiffs contend that they provided Defendants with proposed "search terms" on November 6, 2012 and that Defendants ignored them for more than two months. However, the actual chronology with respect to search terms is as follows:

At a discovery conference on November 5, 2012, Plaintiffs offered to send a list of the general types of documents that they might seek, and then provided a document referred to as an "initial list of document categories". (Decl., ¶17.) Defendants interpreted this as a preservation list of documents Plaintiffs would eventually request. Next, at a November 13, 2012 conference, Plaintiffs stated that they *wanted to* provide search terms for "e-mail inboxes, Sent Items, and so on", but they did not do so. (*Id.*, ¶18.) Plaintiffs' first draft of the ESI protocol, circulated on November 29, 2012, stated that the Parties would work on search terms <u>in the future</u> – without referencing the "initial list of document categories" as constituting actual search terms. (*Id.*, ¶19

& Decl. Exh. 1.) On January 10, 2013, the Parties had yet another conference to discuss the ESI protocol; again, Plaintiffs did not mention having allegedly provided any search terms. (*Id.*, ¶20.)

However, following a January 24, 2013 discovery conference, Plaintiffs claimed (by letter dated January 25) that they provided search terms "two months ago." (Exh. F, p.2.) On January 29, 2013, Defendants responded that Plaintiffs' correspondence was the first mention of actual search terms allegedly provided, (Exh. G, p.2), but nevertheless promptly used Plaintiffs' "initial list of document categories" to craft and send proposed search strings. (Exh. H.) Thus, it was Defendants who proposed the first set of actual Boolean search strings, as shown below:

| Plaintiffs' Proposed Document Categories (Numbered as in Original, Dkt. 89-2, p. 3) | Defendants' Proposed Search Strings |
|---|---|
| 14. "Universal Side Work," | sidework OR "side work" |
| 15. "Tip Share Program Rollout Guide," | "tip shar*" OR "tipshar*" |
| 17. documents using the term "off-the-clock" or "off the clock," | "off the clock" |
| 19. documents containing the words: "end of day" and clock[] out,"<br>20. documents containing the words: "during the day" and "clock[]out,"<br>21. documents containing the words: "closing" and "clock[] out,"<br>22. documents containing the words: "shift" and "clock[]out," and<br>23. documents containing the words: "end of shift" and "clock[] out.<br>24. documents containing the words: "before clocking in"<br>25. documents containing the words: "after clocking out" | (day OR closing OR shift OR before OR after) w/15 ("clock in" OR clockin OR "clocking in" OR "clock out" OR clockout OR "clocking out") |
| < Defendants also proposed this additional, broad version of the search string proposed for the above set of categories> | "clock in" OR clockin OR "clocking in" OR "clock out" OR clockout OR "clocking out" |

**F.      Plaintiffs' Demand For Certain Additional "Time Records" Is Improper.**

Because Plaintiffs did not serve their discovery requests until January 7, 2013, Defendants were not obligated to produce any documents until February 11, 2013. Nevertheless, Defendants agreed to accommodate Plaintiffs with early production of personnel, time, and payroll records of the plaintiffs who were scheduled for deposition. (Exh. I). Defendants

-6-

produced those documents on January 28, 2013. (*Id.*) On February 7, 2013 – still before any document production by Defendants was due – Plaintiffs' counsel claimed that the production was deficient because it did not include "T-logs or cash out slips." (Dkt. 89-12, p.2.)

> Plaintiffs claim that these documents are responsive to their Request for Production 12:
>
> All Documents relating to (i) the work schedule for each Plaintiff at the Restaurants; (ii) each and every time when Plaintiffs clocked in or clocked out at the Restaurants; (iii) the time worked by Plaintiffs at the Restaurants; (iv) the work performed by Plaintiffs at the Restaurants; (v) all pay stubs for Plaintiffs; and (vi) all payments made to Plaintiffs.

(Dkt. 89, p.8). Defendants disagreed that this vague request properly requested "T-logs and cash out slips," and noted moreover that if Plaintiffs had intended to seek such ESI, they should have discussed them with e-discovery counsel, so the parties could define what specifically was sought and whether it was accessible or usable. (Exh. J.) Plaintiffs did not do so, and instead moved to compel this yet-undefined dataset.[1]

With respect to data reflecting Plaintiffs' time, payroll, and scheduling information, Defendants did not refuse to produce any of this during the meet-and-confer process. Defendants advised Plaintiffs that while they anticipated that their production would be mostly complete by February 11, they may require additional time to gather some of the documents. (Exh. K.) The electronic time, payroll, and scheduling information fall into that category.

---

[1] Because Plaintiffs filed this motion rather than explain what they were seeking, Defendants' remain unclear what Plaintiffs are seeking by way of "T-log" data. To the extent they are seeking data regarding transactions at the POS (point of sale) terminals in each location where Plaintiffs worked, Defendants do not see how such data is relevant, as it is not individual-specific and does not bear any timestamps indicating the end of an individual plaintiff's workday. (*See* III.H, below.) With respect to "cash out slips," Plaintiffs' request is also unclear. Defendants understand "cash out slips" to refer to the end-of-shift report that servers run in order to settle up at the end of the night. The cash out is not necessarily the last thing a server does before the end of shift, so the relevance of this information is doubtful. In any event, Defendant can generate a report showing when the Plaintiffs cashed out, and it will do so.

Defendants have collected all available data and are preparing it for production. The only point of disagreement is the T-Logs.

### III. ARGUMENT

#### A. Legal Standard

Plaintiffs miss the mark on the breadth of permissible discovery at this stage of litigation. "Precertification discovery should be limited to matters relevant to class certification, not the merits of the case." *Commonwealth Land Title Ins. Co. v. Higgins*, 975 So. 2d 1169, 1174 (Fla. Dist. Ct. App. 2008) (based on federal law, [2] finding in a class action that broad discovery of data for about 1,000 employees was "in effect, full merits discovery" that would be "unduly burdensome and [would] result in irreparable injury at this stage of the litigation" (*Id.* at 1171)). "Discovery relevant only to the merits delays the certification decision and may ultimately be unnecessary," while still creating "extraordinary expense and burden." *Manual for Complex Litigation (4th)* § 21.14 (2004). Pre-certification discovery must therefore "balance the need to discover facts relevant to class certification issues with the burdens imposed by the discovery request." *Commonwealth*, 975 So. 2d at 1175.[3] Plaintiffs' citation to the standards for merits or post-judgment discovery, especially in non-class contexts, is inapt. (Dkt. 89, pp. 3-4.)

In addition, any and all discovery is subject to the limitations imposed by Rule 26(b)(2)(C), which authorizes restrictions when the burden or expense of proposed discovery outweighs its likely benefit, or when the discovery sought is either unreasonably cumulative or

---

[2] The court based its analysis on federal case-law, noting that Florida's pre-certification discovery rules are "patterned after federal rules," in which case "Florida has a longstanding tradition of relying on federal case law." *Id.* at 1174 & n. 4.

[3] *See also, e.g., Tracy v. Dean Witter Reynolds, Inc.* 185 F.R.D. 303, 305 (D. Colo. 1998) (recognizing in the class action context "the need to prevent potential abuse" via overbroad pre-certification discovery); *Sperry Rand*, 88 F.R.D. at 277 (stating that at the pre-certification stage, defendants should be shielded from "overly burdensome, irrelevant" merits discovery).

duplicative, or can be obtained more easily and less expensively from a different, more convenient source. Fed. R. Civ. P. 26(b)(2)(C). Discovery is to be produced following reasonable inquiry, and perfection is not the standard – as courts routinely recognize, there is no duty to preserve, let alone search, review and produce, "every shred of paper, every e-mail or electronic document" that is arguably within the scope of discovery. *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 523 (D. Md. 2010).[4]

Instead, courts require parties to produce documents and other information under the "rule of proportionality," which "serves to protect a party against having to produce voluminous documents of questionable relevance." *Woods v. Capital One Servs., LLC*, No. 5:09-CV-1445, 2011 U.S. Dist. LEXIS 61962, at *10 (N.D.N.Y Apr. 15, 2011) (denying plaintiff's motion to compel, but allowing plaintiff to re-file were he willing to underwrite the expense associated with the request); *see also, e.g.*, *Med Pharma, Inc. v. BioMatrix*, No. 03-3677, 2011 U.S. Dist. LEXIS 141614, at *15 (D.N.J. Dec. 9, 2011) (applying the Rule 26(b)(2)(C) proportionality analysis and affirming magistrate judge's ruling that party did not have to review the nearly 2 million documents retrieved by a poorly-crafted set of search terms); *Thermal Design, Inc. v. Guardian Building Products, Inc.*, No. 08-C-828, 2011 U.S. Dist. LEXIS 50108, at *3 (E.D. Wis. Apr. 20, 2011) (denying Plaintiff's fishing expedition simply because Defendant had the financial resources to pay for the searches, where Defendant had already produced 91GB of data at a cost of $600,000, and noting that Defendant's financial resources are an insufficient basis for

---

[4] *See also, e.g., Zubulake v. UBS Warburg*, 217 F.R.D. 212, 217 (S.D.N.Y. 2004); *Wiginton v. CB Richard Ellis, Inc.*, No. 02 C 6832, 2003 U.S. Dist. LEXIS 16266, at *4 (N.D. Ill. Sept. 15, 2003) (explaining that "a party does not have to . . . preserve every single scrap of paper in its business"); *The Sedona Conference Commentary on Proportionality in Electronic Discovery*, 11 Sedona Conf. J. 289, 294 (2010) (explaining that Rule 26 provides courts "significant flexibility and discretion to assess the circumstances of the case and limit discovery accordingly to ensure that the scope and duration of discovery is reasonably proportional to the value of the requested information, the needs of the case, and the parties' resources").

ordering such discovery); *Tamburo v. Dworkin*, No. 04 C 331, 72010 U.S. Dist. LEXIS 121510 (N.D. Ill. Nov. 17, 2010) (ordering a phased discovery plan in conformity with the Federal Rules' proportionality requirement).

      **B.**      **Plaintiffs' Motion Is Premature And Ignores Defendants' Productions.**

Discovery productions from Defendants have progressed apace, with nearly 14,000 pages of documents produced thus far. (Exh. L, p.1.) Defendants produced documents related to the named plaintiffs, as well as corporate-level documents and data such as policies, training materials, team member guides, job descriptions, side work charts, SOPs, time-punch records, payroll data, and manager "recommitment" documents. (Decl., ¶21.) Defendants' production thus comprises voluminous information that allows Plaintiffs to investigate certification issues ahead of the April 5th deadline for notice briefing. Defendants also informed Plaintiffs that the final 5,000 to 10,000 pages of non-email discovery will be produced this week. (*Id.*, ¶22.)

During a conference days *after* this motion was filed (let alone initially drafted), Plaintiffs admitted that they had failed to review all of Defendants' production, and could not even estimate when they would complete their review of the 14,000 pages already produced. (Exh. L, p.1; Decl., ¶23.) Rather than first completing their review of Defendants' production, Plaintiffs elected to file this motion for even more discovery. In light of the fact that, Plaintiffs conceived and drafted this motion without first reviewing Defendants' production, their motion is *per se* premature, particularly in suggesting that absent relief, they will "receive no meaningful discovery" from Defendants. (Dkt. 89, p. 3.)

Nor is there room to argue that Defendants have caused production delays. Defendants served discovery requests the day the bifurcation order was entered, while Plaintiffs delayed one full month. (*See* I.B, above.) Unlike Plaintiffs, Defendants also served timely (and even early) responses, objections, and responsive discovery. (*See* I.F, above.) Therefore, in all fairness, it is

Plaintiffs, if anyone, who are responsible for the ensuing one-month (December 7th-January 7th) delay.  Not only is Defendants' production to date meaningful and significant, Plaintiffs could have had these documents sooner had they promptly served their discovery requests or engaged in reasonable efforts to meet and confer regarding the search and production of ESI.

   **C.**  **Rather Than Being Disinterested, Defendants Have Pushed For An ESI Protocol, But Remain Stymied By Plaintiffs' Refusal To Compromise.**

  Defendants have not been disinterested in cooperating with Plaintiffs regarding ESI, as Plaintiffs claim. (Dkt. 89, p. 10.)  Rather, it was Defendants who proposed, at the November 13, 2012 meet-and-confer, that the parties enter into an ESI protocol.  (*See* I.C, above.)  While Plaintiffs agreed to write the first draft of the protocol upon Defendants' suggestion, their subsequent actions made clear that they were not interested in achieving any real agreement or compromise on the issues, and instead, viewed the protocol as yet another way to create unnecessary burden on Defendants.  Plaintiffs not only rejected the substance of Defendants' edits to the protocol in their entirely, they went further and made revisions that would allow them to evade their own ESI obligations, largely exempting them from its purview. (*Id.*)

  Upon seeing that Plaintiffs sought to use the protocol as a way to generate leverage in the litigation rather than trying to reach any compromise, Defendants chose a different tack.  Because Plaintiffs had already rejected Defendants' first set of revisions, Defendants did not comment further on Plaintiffs' redrafted protocol.  This would have been futile given Plaintiffs' rejection of any compromise.  Instead, Defendants prepared a stripped-down version of the protocol to address agreed-upon items only.  (*See* I.C, above*.*)  Plaintiffs now refuse to agree to even this compromise.  (*Id.*)  Thus, it is Plaintiffs who are blocking even a basic ESI agreement.

### D. Defendants' Proposal To Produce 34 Custodians' E-mail And Home Drive Data Is Reasonable And Appropriate At The Class Certification Stage.

Although Plaintiffs ask the Court to order much broader production, Defendants' proposal to produce email and Home Drive data for 34 custodians is reasonable for certification discovery based on Plaintiffs' basic theory of the case. If, as Plaintiffs assert, tipped employees at all five restaurant brands and across the nation are subject to consistent policies and practices, then this pattern should reveal itself in the files of both the 23 restaurant-related custodians, and the 11 custodians who have broad oversight across all of the restaurants. In addition, the higher-level custodians included in Defendants first tier custodian list (managing directors, senior vice-presidents, and even some operations directors), are each responsible for multiple restaurant locations. Accordingly, their inclusion in the custodian list expands the geographical scope of the dataset so it covers a total of 35 additional locations and 12 more states. (Decl., ¶9.)

As Judge Rosenbaum recognized on a similar point, while one "might have to look at more than one Plaintiff obviously within each brand," at some point short of "overkill … a pattern emerges. Either it looks like everyone we are talking to is saying the same thing or it looks like people are saying different things." (Dkt. 62, p. 15.) If there is not any discernible pattern after Plaintiffs have received—and fully reviewed—discovery related to 45 locations across 17 states, as well as human resources and training-related discovery for all five brands, there arguably need not be any further production; however, in the spirit of cooperation, Defendants have agreed to consider expanding discovery further if Plaintiffs find reasonable insufficiencies in the production from the 34 custodians. (Decl., ¶11.)

It will cost Defendants at least $393,825.00,[5] to review and produce e-mails for just 34 custodians. (*See* I.D, above.) While this cost and effort is significant, it pales in comparison to

---

[5] Defendants note that the review estimates provided by vendor-declarant Matthew Clarke do not

the burden of review and production that Plaintiffs are attempting to place on Defendants by trying to enlarge the custodial scope of pre-certification discovery. (*Id.*) The Court should deny Plaintiffs' attempts to unreasonably expand the proposed discovery scope.

> **E.  Plaintiffs' Various Proposed Expansions Of Custodial Scope – To 135, 275 And Even 5,800 Custodians – Are All Patently Unreasonable At This Stage.**

As shown by the chart in section II.D above, the burden of Plaintiffs' proposals is extreme. Such a burden is unjustified because this phase of discovery is limited to class certification issues only. To appropriate the argument that Plaintiffs' counsel made at the November 30th, 2012 court hearing, certification discovery should not be allowed to become "merits discovery in the guise of discovery in the notice phase." (Dkt. 62, p. 11.) Any benefit of the broad discovery Plaintiffs seek rapidly diminishes as discovery expands beyond the 34 custodians proposed by Defendants. All five restaurant brands at issue are already covered within the 34 custodians Defendants have proposed, as are the managers of all tipped employees at issue in this case. The 135 or 275 custodians Plaintiffs propose do not include additional job titles. In fact, the 135 actually exclude restaurant-level general managers as well as senior vice-presidents (who have the broadest relevant purview). Both the 135 and the 275 custodians Plaintiffs proposed also exclude the nationwide human resources and training personnel, which are included in Defendants' 34 custodians. Thus, Plaintiffs' expanded lists of custodians actually narrow the categories of personnel covered and are <u>less informative</u> of any pattern across restaurant brands. What they add, on the other hand, is volume via more examples of the same types of personnel, and the repetitious overkill that Judge Rosenbaum specifically cautioned the parties to avoid.

---

include several categories of cost, foremost of which is the cost of counsel's own time and effort in supervising the vendor review, conducting privilege review, and otherwise completing all the tasks attendant to a vendor-conducted document review.

In addition, the likely benefit of this cumulative discovery is outweighed by the excessive cost and effort of each proposed expansion, and is thus unreasonable -- especially when compared to the more reasonable burden of Defendants' <u>broader</u> proposal.  "To spend either three million or three hundred thousand dollars, in order to move a mountain of documents and statistics from the defendant's facilities to the plaintiffs' offices, would be, in this pre-certification context, a wasteful and unjustifiable action."  *Sperry Rand*, 88 F.R.D. at 277.  As in *Sperry Rand*, Plaintiffs' proposed expansions do not pass the Rule 26 test of proportionality.  As for the proposal to search all 5,800 e-mail custodians, it goes without saying that extending the custodial scope of class certification discovery to the fullest reach of merits discovery is patently unreasonable, even before one considers cost.  When this is coupled with the fact that running Plaintiffs' proposed search terms across all 5,800 email custodians is functionally impossible from a technical standpoint, (Decl., ¶16), it becomes obvious this request should be rejected.

At bottom, Plaintiffs' demand that additional custodians be added immediately to the class certification review scope is premature and based on hypotheticals.  It is more reasonable for them to receive and review Defendants' productions before evaluating whether more is needed.  Thus, Plaintiffs' motion for broader discovery should be denied.

**F.     Defendants' Proposed Search Terms Actually Encompass And Go Beyond Plaintiffs' Own Initial Proposed "Document Categories".**

Plaintiffs did not present a set of search terms that Defendants ignored for more than two months, as Plaintiffs claim.  (*See*, II.E, above)  Rather, Plaintiffs provided an "initial list of document categories," followed by a promise of terms yet to be provided.  Once it was clear that Plaintiffs intended to cast this vague list as their actual search terms, Defendants promptly responded.  Defendants grouped Plaintiffs' applicable document categories into five search strings that collectively (and efficiently) retrieve the documents described in those categories.

Anticipating that concepts of side-work and tip-sharing might more universally apply to this matter, Defendants actually proposed more comprehensive search strings. For instance, for the "Universal Side Work" category, Defendants expanded Plaintiffs' category by using two spellings of "side work" and eliminating the limiting word "universal". Defendants also agreed to test 12 additional search terms subsequently proposed by the Plaintiffs. (*See* II.E., above.).

### G. Without Testing And Refinement, However, Any Proposed Search Strings Are Likely To Result In Unnecessary And Burdensome ESI Review.

The Court should reject the demand to run search terms as-is, because to ensure a reasonable burden, terms must first be tested against actual data. Plaintiffs cannot reasonably object to this, as their first draft of the ESI protocol provides that "parties and their counsel will work in good faith to <u>identify, discuss, agree upon and revise</u>" search terms. (Decl. Exh. 1, §2(a) (emphasis added).) Plaintiffs' draft further describes the search-result details such as "hit" counts that parties will use to evaluate the search burden. (*Id.* §2(c).) Disagreement about other terms aside, it is evident that both parties expected iterative refinement of search terms to minimize review burden, and (from Defendants' perspective at least), return results tailored narrowly to certification/notice issues only.

Such an approach is reasonable. Consider, for instance, Plaintiffs' proposed terms "Department of Labor" and "job description". (Exh. C, p.2.) One will bring back every DOL-related document and communication, from mass-mailed bulletins to routine forms and correspondence related to every aspect of Defendants' business regulated by the DOL. The other will bring back every employment application and related communication, whether for a server or upper management. While some will likely be relevant, the vast majority of these overbroad results will not apply to the employees and aspects of Defendants' operations actually at issue. Beyond such instances of facially obvious over-breadth, there will also be room to eliminate

numerous so-called 'false positive' irrelevant hits that can only be identified by testing the search terms. Moreover, revisions will prevent premature merits discovery. The DOL search term, for instance, may probe Defendants' good-faith and willfulness defenses, which are strictly merits issues that are outside the scope of these searches under Judge Rosenbaum's discovery order.

Defendants are not proposing that every instance of over-breadth, false-positive hit, or merits-related discovery be ironed out. Rather, Defendants have maintained that a reasonable process of iterative testing and revision will help eliminate some significant amount of this irrelevant burden. Plaintiffs' insistence that their proposed terms be run *per se* is the unreasonable position here. Accordingly, the Court should deny Plaintiffs' motion.

**H.     Plaintiffs' Demand For "T-Logs" Is Neither Appropriate Nor Practical.**

The only category of "time record" data subject to Plaintiffs' motion to compel, and which Defendants have not agreed to produce, is "T-log" data. First and foremost, the Court should deny Plaintiffs' motion to compel TLOG files because these files were not properly requested. The Local Rules require that requests for production "be clear, concise and reasonably particularized." Appendix A to the Local Rules (Discovery Practices Handbook) Pt. III.A (1). A purported request for TLOG files, which does not actually mention TLOGs, does not satisfy this requirement.

Further, it is unclear what Plaintiffs mean by "T-logs," and Plaintiffs ignored Defendants' request that they work through e-discovery counsel to clarify this. If, as Defendants assume, Plaintiffs are referring to the TLOG files used daily to convey cash-register data to Defendants' corporate databases, then Plaintiffs are plainly wrong about the evidentiary value of these, because (a) thousands of these are created daily or weekly *for entire restaurants*, not server-by-server, and (b) these are created using an automated process, and the file-level timestamp would merely reflect the time (typically afterhours) when the automated process created the file.

(Decl., ¶¶25-26). This timestamp would thus not correspond to the time that a particular server may have clocked out, and the file itself would not be specific to a particular server either. Requiring Defendants to redundantly preserve and then produce many thousands of irrelevant TLOG files is clearly not efficient, judicious, reasonable, or otherwise reflective of the content, or intent, of Rules 1 and 26. Accordingly, the Court should not compel this production.

## IV.   CONCLUSION

Defendants have attempted to be transparent and cooperative in discovery. Defendants provided extensive information on their data sources and IT systems. Defendants proposed drafting an ESI protocol to regulate the mechanics of how ESI would be searched and produced by the parties. Defendants proposed search terms based on Plaintiffs' own document categories. Defendants identified a reasonable custodian set for initial class certification search and review. Finally, Defendants have produced 14,000 pages of non-email information already, with another 5,000-10,000 soon to follow. Plaintiffs claim that this is all inadequate and ask this Court to order immediate production that is unduly burdensome and far beyond what is called for in this phase of discovery, which is limited to certification issues only. Plaintiffs have even gone so far as to demand documents that are not conceivably encompassed in their discovery requests.

Courts have routinely warned that discovery should not be a weapon. Plaintiffs' tactics – demanding unreasonably burdensome and impractical discovery, failing to review productions, rejecting their own compromises, overlooking court rulings, ignoring and exempting themselves from routine discovery duties, treating cooperation as a formality, and acting as though they have minimal obligations throughout – illustrate their intent to weaponize discovery. The Court should signal its rejection of this behavior by denying Plaintiffs the relief sought and awarding Defendants the costs it has incurred in responding to this frivolous and premature motion.

DATED this 26th day of February, 2013.

        Respectfully submitted,

        LITTLER MENDELSON, P.C.
        One Biscayne Tower, Suite 1500
        Two South Biscayne Blvd.
        Miami, Florida  33131
        Tel:  (305) 400-7500
        Fax: (305) 603-2552

        By: */s/ Patrick G. DeBlasio*
            Patrick G. DeBlasio, FL Bar No. 871737
            E-mail: *pdeblasio@littler.com*
            Aaron Reed, FL Bar No. 0557153
            E-mail:  *areed@littler.com*

        John A. Ybarra (admitted *pro hac vice*)
        E-mail: *jybarra@littler.com*
        Amy S. Ramsey (admitted *pro hac vice*)
        E-mail: *aramsey@littler.com*
        LITTLER MENDELSON, P.C.
        321 North Clark Street, Suite 1000
        Chicago, Illinois 60654
        Tel: (312) 372-5520
        Fax: (312) 372-7880

        Attorneys for Defendants

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 26th day of February, 2013, a true and correct copy of the foregoing and its attachments was electronically filed and served via transmission of Notice of Electronic Filing generated by CM/ECF on all counsel or parties of record on the Service List below.

/s/ *Patrick G. DeBlasio*
Patrick G. DeBlasio

## SERVICE LIST

**David Henry Lichter**
E-mail: dlichter@hlglawyers.com
Higer Lichter & Givner
18305 Biscayne Boulevard
Suite 402
Aventura, Florida 33160
Telephone: (305) 356-7555
Facsimile: (305) 933-0998

**Peter S. Pearlman**
E-mail: psp@njlawfirm.com
**Alex Pisarevsky**
E-mail: ap@njlawfirm.com
Cohn Lifland Pearlman Hermann & Knopf
Park 80 Plaza West One
250 Pehl Avenue, Suite 401
Saddle Brook, New Jersey
Telephone: (201) 845-9600
Facsimile: (201) 845-9423

Attorneys for Plaintiffs

**Ted Trief**
E-mail: ttrief@triefandolk.com
**Matthew Wojtkowiak**
E-mail: mwojtkowiak@triefandolk.com
**Barbara Olk**
E-mail: bolk@triefandolk.com
Trief and Olk
150 East 58th Street, 34th Floor
New York, New York 10155
Telephone: (212) 486-6060
Facsimile: (212) 317-2946

Firmwide:118634671.2 069299.1040