IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 12-61742-CIV-DIMITROULEAS/SNOW

| | |
|---|---|
| AMANDA MATHIS, *et al.,* | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) |
| | ) |
| DARDEN RESTAURANTS, INC., *et al*., | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' MOTION TO DECERTIFY COLLECTIVE ACTION AND
INCORPORATED MEMORANDUM OF LAW**

Dated:  June 27, 2014

By:  */s/ Aaron Reed*

Patrick G. DeBlasio, FL Bar No. 871737
E-mail: pdeblasio@littler.com
Aaron Reed, FL Bar No. 557153
E-mail: areed@littler.com
Jessica T. Travers, FL Bar No. 18129
E-mail: jtravers@littler.com
LITTLER MENDELSON, P.C.
333 S.E. 2nd Avenue, Suite 2700
Miami, Florida  33131
Tel:  (305) 400-7500
Fax: (305) 603-2552

John A. Ybarra (admitted *pro hac vice*)
E-mail: jybarra@littler.com
Amy S. Ramsey (admitted *pro hac vice*)
E-mail: aramsey@littler.com
Michael J. Lehet (admitted *pro hac vice*)
E-mail: mlehet@littler.com
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1000
Chicago, Illinois 60654
Tel: (312) 372-5520
Fax: (312) 372-7880

Gerald L. Maatman, Jr. (admitted *pro hac vice*)
E-mail: gmaatman@seyfarth.com
Matthew Gagnon (admitted *pro hac vice*)
E-mail: mgagnon@seyfarth.com
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
Tel: (312) 460-5000
Fax: (312) 460-7000

ATTORNEYS FOR DEFENDANTS

## TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION ............................................................................................... 1

II.     STATEMENT OF RELEVANT FACTS ........................................................... 3

      A.      Procedural History And Composition Of Class ...................................... 3

      B.      Sidework Assignment And Oversight ..................................................... 4

      C.      Plaintiffs Have Different Sidework Claims ............................................. 6

            1.      Different Tip Credit Pay Practices And Employment Settings
                 Impact Plaintiffs' Claims ............................................................. 6

            2.      Sidework Differed Based On Brand, Location, Position, and Shift ......... 8

            3.      Plaintiffs Disagree About Whether And To What Extent Sidework
                 Duties Were Tip-Producing ......................................................... 9

            4.      Plaintiffs Devoted Substantially Different Amounts Of Time To
                 Sidework Tasks ............................................................................ 9

      D.      Prohibition Against Off-The-Clock Work ............................................. 10

      E.      Differences In Plaintiffs' Off-The-Clock Claims ................................. 12

            1.      Plaintiffs Describe Several Different Practices Resulting In
                 Alleged Off-The-Clock Work .................................................... 12

            2.      Plaintiffs' Alleged Experiences Differ Based On Restaurant And
                 Manager ....................................................................................... 13

            3.      Plaintiffs Spent Different Amounts of Time Working Off-The-
                 Clock ........................................................................................... 14

            4.      Plaintiffs Knew It Was Against Company Policy to Work Off The
                 Clock But Failed To Take Available Remedial Measures ...................... 15

      F.      Enforcement Of Wage-And-Hour Policies ........................................... 15

      G.      Department Of Labor Investigations Confirm That Wage-And-Hour
          Violations Are Isolated ......................................................................... 17

i

## TABLE OF CONTENTS
### (CONTINUED)

PAGE

H.  The Parties' Experts Differ On Whether Collective Adjudication Is Appropriate .......................................................................................... 18

III.  LAW AND ARGUMENT ......................................................................... 19

A.  Legal Standard On Decertification ................................................... 19

B.  Plaintiffs Are Not Similarly Situated .............................................. 20

1.  Legal Standard On Plaintiffs' Claims ..................................... 20

2.  Plaintiffs Experienced Materially Different Factual And Employment Settings .............................................................. 22

a.  Pay Practices Affecting The Class Differ By Brand, State, Position, And Time Period ....................................... 23

b.  There Is No Evidence Of A Common Unlawful Policy That Affected The Entire Class ............................................ 24

(1)  Plaintiffs Bring Different Claims And Describe Different Alleged Practices .............................. 24

(2)  Plaintiffs Complain Of Different Alleged Practices That Affected Them In Different Ways ...................... 26

(3)  The Evidence Does Not Support Plaintiffs' Claims That Through Centralized Control Defendants Encourage Managers To Cheat Employees .................... 28

3.  The Class Is Subject To Individualized Defenses .................................... 29

4.  Collective Adjudication Would Be Neither Manageable Nor Fair .......... 31

(1)  Individualized Questions Pervade This Litigation ........... 31

(2)  Representative Evidence Is Not An Option .................... 32

(3)  The Result Of Collective Adjudication Would Be An Impermissible "All Or Nothing" Determination ........ 35

**TABLE OF CONTENTS**
(CONTINUED)

PAGE

IV.     CONCLUSION................................................................................................................. 35

# TABLE OF AUTHORITIES

PAGE

CASES

*Anderson v. Cagle's, Inc.*,
    488 F.3d 945 (11th Cir. 2007) ................................................................19, 29

*Basco v. Wal-Mart Stores, Inc.*,
    216 F. Supp. 2d 592 (E.D. La. 2002) ...............................................................30

*Bayles v. Am. Med. Response of Colo., Inc.*,
    950 F. Supp. 2d 994 (D. Colo. 1996)................................................................32

*Bolick v. Brevard County Sheriff's Dept.*,
    937 F. Supp. 1560 (M.D. Fla. 1996)................................................................20

*Briggins, v. Ellwood Tri, Inc.*,
    882 F. Supp. 2d (N.D. Ala. 2012) ........................................................... passim

*Crate v. Q's Rest. Group LLC*,
    2014 U.S. Dist. LEXIS 61360 ...................................................................21, 32

*Creely v. HCR ManorCare, Inc.*,
    920 F. Supp. 2d 846 (N.D. Ohio 2013)........................................................25, 28

*Echevarria v. Las Vegas Beach, Inc.*,
    2010 U.S. Dist. LEXIS 61107 ........................................................................27

*Fast v. Applebee's International, Inc.*,
    638 F.3d 872 (8th Cir. 2011) ....................................................................20, 21

*Frye v. Baptist Mem'l Hosp., Inc.*,
    2010 U.S. Dist. LEXIS 101996 (W.D. Tenn. Sept. 27, 2010).........................30, 31

*Gatewood v. Koch Foods of Miss., LLC*,
    2009 U.S. Dist. LEXIS 113896 ......................................................................32

*Grayson v. K-Mart Corp.*,
    79 F.3d 1086 (11th Cir. 1996) .......................................................................19

*Illano v. H&R Block Eastern Enters.*,
    2010 U.S. Dist. LEXIS 145673 ..................................................................25, 26

iv

## TABLE OF AUTHORITIES
### (CONTINUED)

PAGE

*Johnson v. Big Lots*,
  561 F. Supp. 2d 567 (E.D. La. 2008)........................................................................2, 34, 35

*Jonites v. Exelon Corp.*,
  522 F.3d 721 (7th Cir. 2008) ........................................................................................23

*Knott v. Dollar Tree Stores, Inc.*,
  897 F. Supp. 2d 1230 (N.D. Ala. 2012)....................................................................19, 29

*Lugo v. Farmer's Pride Inc.*,
  737 F. Supp. 2d 291 (E.D. Pa. 2010) ..............................................................................24

*Martin v. Citizens Fin. Group, Inc.*,
  2013 U.S. Dist. LEXIS 43084 ............................................................................... passim

*Monger v. Cactus Salon & Spa's, LLC*,
  2009 U.S. Dist. LEXIS 60066 (E.D.N.Y. July 6, 2009)............................................20, 23

*Morgan v. Family Dollar Stores, Inc.*,
  551 F.3d 1233 (11th Cir. 2008) ......................................................................................19

*Pellon v. Business Rep. Int'l., Inc.*,
  528 F. Supp. 2d 1306 (S.D. Fla. 2007), *aff'd*, 2008 U.S. App. LEXIS 19077 (11th Cir.
  Sept. 3, 2008) ..........................................................................................................21, 32

*Perez v. Brandsmart Serv. Corp.*,
  2011 U.S. Dist. LEXIS 82708 (S.D. Fla. July 28, 2011)..................................................20, 34

*Prise v. Alderwoods Group, Inc.*,
  817 F. Supp. 2d 651 (W.D. Pa. 2011)...............................................................................22

*Proctor v. Allsups Convenience Stores, Inc.*,
  250 F.R.D. 278 (N.D. Tex. 2008) ..........................................................................27, 28, 31

*Rindfleisch v. Gentiva Health Servs.*,
  2014 U.S. Dist. LEXIS 69217 (N.D. Ga. Apr. 18, 2014) ...............................................20, 24

*Roberts v. Apple Sauce, Inc.*,
  945 F. Supp. 2d 995 (N.D. Ind. May 13, 2013)................................................................22

TABLE OF AUTHORITIES
(CONTINUED)

PAGE

*Seward v. IBM,*
    2012 U.S. Dist. LEXIS 49688 (S.D.N.Y. Jan. 20, 2012).......................................27

*Smith v. Tradesmen Int'l, Inc.,*
    289 F. Supp. 2d 1369 (S.D. Fla. 2003) ...........................................................19, 22

*Thiessen v. Gen. Elec. Capital Corp.,*
    267 F.3d 1095 (10th Cir. 2001) .........................................................................31

*United States v. Klinghoffer Bros. Realty Corp.,*
    285 F.2d 487 (2d Cir. 1960)...............................................................................20

*Velasquez v. HSBC Finance Corp.,*
    266 F.R.D. 424 (N.D. Cal. 2010).......................................................................26

*Whineglass v. Smith,*
    2013 U.S. Dist. LEXIS 71977 ................................................................22, 24, 30

**STATUTES**

29 U.S.C. § 203(m).............................................................................................20

29 U.S.C. § 206....................................................................................................7

29 U.S.C. §§ 206, 207........................................................................................20

Alaska Stat. § 23.10.065 .......................................................................................7

Cal. Code Regs. tit. 8, § 11010 ............................................................................7

Cal. Lab. Code §§ 1182, 1182.12 .........................................................................7

FLSA............................................................................................................ passim

Me. Rev. Stat. Ann. tit. 26, § 664 ........................................................................7

Mich. Comp. Laws § 408.384...............................................................................7

Mont. Code Ann. §§ 39-3-404, 39-3-409 ............................................................7

Or. Rev. Stat. §§ 653.025, 653.035......................................................................7

**TABLE OF AUTHORITIES**
(CONTINUED)

PAGE

Wash. Rev. Code § 49.46.020...................................................................................7

**OTHER AUTHORITIES**

29 C.F.R. § 531.56(e)..........................................................................................21

29 C.F.R. § 785.11 ............................................................................................30

76 Fed. Reg. 18832, 18835 (Apr. 5, 2011) ...........................................................20

Nev. Admin. Code Ch. 608, §§ 2..........................................................................7

Nevada Constitution Article 15, § 16 ....................................................................7

## I.      INTRODUCTION

Plaintiffs contend that Defendants violated the FLSA's minimum wage and overtime requirements by requiring them to work off the clock and by taking a tip credit against their hourly wage while requiring an excessive amount of "sidework" or tasks unrelated to their tipped occupations.[1]  Judge Rosenbaum conditionally certified a class of all servers and bartenders who worked at any Bahama Breeze, LongHorn, Olive Garden, Red Lobster, or Seasons 52 restaurant in the United States (collectively "Brands") between September 6, 2009, and September 6, 2012 – a putative class of over 218,000 employees.[2]  Besides the Named Plaintiffs, over 20,000 individuals opted into this lawsuit (Named Plaintiffs and Opt-Ins collectively referred to as "Plaintiffs").  Defendants now move to decertify.

To succeed on their tip credit claim, Plaintiffs must show, collectively, that they all had to perform too much non-tip-producing work at the tip credit rate.  To succeed on their off-the-clock claim, they must show they were all victims of a uniform departure from Defendants' lawful policy that prohibits off-the-clock work.  The evidence adduced through discovery confirms this will be impossible to do on a collective basis due to the irreconcilable dissimilarities among Plaintiffs.  At the most basic level, whether (and when) the Brands take the tip credit vary by Brand, state, position, and date.  Hourly rates likewise vary.  These differences directly impact whether Defendants are liable to each class member *even if* Plaintiffs' factual allegations are true, and the only way to resolve them is by doing an individualized analysis for each one of the 20,000-plus members.  That is just the start of the disparate circumstances. Importantly, there is no evidence of a common unlawful policy, plan, or decision.  This critical void is reflected not only by the Brands' continuous good faith efforts to comply with wage-and-hour laws, as confirmed by the U.S. Department of Labor's repeated compliance findings, but Plaintiffs' conflicting array of claims (*e.g.*, some make a tip credit claim but not an off-the-clock claim, some assert an off-the-clock claim but not a tip credit claim, some assert an overtime claim, and others do not).

Plaintiffs' deposition testimony highlights even more differences.  Regarding the tip credit claim, Plaintiffs confirm that (1) the type of sidework, (2) the time it takes, and (3)

---

[1] D.E. 937.  Plaintiffs also assert a collective retaliation claim, but this claim was not part of their motion for conditional certification.  *Id*.; see also D.E. 168.
[2] D.E. 211.

whether it is tip-producing, related to the tipped occupation, or unrelated to the tipped occupation – all necessary inquiries in determining liability – vary from Plaintiff to Plaintiff along a series of factors, including: Brand; location; position; shift; time of day; business volume; individual experience and preference; co-worker efficiency; and expectations of local restaurant managers. Regarding off-the-clock work, some Plaintiffs confirmed they never worked off the clock and others said they did so only at certain locations and under certain managers.  The reasons for working off the clock likewise vary, ranging from voluntary conduct on Plaintiffs' part, unbeknownst to management, to individual managers deviating from corporate policy and either permitting or requiring off-the-clock work.  Even then, the circumstances leading to off-the-clock work, and the time it consumes (and thus whether it constitutes an FLSA violation), differ from Plaintiff to Plaintiff.

These differences among Plaintiffs provide *individualized* defenses to liability.  Courts have made clear that the "one-size-fits-all" determination advocated by Plaintiffs is impossible in the face of such defenses.  Due process demands that Defendants have the opportunity to present these defenses, but doing so requires consideration of facts unique to each Plaintiff.  The only way to ensure that happens is through decertification.

Decertification is also necessary because it is impossible to adjudicate the claims of this 20,000-plus employee class collectively.  "Representative testimony" is not an option because of the many differences among the Plaintiffs' work experiences and their claims. "[W]here there are significant differences in employment experiences, . . . the procedural advantages of a collective action evaporate, and the Court's confidence that a just verdict on the merits can be rendered is seriously undermined."  *Johnson v. Big Lots*, 561 F. Supp. 2d 567, 588 (E.D. La. 2008).  If there is any case in which a collective proceeding is unworkable, it is this one, and the *Big Lots* case illustrates that it is critical for the court to decertify this case *before* the parties prepare for and present evidence at trial.  The *Big Lots* court was unable to do so, and later stated that it "regrets that it must decertify this action at this stage [during trial], after the large investment of resources by the parties."  *Id.* at 587.

For these reasons, and those further discussed below, Defendants request that the Court decertify the class and dismiss the Opt-Ins without prejudice.

II.     **STATEMENT OF RELEVANT FACTS**[3]

     A.     **Procedural History And Composition Of Class.**

     On July 12, 2013, Judge Rosenbaum found that Plaintiffs "met their low burden" and conditionally certified a nationwide class of all servers and bartenders who worked between September 6, 2009, and September 6, 2012 at the Bahama Breeze, LongHorn, Olive Garden, Red Lobster, and Seasons 52 Brand restaurants.[4]  Each of the Brands represents a very distinct concept.[5]  Between September 6, 2009, and September 6, 2012, there were approximately 218,042 servers and bartenders employed at these Brands in the United States.[6]  These servers and bartenders worked across approximately 36 Bahama Breeze restaurants (17 states), 456 LongHorn restaurants (30 states), 836 Olive Garden restaurants (49 states), 690 Red Lobster restaurants (44 states), and 32 Seasons 52 restaurants (18 states).[7]

     Of the 218,042 putative class members, 20,255 opted into the lawsuit.[8]  The class is expansive, covering 31 Bahama Breeze restaurants, 402 LongHorn restaurants, 821 Olive Garden restaurants, 718 Red Lobster restaurants, and 23 Seasons 52 restaurants.[9]  These 1,995 restaurants are spread across 50 states.[10]  With each restaurant locally managed by either a General Manager ("GM") or Managing Partner ("MP"), as well as a team of assistant managers, the class also implicates over 11,278 different restaurant managers.[11]

     The claims asserted by the Plaintiffs are as varied as the class itself.  The consent form approved by the Court required Opt-Ins to identify their claims: tip credit; off-the-clock, and/or overtime.[12]  Of the 20,255 individuals who filed consent forms: 5,024 indicated they have all three claims; 967 indicated they have only tip credit and overtime claims; 6,195 indicated they have only off-the-clock and tip credit claims; 418 indicated they have only off-the-clock and

---

[3] Attached Exhibits shall be cited as "Ex. [#]: [Name]."

[4] D.E. 211.

[5] Ex. 1: Burrowes Decl. (D.E. 186-1) ¶ 2; Ex. 2: Iaciofoli Decl. (D.E. 186-1) ¶ 2; Ex. 3: Kiernan Decl. (D.E. 186-1) ¶ 2; Ex. 4: Norberg Decl. (D.E. 186-1) ¶ 2; Ex. 5: Wilkerson Decl. (D.E. 186-1) ¶ 2.

[6] Ex. 6: Babitt Decl. ¶ 2.

[7] *Id.* ¶ 3.

[8] Ex. 7: O'Keefe Decl. ¶ 4(a).

[9] *Id.*

[10] *Id.*

[11] Ex. 8: McCarty Decl. (D.E. 311-1) ¶ 37; Ex. 10: Wilson Dep. 19:20-20:8; Ex. 6: Babitt Decl. ¶ 2.

[12] D.E. 228.

overtime claims; 5,124 indicated they have only a tip credit claim; 1,537 indicated they have only an off-the-clock claim; 98 indicated they have only an overtime claim; 2,736 indicated they have no sidework claim; 6,964 indicated they have no off-the-clock claim; and 13,644 indicated they have no overtime claim.[13]

Plaintiffs' testimony confirms the consent forms are not a reliable means of ascertaining each of their claims. For example, two of the deposed Plaintiffs did not list off-the-clock claims on their consent forms, but later testified they have such claims.[14] Two others confirmed they are bringing overtime claims, but did not so indicate on their consent forms.[15] Still others indicated on their consent forms that they have overtime claims, but later confirmed they do not.[16]

**B.    Sidework Assignment And Oversight.**

"Sidework" is a restaurant industry term used to describe tasks performed by servers and bartenders to facilitate guest service.[17] The term encompasses an array of tasks, including, by way of example only, rolling silverware, stocking ice, brewing coffee, and light cleaning.[18] The Brands do not expect servers or bartenders to perform tasks unrelated to guest services, and thus tip generation, while receiving the tip credit minimum wage.[19] Nor do any of the Brands expect, based on the experiences and observations of the operators, that servers or bartenders will devote more than 20% of their time to sidework while earning the tip credit minimum wage.[20] As John Cooper, a Bahama Breeze Director of Operations, explained about his server team:

I view my servers as my sales team, and I want my servers to spend their time

---

[13] Ex. 7: O'Keefe Decl. ¶ 4(d).

[14] Ex. 35: Rabeneau Dep. 21:5-24:6; Ex. 36: Serra Dep. 39:13-42:5.

[15] Ex. 37: Andrews Dep. 55:13-57:7; Ex. 38: Tigney Dep. 68:14-72:21.

[16] Ex. 39: Bullerman Dep. 82:2-83:11; Ex. 40: Dedeaux Dep. 102:7-106:7; Ex. 41: Jones Dep. 57:2-20; Ex. 42: Oikle Dep. 36:10-37:3; Ex. 43: Stokes Dep. 70:3-13.

[17] Ex. 11: Livrieri Dep. 40:6-12; Ex. 12: Wilkerson Dep. 49:5-50:10.

[18] Ex. 14: Kiernan Dep. 12:17-21:22; Ex. 11: Livrieri Dep. 40:25-41:7; Ex. 12: Wilkerson Dep. 49:5-50:10.

[19] Ex. 20: Davis Dep. 13:20-14:3; Ex. 15: Edwards Dep. 36:3-12, 132:23-133:17; Ex. 16: Iaciofoli Dep. 35:23-36:7; Ex. 17: Norberg Dep. 10:3-22; Ex. 21: Sorenson Dep. 20:13-17; Ex. 12: Wilkerson Dep. 107:10-16.

[20] Ex. 1: Burrowes Decl. (D.E. 186-1) ¶ 3; Ex. 2: Iaciofoli Decl. (D.E. 186-1) ¶ 4; Ex. 3: Kiernan Decl. (D.E. 186-1) ¶ 4; Ex. 4: Norberg Decl. (D.E. 186-1) ¶ 3; Ex. 5: Wilkerson Decl. (D.E. 186-1) ¶ 3; Ex. 19: Clement Dep. 73:23-74:2; Ex. 15: Edwards Dep. 38:16-24; Ex. 16: Iaciofoli Dep. 35:16-36:7; Ex. 11: Livrieri Dep. 56:9-12; Ex. 21: Sorenson Dep. 20:13-17; Ex. 12: Wilkerson Dep. 42:7-18, 107:10-16.

4

with guests.

\* \* \*

Our policies at Bahama Breeze are designed to make sure that our servers spend minimal time doing anything outside of what they should be doing, which is to take care of their guests.

\* \* \*

So the focus is on making sure that servers are spending time with their guests, and everything that they do needs to be related to spending time with their guests.[21]

Consistent with this expectation, the January/February 2011 Introducing Tip Share training provided by Olive Garden and Red Lobster Senior Vice Presidents to Directors of Operations reiterated that tipped employees, including servers and bartenders, should not spend more than 20% of their time on tasks unrelated to providing direct service to guests.[22] Several months later, in August 2011, Darden's Internal Audit Department issued an Operations Excellence Server Study examining the time spent by Olive Garden servers performing their various duties at 22 different restaurants.[23] The Sample Data Plaintiffs worked at 6 of these 22 restaurants as servers during the relevant period.[24] The study revealed that the time servers devoted to their tasks varied, but overall, potential sidework activities (e.g.,"side station activities" and "replenishment activities") constituted just 6.8 to 18.7% of the total shift.[25]

The Brands have numerous measures in place to ensure that sidework performed at the tip credit rate is related to server or bartender guest service and does not exceed 20% of the time a server or bartender receives the tip credit rate. These measures include, but are not limited to: team member and manager training, including position guides, delineating sidework activities; formal and informal guidance to restaurant operators on activities servers and bartenders may perform while at the tip credit rate; distribution of sidework among the service team so no one server or bartender needs to spend a substantial percentage of time performing sidework; assignment of sidework tasks when servers and bartenders receive the full minimum wage as opposed to the tip credit minimum wage; directions to restaurant managers to monitor the amount of time it takes their team members to perform sidework; and observations by restaurant

---

[21] Ex. 22: Cooper Dep. 28:6-7, 34:17-20, 37:6-9.
[22] Ex. 2: Iaciofoli Decl. (D.E. 186-1) ¶ 4; Ex. 3: Kiernan Decl. (D.E. 186-1) ¶ 4.
[23] Ex. 26: Defendants' Objections and Answers to Plaintiffs' Second Set of Interrogatories, at p. 10; Ex. 19: Clement Dep. 73:23-74:2; Ex. 27: Gufford Dep. 36:2-38:4, 40:4-9.
[24] Ex. 7: O'Keefe Decl. ¶ 5.
[25] Ex. 14: Kiernan Dep. 26:24-28:9, 44:25-46:7 and Ex. 61 to Kiernan Dep.

managers, Directors of Operation, and others in operations who visit the restaurants to make sure servers and bartenders perform sidework efficiently.[26]

The different Brand restaurants convey sidework assignments in a number of ways, including training materials, position guides, and written sidework charts.[27]  Some Brands have standardized sidework charts, and others do not.  For example, LongHorn created a series of server and bartender sidework charts for use in the restaurants,[28] while the other Brands have not.[29]  Instead, the individual restaurants in these other Brands have either developed their own local sidework charts or do not use charts at all.[30]  Further, even individual LongHorn restaurants may augment the standardized sidework charts to meet to needs of their particular restaurants.[31]  It is the individual restaurant managers who implement the sidework requirements for their particular locations.[32]

### C.   Plaintiffs Have Different Sidework Claims

#### 1.   Different Tip Credit Pay Practices And Employment Settings Impact Plaintiffs' Claims.

The "excessive sidework" claim is actually a claim that employees performed too much non-tip-producing work at the tip credit rate.  The Brands differ regarding who is paid the tip credit wage and when.  Bahama Breeze and Seasons 52 servers and bartenders receive the full minimum wage before the restaurants open, but not after closing.[33]  LongHorn servers and bartenders receive the tip credit wage for the entire shift.[34]  Olive Garden and Red Lobster servers and bartenders receive the full minimum wage before the restaurants open, while bartenders, but not servers, receive the full minimum wage beginning 30 minutes after closing.[35]

Also, the Brands do not take the tip credit in several states: Alaska, California,

---

[26] Ex. 19: Clement Dep. 73:23-74:2; Ex. 15: Edwards Dep. 27:21-28:7, 36:3-12, 38:16-24, 80:15-81:1; Ex. 16: Iaciofoli Dep. 20:20-24; Ex. 14: Kiernan Dep. 22:13-21; Ex. 11: Livrieri Dep. 55:7-12; Ex. 33 to Ex. 11: Livrieri Dep. (67:12-69:3); Ex. 17: Norberg Dep. 23:17-24:20; Ex. 12: Wilkerson Dep. 73:6-19, 75:19-76:7; Ex. 13: Williams Dep. 142:24-143:7.

[27] Ex. 15: Edwards Dep. 27:21-28:7; Ex. 16: Iaciofoli Dep. 20:20-24; Ex. 14: Kiernan Dep. 22:13-21; Ex. 17: Norberg Dep. 23:10-11; Ex. 12: Wilkerson Dep. 73:6-19.

[28] Ex. 15: Edwards Dep. 27:21-28:7.

[29] Ex. 17: Norberg Dep. 23:10-11; Ex. 12: Wilkerson Dep. 48:13-16.

[30] Ex. 19: Clement Dep. 162:12-22; Ex. 17: Norberg Dep. 23:10-11.

[31] Ex. 15: Edwards Dep. 133:9-17; Ex. 11: Livrieri Dep. 65:1-13.

[32] Ex. 11: Livrieri Dep. 81:22-82:3.

[33] Ex. 5: Wilkerson Decl. (D.E. 186-1) ¶ 3; Ex. 4: Norberg Decl. (D.E. 186-1) ¶3.

[34] Ex. 1: Burrowes Decl. (D.E. 186-1) ¶ 3.

[35] Ex. 3: Kiernan Decl. (D.E. 186-1) ¶ 3; Iaciofoli Decl. (D.E. 186-1) ¶ 3.

Minnesota, Montana, Nevada, Oregon, and Washington.[36]   The class, however, includes 1,213 individuals who worked in these states during the relevant period who nevertheless assert a tip credit claim.[37]   In another seven states, Olive Garden and Red Lobster do not take the tip credit for bartenders:   Delaware, Kentucky, Maine, Michigan, New Hampshire, North Dakota, and Wyoming.[38]   Nonetheless, 201 individuals who worked as bartenders in these states assert a tip credit claim.[39]

Furthermore, Olive Garden and Red Lobster began rolling out a "Tip Share Program" in 2011.[40]   Before this program, which these Brands implemented in different areas at different times, the bartenders were paid at least the full minimum wage.[41]   This case includes 3,115 Plaintiffs bartenders who bring a sidework claim, though they worked before 2011 when tip share was implemented and were therefore paid at least minimum wage.   This is reflected in the depositions.   One Bahama Breeze bartender testified that during many months as a bartender, he was paid minimum wage for all time including set up, and that this changed in November 2011.[42]   An Olive Garden bartender testified she was paid minimum wage for all hours worked prior to March 2011. [43]   A Red Lobster bartender also testified she was paid minimum wage her entire time as a bartender so has no sidework claim for her work as a bartender.[44]

In states where the Brands do not take the tip credit, they pay at least the federal or state minimum wage, whichever is greater.[45]   During the relevant period, the minimum wage in a number of these states exceeded the federal rate.[46]   Thus, many Plaintiffs were paid more than

---

[36] Ex: 9: Babitt Decl. (D.E. 186-1) ¶ 9.

[37] Ex. 7: O'Keefe Decl. ¶ 4(b).

[38] Ex. 9: Babitt Decl. (D.E. 186-1) ¶ 9.

[39] Ex. 7: O'Keefe Decl. ¶ 4(c).

[40] Ex. 6: Babitt Decl. ¶ 4.

[41] *Id.*

[42] Ex. 67: Corren Dep. 114:25-116:25.

[43] Ex. 68: Scott Dep. 24:18-25:5.

[44] Ex. 61: Middleton Dep. 29:3-31:2.

[45] Ex. 6: Babitt Decl. ¶ 5.

[46] Taking just 2012 minimum wage rates as an example, *compare* the federal rate of $7.25 (29 U.S.C. § 206, *with* AK ($7.75) Alaska Stat. § 23.10.065; CA ($8.00) Cal. Lab. Code §§ 1182, 1182.12; Cal. Code Regs. tit. 8, § 11010; ME ($7.50) Me. Rev. Stat. Ann. tit. 26, § 664; MI ($7.50) Mich. Comp. Laws § 408.384; MT ($7.65) Mont. Code Ann. §§ 39-3-404, 39-3-409; NV ($8.25) Nevada Constitution Article 15, § 16; Nev. Admin. Code Ch. 608, §§ 2 to 9; OR ($8.80) Or. Rev. Stat. §§ 653.025, 653.035; WA ($9.04) Wash. Rev. Code § 49.46.020.

the federal minimum wage for some or all of the class period.[47]

        2.      **Sidework Differed Based On Brand, Location, Position, and Shift.**

Plaintiffs testified that different Brands have different sidework requirements.[48] One Plaintiff worked as a server at three different brands: Bahama Breeze, Olive Garden, and Red Lobster.[49] She testified that the "concepts are totally different" with respect to sidework.[50] She said that at Olive Garden, servers did "no closing sidework at all" and "no pre-shift sidework" because the bussers performed those duties.[51] Sidework can also vary by location within a brand.[52] A server who worked at Seasons 52 testified that he performed much more extensive sidework in one location because there was a patio, which entailed a lot more closing sidework than in the other location where he had worked.[53] Sidework can also vary by position. A Plaintiff who worked as both a server and bartender at Bahama Breeze testified that he did *not* perform substantial sidework as a server and that his sidework claim is limited to the time he spent working as a bartender.[54]

Plaintiffs also testified that the sidework varied based on the shift they worked.[55] One Plaintiff stated he generally did two types of server sidework, rolling silverware and cleaning booths, because he only worked double shifts. [56] One server testified that closing sidework for the dinner shift was different and far more involved than closing sidework for the lunch shift.[57] Another server testified that sidework during lunch, particularly after bussers went home, was

---

[47] Ex. 85: Ramsey Decl. ¶ 11-12.

[48] Ex. 44: Emerson Dep. 131:23-133:4; Ex. 45: Long Dep. 30:10-31:22, 157:4-22, 309:9-310:2; Ex. 46: Doneth Dep. 50:15-51:23, 84:9-85:21.

[49] Ex. 41: Jones Dep. 18:8-9.

[50] *Id.* at 167:25-168:1.

[51] *Id.* at 76:7-79:17. *See also* Ex. 44: Emerson Dep. 87:7-88:8; Ex. 46: Doneth Dep. 84:9-85:21; Ex. 47: McNutt Dep. 109:5-24; Ex. 48: Roberson Dep. 155:2-16; Ex. 49: Rogers Dep. 40:21-41:19.

[52] Ex. 50: Vaccaro Dep. 103:25-104:3; 118:8-112:1; Ex. 51: White Dep. 169:13-170:6.

[53] Ex. 52: Stone Dep. 30:2-33:19; *See also* Doneth 93:21-94:2; Ex. 44: Emerson Dep. 63:18-64:11.

[54] Ex. 39: Bullerman Dep. 83:24-84:22. See also Ex. 53: Mathis Dep. 276:10-277:22, 281:1-10; Ex. 54: Henry Dep. 97:14-97:20; 278:4-11.

[55] Ex. 47: McNutt Dep. 138:17-139:3, 155:7-13, 157:19-164:12; Ex. 48: Roberson Dep. 123:13-125:14; Ex. 54: Henry Dep. 87:1-89:6; Ex. 55: Zilkey Dep. 132:5-20; Ex. 45: Long Dep. 220:11-221:14, 223:15-224:4; Ex. 46: Doneth Dep. 125:3-17, 125:20-126:5, 132:6-15.

[56] Ex. 56: Berg Dep. 195:22-197:3

[57] Ex. 40: Dedeaux Dep. 82:19-84:2.

more demanding than at any other time of day.[58]  Another server cited the length of his shift as a basis for different sidework requirements; he did less sidework on shorter shifts and sometimes was too busy to do any sidework.[59]  Sidework also varies depending on how well other servers did their sidework and specific customer requests.[60]

### 3.    Plaintiffs Disagree About Whether And To What Extent Sidework Duties Were Tip-Producing.

Under the legal analysis that Plaintiffs claim the Court must use to assess whether an employer has properly taken the tip credit, the critical inquiry is whether duties are tip–producing, or are merely related to tip-producing duties.  Plaintiffs espouse widely divergent views on how their various sidework tasks should be classified.  Some admit that all the sidework duties they perform are tip-producing.[61]  One server explained that his section of tables is like his own little business, and that he does whatever is needed to take care of his guests because "tips" stands for "to ensure proper service."[62]  Other Plaintiffs, however, denied that their sidework better assisted them to serve guests and earn tips.[63]

### 4.    Plaintiffs Devoted Substantially Different Amounts Of Time To Sidework Tasks.

Plaintiffs' experiences regarding how much time they allegedly spent performing sidework duties are very different.  One server estimated she spent about 20–30 minutes of a 4–5 hour shift doing running sidework.[64]  Another server estimates that during a 6–hour shift, she spent about 70% of her shift doing running sidework.[65]  Similar ranges exist for closing

---

[58] Ex. 57: Butler Dep. 98:16-99:17.

[59] Ex. 58: Herrera Dep. 59:18-60:01, 110:23-112:7.

[60] *Id.*; Ex. 44: Emerson Dep. 124:7-125:19, 127:5-128:2; Ex. 48: Roberson Dep. 98:8-23, 194:16-195:23; Ex. 46: Doneth Dep. 109:2-110:2; Ex. 49: Rogers Dep. 46:25-47:14; Ex. 50: Vaccaro Dep. 60:10-15.

[61] Ex. 38: Tigney Dep. 113:6-11, 114:6-9; Ex. 59: McCready Dep. 92:10-97:14; Ex. 43: Stokes Dep. 95:25-96:12.

[62] Ex. 52: Stone Dep. 26:9-27:4.  Others admit many sidework duties are tip-producing.  Ex. 54: Henry Dep. 69:21-71:5,18-72:23, 73:14-74:19, 76:6-78:22, 238:6-239:17, 240:7-243:4,14-22; Ex. 45: Long Dep. 398:5-407:12, 408:13-25; Ex. 53: Mathis Dep. 267:13-274:21; Ex. 60: McDougal Dep. 381:19-384:20; Ex. 55: Zilkey Dep. 60:9-23, 111:8-114:23, 125:8-126:16.

[63] Ex. 61: Middleton Dep. 101:18-103:23; Ex. 36: Serra Dep. 60:19-61:5, 62:19-63:6, 75:7-12, 88:21-89:22, 140:16-145:18.

[64] Ex. 37: Andrews Dep. 70:16-71:10.

[65] Ex. 35: Rabeneau Dep. 77:12-18.

sidework.  While one server testified he spent only 15 minutes on closing sidework,[66] another testified that her closing sidework took 30–60 minutes,[67] while another said it took up to 90 minutes.[68]

The amount of time employees spend rolling silverware – just one type of sidework which was not required in all locations or at all times[69] – differs greatly.  For Plaintiffs who roll silverware, the time they say it takes to do this ranges from 10–12 minutes per day,[70] to 20 minutes per day,[71] to 30–60 minutes per day,[72] to 45 minutes to 90 minutes per day.[73]

Plaintiffs also admitted that their own work habits and preferences, rather than management directives, impacted the time spent on sidework.  One server acknowledged she was "picky" about cleanliness, so she went over and above what was required as far as sidework, including wiping down tables at the start of the dinner shift that had already been wiped down at the end of the lunch shift.[74]  Another server similarly described herself as having "OCD" about cleaning, so she cleaned more than most servers.[75]  Taking another view, a different server stated that some servers take a long time to perform sidework because they "lollygag."[76]

### D.    Prohibition Against Off-The-Clock Work.

The only common plan or policy related to off-the-clock work is the lawful prohibition of off-the-clock-work.  The Brands emphasize this policy in their respective training materials, position guides, and team member handbooks.[77]  Hourly employees who voluntarily violate these policies are subject to disciplinary action, including termination.[78]  In addition, restaurant

---

[66] Ex. 58: Herrera Dep. 55:3-22, 115:18-24.

[67] Ex. 62: Woernle Dep. 45:3-12, 47:18-24.

[68] Ex. 54: Henry Dep. 170:10-171:4, 281:16-282:16; Ex. 53: Mathis Dep. 144:14-145:10.

[69] Ex. 63: Spangler Dep. 101:18-22; Ex. 64: Phillips Dep. 139:11-22; Ex. 50: Vaccaro Dep. 102:18-103:3; Ex. 45: Long Dep. 361:1-362:12; Ex. 47: McNutt Dep. 128:15-129:8.

[70] Ex. 58: Herrera Dep. 110:3-13.

[71] Ex. 65: Steele Dep. 25:13-17.

[72] Ex. 36: Serra Dep. 91:11-92:12; 108:16-109:7.

[73] Ex. 66: Pratt Dep. 127:24-128:10.

[74] Ex. 65: Steele Dep. 88:12-15, 135:20-136:11.

[75] Ex. 35: Rabeneau Dep. 84:17-85:1.

[76] Ex. 52: Stone Dep. 41:18-42:3.

[77] Ex. 23: Gathers Decl. (D.E. 186-2) ¶ 2; Ex. 24: Psaras Decl. (D.E. 186-3) ¶ 2; Ex. 25: Willings Decl. (D.E. 186-3) ¶ 2; Ex. 18: Psaras Dep. 55:5-11; Ex. 21: Sorenson Dep. 12:14-25; Ex. 12: Wilkerson Dep. 103:20-104:4; Ex. 13: Williams Dep. 90:8-21.

[78] Ex. 23: Gathers Decl. (D.E. 186-2) ¶ 4; Ex. 24: Psaras Decl. (D.E. 186-3) ¶ 4; Ex. 25: Willings Decl. (D.E. 186-3) ¶ 4.

managers must enter into annual "Recommitments" affirming their promise to comply with brand policies and procedures, including those requiring that employees receive compensation for all hours worked.[79]

The 2011-2012 Red Lobster Recommitment, for example, reminds restaurant managers, "You are expected to pay employees for *all time* worked," defined as "any time an employee is at the restaurant at his or her scheduled work time, or any time he or she is at the restaurant during a non-scheduled time" and "performing any kind of work (such as attending a meeting, running food, cleaning, answering the phone, making orders for product, putting away product, etc.)."[80]   This Recommitment provides a non-exhaustive list of prohibited conduct, including adjusting employee hours for any reason that does not accurately reflect actual hours worked (*e.g.*, to reduce overtime or impact labor costs).[81]  The Recommitment explicitly directs management to take proactive steps to ensure off-the-clock work is not occurring at their restaurants.[82]  Managers who violate their Recommitments, even unintentionally, are subject to disciplinary action, including termination.[83]

The Brands direct local management to efficiently staff their restaurants to provide guests with a quality dining experience.[84]   That means ensuring that restaurants are appropriately staffed at the right times of day,[85]  but not in a way that would result in needless labor expense, including overtime.[86]  When overtime is necessary,[87] the Brands require that any employee who

---

[79] Ex. 23: Gathers Decl. (D.E. 186-2) ¶ 3; Ex. 24: Psaras Decl. (D.E. 186-3) ¶ 3; Ex. 25: Willings Decl. (D.E. 186-3) ¶ 3; Ex. 28: Anderson Dep. 246:14-247:1; Ex. 29: Hohman Dep. 195:1-2; Ex. 14: Kiernan Dep. 66:16-67:11; Ex. 21: Sorenson Dep. 12:14-12; Ex. 12: Wilkerson Dep. 33:19, 34:3-20; Ex. 10: Wilson Dep. 52:5-12.

[80] Ex. B to Ex. 24: Psaras Decl. (D.E. 186-3), MATHIS DEFS 21314.

[81] *Id.* at MATHIS DEFS 21314-15.

[82] *Id.* at MATHIS DEFS 21315.

[83] Ex. 23: Gathers Decl. (D.E. 186-2) ¶ 4; Ex. 24: Psaras Decl. (D.E. 186-3) ¶ 4; Ex. 25: Willings Decl. (D.E. 186-3) ¶ 4.

[84] Ex. 19: Clement Dep. 129:19-130:10; Ex. 16: Iaciofoli Dep. 59:2-8; Ex. 14: Kiernan Dep. 54:4-57:20; Ex. 11: Livrieri Dep. 12:5-10.

[85] Ex. 19: Clement Dep. 129:19-130:10; Ex. 16: Iaciofoli Dep. 59:2-8; Ex. 14: Kiernan Dep. 54:4-57:20; Ex. 11: Livrieri Dep. 12:5-10; Ex. 17: Norberg Dep. 26:8-14; Ex. 12: Wilkerson Dep. 135:20-136:5.

[86] Ex. 19: Clement Dep. 135:15-25; Ex. 29: Hohman Dep. 214:19-215:18; Ex. 11: Livrieri Dep. 12:5-10; Ex. 12: Wilkerson Dep. 136:6-12.

[87] Ex. 19: Clement Dep. 135:15-25; Ex. 29: Hohman Dep. 214:19-215:18; Ex. 11: Livrieri Dep. 23:17-24:13; Ex. 12: Wilkerson Dep. 136:1-5.

works overtime receive full compensation for it.[88]

       **E.**    **Differences In Plaintiffs' Off-The-Clock Claims.**

Based on the consent forms, approximately one–third of the opt–ins do not have an off–the–clock claim.[89] Likewise, several of the Plaintiffs deposed confirmed they did not work off the clock.[90]

       **1.**    **Plaintiffs Describe Several Different Practices Resulting In Alleged Off-The-Clock Work.**

Rather than identifying a single corporate policy that resulted in similar off–the–clock work by all class members, Plaintiffs who have off–the–clock claims describe different practices that allegedly caused them to work off the clock. Some claim they were required to wait to clock in until their first guests were seated.[91] Some arrived before their shifts started and began working before clocking in.[92] Some clocked out, or were clocked out, after their guests left and completed sidework off the clock.[93] One server stated that at his location, the managers staffed servers as "extras," who would show up to work but clock in and work only if another server called off.[94] Some worked off the clock because they forgot to clock in.[95] Some worked off the clock because they waited to walk out with another employee pursuant to the company's safe and secure policy.[96] Some failed to clock in before pre-shift meetings, or lengthier staff

---

[88] Ex. 23: Gathers Decl. (D.E. 186-2) ¶ 2; Ex. 24: Psaras Decl. (D.E. 186-3) ¶ 2; Ex. 25: Willings Decl. (D.E. 186-3).

[89] Ex. 7: O'Keefe Decl. ¶ 4(d).

[90] Ex. 66: Pratt Dep. 35:6-19; Ex. 65: Steele Dep. 88:7-24, 100:1-20; Ex. 69: Swenson Dep. 33:19-34:21.

[91] Ex. 37: Andrews Dep. 28:13-23; Ex. 70: Fortner Dep.42:21-43:5; Ex. 71: Iavecchia Dep.19:12-21; Ex. 61: Middleton Dep.35:3-19; Ex. 42: Oikle Dep. 13:15-14:1; Ex. 43: Stokes Dep. 34:15-35:20;

[92] Ex. 72: Breum Dep. 20:12-21:7; Ex. 71: Iavecchia Dep.16:12-16; Ex. 61: Middleton Dep. 33:14-17; Ex. 73: Nelson Dep. 45:21-46:8; Ex. 35: Rabeneau Dep. 24:7-27:1; Ex. 68: Scott Dep. 26:26-28:20; Ex. 63: Spangler Dep. 38:16-23; Ex. 74: Taplin Dep. 56:2-5; Ex. 62: Woernle Dep. 24:7-26:12.

[93] Ex. 37: Andrews Dep. 50:20-53:18; Ex. 57: Butler Dep. 45:3-46:3; Ex. 67: Corren Dep. 25:6-26:21; Ex. 75: Foose Dep. 43:19-46:15; Ex. 71: Iavecchia Dep. 23:17-24:5; Ex. 61: Middleton Dep. 55:16-22; Ex. 73: Nelson Dep. 63:1-13; Ex. 35: Rabeneau Dep. 38:8-44:16; Ex. 68: Scott Dep. 37:14-38:2; Ex. 43: Stokes Dep. 66:21-67:4; Ex. 38: Tigney Dep. 30:1-15, 35:14-37:1; Ex. 62: Woernle Dep. 38:14-20.

[94] Ex. 72: Breum Dep. 62:23-64:6.

[95] Ex. 36: Serra Dep. 39:13-42:5.

[96] Ex. 76: Dean Dep. 31:6-14; Ex. 77: Gonzales Dep. 35:2-36:1; Ex. 58: Herrera Dep. 35:17-

meetings, and then continued to work off the clock.[97]  Some were required to run errands off site, and did this off the clock.[98]

Plaintiffs cited other off-the-clock practices that they *voluntarily* engaged in for different reasons.  Some servers admitted that they wanted to wait to clock in until they had guests to serve because this reduced their reported work time, artificially keeping their recorded hours well below 40 so they might be eligible to pick up an extra shift.[99]  Another server testified that she took it upon herself to arrive before her shift and start doing running sidework.[100]  A bartender admitted that he sometimes came in before his bartender shifts to set up the bar.  He believed that if the prep work was already completed, his guests would not have to wait for anything, which in turn, would help him earn more money in tips.[101]  Others worked off the clock to assist their fellow employees.[102]

## 2.    Plaintiffs' Alleged Experiences Differ Based On Restaurant And Manager.

Although Plaintiffs claim Defendants had a pervasive policy of requiring or allowing off-the-clock work, Plaintiffs' testimony confirms that alleged off-the-clock work was isolated and differed from restaurant to restaurant and from manager to manager.  Thus, the alleged off-the-clock work different by brand.  A server who worked at both Red Lobster and Bahama Breeze claims that she worked off the clock only at Red Lobster.[103]  A server who worked at both Olive Garden and Bahama Breeze testified that she worked off the clock at Bahama Breeze, but not at Olive Garden.[104]  Alleged off-the-clock work varied within a single brand.  An Olive Garden server testified he did not have any off–the–clock or overtime issues at one Olive Garden location, which he says was run "by the book" with all standards followed to a "tee," but that he

---

36:2; Ex. 78: Makki Dep. 44:24-46:12; Ex. 36: Serra Dep. 39:13-42:5; Ex. 74: Taplin Dep. 164:18-165:14.

[97] Ex. 40: Dedeaux Dep. 36:3-45:24; Ex. 61: Middleton Dep.55:16-22.

[98] Ex. 79: Chadwick Dep. 152:9-153:6; Ex. 75: Foose Dep. 34:4-35:18; Ex. 42: Oikle Dep. 81:12-83:16; Ex. 43: Stokes Dep. 57:1-5; Ex. 52: Stone Dep. 135:22-137:12; Ex. 38: Tigney Dep. 43:24-44:7.

[99] Ex. 56: Berg Dep. 76:7-15; Ex. 57: Butler Dep. 35:1-36:18; Ex. 78: Makki Dep. 24:15-25:15.

[100] Ex. 63: Spangler Dep. 13:18-20.

[101] Ex. 77: Gonzales Dep. 21:13-22:15; *see also* Ex. 55: Zilkey Dep. 82:19-86:9.  His managers told him not to work off the clock, but he did so anyway. *Id.* at 176:5-179:18.

[102] Ex. 46: Doneth Dep. 207:4-208:15; Ex. 45: Long Dep. 91:24-96:2.

[103] Ex. 35: Rabeneau Dep. 24:7-25.

[104] Ex. 41: Jones Dep. 45:15-56:2.

did work off the clock in another Olive Garden location.[105]  Likewise, a Seasons 52 server, who worked in two locations during the relevant time period, never worked off the clock in one location, but did in the other.[106]  Plaintiffs' alleged experiences working off the clock also differed within a single location based on the requirements of local management.  Some Plaintiffs claim they worked off the clock at the direction of managers.[107]  However, many of those Plaintiffs testified that only *certain* managers did this; not all managers.[108]  Other Plaintiffs testified that their managers *never* instructed them to work off the clock.[109]  Some Plaintiffs did not believe their managers even knew about their off-the-clock work.[110]

Alleged off-the-clock work was also not consistent between servers and bartenders.  One Plaintiff who worked as both a server and a bartender testified that as a bartender, he worked very little off the clock because the schedule and expectations were different for a bartender than for a server.[111]  Another Plaintiff, who worked as both a server and a bartender, testified she did not engage in any pre– or post–shift off-the-clock work as a bartender, but she did as a server.[112]  Another server/bartender testified that she waited off the clock for her first table as a server, but not as a bartender.[113]  Another bartender likewise testified that servers in his location waited off the clock until they had customers to serve, but bartenders did not have that issue.[114]

### 3.  Plaintiffs Spent Different Amounts of Time Working Off-The-Clock.

Not only do the alleged practices causing off–the–clock work vary, so too, do the amounts of time Plaintiffs estimate working off–the–clock.  Some with off–the–clock claims cite to a few discrete examples resulting in just a few minutes or hours for the entire class period.  For example, on the low end, one Plaintiff testified that his off–the–clock work was limited to a

[105] Ex. 72: Breum Dep. 42:8-22.
[106] Ex. 52: Stone Dep. 15:3-7; 66:8-10.
[107] Ex. 37: Andrews Dep. 28:13-29:19; Ex. 56: Berg Dep. 77:21-80:4; Ex. 76: Dean Dep. 20:14-21:14;  Ex. 70: Fortner Dep.74:19-75:2; Ex. 61: Middleton Dep.33:14-17; Ex. 35: Rabeneau Dep. 24:7-21; 40:4-41:2; Ex. 43: Stokes Dep. 34:15-35:20.
[108] Ex. 37: Andrews Dep. 53:7-18; Ex. 72: Breum Dep.56:3-17; Ex. 40: Dedeaux Dep. 27:14-30:21; Ex. 35: Rabeneau Dep. 42:24-44:1.
[109] Ex. 57: Butler Dep. 35:4-6, 40:17-41:4; Ex. 36: Serra Dep. 47:2-12; Ex. 63: Spangler Dep. 39:21-23; Ex. 74: Taplin Dep.66:7-12.
[110] Ex. 77: Gonzales Dep. 14:15-19; Ex. 53: Mathis Dep. 229:10-230:14.
[111] Ex. 72: Breum Dep. 54:4-15.
[112] Ex. 43: Stokes Dep. 38:6-25.
[113] Ex. 61: Middleton Dep. 35:3-19.
[114] Ex. 77: Gonzales Dep. 29:24-30:6.

14

failure to clock in on one occasion, and 2 or 3 occasions when he claims he had to wait off the clock between 5 and 30 minutes to leave per the safe and secure policy.[115]  A generous estimate of this entire time would total about 4–6 hours off the clock.  Another Plaintiff claims he worked off the clock approximately 30 minutes per week.[116]  Other Plaintiffs, however, claim that they worked off the clock for an hour a shift[117] or more.[118]

### 4. Plaintiffs Knew It Was Against Company Policy to Work Off The Clock But Failed To Take Available Remedial Measures.

Some Plaintiffs confirmed that they knew they could alert their managers to the fact they had worked off the clock and get their time entries corrected, but simply neglected to do so.[119]  One Plaintiff admitted that he knew he could ask a manager to override his clock in time but did not always do so.[120]  Another would sometimes start work before clocking in because he was bored but never asked a manager to adjust his time because it annoyed him to have to track down a manager when the restaurant was busy.[121]  Plaintiffs were also aware that Defendants' policies prohibit off-the-clock work and offer an avenue to report it, yet they failed to avail themselves of the process.[122]  For example, one Plaintiff testified that she knew it was against company policy to work off the clock; she acknowledged she signed the employee handbook.[123]  She even trained other servers and instructed them that it was against company policy to work off the clock.[124]  Despite this, she never reported working off the clock.[125]

### F. Enforcement Of Wage-And-Hour Policies.

Darden and the Brands have multiple measures in place to detect and investigate possible wage-and-hour violations, particularly off-the-clock work.  For example, restaurant managers are responsible for approving punch-edits (*e.g.*, if an employee forgets to clock out, the manager clocked him out, and "edits" the time to when the employee actually left), which the employees

---

[115] Ex. 36: Serra Dep. 44:13-47:12; 52:10-55:2.
[116] Ex. 77: Gonzales Dep. 20:21-21:12.
[117] Ex. 71: Iavecchia Dep. 23:12-24:24.
[118] Ex. 35: Rabeneau Dep. 44:12-46:18.
[119] Ex. 54: Henry Dep. 142:19-143:13.
[120] Ex. 72: Breum Dep. 22:22–23:13; Ex. 74: Taplin Dep. 109:12-110:6.
[121] Ex. 56: Berg Dep. 67:12-68:11, 165:20-166:10.
[122] Ex. 46: Doneth Dep. 207:4-208:15.
[123] Ex. 80: Beal Dep. 25:2-26:22.
[124] Ex. 80: Beal Dep. 52:3-25.
[125] Ex. 80: Beal Dep. 21:23-23:4.

must also review and acknowledge.[126]  The restaurant managers also do "spot checks" to confirm that employees are clocked in while working.[127]  In addition, Directors of Operation and, for some Brands Regional Vice Presidents, visit their assigned restaurants.[128]  During these on-site visits, they review restaurant paperwork and operations to ensure the managers and hourly employees are complying with company policy and procedure, including doing spot checks to make sure hourly employees are clocked in and reviewing punch-edit reports for patterns that an employee repeatedly fails to clock in or out on time, or that otherwise might suggest off-the-clock work.[129]

In addition, the Brands adhere to the Darden Dispute Resolution Process ("DRP"), whereby employees can resolve employment-related disputes via a four-step process, beginning with the open door, which provides employees an opportunity to raise concerns with everyone from a restaurant manager to the Employee Relations Department.[130]  The Employee Relations Department, which is subdivided by brand, receives, responds to, and investigates wage-and-hour questions and complaints, whether brought by an hourly employee, restaurant manager, or someone else, typically partnering with Directors of Operations during the investigation.[131]

Complaints regarding off-the-clock work are rare, constituting less than 1.8% of all calls to Employee Relations.[132]  On many occasions, the Brands investigate allegations, including

---

[126] Ex. 20: Davis Dep. 102:23-103:12; Ex. 11: Livrieri Dep. 26:16-27:3; Ex. 17: Norberg Dep. 30:24-31:5, 32:7-11.
[127] Ex. 17: Norberg Dep. 28:9-14; Ex. 18: Psaras Dep. 57:8-12.
[128] Ex. 28: Anderson Dep. 256:6-10, 256:14-15; Ex. 30: Gathers Dep. 29:7-14; Ex. 29: Hohman Dep. 144:11-14; 144:24-145:1; Ex. 14: Kiernan Dep. 62:20-63:2; Ex. 11: Livrieri Dep. 26:16-27:3, 30:19-21; Ex. 17: Norberg Dep. 31:5-8; Ex. 18: Psaras Dep. 57:8-16; Ex. 12: Wilkerson Dep. 10:22-11:10, 13:15-14:8; Ex. 13: Williams Dep. 92:1-5.
[129] Ex. 28: Anderson Dep. 256:6-10, 256:14-15; Ex. 30: Gathers Dep. 29:7-14; Ex. 29: Hohman Dep. 144:11-14; 144:24-145:1; Ex. 14: Kiernan Dep. 62:20-63:2; Ex. 11: Livrieri Dep. 26:16-27:3; Ex. 17: Norberg Dep. 31:5-8; Ex. 18: Psaras Dep. 57:8-16; Ex. 12: Wilkerson Dep. 13:15-14:8.
[130] Ex. 23: Gathers Decl. (D.E. 186-2) ¶ 2; Ex. 24: Psaras Decl. (D.E. 186-3) ¶ 2; Ex. 25: Willings Decl. (D.E. 186-3) ¶ 2; Ex. 11: Livrieri Dep. 55:22-56:7; Ex. 18: Psaras Dep. 11:5-14; Ex. 12: Wilkerson Dep. 12:6-12; Ex. 31: Willings Dep. 19:6-8; Ex. 10: Wilson Dep. 264:9-13.
[131] Ex. 28: Anderson Dep. 31:18-23, 32:5-14; Ex. 19: Clement Dep. 123:14-23; Ex. 18: Psaras Dep. 12:8-15, 15:20-16:13, 53:18-54:11; Ex. 12: Wilkerson Dep. 46:11-16; Ex. 13: Williams Dep. 117:3-17; Ex. 31: Willings Dep. 19:25-20:3, 21:20-22:6.
[132] Ex. 88: Williams Decl. ¶¶ 6-9.

16

claims of off-the-clock work, and find them untrue.[133]  Even with more than 2,000 restaurants and hundreds of thousands of employees, the Brands have encountered few situations where hourly employees worked off the clock, with or without manager knowledge or involvement.[134]  When these situations arise, the Brands take action. The Brands may either discipline or terminate hourly employees who work off the clock, depending on the circumstances surrounding the infraction.[135]  Also, the Brands terminate managers who require or allow hourly employees to work off the clock.[136]  If the Brands determine an employee is owed compensation under company policy, they pay the employee.[137]

      **G.**    **Department Of Labor Investigations Confirm That Wage-And-Hour Violations Are Isolated.**

According to U.S. Department of Labor ("DOL") records, the Wage and Hour Division previously audited 15 Brand restaurants for at least part of the relevant period.[138]  The majority resulted in compliance findings, including those that concerned the issues raised in this litigation (*e.g.*, "Tipped employees spent less than 20% of their time performing work when they were not earning tips."  (Bangor, ME LongHorn); "Servers were in practice of clocking in upon arrival." (Addison, TX Olive Garden); "Interview statements did not reveal any violations for pre-post shift – uncompensated time."  (Greensburg, PA Olive Garden); "There were no unpaid engaged to wait hours found."  (Brandon, FL Red Lobster).[139]  Of these 15 restaurants, the Sample Data

---

[133] Ex. 12: Wilkerson Dep. 79:1-10.

[134] Ex. 19: Clement Dep. 123:14-23; Ex. 29: Hohman Dep. 143:20-23; Ex. 18: Psaras Dep. 56:18-22; Ex. 13: Williams Dep. 26:12-27:16; Ex. 10: Wilson Dep. 124:14-24.

[135] Ex. 20: Davis Dep. 89:23-91:1; Ex. 14: Kiernan Dep. 67:19-68:4; Ex. 18: Psaras Dep. 59:5-7; Ex. 10: Wilson Dep. 82:17-21, 115:4-10.

[136] Ex. 19: Clement Dep. 115:23-116:18; Ex. 30: Gathers Dep. 43:13-24; Ex. 29: Hohman Dep. 33:13-19, 43:17-23, 65:8-9; 114:20-25, 133:16-134:3, 154:11-15; Ex. 14: Kiernan Dep. 67:19-68:4; Ex. 11: Livrieri Dep. 39:17-20, 77:3-14; Ex. 17: Norberg Dep. 34:13-35:4; Ex. 18: Psaras Dep. 59:5-7; Ex. 12: Wilkerson Dep. 17:22-23, 90:25-91:1, 91:11-15; Ex. 10: Wilson Dep. 82:17-21, 115:4-10, 247:6-12, 255:4-6.

[137] Ex. 28: Anderson Dep. 175:19-24; Ex. 32: Caswell Dep. 113:17-22; Ex. 19: Clement Dep. 87:22-25, 97:2-7; Ex. 30: Gathers Dep. 43:13-24; Ex. 11: Livrieri Dep. 77:23-78:2; Ex. 18: Psaras Dep. 63:19-21; Ex. 12: Wilkerson Dep. 98:16-20; Ex. 13: Williams Dep. 52:9-24; Ex. 10: Wilson Dep. 142:9-10, 144:2-15, 183:16-19.

[138] Ex. 33: In-Sample WHISARD Compliance Action Reports (DOL 1827-31, 1832-40, 1841-48, 1849-55, 1876-82, 1883-90, 1907-11; Ex. 34: Out-of-Sample WHISARD Compliance Reports (DOL 1806-10, 1813-18, 1819-26, 1856-75, 1891-1906, 1912-17, 1918-25.

[139] Ex. 33: In-Sample WHISARD Compliance Action Reports (DOL 1827-31, 1832-40, 1849-55, 1876-82, 1883-90, 1907-11; Ex. 34: Out-of-Sample WHISARD Compliance Reports (DOL

Plaintiffs worked at seven as servers and/or bartenders during the relevant period.[140]  Of the seven restaurants, the Wage and Hour Division issued compliance findings for nearly all of them (*i.e.*, six out of seven, or 86%).[141]

> **H.    The Parties' Experts Differ On Whether Collective Adjudication Is Appropriate.**

Defense expert, Dr. Ali Saad, conducted an observation study of servers and bartenders across all five Brands.[142]  He found a wide variation by Brand, position, and individual on how much time employees spent performing various duties at the tip credit rate,[143] including the top 20 tasks observed for servers and bartenders.[144]  For example, the amount of time servers spent serving or carrying food or beverages ranged from 4.5% of the shift to 39.5% of the shift, and for bartenders, it ranged from 10.5% to 51.9%.[145]  Similarly, time spent traveling or monitoring guests ranged from 1.8% to 47.4% of a shift for servers, and 6.8% to 29.8% for bartenders.[146]  Dr. Saad also found significant variation within each Brand and position in the time spent performing various cleaning duties, which Plaintiffs complain about here.[147]  This variation confirms that the question of how much time servers and bartenders spend on different duties cannot be litigated collectively.  As for work performed off the clock, Dr. Saad calculated the time between employees' arrival to work and clock-in time, and reviewed the duties performed during this period.  He likewise calculated the time between employees' clock-out time and when they left work and reviewed duties performed during this time.[148]  He concluded that the "observation data contradicts the claim that there is systematic and widespread off-the-clock work occurring at the beginning and end of shifts."[149]

---

1856-75, 1912-17).

[140] Ex. 7: O'Keefe Decl. ¶ 8.

[141] Ex. 33: In-Sample WHISARD Compliance Action Reports (DOL 1827-31, 1832-40, 1849-55, 1876-82, 1883-90, 1907-11).

[142] Ex. 81: Saad Decl. ¶ 1.

[143] *Id.* ¶¶ 42-53, 57-60.

[144] *Id.* at ¶¶ 46-47.

[145] *Id.* ¶¶ 48-49.

[146] *Id.* ¶ 50

[147] *Id.* ¶52-53.  Based on his classification of the various duties performed, Dr. Saad found that 95.4% of those observed did not exceed the 20% threshold for related (non-tip-producing) duties. *Id.* ¶ 44.  He also found that observed employees spent a miniscule amount of time (a fraction of a percent of each shift) performing "unrelated" duties.  *Id.* ¶ 45.

[148] *Id.* ¶¶ 67-71.

[149] *Id.* ¶ 71.

Plaintiffs offer testimony of two experts.  One expert, William Cutler, retired DOL Compliance Officer, opines it is possible to use surveys prepared by Plaintiffs' other expert, Dr. Albert Madansky, to measure liability and damages under the "20% rule" and for alleged off-the-clock work and any resulting unpaid overtime, and then extrapolate these amounts to the 20,000-plus individuals who opted into the litigation.[150]  However, no survey had been conducted, and no data had been analyzed.[151]  Therefore, Plaintiffs' experts have done nothing but describe a hypothetical for how a survey *might* be used.[152]  Based on the draft surveys and mathematical formulas for extrapolation provided in Dr. Madansky's report, it is apparent that he does not account for the myriad differences among the class members.[153]

## III.    LAW AND ARGUMENT

### A.    Legal Standard On Decertification

On a motion to decertify, plaintiffs must prove that class members are similarly situated, and must demonstrate a reasonable basis for their claim of classwide FLSA violations. *Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1096-97 (11th Cir. 1996).  At the decertification stage, plaintiffs bear a heavier burden than at the initial stage. *Smith v. Tradesmen Int'l, Inc.*, 289 F. Supp. 2d 1369, 1372 (S.D. Fla. 2003).  "[L]ogically the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action."  *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007).  "[A]s more legally significant differences appear amongst the opt-ins, the less likely it is that the group of employees is similarly situated." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008).

When evaluating whether class members are similarly situated, courts typically consider: (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that appear to be individual to each plaintiff; and (3) fairness and procedural considerations.  *Anderson*, 488 F.3d at 953.  "The three factors of this analysis "are not mutually exclusive – there is considerable overlap among them.  Each factor directly influences the others."  *Knott v. Dollar Tree Stores, Inc.*, 897 F. Supp. 2d 1230, 1234 (N.D. Ala. 2012).  These factors overwhelmingly support decertification because the evidence confirms there are numerous, vast, and legally significant variations among the class members.

---

[150] Ex. 82: Cutler Report p. 22, 24-27; Ex. 86: Madansky Report ¶ 9, Appx. A and B.
[151] Ex. 87: Madansky Dep. 106:5-15, 57:23-58:5.
[152] D.E. 902.
[153] *See* page 34, *infra*.

**B.      Plaintiffs Are Not Similarly Situated.**

**1.      Legal Standard On Plaintiffs' Claims**

To show they are similarly situated, Plaintiffs must demonstrate they can establish liability on a classwide basis. *Rindfleisch v. Gentiva Health Servs.*, 2014 U.S. Dist. LEXIS 69217, at *14 (N.D. Ga. Apr. 18, 2014) (*citing Briggins, v. Ellwood Tri, Inc.*, 882 F. Supp. 2d, 1256, 1267 (N.D. Ala. 2012)).  Therefore, a determination whether there are *legally significant* differences among the Plaintiffs should be made in context of the applicable legal standards.

The FLSA requires that employees receive at least the federal minimum wage and time-and-a-half the regular rate for all hours worked over 40 per week, 29 U.S.C. §§ 206, 207.  An employee cannot succeed on such FLSA claims if her average wage, for a week in which she does not work overtime, exceeds the minimum wage.  *Bolick v. Brevard County  Sheriff's Dept.*, 937 F. Supp. 1560, 1568 (M.D. Fla. 1996); *see also Perez v. Brandsmart Serv. Corp.*, 2011 U.S. Dist. LEXIS 82708, at *19 (S.D. Fla. July 28, 2011) (*citing Bolick*, *supra*, and *United States v. Klinghoffer Bros. Realty Corp.*, 285 F.2d 487, 490 (2d Cir. 1960)).  Accordingly, "[i]t does not matter that an employee is required to work 'off the clock' for any given number of hours if her pay for the entire week is sufficient to maintain the statutory hourly rate when averaged over all the hours worked during that week." *Monger v. Cactus Salon & Spa's, LLC*, 2009 U.S. Dist. LEXIS 60066, at *3 (E.D.N.Y. July 6, 2009).

Section 3(m) of the FLSA permits an employer to take a "tip credit" toward its minimum wage obligation for tipped employees equal to the difference between the required cash wage (at least $2.13/hour) and the federal minimum wage.  The maximum tip credit an employer can claim under the FLSA is $5.12 per hour (the minimum wage of $7.25 minus the minimum required cash wage of $2.13). *See* 29 U.S.C. § 203(m); Updating Regulations Issued Under the Fair Labor Standards Act, 76 Fed. Reg. 18832, 18835 (Apr. 5, 2011).

Plaintiffs contend that Section 30d00(e) of the U.S. Department of Labor's Field Operations Handbook ("FOH") establishes the standard for lawful taking of the tip credit.[154] The FOH provides that an employer cannot take the tip credit for any tipped employee if the employee spends more than 20% of her time performing duties that are merely incidental to, or related to, tip-producing duties, or if the tipped employee performs any duties that are unrelated to the tipped occupation.  Plaintiffs rely on cases such as *Fast v. Applebee's International, Inc.*,

---

[154] D.E. 168 at 26.

638 F.3d 872 (8th Cir. 2011), to support their position.[155]  In *Fast*, the court found that this "20% rule" resolves ambiguity in the DOL's "dual jobs" regulation and is entitled to deference.[156]

Based on those authorities, Plaintiffs contend that tasks performed by tipped employees fall into three categories: (1) directly tip-producing; (2) related to tip-producing activities; and (3) unrelated to the tipped occupation.[157]  Plaintiffs' expert asserts that to evaluate compliance with the "20% rule," a fact finder must analyze *each* duty *each* tipped employee performs, determine the category into which *each* duty falls, and calculate the time spent on tip-producing duties versus related duties, and states that the fact finder must perform this analysis for *each* tipped employee *each* day.[158]

Although Plaintiffs claim the "20% rule" as stated in *Fast* is the law, courts within this district have declined to undertake this detailed analysis, calling it "infeasible":

> Permitting Plaintiffs to scrutinize every day minute by minute, attempt to differentiate what qualifies as tipped activity and what does not, and adjust their wage accordingly would create an exception that would threaten to swallow every rule governing (and allowing) for tip credit for employers. First of all, ruling in that manner would present a discovery nightmare. Of greater concern is the fact that under the reasoning proffered by Plaintiffs, nearly every person employed in a tipped occupation could claim a cause of action against his employer if the employer did not keep the employee under perpetual surveillance or require them to maintain precise time logs accounting for every minute of their shifts.

*Pellon v. Business Rep. Int'l., Inc.*, 528 F. Supp. 2d 1306, 1313-14 (S.D. Fla. 2007), *aff'd*, 2008 U.S. App. LEXIS 19077 (11th Cir. Sept. 3, 2008); *see also Crate v. Q's Rest. Group LLC*, 2014 U.S. Dist. LEXIS 61360, at **14-15 (S.D. Fla. May 2, 2014) ("[T]his court agrees with the *Pellon* court that '[p]ermitting Plaintiffs to scrutinize every day minute by minute, attempt to differentiate what qualifies as tipped activity and what does not' would likely be infeasible."). The infeasibility of such an analysis is compounded exponentially in a collective action.

Plaintiffs also claim that all time tipped employees spend performing certain duties that may be considered part of another employee's job, such as emptying trash or washing dishes, is time spent on duties unrelated to the tipped occupation, for which they must receive the full

---

[155] *Id.*

[156] The dual jobs regulation, 29 C.F.R. § 531.56(e), explains that when an employee works dual jobs, a tipped occupation and a non-tipped occupation, the tip credit may be taken only when working in the tipped occupation.

[157] Ex. 83: Cutler Decl. ¶ 5.

[158] Ex. 84: Cutler Dep. 285:4-286:19.

minimum wage.[159]  Courts have rejected this proposition as well.  *Roberts v. Apple Sauce, Inc.*, 945 F. Supp. 2d 995, 1001 (N.D. Ind. May 13, 2013) (concluding that "servers, bartenders, and hosts – who directly relate[ ] with customers – are not also employed in the second occupation of dishwasher, cook, or janitor simply because an unspecified amount of time during their shift is spent performing the duties cited in the amended complaint: 'dishwashing, food preparation, kitchen and bathroom cleaning, [and] trash removal'").

> ### 2.     Plaintiffs Experienced Materially Different Factual And Employment Settings.

In determining whether the factual and employment settings of plaintiffs are disparate, courts examine a non-exhaustive list of factors such as: (1) whether the plaintiffs all held the same job title; (2) whether they worked in the same geographic location; (3) whether the alleged violations occurred during the same time period; (4) whether the plaintiffs were subjected to the same policies and practices, and whether these policies and practices were established in the same manner and by the same decision-maker; and (5) the extent to which the actions constituting the violations claimed by plaintiffs are similar.  *Smith*, 289 F. Supp. 2d at 1372 (S.D. Fla. 2003); *Whineglass v. Smith*, 2013 U.S. Dist. LEXIS 71977, at **16-17 (M.D. Fla. May 3, 2013); *see also Prise v. Alderwoods Group, Inc.*, 817 F. Supp. 2d 651, 670 (W.D. Pa. 2011) (considering opt-ins' geographic location, job duties, supervision, and salary to determine that the factual and employments were disparate).

At the most basic level, the consent forms reveal that these 20,000-plus individuals assert different FLSA claims, and in different combinations.  Although the forms indicate that different individuals are asserting different claims, they are not conclusive.   For example, several Plaintiffs admitted that their selections on the consent forms are inaccurate.  Therefore, even the preliminary question of whether a Plaintiff has a tip credit, off-the-clock, or overtime, or some combination of these claims, requires an individualized inquiry for each one of them.

Beyond the critical point that Plaintiffs are bringing different claims, these 20,000-plus individuals worked in different positions at different Brands in different locations and under different "policies" implemented by different managers.  They identify different types of actions that allegedly violated the FLSA that affected them in different ways, and identify different time periods when this conduct allegedly occurred.   Where, as here, the claims at issue are

---

[159] D.E. 168 at 33.

"hopelessly heterogeneous," use of the collective action mechanism is "egregious." *Jonites v. Exelon Corp.*, 522 F.3d 721, 725-26 (7th Cir. 2008).

        **a.**      **Pay Practices Affecting The Class Differ By Brand, State, Position, And Time Period.**

The Brands' varying pay policies regarding the positions that are paid the tip credit rate and the time of day they are paid the tip credit rate, and the different wage-and-hour laws in the states where they operate,[160] combine to create legally significant differences among Plaintiffs' employment settings. Given these differences, the Court cannot, as a practical matter, determine liability on a classwide basis. To illustrate, assume four individuals claim they worked off the clock for one hour per week, that they worked as openers during the lunch shift and performed non-tip-producing opening sidework, which combined with other non-tip-producing sidework, took 1.2 hours of a five-hour shift. Also assume these allegations are true. Whether Defendants are liable under the FLSA will vary based on the brand, state, and position:

- For a server at LongHorn in Illinois, where tipped employees receive the tip credit wage for the entire shift, Defendants are liable for the one hour of off-the-clock work because it would cause the average pay rate to dip below minimum wage. There is also liability for improperly taking the tip credit because the employee spent 24% of her time at the tip credit rate on non-tip-producing work.

- For an Olive Garden server in California working a 35-hour week, there is no FLSA liability because (1) the Brands do not take a tip credit in California; and (2) the amount the employee received at the California minimum wage of $8.00 per hour for the 34 hours she was on the clock ($272) exceeds what she would be owed at the federal minimum wage of $7.25 for all 35 hours she worked ($253.75). *See Monger*, 2009 U.S. Dist. LEXIS 60066, at **2-3.

- For a Bahama Breeze server in Texas, there is no liability for the tip-credit claim because the employee received the full minimum wage for the 0.5 hours she spent on non-tip-producing sidework as an opener, thus spending less than 20% of her total shift at the tip credit rate performing non-tip-producing sidework. However, there is liability for off-the-clock work because her average wage would have dropped below the federal minimum wage.

---

[160] *See* pages 6-8, *supra*.

- For a Red Lobster bartender in Michigan who works 40 hours per week, there is no FLSA liability because (1) the Brands do not take a tip credit for Red Lobster bartenders in Michigan; and (2) the amount paid at the Michigan minimum wage of $7.50 per hour for the 39 hours on the clock ($292.5) exceeds what the employee would be owed at the federal minimum wage of $7.25 for all 40 hours she worked ($290).

Because these different pay policies impact whether an FLSA violation occurred, just *some* of the factors a jury must evaluate for *each* Plaintiff include: whether the plaintiff was a server or a bartender; the plaintiff's rate of pay; the plaintiff's location and whether the Brand took a tip credit at that location; the number of hours worked per week; whether the work performed was tip-producing; the time of day the non-tip-producing work occurred; and the length of the shift. The answers to these numerous key inquiries will differ from Plaintiff to Plaintiff, compelling decertification. *See Rindfleisch*, 2014 U.S. Dist. LEXIS 69217, at *15 (decertifying class because there was a disparate factual setting among the individual plaintiffs and the issue of liability was thus not susceptible to common proof); *Lugo v. Farmer's Pride Inc.*, 737 F. Supp. 2d 291, 303 (E.D. Pa. 2010) (denying collective action because "the evidence does not demonstrate . . . that the question of under compensation can be answered in a manner common to all plaintiffs").

### b.   There Is No Evidence Of A Common Unlawful Policy That Affected The Entire Class.

Where plaintiffs cannot proffer substantial evidence of a common policy, plan, or decision by the defendants to violate the FLSA, a collective action is improper. *See Whineglass*, 2013 U.S. Dist. LEXIS 71977, at **22-23; *see also Briggins*, 882 F. Supp. 2d at 1273 (denying collective action because there was no common policy, plan, or decision to work employees the clock). Plaintiffs cannot do so here.

### (1)   Plaintiffs Bring Different Claims And Describe Different Alleged Practices.

Plaintiffs identify numerous different ways in which Defendants' lawful policies were allegedly violated, resulting in violations of the FLSA. The alleged violations are not pervasive. To the contrary, they are allegedly perpetrated by *local managers* through different *local* practices.

Plaintiffs' testimony about their sidework duties, on which they base their tip credit

claim, confirms that sidework duties differed by Brand and by location within each Brand, among other factors.[161]

Regarding off-the-clock claims, numerous Plaintiffs simply do not raise such a claim, demonstrating that managers were not violating the Brands' policies prohibiting off-the-clock work on a systematic, company-wide basis.[162]   Among Plaintiffs who raise an off-the-clock claim, many worked at more than one Brand, or more than one location within a Brand.  They, too, confirm that the alleged unlawful pay practices are *not* pervasive throughout Defendant's operations.[163]  Even within locations in which Plaintiffs claim they worked off the clock, they admit that it was the practice under certain managers only; other managers required no off-the-clock work at all. Additionally, Plaintiffs differ about whether their managers instructed them to work off the clock.  Some did, and some did not.  Some Plaintiffs doubted their managers even knew they were working off the clock.[164]  *See Briggins*, 882 F. Supp. 2d at 1273 ("The plaintiffs also have not presented evidence of an overarching policy that this court may infer from the conduct of the supervisors at HMA.  In fact, many plaintiffs testified that their managers did not direct them to work off the clock and, in some cases, testified that their managers were not even aware that they worked off the clock.").

Where, as here, the alleged FLSA violations in a collective action emanate from different actions by different local managers, decertification is appropriate.  *Illano v. H&R Block Eastern Enters.*, 2010 U.S. Dist. LEXIS 145673, at **10-12 (S.D. Fla. Nov. 3, 2010) (district managers managed their districts differently, and individual enforcement of overtime compensation or off-the-clock work by managers at each office demanded an individual inquiry, which required decertification); *Martin v. Citizens Fin. Group, Inc.*, 2013 U.S. Dist. LEXIS 43084, at **17-18 (E.D. Pa. Mar. 27, 2013) (decertifying action because decisions to deny overtime were made independently, by either separate branch or regional managers in contravention of defendants' written policy that complied with wage-and-hour laws); *Creely v. HCR ManorCare, Inc.*, 920 F. Supp. 2d 846, 853 (N.D. Ohio 2013) (decertifying class where managers' alleged conduct of discouraging or preventing plaintiffs from submitting missed punch forms did not appear universal across all managers and all workplaces).

[161] *See* notes 48-60, *supra.*
[162] *See* notes 89-92, *supra.*
[163] *See* notes 103-106, *supra.*
[164] *See* notes 107-110, *supra.*

25

The evidence also shows that some alleged wage-and-hour violations do not emanate from management at all, but rather, are attributable to *Plaintiffs'* choices.[165]  Some Plaintiffs' off-the-clock work resulted from their efforts to reduce their time on the clock, so they would be eligible to pick up another shift.  Another Plaintiff chose to work off the clock because he wanted to get the bar ready earlier, and another worked off the clock because he arrived before his shift and was "bored."  Others worked off the clock to assist fellow employees.  Similarly, as for the time it takes to perform sidework, some Plaintiffs stated it took them a long time because they are "picky" or have "OCD" where cleaning is concerned.

As the court concluded in *Illano*, decertification is required when certain of the plaintiffs' alleged harm arises from their own choices, rather than the defendants' policies:

> Here, it is clear that the motivation for Plaintiffs' overtime work is as attributable to Plaintiffs' own choices as much as it is to any of Defendants' actions. Here, some Plaintiffs claim that they were ordered to work off the clock, while others stated that they worked off the clock of their own volition. This lack of uniformity on such a central issue – whether Plaintiffs performed overtime work because of any alleged plan of Defendant's – cannot be permitted in a collective action under the FLSA.

*Illano*, 2010 U.S. Dist. LEXIS 145673, at **12-13 (internal citations omitted); *see also Velasquez v. HSBC Finance Corp.*, 266 F.R.D. 424 (N.D. Cal. 2010) (denying conditional certification because of plaintiffs' diverse reasons for working off the clock).

### (2)   Plaintiffs Complain Of Different Alleged Practices That Affected Them In Different Ways.

Plaintiffs not only confirm the lack of consistency in *whether* local manager violated the Brands' policies, they also confirm inconsistency in *how* this conduct allegedly occurred, and how much time they may be owed as a result.

For example, Plaintiffs described a wide range of alleged practices that caused them to work off the clock.[166]  Some managers allegedly required employees to arrive early and not clock in, but others did not.  Some managers allegedly required servers to wait until their first guests were seated before clocking in, but others did not.  Some managers required employees to work after they clocked out, but others did not.  Other local practices that allegedly caused Plaintiffs to work off the clock include: scheduling servers as an "extra" to wait and clock in

---

[165] *See* notes 74-76, 99-102, *supra*.
[166] *See* notes 91-98, *supra*.

26

only if another server called off; not having employees clock in in for meetings; having employees wait off the clock to leave with the manager or other employees purportedly pursuant to the safe and secure policy; having servers clock out after the last table leaves and perform sidework off the clock; and requiring employees to run errands off the clock.

All of this variation impacts the amount of time Plaintiffs reported having worked off the clock. One testified to some isolated incidents that may have caused him to work off the clock for four to six hours for the *entire* class period. In contrast, another claimed to have worked off the clock up to 70 minutes every day.[167]

Sidework is similarly varied.[168] Taking just the task of rolling silverware, some claim they did not have to do it at all; others did, and reported doing so for dramatically different amounts of time: 10-12 minutes on one end to 90 minutes on the other. As for running sidework, one Plaintiff claims it can take 20-30 minutes per shift, while another states it consumes 70% of her six-hour shift (more than 4 hours). Likewise, one Plaintiff testified that closing sidework took only 15 minutes, while another claimed it took up to 60 minutes.

This variation regarding the alleged off-the-clock schemes employed, and the time allegedly spent working off the clock or on various sidework duties, demands decertification. *See Martin*, 2013 U.S. Dist. LEXIS 43084, at *17 (decertifying class in part because the alleged unlawful policies and practices "impacted individual plaintiffs in individual ways" as evidenced by the fact that "Plaintiffs point to five different methods that were allegedly used by Defendants in an effort to deny overtime, but the number of plaintiffs who claim to have been subjected to each illegal practice differs"); *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278 (N.D. Tex. 2008) (decertifying action because the time spent working off the clock was not alleged to be uniform or of a predetermined duration); *Seward v. IBM*, 2012 U.S. Dist. LEXIS 49688, at *80 (S.D.N.Y. Jan. 20, 2012) (decertifying class where the plaintiff could not show he shared common factual and employment settings with all of the opt-ins due to the existence of a "sufficiently uniform and pervasive" policy requiring off-the-clock work, given the many differences in specific job duties, team functions and structures, managerial expectations, and individual experiences and understandings among the plaintiffs); *Echevarria v. Las Vegas Beach, Inc.*, 2010 U.S. Dist. LEXIS 61107, at **5-6 (S.D. Fla. June 1, 2010) (denying

---

[167] *See* notes 115-118, *supra*.
[168] *See* notes 64-73, *supra*.

27

conditional certification because the putative class involved different positions, including servers and bartenders, who worked at numerous different restaurants, reported to different supervisors, and complained about seven different pay practices but "not all were practiced against each of the plaintiffs or by each of the separate corporations").

> **(3)   The Evidence Does Not Support Plaintiffs' Claims That Through Centralized Control Defendants Encourage Managers To Cheat Employees.**

To support conditional certification, Plaintiffs argued that Defendants' operations were centralized and strictly controlled, and that its policies caused widespread off-the-clock work, and unlawful taking of the tip credit. These claims cannot overcome the weight of the evidence now before the Court.

The only relevant common policies are the Brands' *lawful* policies. The Brands' maintenance of these lawful policies does not render the class similarly situated. Where there is no evidence of a single policy, plan, or decision on its face resulting in improper payment of the tip credit, or causing Plaintiffs to work off the clock, but instead evidence that the Brands' official policies comport with the FLSA and prohibit wage-and-hour violations, decertification is warranted. *See Briggins*, 882 F. Supp. at 1274 (N.D. Ala. 2012); *Proctor*, 250 F.R.D. at 282; *Creely*, 920 F. Supp. 2d at 854.

To overcome the existence of lawful policies, Plaintiffs must present "substantial evidence that the employer in fact shirked its FLSA responsibilities." *Martin*, 2013 U.S. Dist. LEXIS 43084, at \*\*9, 17. This showing requires evidence that the lawful policies are a sham because supervisors were simultaneously trained, advised, or encouraged not to follow them. *Id.* Here, there is no such evidence. Through the Brands' various policies, trainings, and meetings, all levels of management are consistently instructed that violating wage-and-hour policies is strictly prohibited. The evidence further shows proactive measures by Employee Relations and Brand operations, among others, to prevent, detect, and remedy violations of wage-and-hour policies, including taking disciplinary action against managers, typically termination, for such violations.[169]

Defendants expect Plaintiffs will attempt to support their claims of "widespread" FLSA violations by referencing incidents investigated by Employee Relations. Such argument, however, undermines Plaintiffs' collective allegations because these investigations confirm that

---

[169] *See* notes 26, 77-88, 126-137, *supra*.

Defendants do not have any unlawful policy, plan, or decision. To the contrary, they continuously strive to ensure compliance with their lawful policies.[170] Furthermore, taking into account the number of restaurants, managers, and servers and bartenders, the number of these incidents is minimal, comprising only approximately less than 1.8% of all Employee Relations investigations.[171] Even a hundred examples of such violations could not show that the violations were pervasive. Defendants employed about 11,278 managers during the class period.[172] Even if 100 of these managers were found to have violated Defendants' policies, that would encompass less than 1% of Defendants' managers. That does not constitute a universal or widespread problem. Also, as discussed previously, the DOL records in this matter show that the Wage and Hour Division has repeatedly found the Brands in compliance with the minimum wage and overtime requirements and, when focusing on the restaurants where the Sample Data Plaintiffs worked, the overwhelming majority of those locations, when audited, were compliant.[173]

What the evidence confirms is that the Brands do not condone violations of their lawful wage-and-hour policies, but investigate and take remedial action. In the face of this fact, and the multitude of disparate factual and employment circumstances, isolated instances of misconduct by rogue managers cannot support certification. *See Briggins*, 882 F. Supp. 2d at 1258 ("Although the defendants have all but admitted that off-the-clock work sometimes occurs, the court nevertheless has not found sufficient consistency among the certified class, and notes that so many variables govern whether a plaintiff works off the clock that to determine the defendants' liability, and not merely its damages, would require individual testimony").

For all the above reasons, the factual and employment settings of Plaintiffs are "hopelessly heterogeneous," and therefore the Court should not allow the matter to proceed as a collective action.

### 3.    The Class Is Subject To Individualized Defenses.

The second factor of the decertification analysis, namely, the existence of individualized defenses, likewise supports decertification. *Anderson*, 488 F.3d at 953. Where there are individualized defenses "a one-size-fits-all determination is impossible," *Knott*, 897 F. Supp. 2d

---

[170] *See* notes 126-137, *supra*.
[171] *See* note 132, *supra*.
[172] Ex. 6: Babitt Decl. ¶ 3.
[173] *See* notes 139-141, *supra*.

at 1241, and a representative class is unmanageable, *Frye v. Baptist Mem'l Hosp., Inc.*, 2010 U.S. Dist. LEXIS 101996, at *25 (W.D. Tenn. Sept. 27, 2010).

In off-the-clock cases, courts have identified several individualized defenses that preclude collective adjudication, many of which are applicable here: (1) the class member did not work off-the-clock;[174] (2) instructions received to work off the clock without compensation were outside the scope of authority and directly contrary to well-established policy and practice;[175] (3) if the class member received instructions to work off the clock and/or not to request a time adjustment, she unreasonably relied on instructions directly contrary to express policy;[176] (4) the class member had actual and/or constructive knowledge of the company's policies banning off-the-clock work and voluntarily engaged in such work in defiance of that policy for any one of a number of reasons;[177] and (5) even if the class member worked off the clock, the employee unreasonably failed to avail herself of curative steps provided by the employer to recover compensation.[178] *Basco v. Wal-Mart*, an off-the-clock *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 603 (E.D. La. 2002).

Plaintiffs' off-the-clock work claims are susceptible to the same defenses. First, the alleged off-the-clock work did not violate the FLSA because the individual, on average, still made more than $7.25 for each hour of work that week.[179] Second, there is no FLSA violation, or no willful violation, because the individual admitted her manager may not have known about the off-the-clock work,[180] which establishes two different defenses: (1) whether Defendants suffered or permitted the off-the-clock work, 29 C.F.R. § 785.11; and (2) whether any FLSA violations were willful, *Whineglass*, 2013 U.S. Dist. LEXIS 71977, at **19-20, 24. Third, the individual previously received back pay for the alleged off-the-clock work.[181]

Plaintiffs' individual sidework claims are also subject to individualized defenses. First, the sidework duties for which some Plaintiffs claim to have been improperly paid are admittedly

---

[174] *See* notes 89-90, *supra*.

[175] *See* notes 78-83, *supra*.

[176] *Id.*

[177] *See* notes 119-125, *supra*.

[178] *Id.*

[179] Ex. 85: Ramsey Decl. ¶ 11-12.

[180] *See* note 110, *supra*.

[181] *See* note 137, *supra*.

tip-producing.[182]  Second, in most brands, many of these duties were performed when the Plaintiffs were being paid the full minimum wage,[183] and many Plaintiffs were paid minimum wage for some or all of the class period.[184]  Finally, the law does not allow recover if the work allegedly (improperly) performed at the tip credit rate, and/or done off the clock was *de minimis*.[185] *Briggins*, 882 F. Supp. 2d at 1267 (concluding *de minimis* defenses could not be litigated collectively in a FLSA collective action).

Due process demands that Defendants have the opportunity to raise these defenses. Examination of each Plaintiff on the applicable defenses, however, "would require consideration of different facts and individualized testimony that is unique to each Plaintiff and could not be generalized among the [other] Plaintiffs," which requires decertification. *Martin*, 2013 U.S. Dist. LEXIS 43084, at *21.

**4.     Collective Adjudication Would Be Neither Manageable Nor Fair.**

Finally, decertification is warranted under the third element of the decertification analysis: fairness and procedural considerations.  "As part of the third factor, the court will also consider whether it can 'coherently manage the class in a manner that will not prejudice any party.'"  *Briggins*, 882 F. Supp. 2d at 1263 (*quoting Proctor*, 250 F.R.D. at 281).  Fairness and procedural considerations do not focus only on the benefits to the plaintiffs; instead, "the court must balance the benefits of lowered cost and supposedly increased judicial efficiency against the potential detriment to the defendants and potential for judicial inefficiency."  *Id.* at 1279; *Frye*, 2010 U.S. Dist. LEXIS 101996, at *26.  Courts must be particularly mindful of the burden that a collective action imposes on a jury, which in this case would be immense.  *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001) (internal citation omitted).

**(1)     Individualized Questions Pervade This Litigation.**

For Plaintiffs to show they are similarly situated, they must be able to establish liability on a classwide basis. *Briggins*, 882 F. Supp. 2d at 1267.  As illustrated above, the individualized inquiries arising from Plaintiffs' different factual and employment settings render this case unmanageable.

This unmanageability is further illustrated by Plaintiffs' tip credit claim.  An

---

[182] *See* notes 61-62, *supra*.
[183] *See* notes 33-35, *supra*.
[184] *See* note 47, *supra*.
[185] *See* note 147, *supra*.

individualized analysis will be required, because as Plaintiffs admit, and as Dr. Saad's study confirmed, servers and bartenders spend vastly different amounts of time performing various types of duties.[186]  Also, according to Plaintiffs' own expert, retired DOL Compliance Officer William Cutler, to determine a violation of the "20% rule," a fact finder must conduct an individualized inquiry of every duty a tipped employee performs, how regularly these duties occur, the category into which each duty falls, and how much time is spent on each duty, and then calculate whether the "related" but non-tip-producing duties exceeded more than 20% of the shift.[187]  The unfeasibility of this analysis is compounded by Mr. Cutler's admission that one must also examine the circumstance under which each duty is performed.  For example, he opined that rolling silverware for seated customers may be tip-producing, and thus not subject to the 20% limit, but rolling silverware for general use throughout the shift is not.[188]  Mr. Cutler similarly opined that a server who obtains a glass of ice for her own customer is performing a tip-producing duty, but a server who, in response to his customer's request for ice, also fills the entire ice bin, is not performing tip-producing work.[189]

Courts in this district have correctly concluded that this sort of analysis, which Plaintiffs contend is *required*, is "infeasible."  *Pellon*, 528 F. Supp. 2d at 1313-14 (S.D. Fla. 2007); *Crate*, 2014 U.S. Dist. LEXIS 61360, at **14-15.  It is especially infeasible here where it is required for *tens of thousands* of Plaintiffs for *each* day they worked at the tip credit rate.  "It is oxymoronic to use [the collective action] device in a case where proof regarding each individual plaintiff is required to show liability."  *Bayles v. Am. Med. Response of Colo., Inc.*, 950 F. Supp. 2d 994, 1067 (D. Colo. 1996).

It is also unreasonable to expect that any jury could or should sit through the amount of evidence that is required to resolve Plaintiffs' claims.  "[T]here is simply a realistic limit on what a jury may reasonably be expected to absorb, retain, and process."  *Gatewood v. Koch Foods of Miss., LLC*, 2009 U.S. Dist. LEXIS 113896, at **69-70 (S.D. Miss. Oct. 20, 2009).   The detailed, individualized analysis required here will surely exceed that limit.

### (2)      Representative Evidence Is Not An Option.

In seeking conditional certification, Plaintiffs told this Court that any manageability

---

[186] Ex. 81: Saad Decl. ¶¶ 41-53.
[187] Ex. 84: Cutler Dep. 285:4-286:19.
[188] *Id.* at 72:23-75:16.
[189] *Id.* at 71:3-72:22.

concerns may be alleviated through presentation of "representative evidence."[190]   The evidence shows that this approach is unsuitable for two reasons.   Most importantly, *Plaintiffs'* own testimony confirms they are not at all alike regarding their employment circumstances, and therefore, are not making the same claims.   But even if the Court were to overlook these differences it would be unjust to rely on those Plaintiffs who participated in discovery to establish common proof at this point because their claims are plainly not representative of the class members' claims.   Under the Discovery Plan and Order, discovery was limited to a sample of 768 class members, the "Sample Data Plaintiffs."   Of those, Defendants were permitted to take written discovery and depositions of a randomly selected set of 50 individuals, the "Sample Discovery Plaintiffs."[191]   Plaintiffs' counsel contacted 110 opt-in Plaintiffs and could only get 48 participants before the close of decertification-related discovery.[192]   The likely consequence was an increased concentration of allegedly aggrieved Plaintiffs partaking in discovery (*i.e.*, those willing to invest time in the case because they feel they have valid claims).

The same concerns existed in *Briggins*, in which the court stated:

> If representative testimony were to be a more important part of the plaintiffs' case, the court has concerns over the fairness of proceeding based on the limited deposition testimony taken thus far, even apart from the previously mentioned credibility concerns. Earlier in this case, the court denied a motion to dismiss plaintiffs who failed to attend depositions, see doc. 159, because it found dismissal to be too draconian a sanction. Upon reviewing the depositions, however, the court speculates as to whether a potential bias exists in that testimony among plaintiffs who had claims they were willing to state, noting that those who feel more strongly they worked uncompensated time would have a stronger motivation to attend. By itself, the court's speculation that such a bias exists would not be enough to decertify the class. But in conjunction with the slew of other difficulties posed by litigating this case collectively, the possible prejudice to the defendant is another factor that weighs in favor of decertifying.

*Briggins*, 882 F. Supp. 2d at 1279 n.7.   As in *Briggins*, the self-selection of Plaintiffs here, down to a coalition of the willing, should diminish the Court's reliance on any consistencies that may exist in their testimony as evidence that the entire class is similarly situated.   Instead, the Court should conclude that the prejudice to Defendants from this self-selection bias, coupled with the other fairness and procedural concerns, warrants decertification.

---

[190] D.E. 186 at 43.
[191] D.E. 830 ¶¶ 5, 8.
[192] Ex. 85: Ramsey Decl. ¶¶ 4-10.

Dr. Madanksy's proposed method for taking data from the surveys and extrapolating it to the entire opt-in population to establish liability and damages shows it cannot fairly be done on a representative basis.  The survey fails to account for any of the critical differences known to exist among the class.   Plaintiffs have different claims; some have no off-the-clock claim, and some no tip credit claim.[193] Dr. Madansky does not exclude either from recovery.[194]  Some Plaintiffs claim far more non-tip-producing sidework work than others, and allegedly did more off-the-clock work than others, including some who did none at all,[195] but Dr. Madansky applies an "average" that will apply to all in the strata, causing a windfall to some while shortchanging others.[196]  Plaintiffs also do not agree with Dr. Madansky, or each other, about which of the sidework duties are tip-producing and which are merely related or unrelated.[197]  As Mr. Cutler explained, the classification of a duty for the tip credit analysis is not constant; it will depend on the context in which it is performed.[198]  Yet, the survey takes no account of this this critical fact. Finally, Dr. Madansky's survey presumes that all off-the-clock violates the FLSA,[199] but that is not so; a violation exists only if it results in the employee making less than minimum wage for the average of all time worked that week, or not receiving premium pay for weekly hours in excess of 40.  *Perez*, 2011 U.S. Dist. LEXIS 82708, at **15-19.

Hence, ascribing one individual's experiences to another, as Dr. Madansky intends to do with his survey and extrapolation, is unfair.  *Martin*, 2013 U.S. Dist. LEXIS 43084, at *23. "Drawing liability conclusions about a large group based on a small portion of statements can be problematic, especially when testimony among the representatives themselves is disparate."). *Id.* (quotation omitted); *see also Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 587 (E.D. La. 2008) ("Big Lots cannot be expected to come up with "representative" proof when the plaintiffs cannot reasonably be said to be representative of each other.").

Moreover, if the Court allows the survey, Defendants will have no way to defend against the representations made in the responses.  The *Big Lots* court addressed this very issue: "Because Big Lots could not call the managers and co-workers of the hundreds of plaintiffs to

---

[193] *See* note 13, *supra*.
[194] Ex. 86: Madansky Report ¶¶ 18-21.
[195] *See* notes 64-73, 89-90, 115-118, *supra*.
[196] Ex. 86: Madansky Report ¶¶ 19-21.
[197] *See* notes 61-63, *supra*.
[198] Ex. 84: Cutler Dep. 71:3-75:6.
[199] Ex. 86: Madansky Report ¶¶ 18-21.

refute the individual plaintiffs' deposition testimony or survey answers, opt-in plaintiffs could characterize their experiences without a realistic fear of direct rebuttal." *Big Lots*, 561 F. Supp. 2d at 586. The only possible way Defendants would have had to rebut survey responses would be to compare the respondents' survey responses to their testimony about the nature and extent of their sidework duties and alleged off-the-clock work. Plaintiffs eliminated that possibility by surveying only the Sample Data Plaintiffs who have not participated in discovery.[200]

### (3) The Result Of Collective Adjudication Would Be An Impermissible "All Or Nothing" Determination.

The *Big Lots* decision also demonstrates the impropriety of adjudicating this matter with an "all or nothing" determination:

> After considering the full record, the Court reaches the inescapable conclusion that the all or nothing posture of this case makes ruling on the merits fundamentally unfair to both sides. Were the Court to rule in plaintiffs' favor, it would have to do so on the basis of proof that is not representative of the whole class, and the verdict would result in liability on the defendant in a magnitude that is not likely to be warranted in reality.

561 F. Supp. 2d at 588.

Here, some Plaintiffs may have suffered violations of the FLSA. Other Plaintiffs' admissions (and their denials that they had certain issues at certain times) undercut a claim that FLSA violations were pervasive. A no-liability finding based on those denials as an "all-or-nothing" adjudication would be unfair to those who may have been truly aggrieved. At the same time, if the "all or nothing" adjudication favors Plaintiffs, it will unfairly require Defendants to compensate certain Plaintiffs for certain types of alleged FLSA violations that either the Plaintiffs themselves admitted did not occur, or that cannot exists under the law (*e.g.* tip credit claims by employees who received the full minimum wage). Given this reality, the all-or-nothing adjudication Plaintiffs advocate is improper and only shows that decertification is necessary.

## IV.   CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court enter an order (1) decertifying this matter as a collective action under the FLSA, and (2) dismissing the Opt-Ins without prejudice.

---

[200] D.E. 921, p. 9, n.4.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 27th day of June, 2014,  a true and correct copy of the foregoing was electronically filed and served via transmission of Notice of Electronic Filing generated by CM/ECF on all counsel or parties of record on the Service List below.

*/s/ Aaron Reed*

**David H. Lichter**
E-mail: dlichter@hlglawyers.com
**J. Paxton Marshall**
E-mail: pmarshall@hlglawyers.com
HIGER LICHTER & GIVNER
18305 Biscayne Boulevard, Suite 402
Aventura, Florida 33160

**Ted Trief**
E-mail: ttrief@triefandolk.com
**Barbara E. Olk**
E-mail: bolk@triefandolk.com
**Stan Gutgarts**
E-mail: sgutgarts@triefandolk.com
**Shelly L. Friedland**
E-mail: sfriedland@triefandolk.com
**Caitlin Duffy**
E-mail: cduffy@triefandolk.com
TRIEF & OLK
150 East 58th Street, 34th Floor
New York, New York 10155

**Peter S. Pearlman**
E-mail: ap@njlawfirm.com
**Alex Pisarevsky**
E-mail: psp@njlawfirm.com
**David Adelsberg**
E-mail: da@njlawfirm.com
**Erika R. Piccirillo**
E-mail: ep@njlawfirm.com
COHN LIFLAND PEARLMAN HERMANN & KNOPF, LLP
Park 80 Plaza West One
250 Pehl Avenue, Suite 401
Saddle Brook, New Jersey

ATTORNEYS FOR PLAINTIFFS

Firmwide:127659126.2 069299.1040