**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER

NICOLE ALEQUIN, *et al.*,                          )
                                                   )
    Plaintiffs,                        )
                                                   )
v.                                                 )
                                                   )
DARDEN RESTAURANTS, INC., *et al.*,                )
                                                   )
    Defendants.                        )
                                                   )

**DECLARATION OF TODD BURROWES IN SUPPORT OF DEFENDANTS'
RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL
CERTIFICATION**

I, Todd Burrowes, declare as follows:

    1.    I am currently employed by Darden Corporation as Executive Vice President of Operations for LongHorn Steakhouse.  Except where otherwise indicated, I have personal knowledge of the facts set forth in this declaration or knowledge based upon personal review of corporate records (1) made at or near the time by, or from information transmitted by, someone with knowledge; (2) kept in the course of GMRI, Inc.'s regularly conducted business activity; and (3) made as part of a regular practice of that activity.

    2.    LongHorn restaurants serve guests in a Western-themed atmosphere.

    3.    Since September 2009, the following categories of tipped employees have worked at LongHorn restaurants: servers; bartenders; and service assistants.  Servers, bartenders, and service assistants receive the tip credit wage for all hours worked in these positions.  Sidework tasks are not expected to take more than 20% of this time.

    4.    Tipped employees clock in – or their managers clock them in – for training and

mandatory meetings using a "training" job code to ensure they receive at least the full minimum wage, rather than the tip credit wage, for this time.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _15TH_ day of _MAY_____, 2013

_____

Todd Burrowes

Firmwide:120188606.1 069299.1040

**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER

NICOLE ALEQUIN, *et al.*,                    )
                                             )
      Plaintiffs,                       )
                                             )
v.                                           )
                                             )
DARDEN RESTAURANTS, INC., *et al.*,          )
                                             )
      Defendants.                       )
                                             )

**DECLARATION OF CHRIS IACIOFOLI IN SUPPORT OF DEFENDANTS'
RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL
CERTIFICATION**

I, Chris Iaciofoli, declare as follows:

      1.    I am currently employed by Darden Corporation as Director of Operations Excellence for Red Lobster. Except where otherwise indicated, I have personal knowledge of the facts set forth in this declaration or knowledge based upon personal review of corporate records (1) made at or near the time by, or from information transmitted by, someone with knowledge; (2) kept in the course of GMRI, Inc.'s regularly conducted business activity; and (3) made as part of a regular practice of that activity.

      2.    Red Lobster offers guests fresh seafood dishes in a casual, New England setting.

      3.    Between September 2009 and March 2011, servers were the only employees paid at the tip credit wage rate and only in states where such a rate is permitted. Between March 2011 and July 2012, bartenders and bussers were also paid at a rate below minimum wage where permitted, but the full tip credit was not taken for all employees in these positions. Since July 2012, there are no more bussers and a new position of service assistant has been added, which is

a tip credit position where permitted.   Servers, bartenders, bussers (prior to July 2012) and service assistants (after July 2012) receive at least the federal or state minimum wage, whichever is higher, and not the tip credit wage, when working before the restaurants open for the day. Bartenders and bussers (prior to July 2012) and service assistants (after July 2012) receive at least the federal or state minimum wage, whichever is higher, and not the tip credit wage, beginning 30 minutes after closing.

    4.      Sidework tasks are not expected to take more than 20% of the time tipped employees work at the tip credit wage.   Consistent with this expectation, the <u>Introducing Tip Share</u> presentation made by Red Lobster Senior Vice Presidents to Directors of Operations specifically emphasized that tipped employees should not spent more than 20% of their time on tasks unrelated to providing direct services to guests.   A true and correct excerpt from this presentation is attached as **Exhibit A**.   The Red Lobster Tip Share Rollout Guide, a true and correct excerpt of which is attached as **Exhibit B**, echoes this requirement.

    5.      Tipped employees clock in – or their managers clock them in – for training and mandatory meetings using a "training" job code to ensure they receive at least the full minimum wage, rather than the tip credit wage, for this time.

    I declare under penalty of perjury that the foregoing is true and correct.

Executed this _15th_ day of _____May_____, 2013

_Chris Iaciofoli_
Chris Iaciofoli

Firmwide:120188927.1 069299.1040

2

**EXHIBIT A**



# Introducing Tip Share

## Presentation to
## Red Lobster and Olive Garden – National Rollout
## Senior Vice Presidents to Directors of Operations

### January/February 2011

1

MATHIS DEFS 0024815

# Challenges of Implementing Tip Share

- It's important to treat all employees working in a tipped position fairly by not having them spend more than 20% of their time on tasks unrelated to providing direct service to our guests (*examples are provided in the Training Manual).*

  – Applying this new standard with our Bussers/Bartenders may require a change in how we traditionally accomplish certain tasks *(refer to the training manual for additional information).*

  – This standard applies any time an employee is working in a tipped position earning an hourly wage rate less than the non-tipped minimum wage.

- Based on the Orlando and Texas pilots, it will take approximately 2-3 weeks after going live for the employee feedback and any potential turnover related to Tip Share to decline.

  – Staying close restaurants and employees throughout this time period is critical in order for Tip Share to be a success.

  – Management teams should also expect questions from team members up to three weeks after the one on one meetings and Server All team meeting.

DARDEN

25

MATHIS DEFS 0024839

**EXHIBIT B**

# Unique situations that change with Tip Share

### Busser /Bartender Tip Share Clarification

### Busser

- An essential part of Darden's core values is a commitment to fairness. It's important to treat all employees working in a tipped position fairly by not having them spend more than 20% of their time on tasks that are not related to providing direct service to guests. This standard applies anytime an employee is working in a tipped position earning an hourly pay rate less than the non-tipped minimum wage

- Applying this standard with the busser crew at Red Lobster may require a change in how silverware is rolled and some closing responsibilities are completed. For example, in the past, one busser may have been assigned to roll all the silverware for the shift and dedicated to that task for extended periods of time.

- Here are some simple strategies to apply the 20% standards and accomplish all the work as we have done in the past.

  o Bussers who are working *BEFORE* we open and 30 minutes *AFTER* we close are paid full minimum wage under the set-up job code. Bussers can perform any task while in the set-up job code. Assigning work such as rolling silverware during these times will free up time later for other side work

  o In the Spirit of our Core Value of Teamwork, distribute the tasks evenly between the busser crew. For example, if there are 2 bussers working in the Tip Share job code from 5-9 PM, they will each have 48 minutes available for side work during the shift (4 hours x 20%). This enables the manager to allocate 48 minutes to each busser to complete side work responsibilities

- Direct Service Tasks for bussers that do not fall into the 20% standard are activities described in their job description such as: Pre-bussing/bussing/re-setting a table, cleaning floor around a table/bar, bread/water service, and helping to set up large parties

- Examples of Side Work Duties that should be limited when in Tip Share job code are: Rolling silverware for long periods of time, and mopping the floors at closing

- Other duties such as stocking plates, glasses, side stations, ice, and trash runs should be fine if not used in excess (over the 20%)

### Bartender

- Take the same approach for bartenders. When in the tip share job code (1403), they should not spend more than 20% of their time on tasks that do not contribute to direct service for our guests

  o Examples of Direct Service Tasks for bartenders that do not fall into the 20% standard are:

    ▪ Normal on-going stocking of the bar with plates and glassware for guests
    ▪ Preparing drinks and serving guests at the bar or making drinks for the service bar
    ▪ Working to-go orders, selling gift cards

- Since our bartenders are scheduled for 11:00 am, setting up the bar and preparing large amounts of fruit and mixes will require them to work their complete LMS schedule to avoid exceeding the 20% standard

- Activities no longer appropriate for their tipped job responsibilities are taking inventory, planning bar orders and checking out servers

7

MATHIS DEFS 0024727

**Silverware rolling**

- Never schedule a tipped crew member for the sole purpose of just rolling silverware, since this is not providing direct guest service. Bussers and others regularly scheduled for shifts similar to this example should be given silverware roller Job Code 345 and an acceptable wage rate (generally equal to or slightly above State Minimum Wage)

### Unique Training Scenarios

**Training Wage Rates/Job Codes**

- Busser and bartender certified trainer wage rates do not change; therefore, it is not necessary to adjust wage rates for Job Code 290. Continue to use current practices

| Department | Classroom | Trainer "Lead" Shift and Trainee Job Codes | Trainer "Follow" Shift and Trainee Job Codes |
|---|---|---|---|
| Bartender Certified Trainer | • Service Team Certified Trainer Job Code-290<br>• Certified Trainer Wage<br>• Prior to restaurant opening or any time when not "working the Bar" | • Bartender Job Codes –Set-Up/Tip Share-1402-1403<br>• Bartender Wage Rates – Set-Up/Tip Share<br>• Training new Bartenders behind Bar and "Leading"<br>• Retains tips and participates in Tip Share | • Bartender Job Codes –Set-Up/Tip Share-1402-1403<br>• Bartender Wage Rates – Set-Up/Tip Share<br>• Training new Bartenders behind Bar and "Following"<br>• Retains tips and participates in Tip Share |
| Bar Trainee | • Service Team Trainee Job Code-290<br>• State Minimum Wage | • Service Team Trainee Job Code-290<br>• State Minimum Wage<br>• Does not retain tips and does not participate in Tip Share | • Service Team Trainee Job Code-290<br>• State Minimum Wage<br>• Does not retain tips and does not participate in Tip Share |
| Busser Certified Trainer | • Service Team Certified Trainer Job Code-290<br>• Certified Trainer Wage<br>• Prior to restaurant opening or any time when not "working the floor" | • Busser Job Codes – 1400-1401<br>Set-Up/Tip Share<br>• Busser Wage Rates – Set-Up/Tip Share<br>• Training new Bussers in Dining Room and "Leading"<br>• Retains tips and participates in Tip Share | • Busser Job Codes – 1400-1401<br>Set-Up/Tip Share<br>• Busser Wage Rates – Set-Up/Tip Share<br>• Training new Bussers in Dining Room and "Following"<br>• Retains tips and participates in Tip Share |
| Busser Trainee | • Service Team Trainee Job Code-290<br>• State Minimum Wage | • Service Team Trainee Job Code-290<br>• State Minimum Wage<br>• Does not retain tips and does not participate in Tip Share | • Service Team Trainee Job Code-290<br>• State Minimum Wage<br>• Does not retain tips and does not participate in Tip Share |

8

MATHIS DEFS 0024728

**EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER

| | |
|---|---|
| NICOLE ALEQUIN, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DARDEN RESTAURANTS, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DECLARATION OF DAN KIERNAN IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION**

I, Dan Kiernan, declare as follows:

1.      I am currently employed by Darden Corporation as Executive Vice President of Operations for Olive Garden.  Except where otherwise indicated, I have personal knowledge of the facts set forth in this declaration or knowledge based upon personal review of corporate records (1) made at or near the time by, or from information transmitted by, someone with knowledge; (2) kept in the course of GMRI, Inc.'s regularly conducted business activity; and (3) made as part of a regular practice of that activity.

2.      Olive Garden restaurants provide guests with an Italian-style dining experience.

3.      Between September 2009 and March 2011, servers were the only employees working at Olive Garden restaurants who were paid a tip credit wage rate and only in states where a such a rate is permitted.  After March 2011, bartenders and bussers were also paid a wage below minimum wage where permitted, but the full tip credit was not taken for all employees.  Servers, bartenders, and bussers receive at least the federal or state minimum wage,

whichever is higher, and not the tip credit wage, when working before the restaurants open for the day. Bartenders and bussers receive at least the federal or state minimum wage, whichever is higher, and not the tip credit wage, beginning 30 minutes after closing.

4.      Sidework tasks are not expected to take more than 20% of the time tipped employees work at the tip credit wage. Consistent with this expectation, the <u>Introducing Tip Share</u> presentation made by Olive Garden Senior Vice Presidents to Directors of Operations specifically emphasized that tipped employees should not spent more than 20% of their time on tasks unrelated to providing direct services to guests. A true and correct excerpt from this presentation is attached as **Exhibit A.**

5.      Tipped employees clock in – or their managers clock them in – for training and mandatory meetings using a "training" job code to ensure they receive at least the full minimum wage, rather than the tip credit wage, for this time.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _16_ day of ___May___, 2013

_____
Dan Kiernan

Firmwide:120188795.1 069299.1040

**EXHIBIT A**



# Introducing Tip Share

**Presentation to**
**Red Lobster and Olive Garden – National Rollout**
**Senior Vice Presidents to Directors of Operations**

**January/February 2011**

1

MATHIS DEFS 0024815

# Challenges of Implementing Tip Share

- It's important to treat all employees working in a tipped position fairly by not having them spend more than 20% of their time on tasks unrelated to providing direct service to our guests *(examples are provided in the Training Manual)*.

  - Applying this new standard with our Bussers/Bartenders may require a change in how we traditionally accomplish certain tasks *(refer to the training manual for additional information)*.

  - This standard applies any time an employee is working in a tipped position earning an hourly wage rate less than the non-tipped minimum wage.

- Based on the Orlando and Texas pilots, it will take approximately 2-3 weeks after going live for the employee feedback and any potential turnover related to Tip Share to decline.

  - Staying close restaurants and employees throughout this time period is critical in order for Tip Share to be a success.

  - Management teams should also expect questions from team members up to three weeks after the one on one meetings and Server All team meeting.

DARDEN

25

MATHIS DEFS 0024839

**EXHIBIT 6**

**EXHIBIT 4**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER

NICOLE ALEQUIN, *et al.*,                    )
      Plaintiffs,                            )
                                )
v.                                           )
                                )
DARDEN RESTAURANTS, INC., *et al.*,          )
      Defendants.                            )
                                )
                                )

## DECLARATION OF MARK NORBERG IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

I, Mark Norberg, declare as follows:

1.     I am currently employed by Darden Corporation as Managing Director for Seasons 52. Except where otherwise indicated, I have personal knowledge of the facts set forth in this declaration or knowledge based upon personal review of corporate records (1) made at or near the time by, or from information transmitted by, someone with knowledge; (2) kept in the course of GMRI, Inc.'s regularly conducted business activity; and (3) made as part of a regular practice of that activity.

2.     Seasons 52 restaurants are fresh grills and wine bars serving guests from seasonally inspired menus in a "casually sophisticated" environment.

3.     Since September 2009, the following categories of tipped employees have worked at Seasons 52 restaurants: servers; bartenders; and food runners. Servers and bartenders receive at least the federal or state minimum wage, whichever is higher, and not the tip credit wage, when working before the restaurants open for the day. Sidework tasks are not expected to take

more than 20% of the time these tipped employees work at the tip credit wage.

4.      Tipped employees clock in – or their managers clock them in – for training and mandatory meetings using a "training" job code to ensure they receive at least the full minimum wage, rather than the tip credit wage, for this time.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _15th_ day of ___May___, 2013

Mark Norberg

Firmwide:120188365.1 069299.1040

2

**EXHIBIT 5**

-- --

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

~~CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER~~

NICOLE ALEQUIN, *et al.*,                    )
                                             )
    Plaintiffs,                          )
                                             )
v.                                           )
                                             )
DARDEN RESTAURANTS, INC., *et al.*,          )
                                             )
    Defendants.                          )
                                             )
                                             )

**DECLARATION OF JOHN WILKERSON IN SUPPORT OF DEFENDANTS'
RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL
CERTIFICATION**

I, John Wilkerson, declare as follows:

    1.    I am currently employed by Darden Corporation as Senior Vice President of Operations for Bahama Breeze. Except where otherwise indicated, I have personal knowledge of the facts set forth in this declaration or knowledge based upon personal review of corporate records (1) made at or near the time by, or from information transmitted by, someone with knowledge; (2) kept in the course of GMRI, Inc.'s regularly conducted business activity; and (3) made as part of a regular practice of that activity.

    2.    Bahama Breeze restaurants serve guests in Caribbean-inspired surroundings, accenting familiar favorite foods with Caribbean and Latin flavors.

    3.    Since September 2009, the following categories of tipped employees have worked at Bahama Breeze restaurants: servers; bartenders; food runners; and barbacks. These employees receive at least the federal or state minimum wage, whichever is higher, and not the tip credit wage, when working before the restaurants open for the day. Sidework tasks are not expected to

take more than 20% of the time these tipped employees work at the tip credit wage.

    4.      Tipped employees clock in – or their managers clock them in – for training and ~~mandatory meetings using a "training" job code to ensure they receive at least the full minimum~~ wage, rather than the tip credit wage, for this time.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed this _19th_ day of _____MAY_____, 2013

                           _John Wilkerson_
                           John Wilkerson

Firmwide:120188118.1 069299.1040

2

**EXHIBIT 6**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 12-61742-CIV-DIMITROULEAS/SNOW

AMANDA MATHIS, *et al.*,                    )
                                            )
    Plaintiffs,                         )
                                            )
v.                                          )
                                            )
DARDEN RESTAURANTS, INC., *et al.*,         )
                                            )
    Defendants.                         )
                                            )

**DECLARATION OF RANDY BABITT IN SUPPORT OF DEFENDANTS' MOTION TO DECERTIFY COLLECTIVE ACTION**

    I, Randy Babitt, declare as follows:

    1.    I am currently employed as the Senior Director of Payroll & Employee Services for GMRI, Inc. ("GMRI"), the employer of all employees working at Bahama Breeze, LongHorn, Olive Garden, Red Lobster, and Seasons 52 restaurants (collectively "Brands"). In this capacity, I serve as an authorized custodian of GMRI's records relating to human resources practices and policies, including, but not limited to, payroll records. Except where otherwise indicated, I have personal knowledge of the facts set forth in this declaration or knowledge based upon personal review of corporate records (1) made at or near the time by, or from information transmitted by, someone with knowledge; (2) kept in the course of GMRI's regularly conducted business activity; and (3) made as part of a regular practice of that activity.

    2.    Between September 6, 2009, and September 6, 2012, GMRI employed approximately 218,042 servers and bartenders at Bahama Breeze, LongHorn, Olive Garden, Red Lobster, and Seasons 52 restaurants in the United States. During this time frame, GMRI has employed approximately 11,278 managers in these 5 Brands.

    3.    These servers and bartenders worked across approximately 36 Bahama Breeze restaurants (17 states), 456 LongHorn restaurants (30 states), 836 Olive Garden restaurants (49 states), 690 Red Lobster restaurants (44 states), and 32 Seasons 52 restaurants (18 states).

4.      Olive Garden and Red Lobster began rolling out a Tip Share Program in 2011 under which bartenders began receiving a reduced minimum wage, reflecting a tip credit taken against their hourly rate in accordance with applicable wage-and-hour law.  Prior to this point, the bartenders received at least the full minimum wage as their hourly rate.  Olive Garden and Red Lobster did not immediately implement this program; they did so in phases, *i.e.*, different restaurants at different times.

5.      In those states where the Brands do not take the tip credit, GMRI pays at least the full federal minimum wage or the full state minimum wage, whichever is greater.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 25 day of JUNE                     , 2014

                                            _Randy Babitt_
                                            Randy Babitt

Firmwide:127473415.3 069299.1040

2

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 12-61742-CIV-DIMITROULEAS/SNOW

AMANDA MATHIS, *et al.*,        )
                                )
      Plaintiffs,           )
                                )
v.                                )
                                )
DARDEN RESTAURANTS, INC., *et al.*,  )
                                )
      Defendants.       )
                                )

## <u>DECLARATION OF RANDY BABITT IN SUPPORT OF DEFENDANTS' MOTION TO DECERTIFY COLLECTIVE ACTION</u>

I, Randy Babitt, declare as follows:

1.    I am currently employed as the Senior Director of Payroll & Employee Services for GMRI, Inc. ("GMRI"), the employer of all employees working at Bahama Breeze, LongHorn, Olive Garden, Red Lobster, and Seasons 52 restaurants (collectively "Brands"). In this capacity, I serve as an authorized custodian of GMRI's records relating to human resources practices and policies, including, but not limited to, payroll records. Except where otherwise indicated, I have personal knowledge of the facts set forth in this declaration or knowledge based upon personal review of corporate records (1) made at or near the time by, or from information transmitted by, someone with knowledge; (2) kept in the course of GMRI's regularly conducted business activity; and (3) made as part of a regular practice of that activity.

2.    Between September 6, 2009, and September 6, 2012, GMRI employed approximately 218,042 servers and bartenders at Bahama Breeze, LongHorn, Olive Garden, Red Lobster, and Seasons 52 restaurants in the United States. During this time frame, GMRI has employed approximately 11,278 managers in these 5 Brands.

3.    These servers and bartenders worked across approximately 36 Bahama Breeze restaurants (17 states), 456 LongHorn restaurants (30 states), 836 Olive Garden restaurants (49 states), 690 Red Lobster restaurants (44 states), and 32 Seasons 52 restaurants (18 states).

4.      Olive Garden and Red Lobster began rolling out a Tip Share Program in 2011 under which bartenders began receiving a reduced minimum wage, reflecting a tip credit taken against their hourly rate in accordance with applicable wage-and-hour law.  Prior to this point, the bartenders received at least the full minimum wage as their hourly rate.  Olive Garden and Red Lobster did not immediately implement this program; they did so in phases, *i.e.*, different restaurants at different times.

5.      In those states where the Brands do not take the tip credit, GMRI pays at least the full federal minimum wage or the full state minimum wage, whichever is greater.

I declare under penalty of perjury that the foregoing is true and correct.


Executed this 25 day of JUNE                    , 2014

Randy Babit

Firmwide:127473415.3 069299.1040

2

**EXHIBIT 7**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 12-61742-CIV-DIMITROULEAS/SNOW

AMANDA MATHIS, *et al.*,                          )
                                                 )
    Plaintiffs,                              )
                                                 )
v.                                               )
                                                 )
DARDEN RESTAURANTS, INC., *et al.*,              )
                                                 )
    Defendants.                              )
                                                 )

## DECLARATION OF JULIE O'KEEFE IN SUPPORT OF DEFENDANTS' MOTION TO DECERTIFY COLLECTIVE ACTION

I, Julie O'Keefe, declare as follows:

1.     I am currently employed as a paralegal in the Chicago office of Littler Mendelson, P.C. ("Littler" or "Firm"), legal counsel for Defendants in the above-captioned matter.

2.     Littler has utilized Microsoft Access to maintain data on the persons who opted into this litigation, specifically information they recorded on their e-filed consent forms and certain data about their employment as servers and/or bartenders at the relevant brands.

3.     Under my supervision, a third-party vendor, Robert Half Legal, entered consent form data in Excel format, and Littler imported this data into Access. The Firm also imported certain employment information received from Defendants (*i.e.*, employee identification numbers) into the Access database.

4.     The following is based on my personal review and querying of the Access database. It is, to the best of my knowledge, an accurate reflection of the information contained in the database.

     a.    20,255 individuals filed opt-in consent forms. Collectively, these individuals claim they worked at approximately 1,995 different restaurants during the relevant period (September 6, 2009, to September 6, 2012): 31 Bahama Breeze restaurants; 402 LongHorn restaurants; 821 Olive Garden restaurants; 718 Red Lobster restaurants; and 23 Seasons 52 restaurants. These restaurants are spread

across 50 states.

b.    The 20,255 individuals include 1,213 opt-ins who contend they worked in the following states during the relevant period, yet still assert a tip credit claim: Alaska (6); California (904); Minnesota (66); Montana (7); Nevada (65); Oregon (28); and Washington (137).

c.    The 20,255 individuals also include 201 opt-ins who assert a tip credit claim but contend they worked as bartenders in following states during the relevant period: Delaware (17); Kentucky (42); Maine (14); Michigan (110); New Hampshire (22); North Dakota (8); and Wyoming (5).

d.    Of the 20,255 individuals who filed opt-in consent forms:

- 5,024 indicate they have all three claims (tip credit, off-the-clock, and overtime)
- 6,195 indicate they have tip credit and off-the-clock claims only
- 967 indicate they have tip credit and overtime claims only
- 418 indicate they have off-the-clock and overtime claims only
- 5,124 indicate they have a tip credit claim only
- 1,537 indicate they have an off-the-clock claim only
- 98 indicate they have an overtime claim only
- 2,736 indicated they have no sidework claim
- 6,964 indicated they have no off-the-clock claim
- 13,644 indicated they have no overtime claim.

5.    In addition to the Access database, I have personally reviewed the August 2011 Operations Excellence Server Study by Darden's Internal Audit Department (MATHIS DEFS 108435-108494) and compared it with the Confidential Data Sheets produced for the Sample Data Opt-Ins in this action (MATHIS DEFS 193341, 193342-194099, 745649-745691). According to these records, of the 22 restaurants identified in the server study, the Sample Data Opt-Ins worked at six as servers during the relevant period: OG 1180; OG 1457; OG 1284; OG 1491; OG 1191; and OG 1192.

6.    I have also personally reviewed the U.S. Department of Labor ("DOL") files produced by Plaintiffs in this matter (DOL 1786-1925) and compared them with the Confidential Data Sheets referenced in Paragraph 5. According to these records, of the 15 restaurants audited for all or part of the

relevant period, the Sample Data Plaintiffs worked at seven as servers and/or bartenders during the relevant period: LongHorn (Bangor, ME – 605 Hogan Road); LongHorn (Brandon, FL – 11102 Causeway Boulevard); LongHorn (Tampa, FL – 2055 North Dale Mabry Highway); Olive Garden (Addison, TX – 4240 Beltline Road); Olive Garden (Greensburg, PA – 1085 East Pittsburgh Street); Red Lobster (Lubbock, TX – 5034 50th Street); and Red Lobster (Tampa, FL – 17021 Palm Pointe Drive).

7.     In addition, I have analyzed the Magic Call Note reports produced in connection with the Sample Data Plaintiffs: MATHIS DEFS 0198170-0198179.  Specifically, with the assistance of Littler's Litigation Support Team, I isolated the subset of these call notes with hits for the following search terms:

- "adjust*"
- "clock-in" OR "clock-out" OR "clocked" OR "clocking"
- "edit*"
- "falsif*"
- "manipulate*"
- "punch*"
- "shave*" OR "shaving"
- "sidework" OR "side work"

This search returned 30 unique "incidents."  Based on my review, 19 discuss issues of alleged "off-the-clock" work (*e.g.*, contested time adjustments, employees admitting to working without clocking in).  An example of one of these call notes (Incident 468453984), with personal identifying information redacted, is attached as Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of June , 2014

Julie O'Keefe

Firmwide:127473580.3 069299.1040

3

**EXHIBIT 8**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER

NICOLE ALEQUIN, *et al.*,                          )
                                                   )
     Plaintiffs,                                  )
                                                   )
v.                                                 )
                                                   )
DARDEN RESTAURANTS, INC., *et al.*,                )
                                                   )
     Defendants.                                  )

**DECLARATION OF C. ELIZABETH MCCARTY IN SUPPORT OF DEFENDANTS'
MOTION FOR PROTECTIVE ORDER IN CONNECTION WITH PLAINTIFFS' FIRST
SET OF REQUESTS FOR PRODUCTION, SECOND SET OF REQUESTS FOR
PRODUCTION, FIRST SET OF INTERROGATORIES, AND RULE 30(B)(6)
DEPOSITION NOTICE**

I, C. Elizabeth McCarty, declare as follows:

1.     I am currently employed as Vice President of HR Business Excellence for Darden Restaurants, Inc. and its subsidiaries (collectively "the Company").

2.     Except where otherwise indicated, I have personal knowledge of the facts set forth in this declaration, or knowledge based upon consultation with members of the Company's Human Resources and Information Technology Teams, or knowledge based upon personal review of corporate records (1) made at or near the time by, or from information transmitted by, someone with knowledge; (2) kept in the course of regularly conducted business activity; and (3) made as part of a regular practice of that activity.

**Personnel Files**

3.     Personnel files are maintained in hard copy at the restaurant location where a server or bartender works or last worked. The size of a personnel file varies from employee to employee, but generally ranges between approximately 30 and 80 pages.

4.      The litigation collection process involves the Restaurant Support Center ("RSC") contacting the individual restaurant, at which point restaurant management will search for the personnel file and, if it locates the file, overnight it to the RSC.   We utilize overnight service, which costs between approximately $15 per file, to track the file's location while in route.

5.      Upon receipt, RSC personnel review the file and prepare it for production, including removing staples, rescanning loose sheets on 8.5 x 11" paper, and redacting certain identifying information.  The RSC scans the personnel file into its system for transmission to the Company's outside legal counsel and overnights the file back to the restaurant.  The processing time between receiving the file at the RSC and transmitting it to outside counsel will vary but could take one hour or more.

6.      Assuming 40,000 personnel files, the collection efforts could cost the Company approximately 40,000 manpower hours and up to $600,000 in mailing expenses just to obtain the file, not including an equal amount to the cost return the files to the restaurant.

## Work Schedules

7.      Certain restaurants may, but do not always, maintain scheduling information in hard copy form.   Otherwise, the scheduling data is maintained in the electronic Labor Management System ("LMS").

8.      To extract scheduling data for 40,000 employees, the Company would need to create an input file with employee identification numbers and import it into both the main and archived LMS databases.  The Company would then need to create a "primary key" on employee identification numbers to make the searches run faster when joined with the scheduling tables. The Company would next need to write a query to join the tables together and extract the desired employees' schedules, also pulling any older schedules from the archive database.

9.      The amount of time to create and test this query is approximately 16 development hours.  The estimated run time is 2-4 hours.

2

## Timekeeping and Payroll

10.     The Company maintains electronic clock-in/clock-out data in PeopleSoft for nine months and electronic wage compensation data in PeopleSoft for two years.   The Company archives older data in an Outerbay tablespace.

11.     Assuming 40,000 employees, the Company cannot simply run one search across these databases and secure all responsive clock-in/clock-out and wage compensation data.  To do so would significantly interfere with the Company's weekly payroll and backup schedules due to the extremely large volume of data processing time required.

12.     The Company's payroll schedule runs from Monday at 12:00 a.m. through late Tuesday evening, and its backup schedule runs from 4:00 a.m. to 4:30 a.m. on Friday morning. Therefore, the Company can only pull clock-in/clock-out and wage compensation data during the following periods: 12:00 a.m. on Wednesday to 4:00 a.m. on Friday and 4:30 a.m. on Friday to 11:59 a.m. on Sunday.

13.     Running  such  voluminous  data  for  a  large  number  of  employees  can  cause significant degradation in system performance.  As a result, the Company would need to pull the data in batches over an extended period.  Running a batch of 100 employees will take at least two hours.  Given the approximately 120 hours of available run time per week, it would likely take more than 6 weeks to complete this data pull for 40,000 individuals (6,000 individuals per week), assuming  no  unexpected  technical  issues  or  disruptions  to  the  Company's  PeopleSoft users.  The Company would still need to perform test runs on the batches to verify these estimates, which may be even greater.

## Punch Edit Data

14.     Because  all  of  the  restaurant  locations  implicated  in  this  litigation  (where Plaintiffs and Opt-Ins worked during the relevant time) are presently unknown, one needs to make two assumptions when estimating the time to extract punch edit data from the DASH system: (1) the Company will retrieve punch edit data for 2,000 restaurants back one year; and

(2) all restaurants placed on litigation hold have one years' worth of data (ordinarily, in the absence of a litigation hold, restaurants have only 90 days of retrievable DASH data).

15.     The Company's retention process pulls a copy of the restaurant database every six months in its native format and date stamps the database file; this database file is then placed in a secure network folder.  As an example, for any restaurant on litigation hold for one year back, the Company would have two database files on its network (one for every six months).  To recover the requested data, the Company would need to complete two steps:

- First: the Company would need to mount or install the database file on a lab system so it can extract the requested data.  The estimated time for this process is 10-15 minutes per database file.

- Second: the Company would need to run a query to search for any employee who is part of the litigation and extract the requested information from the database file.  The estimated runtime for this query is 5 minutes per database file.

16.     Assuming a restaurant has been on litigation hold for one year, it would have two files to process and a total time of 40 minutes to complete.  Extrapolating the per-restaurant estimate of 40 minutes across 2,000 restaurants results in approximately 1,300 hours of work. Therefore, if one full-time RSC employee was responsible for processing this data, it would take him or her at least 30 weeks to complete it.

### Cash-Out Information

17.     Any hard copies of cash out information would consist of a summary of each employee's transactions for the shift, which are compiled with those for all servers and bartenders for a particular location, and are sent to Iron Mountain.  They are stored in boxes, which are organized by restaurant location and date; they are not organized by employee.  To retrieve a particular employee's cash out information, the Company would need to determine the location(s) where the employee worked during the relevant period as well as the time frame during which he or she worked at a particular location.  The Company would then need to pull the items from storage at a fee ($15.42 per retrieved box) and manually search through the

4

receipts, which could take up to 2 to 3 hours per box. Assuming that at least one box must be retrieved for each of the more than 2,000 restaurant locations (which is very conservative because each box contains only one or two months' worth of receipts), this would cost more than $30,000 in storage fees and up to 6,000 hours of review time. The Company also maintains cash out information in electronic form. To obtain the data, however, the Company would need to coordinate with its IT Team to run separate reports for each individual by employee identification number and, if the number of individuals is substantial (*i.e.*, 40,000 employees), the process will require a significant number of manpower hours to initiate the reports and a large amount of time to complete the run process. Assuming 40,000 employees, we estimate this process will consume 1,300 manpower hours and take a total of at least 30 weeks to complete.

### Food and Drink Orders

18.     The Company maintains hard copies of guest checks off site using Iron Mountain. The checks are organized by restaurant location and date; they are not organized by employee. Credit card receipts are maintained in hard copy, and cash receipts are summarized on a Daily Conciliation Report. To retrieve a particular employee's guest checks, the Company would need to determine the location(s) where the employee worked during the relevant period as well as the time frame during which he or she worked at a particular location. The Company would then need to pull the items from storage at a fee ($15.42 per retrieved box) and manually search through the receipts, which could take up to 2 to 3 hours per box. Assuming that at least one box must be retrieved for each of the more than 2,000 restaurant locations (which is very conservative because each box contains only one or two months' worth of receipts) this would cost more than $30,000 in storage fees and up to 6,000 hours of review time. Moreover, the receipts do not include the full employee name, which makes it difficult to confirm that a particular employee placed a specific order, especially for employees with more common names.

19.     The Company also maintains guest check information in its data warehouse for two years. This data is organized into separate database tables for each brand and separated into (1) header level data, (2) line item data, and (3) tender or payment data.

20.     Given the large number of individuals for whom this data is sought, there are two collection options:

- First: the Company could produce all guest check data at which point the recipient would need to manually locate and pull the data for the at-issue employees. The recipient would need training to understand the fields and have adequate storage space to house the data.

- Second: the Company could provide data for Plaintiffs and the 40,000 individuals estimated to opt into the litigation. To do so, the Company would need to extract the data for these particular individuals. These extractions could yield well over one billion rows of data. Given the likely volume of material, as well as timing and resource constraints due to production schedules and ongoing development projects, collecting and producing this data would take approximately 200 manpower hours to complete and would not be ready for production for at least four weeks.

21.     Whether produced in hard copy or electronic form, the guest check data will not necessarily reflect an employee's first or last check and is not a useful source of such information.

<u>**Duties and Responsibilities**</u>

22.     There is no effective method to confirm the duties and responsibilities of each and every server and bartender at Bahama Breeze, LongHorn, Olive Garden, Red Lobster, and Seasons 52.

23.     Although these positions generally have job descriptions and certain restaurant locations have additional guidelines (*e.g.*, sidework charts), these materials are not an exhaustive list of each task actually performed. As a result, the only way to determine every duty and responsibility, including the nature of the duty and responsibility, is to confirm the tasks performed by each server and bartender at each restaurant. Obtaining this information would therefore likely require not only interviews with restaurant-level managers but the servers and bartenders themselves. Likewise, information regarding the amount and proportion of time a

6

particular task does, or is expected to, take, and any monitoring efforts, if any, is specific to each employee, shift, manager, and location, among others.

24.  These issues are not unique to servers and bartenders.  The duties of other positions, including hourly, management, and corporate-level roles, are not limited by written job descriptions, to the extent such descriptions are used at all.  Rather, to properly determine the duties of a particular employee, one would need to not only review any relevant written materials, which could include an array of documents beyond job descriptions, but conduct interviews of supervisors and/or the employees themselves to confirm this information.

25.  Given the number of employees and the time necessary to collect all information regarding their duties, this process could take thousands of manpower hours to complete.

## Server and Bartender Communications

26.  Recorded communications, including complaints, are generally maintained in either Employee Relation's call reports or DiSH messages.

### Call Reports

27.  In order to obtain call reports, one would need the employee identification number of the individuals who placed, or were the subject of, a call.  Even if this data for multiple employees is consolidated on a spreadsheet, one would need to program the Magic system to ensure it will generate call reports pertaining to all of those individuals.  This programming will likely take at least one hour.

28.  Entering the employee identification numbers into the system will generate a large spreadsheet including multiple entries for each call report regarding each queried individual.  Call reports may include attachments, in which case the spreadsheet will note this fact.  One would then need to individually query the Magic system by employee ID to access and print these attachments.  To look up and download attachments could take approximately an hour for each call that has associated documents.  Generating the spreadsheet of call reports for approximately 40,000 employees will take approximately16 manpower hours, and locating and

7

pulling any attachments could add a significant amount of time for each individual whose call notes reflect an attachment.

29.     To locate call reports on specific wage-and-hour issues, such as off-the-clock work, sidework, and overtime, one would need to review the individual spreadsheet entries for each individual because the call reports are not coded by these issues and running a Find search using these keywords will not necessarily yield a complete and accurate set of call reports involving such issues.  One would also need to separately review each attachment to confirm whether it addresses off-the-clock work, sidework, or overtime.

### DiSH Messages

30.     The Company ordinarily maintains only the last 40 days of messages in the DiSH database.  One brand, Olive Garden, does not maintain messages in the database but instead submits them via Outlook.

31.     To extract DiSH messaging data for 40,000 employees, the Company would first need to create an input file with employee identification numbers and write a C#.Net console application to process the data on these employees, extracting their network identification numbers from the active directory.  This process is necessary because the DiSH messaging database does not contain employee identification numbers, only network identification numbers.

32.     The Company would next need to import the resulting file into the DiSH messaging database.  Then the Company would need to create a "primary key" to allow the searches to run faster when joined with the messaging table.  At that point, the Company would need to write a query to join the tables and extract the DiSH messages.

33.     The estimated time to create and test the query is 32 development hours and the run time is estimated at between two and four hours.  However, the Company would need to search through the messaging, likely using a combination of search terms and manual review, to determine whether the communications related to a particular time frame, topic, etc., which could take one or more days given the potential number of employees for whom data is sought.

8

**Back Payments**

34.     Information and documentation of back payments made to employees are not maintained in any single database.  This information may be located in a number of different sources, including internal U.S. Department of Labor files and Employee Relations files housing acknowledgments signed by employees.   Employee Relations maintains a spreadsheet identifying by name, restaurant location, and payment amount each employee who received back payments since the inception of this lawsuit.  However, it includes every employee, not just servers and bartenders at particular brands.  Therefore, to locate information and documentation on these payments, one would not only need to cross-reference this spreadsheet to locate the relevant employees, but consult every personnel file and other materials, including internal U.S. Department of Labor files.  Even if done in conjunction with the collection and production of personnel files, this process would likely take at least an additional one-half hour for each employee (20,000 hours assuming 40,000 employees).

**Manager Discipline and Termination**

35.     There is no effective method to electronically search for and locate information and documentation on restaurant-level managers disciplined or terminated for allowing employees to work off the clock or perform excessive sidework, or engaging in misconduct to avoid paying overtime.

36.     Neither the termination records nor disciplinary records are coded in a manner that allows someone to readily search for actions taken based on these particular forms of misconduct.  Instead, one would need to speak with the numerous Directors of Operation overseeing the various restaurants and inquire about these issues for managers working under them during the relevant period.  Some Directors of Operation may retain termination reports, but most do not.  As a result, based on this communication, one would then need to review the personnel files of each manager to locate additional information and documentation regarding any such discipline or termination.  Not every current Director of Operations is still employed, however.  Therefore, to ensure no relevant disciplinary action or termination is missed, one

9

would likely still need to review each and every personnel file of each and every manager overseeing the at-issue brands during the relevant period.

37.     Given the number of Bahama Breeze, LongHorn, Olive Garden, Red Lobster, and Seasons 52 restaurant locations (approximately 2,000), each with its own management team of 3 to 6 managers per location (which team may have changed during the relevant time period), and the likely amount of time necessary to confirm this information for those managers (approximately two hours each), collecting this information and documentation would likely take at least 4,000 manpower hours.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this *25th* day of *September*, 2013

*C Elizabeth McCarty*

C. Elizabeth McCarty

Firmwide:123239294.2 069299.1040

10

**EXHIBIT 9**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

~~CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER~~

NICOLE ALEQUIN, *et al.*,                )
                                         )
    Plaintiffs,                      )
                                         )
v.                                       )
                                         )
DARDEN RESTAURANTS, INC., *et al.*,      )
                                         )
    Defendants.                      )
                                         )

### DECLARATION OF RANDY BABITT IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

I, Randy Babitt, declare as follows:

    1.    I am currently employed by Darden Corporation as the Director of Payroll. In this role, I am responsible for payroll functions for GMRI, Inc. ("GMRI"), the employer of all employees working at Bahama Breeze, LongHorn Steakhouse, Olive Garden, Red Lobster, and Seasons 52 restaurants. In this capacity, I serve as an authorized custodian of GMRI's records relating to human resources practices and policies, including, but not limited to, payroll records. Except where otherwise indicated, I have personal knowledge of the facts set forth in this declaration or knowledge based upon personal review of corporate records (1) made at or near the time by, or from information transmitted by, someone with knowledge; (2) kept in the course of GMRI's regularly conducted business activity; and (3) made as part of a regular practice of that activity.

    2.    Since September 2009, there have been approximately 36 Bahama Breeze restaurants in 17 different states. These may include closures and/or relocated restaurants. Since

at least September 2009, the following categories of employees working at Bahama Breeze restaurants have received the tip credit wage rate: servers; bartenders; food runners; and barbacks.  Approximately 9,587 employees have worked in these positions at Bahama Breeze since September 2009.

      3.    Since September 2009, there have been approximately 456 LongHorn restaurants in 30 different states.  Of these, some may be closed and/or relocated locations.   Since at least September 2009, the following categories of employees working at LongHorn restaurants have received the tip credit wage rate: servers; bartenders; and service assistants.  Approximately 59,666 employees have worked these positions at LongHorn since September 2009.

      4.    Since September 2009, there have been approximately 836 Olive Garden restaurants in 49 different states.  Of these, some may be closed and/or relocated locations. Since at least September 2009 until March 2011, servers were the only category of employees working at Olive Garden restaurants who received the tip credit wage rate.  After March 2011, bartenders and bussers at Olive Garden restaurants also received the tip credit wage rate. Approximately 184,004 employees have worked these positions at the Olive Garden since September 2009.

      5.    Since September 2009, there have been approximately 690 Red Lobster restaurants in 44 different states.  Of these, some may be closed and/or relocated locations. Since at least September 2009 until March 2011, servers were the only category of employees working at Red Lobster restaurants who received the tip credit wage rate.  Between March 2011 and July 2012, the following categories of employees working at Red Lobster restaurants received the tip credit wage rate: servers; bartenders; and bussers.  Since July 2012, the following categories of employees working at Red Lobster restaurants have received the tip

credit wage rate: servers; bartenders; and service assistants.  Approximately 120,720 employees have worked these positions at Red Lobster since September 2009.

6.   ~~Since September 2009, there have been approximately 32 Seasons 52 restaurants~~ in 18 different states.  Since at least September 2009, the following categories of employees working at Seasons 52 restaurants have received the tip credit wage rate: servers; bartenders; and food runners.  Approximately 5,190 employees have worked in these positions at Seasons 52 since September 2009.

7.   Since September 2009, and across the five brands, approximately 299,458 employees have worked as servers and/or bartenders, and an additional approximately 79,709 have worked in one or more of the other above-listed positions.

8.   The employee numbers set forth above are estimates based on GMRI's payroll records.  The data was pulled from our internal records based on job codes.  Because some job codes no longer exist (ex: bussers at Red Lobster), there may be additional employees who worked in that job code at some point but were either no longer employed when the position was eliminated or transitioned into another job code, such as service assistant.  In order to provide conservative estimates, none of those employees were included in the counts above.  In addition, certain employees, for example, may have worked in the same position at two different brands or held two different positions at the same brand.  Furthermore, with respect to Red Lobster service assistants, some Red Lobster servers transitioned to that role and other individuals, who did not previously work at a Red Lobster, were directly hired into the position.  Consideration of these terminated and duplicate employees may increase or reduce the employee numbers cited.

9.   Since at least September 2009, bartenders and bussers at Olive Garden and Red Lobster restaurants in the following states have received at least the federal or state minimum

3

wage, whichever is higher; they have not received the tip credit wage rate: Delaware; Kentucky; Maine; Michigan; New Hampshire; North Dakota; and Wyoming.   Regardless of brand, all ~~employees, including servers, bartenders, food runners, bussers, service assistants, and barbacks,~~ in the following states have received at least the federal or state minimum wage, whichever is higher, since at least September 2009; they have not received the tip credit wage rate: Alaska; California; Minnesota; Montana; Nevada; Oregon; and Washington.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17 day of MAY                , 2013

Randy Babit

Randy Babit

Firmwide:120162911.1 069299.1040

4

**EXHIBIT 10**

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 61742-CIV-ROSENBAUM/SELTZER

NICOLE ALEQUIN, TESHIURE AMOS,
et al,

      Plaintiffs,

vs.

DARDEN RESTAURANTS, INC.,

      Defendants.

_____/


111 North Magnolia Avenue
Orlando, Florida
10:00 a.m. - 1:21 p.m.
May 12, 2014


VIDEOTAPE DEPOSITION OF:

CHRISTINE WILSON

Volume I


      Taken on behalf of the Defendant before Nancy M. Wingo, RPR, RMR, Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition in the above cause.

Page 4

```
 1   THEREUPON:

 2             THE VIDEOGRAPHER:  My name is Mike Gerlach of

 3        Veritext Legal Solutions.  The date today is May

 4        12, 2014.  The time is 10 a.m.  This deposition is

 5        being held in the law office of Littler Mendelson

 6        -- Mendelson, pardon me, located at 111 North

 7        Magnolia Ave., Orlando, Florida.  The caption of

 8        the case is Nicole Alequin, et al.  The name of

 9        the witness is Christine Wilson.

10        At this time, attorneys will identify

11        themselves and the parties they represent, after

12        which our court reporter, Nancy Wingo, also of

13        Veritext, will swear in the witness and we

14        proceed.

15        MR. PEARLMAN:  Peter Pearlman, Cohn, Lifland,

16        Pearlman, Herrmann & Knopf.  I represent the

17        plaintiffs.

18        MR. LEHET:  Mike Lehet, Littler Mendelson on

19        behalf of the defendants.  Also with me is Dawn

20        Rodda from Darden legal.

21   THEREUPON:

22                   .   CHRISTINE WILSON,

23   a Witness herein, having first been duly sworn, was

24   examined and testified on her oath as follows:

25             THE WITNESS:  I do.
```

Page 19

1    according to our standards, that they were performing

2    the -- their interactions with the guests according to

3    our standards.  So telling them about featured specials,

4    timely bringing them food and drink items, giving them

5    coaching and direction if they were not meeting those

6    expectations.

7        Q     You said that they were -- you said one of

8    the things that the managers did with respect to the

9    servers and bartenders was to make sure that they're

10   performing their services according to standards.  Are

11   these standards written down someplace?

12       A     I'm not 100 percent sure that they're written

13   down in all brands.  I can tell you that they are

14   written down for Bahama Breeze today.

15       Q     What about during the time that you were the

16   director of employee relations or a director of employee

17   relations?

18       A     I'm not 100 percent sure if the steps of

19   service would be written down for all brands.

20       Q     Who is above the manager?  Who's the person

21   that's directly above the manager?

22       A     For Olive Garden?

23       Q     And, again, when I say "is," I mean during

24   the period of time that you were the director of

25   employee relations.

Page 20

```
 1      A      For Olive Garden, the next level supervisor
 2  is the general manager.  For Specialty Restaurant Group,
 3  the titles vary, based on the brand.  Some brands are
 4  also general manager, others are managing partner.
 5      Q      And are you aware, for any of the other
 6  restaurants, who are above the managers?
 7      A      Yes.  At Red Lobster, the title is general
 8  manager and at LongHorn the title is managing partner.
 9      Q      To your understanding, did, during the period
10  of time that you were the director of or a director of
11  employee relations, did the functions of general manager
12  at Olive Garden, general manager at Red Lobster,
13  managing partner at LongHorn and either general manager
14  or managing partner at Specialty Restaurants differ or
15  were the functions generally the same?
16      A      I'm not comfortable saying for sure if their
17  functions were the same, with any level of detail.  The
18  brands vary significantly in what the expectations might
19  be, and that's not an area that I would be an expert in.
20  That would be led and driven by the operations
21  leadership team.
22      Q      Let's confine ourselves then to the functions
23  of the general manager or managing partner in connection
24  with their supervision of the servers and bartenders.
25  In connection with their supervision of the servers and
```

1    performance and disciplinary standards?

2        A     I don't recall specifically preparing that,

3    but I know that that particular document was part of the

4    recommitment at that time.

5        Q     What was the purpose of the recommitment, the

6    2010 recommitment?

7        A     As I understand the purpose of the

8    recommitment process was to, yearly, have our managers

9    review, refresh, have an opportunity to ask questions

10   around some of our standards and policies and procedures

11   and then to acknowledge that they went through the

12   process.

13              MR. PEARLMAN:  Exhibit 1, please, Wilson 1.

14              (Wilson Exhibit 1, E-mail and Performance and

15   Disciplinary Standards, marked for Identification.)

16              MR. PEARLMAN:  I apologize.  I didn't know

17          there were going to be two of you today.  I only

18          brought one copy of the exhibits.

19              MS. RODDA:  That's okay.

20   BY MR. PEARLMAN:

21       Q     Exhibit 1 is a multi-page document, the first

22   page of which is an e-mail from you to something

23   referred to as DL-OG SVPs, and it runs from Document

24   Number 281671 through 281685.  Do you recognize this

25   document?

1 Q Generally?

2 A It's hard for me to answer that because I've

3 never specifically talked with anyone about why they

4 chose to do it.

5 Q They, being the -- the employee or the

6 manager?

7 A Whomever.  If it was an employee who decided

8 to work off of the clock or if it was a manager that,

9 you know, did something to violate one of these

10 standards.  I've never specifically had a conversation

11 with anybody about why they did it.

12 Q Well, weren't you curious to know why it was

13 being done?

14 A No.

15 Q It wasn't important to you in connection with

16 your preparation of these policies?

17 A No.  It was a very clear standard that, you

18 know, it was, you know, something that we were clear

19 about, that if you violate these standards, these

20 policies, that it could result in severe disciplinary

21 action, up to and including termination.

22 Q Did you have an understanding that the reason

23 that managers would have employees work off the clock

24 was to save an employee hours?

25 A I could speculate that that could be a reason

1            in the termination of a -- of a manager or general

2       manager.

3    BY MR. PEARLMAN:

4       Q      Why would not paying for time worked carry a

5    higher level of risk?

6       A      Because that's a policy that the company felt

7    very strongly about.  And it's something that, if it

8    were deemed to be true, in my experience, almost always

9    resulted in disciplinary action and, most frequently,

10   resulted in termination.

11      Q      Well, you're talking about a higher risk to

12   the employee or a higher risk to the employer?  You're

13   talking about, here, in these categories, a higher risk

14   to Darden, aren't you?

15      A      I mean, they're just high -- these are issues

16   where if the -- if it was found in the facts of the

17   investigation that the person violated our policy, they

18   would, typically, result in severe disciplinary action

19   and, often, termination.  So risk is, I would say -- I

20   use that term broadly -- to mean that the risk of losing

21   a manager, it could be just the risk that something

22   could become a large issue involving multiple people or

23   multiple managers.  You could also use the word, maybe,

24   "complicated" or more that would require a higher level

25   of -- an in-depth investigation and things like that.

Page 124

1     A     Yes.  I think that they -- they were all

2  recommended that they go through employee relations

3  because these are issues that we would want to provide

4  counseling and input on.

5     Q     Did you have an understanding that these

6  issues were all company-wide issues?

7          MR. LEHET:  Form.

8          THE WITNESS:  They are all issues that could

9      potentially arise at any time, at any given

10     restaurant.  I don't know that any of them

11     actually had arisen or were in the midst of going

12     on at any particular restaurant.

13  BY MR. PEARLMAN:

14     Q     You knew, however, that the issue of not

15  paying for time worked and employee -- asking employees

16  to wait to clock in were occurring at a number of

17  restaurants at that point, did you not?

18          MR. LEHET:  Form.

19  BY MR. PEARLMAN:

20     Q     As of September, 2012?

21          MR. LEHET:  Same objection.

22          THE WITNESS:  I was aware and am I aware that

23     there have been a few issues that have come up in

24     Darden Restaurants involving those issues, yes.

25          MR. LEHET:  So, Peter, I think now might be a

Page 126

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 61742-CIV-ROSENBAUM/SELTZER

NICOLE ALEQUIN, TESHIURE AMOS,
et al,

      Plaintiffs,

vs.

DARDEN RESTAURANTS, INC.,

      Defendants.

_____/


                  111 North Magnolia Avenue
                  Orlando, Florida
                  1:54 p.m. - 5:50 p.m.
                  May 12, 2014


VIDEOTAPE DEPOSITION OF:

CHRISTINE WILSON

Volume II



      Taken on behalf of the Defendant before Nancy M. Wingo, RPR, RMR, Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition in the above cause.

Page 142

```
 1      A      Not that I know of, no.

 2      Q      Okay.  Go ahead.  Answer the question.

 3      A      So the answer to your question is:  No, I was

 4  not aware that there was a legal obligation.

 5      Q      Did you subsequently become aware of that?

 6      A      No.

 7      Q      The -- why -- why was Darden only going to

 8  pay current Darden employees this back pay?

 9      A      That was our practice, to pay current

10  employees, when we realized that anyone was owed money.

11      Q      You felt these people were owed money, these

12  current employees were owed money, for this back pay; is

13  that right?

14      A      We felt like --

15      Q      I think you just said you felt they were owed

16  money, right?

17             MR. LEHET:  Form.

18             THE WITNESS:  We -- we felt that they were

19         not paid all of the money that they should have

20         been paid according to what the brand leadership

21         had intended them to be paid.

22  BY MR. PEARLMAN:

23      Q      Do you think that the brand leadership -- did

24  you think that the brand leadership only intended for

25  people that were going to stay at Darden indefinitely,
```

Page 144

```
 1         pretty standard across the board with any types of
 2         issues.  It was not a general practice in employee
 3         relations for us to proactively contact a former
 4         employee.  But in the event that a former employee
 5         was to contact employee relations, we would always
 6         investigate their concerns or theirs question
 7         completely.  And so we followed that same protocol
 8         with relation to this particular issue and we did
 9         ask through our communications, we did ask -- or
10         we would typically do it -- to have, if any
11         current employee was aware of a former employee
12         that felt like they had a complaint, a question or
13         a concern about anything, including the way that
14         they were paid, to contact employee relations so
15         that we could look into it.
16   BY MR. PEARLMAN:
17      Q     Would you read that back, please.
18            (The answer was read by the reporter.)
19            MR. PEARLMAN:  Okay.  Thank you.  That's
20         fine.
21   BY MR. PEARLMAN:
22      Q     You said that this approach was pretty
23   standard across the board with any type of issues.  Was
24   it, then, standard across the board for all Darden
25   Restaurants, as you understood it?
```

1      A      That's what it looks like.

2      Q      And therefore, they weren't getting paid; is

3   that right?

4      A      Yes, that's right.  If they were there at the

5   scheduled time and they were unable to clock in, they

6   wouldn't be getting paid.

7      Q      Do you know what was done to -- withdraw

8   that.

9              Do you know whether anything was done to --

10  to see that these people got paid?

11              MR. LEHET:  Form.

12              THE WITNESS:  I don't recollect,

13        specifically.

14  BY MR. PEARLMAN:

15      Q      Do you recollect generally?

16      A      I would say that whenever it was discovered

17  that employees were not paid properly, according to our

18  policies and standards, that they were made whole and

19  paid for that time that they should have been paid for.

20      Q      But only current employees, not ex-employees;

21  is that right?

22      A      Only ex-employees if they came forward and

23  contacted us.

24      Q      No effort was made to contact ex-employees;

25  is that right?

Page 247

```
 1   that they were sitting there; is that correct?

 2              MR. LEHET:  Form.

 3              THE WITNESS:  According to our policies, they

 4         should have been paid, yes.

 5   BY MR. PEARLMAN:

 6      Q      Do you know whether -- what the result of the

 7   investigation ultimately was?

 8      A      It looks like we terminated or recommended

 9   termination for Amy Meads.  I do not remember what we

10   did with regard to Jennifer Williams, as far as

11   disciplinary action goes, and I'm not sure about any

12   other managers.

13      Q      Do you know whether any of the employees were

14   paid back pay?

15      A      I don't know.

16      Q      Have you seen any documents that suggested to

17   you they were given back pay?

18      A      No.

19      Q      Now, there were a number of other

20   investigations as well that we have not yet touched on;

21   is that correct?

22              MR. LEHET:  Form.

23              THE WITNESS:  There were hundreds of

24         thousands of investigations done in my time.

25
```

Page 255

```
 1      A     Excuse me.  Before you go on, can I add
 2   something?
 3      Q     Yes.  Yeah, sure.
 4      A     I do remember that I believe this incident
 5   resulted in all or almost all of the managers at that
 6   Bahama Breeze being terminated.
 7      Q     The next item is -- deals with a Red Lobster
 8   in Danville, Virginia, correct?
 9      A     Yes.
10      Q     And that investigation revealed that the
11   director of operations was talking to an employee about
12   an unrelated issue and found that a back -- BOH is back
13   of house?
14      A     Yes.
15      Q     That a back of house employee was clocking
16   out and doing server sidework.  See that?
17      A     Yes.
18      Q     Now, the next section deals with current
19   investigations, those that were -- the ones we just
20   dealt with were those that were resolved prior to
21   October 10th of 2011; is that right?
22      A     It looks like they all have a closed date of
23   sometime in 2011.
24      Q     Or '10 maybe.  No.  Maybe '11.
25      A     Looks like '11, '11, '11.  It looks like they
```

1   I believe Mr. Pearlman had asked you if you felt that

2   allegations -- whether the substance of those

3   allegations that were made, whether that was important

4   to you.  And if I recall correctly, you said no.  Would

5   you be able to explain a little bit more what you meant?

6          MR. PEARLMAN:  Object to the form of the

7      question.

8          THE WITNESS:  I think I remember what you're

9      referring to.  And the -- we have an open-door

10     policy.  So any employee, at any level within the

11     company, can bring forward a complaint or a

12     concern at any time, and they do from time to

13     time.

14         And those complaints or concerns can be

15     anything from, you know, my manager doesn't like

16     me because I'm short to, you know, a more involved

17     allegation, like a claim of harassment,

18     discrimination or, like, a wage and hour example,

19     which was the example in question.  And so all of

20     those allegations, when they come to the employee

21     relations team, are handled with the same level of

22     importance.  And so when it's an allegation,

23     that's not something that I would necessarily feel

24     like was super important, because they're all

25     important.  So if it was an issue just around wage

**EXHIBIT 11**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER


NICOLE ALEQUIN, TESHIURE AMOS,
et al,

     Plaintiffs,

vs.

DARDEN RESTAURANTS, INC,
et al,

     Defendants.

_____/


                                  Littler Mendelson
                                  111 N. Magnolia Avenue
                                  Suite 1250
                                  Orlando, Florida
                                  Tuesday, 3:32 p.m.-6:09 p.m.
                                  March 18, 2014



                     DEPOSITION OF PAUL LIVRIERI


       Taken on Behalf of the Plaintiffs before

Lisa Gerlach, Court Reporter, Notary Public

in and for the State of Florida at Large,

pursuant to Plaintiffs' Notice of Taking

Deposition in the above cause.

Page 6

1    THEREUPON,

2                        PAUL LIVRIERI,

3         A Witness herein, acknowledged after having

4    been duly sworn and testified upon his oath as

5    follows:

6              THE WITNESS:  I do.

7                     DIRECT EXAMINATION

8    BY MR. TRIEF:

9         Q.  Good afternoon.

10        A.  Good afternoon.

11        Q.  Do you know who I am?

12        A.  Uh-huh.

13        Q.  My first instruction is going to be then, if

14   you going to answer a question yes or no, to say the

15   word "yes" or "no."

16        A.  Certainly.

17        Q.  If you would like -- if you would -- even if

18   you understand a question that I'm asking before I

19   complete it, wait until I'm done before you answer it.

20   Is that all right?

21        A.  Yes.

22        Q.  If you don't understand a question, please

23   let me know.  I'll be happy to rephrase it.  But if

24   you do answer it, I will assume you understand it.

25   Okay?

Page 12

1   forecast the business of the day.  So it looks at

2   the -- not just the number -- the total number of

3   guests, but the time periods throughout the day when

4   those guest will be arriving.

5           What the LMS does, or the Labor Management

6   System does, it allows us to look at the flow of the

7   upcoming business and match it with the availability

8   of our staff, so that we can thereby write a schedule

9   that allows us to have the employees there when the

10  guests are there and run a profitable business.

11      Q.  So the LMS system is computer-based, correct?

12      A.  That is correct.

13      Q.  And it looks at the historical data to

14  predict prospective information?

15      A.  Correct.

16      Q.  And it could be set up to look at different

17  periods of time in the past to make predictions?

18      A.  That is correct.

19      Q.  And that is a system that's used by every

20  Longhorn restaurant, correct?

21      A.  That is our standard -- that is a standard

22  for our brand is that -- and our policy -- that LMS is

23  the scheduling tool we use to write our schedules.

24      Q.  So the manager -- let me just take that back.

25  Does the LMS system make recommendations to the

Page 23

1    partner and then the three assistants would report to

2    that managing partner.

3        Q.  The managing partner would be the most senior

4    person who's in the restaurant on a daily basis?

5        A.  Correct.

6        Q.  What is the employee break and meal exception

7    report?

8        A.  That would be a report that talks about when

9    an employee is given a break, from a labor standpoint,

10   so that they could enjoy an employee meal.  In certain

11   states, by law, you have to give certain break time.

12   I don't really have too many of those in my particular

13   area.  I'm not a subject matter expert by any means.

14       Q.  So the break in meal exception is one report

15   and it involves just a meal break?

16       A.  Correct.

17       Q.  What is labor threshold/overtime report?

18       A.  The labor threshold/overtime report allows us

19   to watch hourly employees to see exactly how many

20   hours that they've incurred during the course of the

21   week.  Any employee that works in excess of 40 hours

22   is paid overtime.

23           So the threshold lets us know when these

24   employees are getting close to that time, so, if we

25   can -- and we're able to make a good financial

Page 24

1   decision by pulling those employees and redistributing

2   employees to cover those particular hours, so we can

3   deliver the great experience to the guests and still

4   minimize or eliminate the overtime.  That's how we

5   would use that particular report.

6       Q.  So that report tries to give you advanced

7   warnings so you can avoid an overtime issue before it

8   occurs?

9       A.  Well, it allows us to let us know when we're

10  getting close to overtime.  In many cases, we don't

11  avoid overtime.  In many cases, it's the right

12  business decision.  But it allows us to make the best

13  business decision we can based on the circumstances.

14      Q.  And the punch edit report tells you when

15  there's been changes made to the records?

16      A.  Yes.  The punch edit report basically tells

17  any time that a manager has had to go in and either

18  sign an employee in or change a time.  So that allows

19  us to keep a record to see that, when in fact a time

20  has been affected by an employee that has been done by

21  anyone other than the employee, which would be by the

22  manager.

23      Q.  And when is a punch edit report used?  When

24  do you need to make changes to the times?

25      A.  Well, there are several instances that come

1    out?

2           A.   Yes.

3           Q.   How is that used then?

4           A.   If an employee takes a break and -- they're

5    able to take a break -- I believe that's recorded in

6    the punch edit report.  But in addition to that, if

7    they either fail to clock back in after a break or if

8    they -- if say they're going to break and, for some

9    reason, the manager pulls them back, that would also

10   require a manager to go in and manually edit that at

11   the system -- at the register -- and, therefore, that

12   would be recorded on the punch edit report.

13          Q.   Are these punch edit reports monitored by

14   Longhorn to see if there's any pattern of unusual

15   activity going on with them?

16          A.   Our policy at Longhorn is that the punch edit

17   report is reviewed by the directors of operations

18   whenever they're in a restaurant, in addition to the

19   managing partner reviewing those on a regular basis.

20               So there's the control that the managers on

21   duty should be reviewing the punch edit report every

22   day.  Any time a manager has swiped them in, they're

23   to initial that report.  That is our policy.  Then the

24   directors of operations, during their visits, would

25   also be reviewing those punch edit reports.  And then

1    the regional vice presidents, when they're in

2    restaurants, would also be reviewing the punch edit

3    reports.

4          Q.  What would they be looking for when they're

5    reviewing the reports?  Not the manager, but the

6    people above manager level when they come in and look

7    at it.

8          A.  Well, first and foremost, you'd like to look

9    and make sure the policy is being followed.  Thereby,

10   there's a punch edit report for every day and that the

11   managers have initialled those particular transitions.

12          Secondly, they would be looking for any sort

13   of pattern or anomaly on those reports.  For example,

14   if you've had an employee that's continually late and

15   their name continually shows up on a punch edit

16   report, you would want the director of operations to

17   investigate and find out if in fact there may be an

18   issue with an hourly employee who's routinely late.

19   How is that negatively affecting the business?  And

20   are we doing something to hurt our ability to deliver

21   great experiences?

22          So that's pretty much what they would look

23   for, patterns in that particular regard.

24          Q.  For example, with respect to the example that

25   you gave, if there is an employee who's continuously

1    Q.   Does it know how many employees for what

2  hours were working in the past?

3    A.   No.

4    Q.   That's just made -- that projections is made

5  by the number of guests and other information as

6  opposed to the staffing?

7    A.   Correct.

8    Q.   How does Longhorn ensure that its servers and

9  bartenders are not working off the clock?  What steps

10  are taken other than verbal instructions?

11    A.   We have quite a few policies and procedures

12  in place to ensure that that does not happen, but it

13  really does start with the education of both our

14  managers and our hourly employees on what the

15  expectation is of people being paid for their work.

16         We've established that.  We set a very clear

17  expectation with our hourly employees and managers on

18  what the proper behavior is.

19         The real system that we have that works for

20  us to ensure that is the visits by our directors of

21  operations and our regional vice presidents, to -- not

22  just in reviewing the data and in reviewing the

23  reports, but also in talking to hourly employees,

24  talking to managers and observing behaviors during the

25  shift.

Page 39

```
 1    really hard to move any of these numbers

 2    significantly.  If in fact it was determined that the

 3    managers were doing that, they would lose their

 4    position.

 5         Q.  First time?

 6         A.  Yes.

 7         Q.  Are there examples that you have of that?

 8         A.  I know that it's happened in my world.  I'm

 9    not really here today to give you the specific

10    examples, but yes.

11         Q.  You can't today because you're not prepared

12    today?

13         A.  Correct.

14         Q.  Are employees who work off the clock fired

15    the first time they work off the clock?

16         A.  It depends.

17         Q.  So in the case of a manager, the first time

18    that they allow an employee to work off the clock,

19    they're fired.

20         A.  Correct.

21         Q.  An employee, it depends?

22         A.  Correct.

23         Q.  Again, if I asked you for examples of

24    employees, you'd say the same thing -- you have no

25    examples of employees because you weren't prepared for
```

Page 40

1   that.

2        A.   Correct.

3        Q.   I want to change subject matters for a

4   second.  I want to talk about sidework.  What is

5   sidework?

6        A.   Sidework, as it pertains to the restaurant

7   business, is a common term that we use to talk about

8   the work that's necessary to best serve our guests.

9   Work that's done -- I can give you some examples, but

10  it's work that's done to basically set our servers and

11  bartenders up for success.  It's so that they can

12  better deliver a great guest experience.

13       Q.   Is there sidework that is related to the

14  tip-producing activity and is there sidework that's

15  not related to tip-producing activity?

16       A.   Yes.

17       Q.   What sidework is not related to tip-producing

18  activity?

19       A.   Well, that's a -- I would say it depends.

20  Certain sidework that you could consider would be

21  directly related to the guest delivering tips or

22  generating tips, in one instance, could be work that

23  would not generate tips for another.  I'll give you an

24  example.

25            I'll use the rolling silverware as an

Page 41

1    example.  There are times -- many times -- when the

2    rolling silverware is in direct service to that guest

3    experience.  There's also times when the shift is over

4    and you're trying to set yourself up for the next

5    shift, and I would say that that sidework is probably

6    for alongside the lines of maintenance, because we're

7    not serving guests at that particular time.

8            But most -- I would say the majority of all

9    of the sidework that we ask any of our bartenders or

10   servers to do is done in direct response to generating

11   tips for them.

12       Q.  Do you have any other examples, besides

13   rolling silverware when you're not serving guests, as

14   being non-related sidework?

15       A.  I would say when we ask a bartender to -- at

16   the end of the night -- to take the trash from their

17   specific bar.  There's times when there's creating a

18   clean environment, so that would be considered

19   directly tip-relating, because you don't want somebody

20   sitting there at the bar in a dirty environment.

21           But at the end of the night, when the work is

22   done and they're removing the trash and taking it to

23   the back door, that would probably be considered

24   non-tip-producing.

25       Q.  Are you familiar with the 20 percent rule?

```
 1   when the guest is there, if you don't have the rolled

 2   silverware, now you're bringing silverware, plus a

 3   napkin, to the table and setting it up for the guest

 4   and that's very time-consuming.  So we feel we can

 5   better serve our guests by rolling the silverware, so

 6   it always has an impact on the guests.

 7        Q.  Understood.  Is there any tracking mechanism

 8   that Longhorn has to determine whether a server or

 9   bartender is over the 20 percent rule as defined by

10   you?

11        A.  The tracking system that we have is the -- it

12   really encompassed a few things.  It encompasses the

13   training that we give to our hourly employs, the

14   training we give to our managers, the expectations

15   that we set and the observations that we have within

16   the restaurants.

17             As I stated earlier, with the structure that

18   we have between the directors, the regional vice

19   presidents and the senior vice presidents, for that

20   matter, we're in restaurants.  That's what we do.  So

21   we're constantly evaluating how the work is going.

22             I can tell you that we also have an open-door

23   policy with our hourly employees that they understand.

24   We're very much open about that policy.  We talk about

25   it during orientation.  We talk about it during their
```

1    training.  We actually have it posted in the

2    restaurants what the policy is with the phone numbers

3    of the directors, to call if they have any questions

4    or concerns that, what they were being told and what

5    they were being promised when they first came on

6    board, is not what we're living up to on a day-to-day

7    basis.  It's a big part of our culture.

8              So the mechanism that we have to ensure that

9    the 20 percent is really observation.  And I can just

10   say, even from my observations, the sidework that they

11   do -- the amount of work that they do -- far exceeds

12   the -- is less than the 20 percent.

13        Q.  That's your impression from your

14   observations?

15        A.  Absolutely.

16             (Exhibit 30 was marked for

17        identification.)

18   BY MR. TRIEF:

19        Q.  I show a document which is Exhibit 30.  It

20   looks like the brother-sister document to the

21   bartender document, but this one is for servers.  Do

22   you see it?

23        A.  I do.

24        Q.  Are you familiar with it?

25        A.  I am not.

Page 65

1      A.  Correct.  That being said, I will tell you

2  that we still have individual restaurants that will

3  augment these particular sidework charts to better

4  serve their business.  We encourage that in the

5  instances where we have many restaurants that are

6  different prototypes.  We have many restaurants that

7  have different types of business.  Some have heavier

8  lunch, some have heavier dinner.  And we give the

9  managing partners and the restaurant managers the

10  right and the ability -- the autonomy, if you will --

11  to change the charts to ensure that we're doing the

12  right thing for the employees and we're taking care of

13  the business as well.

14      Q.  But there is a centralized standardized chart

15  to start from?

16      A.  That's actually right.

17      Q.  In the pre-opening sidework that the servers

18  had to do, did that include ledges being wiped by the

19  servers?

20      A.  Yes.

21      Q.  What are the ledges?

22      A.  Not in every area of the restaurant, so this

23  particular sidework wouldn't pertain to every server.

24  But in certain areas, where a server has a certain

25  station, every server that comes in for a shift is

Page 67

1       A.  I see that.

2       Q.  That's where I got the question from.  I was

3   asking if you want to change your answer or you stand

4   by it?

5       A.  No, I'll stand by it in that I can see here,

6   based on this document, that the laminated sidework

7   charts were sent to the restaurants, according to

8   this, the week of February 20th.  I don't see those in

9   the restaurant as being used as a regular tool.

10      Q.  Just from your personal observations?

11      A.  Correct.

12          (Exhibit 33 was marked for

13          identification.)

14  BY MR. TRIEF:

15      Q.  It's that bullet point above "prep

16  productivity guidelines."  Can you take a look at

17  that?

18      A.  Yes.

19      Q.  Is that a policy and procedure that Darden

20  followed?

21      A.  Which specific line?

22      Q.  Take a look at the sidework, cleaning

23  duties --

24      A.  I'm sorry.  Uh-huh.

25      Q.  Do you see that?

Page 68

1        A.   (No response.)

2        Q.   It indicates that, the next day, have the

3   manager complete the same tasks as the worker.  Based

4   on that comparison, set a goal.  Watch, do, set a

5   goal.

6        A.   Uh-huh.  I'm not sure what the question is.

7        Q.   Is that a policy and procedure that was in

8   place at Longhorn Steak?

9             MR. YBARRA:  I have a question.  This

10            seems to be a page 25 -- I sort of let this

11            go, but now it seems very relevant to the

12            question you're asking.  This looks like page

13            25 of a larger document and you're asking him

14            about a portion of that document without

15            showing him the rest of it.

16            MR. TRIEF:  Correct.

17            MR. YBARRA:  I have an objection to that,

18            if you're asking him a question about whether

19            this is a policy and, yet, you're not showing

20            him the whole thing.

21            MR. TRIEF:  Well, I don't agree with

22            that.

23            MR. YBARRA:  Well, I'm stating my

24            objection.

25            MR. TRIEF:  No problem.

Page 69

1           THE WITNESS:  It appears that this was in

2      fact the case, but I do not recall this work

3      being done.

4           MR. TRIEF:  Okay.

5           THE VIDEOGRAPHER:  Going off the record

6      at 5:29 p.m.

7           (Off record.)

8           THE VIDEOGRAPHER:  Going back on the

9      record at 5:35 p.m.  Counsel, you may

10      proceed.

11 BY MR. TRIEF:

12      Q.  I'm showing you Exhibit 34.  Do you see that

13 the question deals with, "Can we still dip butter as

14 we go?"

15      A.  Yes, I do.

16      Q.  If you look at the answer, the second

17 sentence, it says, "In this age of increased

18 regulation, we want to make sure we're complying with

19 labor laws as a company."

20      A.  Yes, I see that.

21      Q.  What is dipping butter?

22      A.  In the service -- at Longhorn, in the service

23 of our bread, each loaf of bread or serving of bread

24 gets a ramekin of butter.  Over the years, we've

25 worked with several different ways to best produce

1      Q.   Could you tell us, please, particularly with

2   respect to the off-the-clock claims?

3      A.   In this particular situation, we had a new

4   director of operations.  Her name is Jennifer Carey.

5   She's no longer employed by the company.  We had

6   received some complaints within the restaurant that

7   the managers -- the managing partner was asking people

8   to work off the clock.

9           I don't recall at the moment whether that was

10  brought to our attention by other managers within the

11  restaurant or hourly employees within the restaurant.

12  We did an investigation.  We determined in fact that

13  there was a situation there.  We terminated the

14  managing partner of the restaurant.  And as part of

15  the follow-up to this, we conducted an all team

16  meeting, whereby we could get all of the employees in

17  the restaurant together with the director and the

18  managers that were left at the restaurant, as well as

19  the new MP.  And the second page here is a list of the

20  talking points that were provided by -- with the

21  assistance, I should say -- of employee relations to

22  address this issue within the restaurant.

23     Q.   Were the employees who worked off the clock

24  paid backpay?

25     A.   Yes.  My understanding is, yes, they were?

1       Q.   Fully?

2       A.   Yes.  My understanding is, yes, they were.

3       Q.   Were they fired?

4       A.   I don't recall whether any employee was fired

5   for this behavior or not.

6       Q.   You don't know one way or the other?

7       A.   I do not.

8       Q.   What was the person who was terminated?  What

9   was his name?

10      A.   I can't recall.

11      Q.   Do you know the specific restaurant?  Is it

12   Denham Springs?

13      A.   Yeah, Denham Springs is in Baton Rouge,

14   Louisiana.

15           MR. TRIEF:  We'll go off the record.

16           THE VIDEOGRAPHER:  Going off the record

17      at 5:46 p.m.

18           (Brief recess.)

19           THE VIDEOGRAPHER:  We are back on the

20      video record the time is 5:54 p.m.  Counsel,

21      you may proceed.

22           MR. TRIEF:  I have no other questions of

23      this witness.

24           MR. YBARRA:  Just a couple of questions

25      in follow-up.

Page 81

1   would be part of the 20 percent rule.

2       Q.  If it's directly related, does it go in the

3   20 percent column?

4       A.  Yes -- no, it does not.

5       Q.  And if it's indirectly related under your

6   example, would it go into the sidework column?

7       A.  Yes.

8       Q.  Counsel asked you if any one person was in

9   charge at Longhorn of implementing these rules for

10  sidework.  Do you recall that?

11      A.  Yes.

12      Q.  Your answer was -- was there any one person?

13      A.  No.

14      Q.  Are there people in charge of implementing

15  our sidework rules?

16      A.  Yes.

17      Q.  Who is that?

18      A.  The managers that run the sidework.

19          MR. TRIEF:  Note my objection to "our

20      sidework rules."

21  BY MR. YBARRA:

22      Q.  By our, I meant Longhorn.  Is there anyone in

23  charge of implementing Longhorn's sidework rules, to

24  address counsel's objection?

25      A.  Yes.  The individual Longhorn managers are

Page 82

1    responsible to implement the sidework.

2        Q.  Is that different in every restaurant?

3        A.  Yes.

4        Q.  Counsel also made reference to what he called

5    standardized charts that were sent out and distributed

6    at some point in the Longhorn organization.  Do you

7    recall that?

8        A.  Yes.

9        Q.  Via those standardized charts, could we, as a

10   company -- could Longhorn, as a company, determine

11   what individual server or bartender did for sidework

12   on any given chart?

13       MR. TRIEF:  Objection.

14       A.  No.

15   BY MR. YBARRA:

16       Q.  I'm sorry.  On any given day?

17       MR. TRIEF:  Objection.

18       A.  No.

19   BY MR. YBARRA:

20       Q.  In any given restaurant?

21       A.  No.

22       Q.  Why not?

23       A.  Because it's variable and it changes based on

24   the needs of the business.

25       Q.  So even though it's on the chart, on chart,



projected). The next day (Tuesday, 540 guests) the DO had the team member stand next to him while he timed how long it took the manager on duty to prep salad mix. It took only 32 minutes. After this exercise, the DO asked the manager on duty and the prep cook how long it should take to prep salad mix. They both agreed it should take 30 minutes. By holding the cooks accountable for completing the salad mix in 30 minutes, an hour of labor was saved without having a negative impact on the guest.

❑ Take a look at the sidework, cleaning duties and other tasks that your servers, bartenders and service assistants perform at opening and closing.

1. Watch them perform these duties while giving zero direction and document how long the tasks take on a legal pad.

2. The next day, have a manager (uninterrupted and focused) complete the tasks and document how long it takes.

3. Based on this research, set goals for each task, communicate the standards to the entire management team and hold your team accountable for these time frames.

## PREP PRODUCTIVITY GUIDELINES

Prep provides us with many opportunities to cut the fat. In order to maximize productivity with our prep team, we will divide prep duties into three HOH team member roles:

**Line Set Cook:** Responsible for the prep items that include baking or cooking of products as well as the handling of steaks and seafood.

**Fresh Daily Cook:** Responsible for all produce items.

**General Prep Cook:** Responsible for the majority of the ready to eat products.

These roles are managed much like the front door service assistant roles – greeter, seater and busser. At the front door, 1 or 2 people may be responsible for all three roles, while on busier shifts, there is generally a designated person in each role. The same holds true for the line set cook, the fresh daily cook, and the general prep cook. Depending on the volume of the shift, 2 or 3 cooks might be responsible for all 3 roles. Prep duties are distributed accordingly by the KM. The GSP matrix is based on 1 hour of prep time per 75 guests whether you are in a low, mid or high volume restaurant.

The line set cook and the fresh daily cook, are the core 8 am positions. The general prep cook's time in will vary according to volume. Additional cooks will be added according to volume requirements. (See the Manpower Loading Chart.) When additional cooks are added, the KM will direct their responsibilities.

The 3 roles of the cooks in the kitchen are a method of organizing for a higher level of productivity in the HOH. All prep, with the exception of a few items, should be completed by 11 am. As always, if help is needed in another area, the KM will direct the team as needed. The KM is accountable for the results of all

Confidential                                                    MATHIS DEFS 0027767

**EXHIBIT 12**

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER


NICOLE ALEQUIN, TESHIURE AMOS,
et al,

        Plaintiffs,

vs

DARDEN RESTAURANTS, INC.,
et al,

        Defendants.

_____/


                              111 North Magnolia Avenue
                              Orlando, Florida
                              May 8, 2014
                              9:06 a.m. - 12:26 p.m.



            DEPOSITION OF JOHN WILKERSON


        Taken on behalf of the Plaintiff before Laurie

Dippolito, Notary Public in and for the State of Florida

at Large, pursuant to Plaintiff's Notice of Taking

Deposition in the above cause.

Page 4

```
 1   THEREUPON:

 2              VIDEOGRAPHER:  My name is Clay McMillan of

 3        Veritext Reporting.  Today's date is Thursday,

 4        May 8, 2014.  It's, approximately, 9:06 a.m.,

 5        eastern daylight time.  This deposition is being

 6        held in the offices of Littler Mendelson, 111 North

 7        Magnolia Avenue, Suite 1250, in Orlando, Florida.

 8              The caption of this case is Nicole Alequin, et

 9        al versus Darden Restaurants, Inc., et al, and it's

10        filed in the U.S. District Court, Southern District

11        of Florida, Fort Lauderdale Division.

12              The name of our witness today is Mr. John

13        Wilkerson.

14              At this time will counsel present please

15        identify yourselves and the parties you represent.

16              MR. TRIEF:  Ted Trief and David Lichter on

17        behalf of the plaintiffs.

18              MR. YBARRA:  And John Ybarra from Littler

19        Mendelson and Dawn Rodda from Darden on behalf of

20        Darden.

21              VIDEOGRAPHER:  Our court reporter today is

22        Ms. Laurie Dippolito of Veritext Reporting, and she

23        will swear in our witness, and we can proceed.

24              (The witness, John Wilkerson, was duly sworn.)

25              THE WITNESS:  Yes.
```

Page 10

1       Q      What was that special project?

2       A      It was to redesign our new prototype

3    restaurant building, from a footprint standpoint.   So

4    kitchen design, dining room layout/design.

5       Q      What are the duties of a director of

6    operations at Red Lobster?

7       A      At Red Lobster?   The duties are very similar,

8    I think, would be across most brands.   A director of

9    operations is responsible from anywhere from -- could

10   be as little as five restaurants, as many as,

11   potentially, 12, 13 restaurants, overseeing the

12   day-to-day operations of those restaurants.

13      Q      Is a director of operations involved in making

14   sure that the individual restaurants operate under

15   appropriate wage-and-hour rules?

16      A      Are they involved directly with an individual

17   restaurant?

18      Q      Correct.

19      A      Sure.   They have a general manager there who

20   oversees that one individual unit, who's ultimately

21   responsibile, yes.

22      Q      And how does a director of operations ensure

23   that an individual restaurant is following the

24   appropriate wage-and-hour rules?

25      A      How do they ensure it?

1        Q      Yes.

2        A      They visit those restaurants -- it depends on

3    the director, depends on the region -- anywhere from

4    twice a month to once every six weeks.  They spend days

5    in those restaurants -- anywhere from one day to four

6    or five days -- visiting with team members, visiting

7    with management.  There's different levels of reporting

8    inside the restaurant that they can look at and observe

9    to make sure that all of those wage-and-hour rules are

10   being followed.

11       Q      So let me separate two types of wage-and-hour

12   issues.  One is working off the clock.  Have you ever

13   heard that term?

14       A      Have I ever heard the term "working off the

15   clock"?

16       Q      Yes.

17       A      Yes.

18       Q      How does a director of operations at Red

19   Lobster make sure that the employees at an individual

20   restaurant are not, to some degree, working off the

21   clock?

22       A      To some degree working off the clock?  How do

23   they know that someone is not working off the clock?

24       Q      How does someone -- how do they ensure that

25   some workers are not, in fact, working off the clock?

1    A    Well, it's a violation of our policies to have

2  anyone working off the clock.  So that would be a very

3  serious offense or allegation, if that were to happen.

4    Q    I understand that.  But how do you make sure

5  that it's not happening?

6    A    Well, team members would, number one, tell

7  someone, through our open-door policy, if they were

8  being forced to work off the clock.

9         They agree, when they get their paychecks

10  every week, that the hours reported on their paycheck

11  are what they were actually paid for, when they pick up

12  -- when they get their direct deposit or check.  And

13  the managers understand what our policies are, in terms

14  of paying employees for the time they are scheduled to

15  work.

16    Q    Okay.

17    A    The appropriate wage as well.

18    Q    And is there any policy or plan in place

19  that's proactive -- maybe from an audit standpoint or

20  something else -- in which you go and look at records

21  to see if, despite whatever you hope is going on in the

22  restaurant, that it is, in fact, going on that way?

23    A    I can't speak to what Red Lobster is doing

24  today.  At the time I was there, we had business --

25  what we referred to as business reviews.  And directors

Page 13

1    of operations went in quarterly into each restaurant

2    and did an audit of the entire operation.

3           And part of that audit was there were wage and

4    hour, I-9, a lot of administrative types of things that

5    they were to check on, and check and make sure those

6    things were being followed.

7           As well as, internally, Darden has an internal

8    audit group that audits our restaurants.  I'm not sure

9    how frequently.  You could ask somebody from that

10   group.  But I get copies of reports today, when one of

11   my restaurants is audited from Orlando, monitoring

12   those types of things.

13   Q     So I want to stay focussed not on a general

14   audit, but on just wage-and-hour issues in the audit.

15          So is there something that a director of

16   operations goes into a restaurant and looks at to see

17   if there might be people working off the clock?

18   A     Well, we have reports that are generated every

19   single day in the restaurants, that are maintained in

20   the restaurants, that have labor, time cards for team

21   members.  We have two summary reports that print out.

22          But those would be the primary things that a

23   director of operations would focus on on their visit,

24   which would be to get the manager analysis tool report

25   log and the manager's summary report log, and flip

1  through those logs.

2          Those logs say, basically, everything that

3  anyone who is assigned a swipe card to use the POS

4  system to make punch edits -- whether it be to time

5  cards, edits to guest checks, things of that nature --

6  those are the things they look at.  If they see

7  anything there that were to catch their attention, they

8  would definitely bring it forward.

9      Q    So tell me the kinds of things in those

10  records that would cause you, as a director of

11  operations, to have a thought that maybe something is

12  going on where the people are not clocked in all the

13  time.

14      A    I don't know if there would be anything in

15  there I would say, We're not clocked in all the time.

16          What would catch my attention, as a director

17  of operations, from personal experience, is if I

18  noticed a lot of what we call "punch edits."

19          If I notice a manager was adjusting a person's

20  time -- if it said they were clocked out at six

21  o'clock -- it would say if that was done by the team

22  member or by a manager.  Occasionally, our team members

23  -- I hate to admit it happens more than what we

24  probably would like -- forget to clock out or leave,

25  and somebody has to clock them out; otherwise, we can't

1      Q     Did you ever use the LMS system to compare the

2   schedule with the clock-in data when you were involved

3   as a director of operations or a senior director of

4   operations for Red Lobster?

5      A     Very rarely as a senior director of

6   operations.  But as a director of operations, yes, I

7   did.

8      Q     And if -- if you found the discrepancies where

9   people were clocking in at odd times or didn't match

10  the LMS schedule, could you take corrective action?

11     A     I investigated why.  And the reaction would

12  depend on what I found out out of that investigation.

13     Q     And tell me, you know, how the actions would

14  vary depending upon what you found out.

15     A     Well, if I found out that we constantly had a

16  tardiness problem with our team members, the action I

17  would take is, "Why are we allowing people to

18  constantly show up late for work, which is impacting

19  our guest experience, without properly documenting them

20  through our company policies in terms of progressive

21  discipline?"

22           If I found out somebody was being forced to do

23  that, that manager would no longer work for us.

24     Q     How much tardiness would be appropriate to

25  tolerate?  Is there a set parameter?

Page 33

1    at the store?

2        A    Yeah.  They're in charge of the restaurant.

3        Q    And that applied the same in Red Lobster as it

4    did to Bahama Breeze?

5        A    Yes.

6        Q    And then there are other people who are called

7    managers, but they report to the general manager, in

8    both Red Lobster and Bahama Breeze, correct?

9        A    Yes.

10        Q    And is there someone at Bahama Breeze who was

11    supposed to be training the general managers on

12    wage-and-hour rules?

13        A    Well, we have, in our policies and our

14    operations handbooks and our recommitment guidelines,

15    those procedures and what we're obligated to follow

16    under the law.  And that is done yearly through a

17    recommitment process.  New managers go through it.

18    Existing managers that have been in position for 30

19    years go through it.

20        Q    Who is supposed to make sure that these

21    managers understand what the rules are?  Who's

22    primarily responsible?

23        A    Depends on which manager you're asking about.

24        Q    The general manager -- there's only one

25    general manager at every Bahama Breeze restaurant,

 1    correct?

 2         A      Correct.

 3         Q      Who is supposed to make sure that that general

 4    manager has the appropriate and proper understanding of

 5    wage-and-hour rules?

 6         A      It comes through a variety of channels.  We

 7    have a lot of support through our home office that

 8    provides us the materials that are in our recommitment

 9    books to make sure that anytime a state, for instance,

10    changes something in a particular state, that we're

11    properly up to speed and making sure that we're meeting

12    the requirements of that individual state.

13             And at the end of the day, the general manager

14    goes through a recommitment process every year, which

15    they're personally acknowledging that they understand

16    what our policies and procedures are.  They don't write

17    them.  They're obligated to follow them.

18             And then the director of operations would be

19    personally responsible for making sure that the general

20    manager is following those policies.

21         Q      That's what I'm asking.  So, one, is there's

22    something written -- in written material.  And the

23    second is that there's a person who's responsible to

24    make sure the manager knows.  Correct?

25         A      There's a person who's responsible, yeah, to

Page 42

```
1        Q    So if I limit my question to policy and
2   procedure, am I correct -- is your understanding that
3   everything that a server or bartender does at Bahama
4   Breeze is directly related to tip-producing activity?
5        A    Based --
6             MR. YBARRA:  Objection.  Asked and answered.
7             THE WITNESS:  Based on our policies and
8        procedures, yes.  There are 37 different
9        restaurants out there that have 37 different
10       general managers that -- restaurants from 15,000
11       square feet to 7,000 square feet -- that have
12       different activities going on on a daily basis.  So
13       they're all doing something different in each
14       restaurant.
15            But what we ask them to do, what they're
16       taught to do, no one would be performing any
17       activities for more than 12 minutes an hour that
18       were not directly tip-producing.
19   BY MR. TRIEF:
20       Q    That wasn't my question.  The 12 minutes an
21   hour is the caveat that you're putting in that's not
22   part of my question.  That's why I'm having trouble
23   with it.  What I'm asking is -- forget the 20-percent
24   rule for a moment.
25       A    Okay.
```

```
 1          beyond -- before are relevant to statute of

 2          limitations here, when this case goes back to, in

 3          terms of September of '09.

 4               So his testimony as to Red Lobster is

 5          irrelevant and beyond the scope at all.  However,

 6          I'm going to withdraw my instruction, instructing

 7          him not to answer about Red Lobster, and I'm going

 8          to merely raise an objection as to its relevance

 9          and scope.  But I'm not going to instruct him not

10          to answer about his Red Lobster experience.

11               MR. TRIEF:  Okay.  I disagree with you, but I

12          understand it now.  I didn't understand it before.

13          I didn't understand the instruction not to answer.

14          But I understand your position.  I don't agree with

15          it.  That's --

16               MR. YBARRA:  I understand.  But I'm going to

17          allow him to answer Red Lobster questions, to the

18          extent you want to spend your 30(B)(6) time going

19          back to it.

20     BY MR. TRIEF:

21          Q    Okay.  With respect to wage-and-hour issues,

22     were there written protocols or written instructions

23     that were given to the directors of operation to use as

24     guidelines?

25               MR. YBARRA:  Ted, I'm sorry, not to interrupt.
```

Page 46

1    for that.

2         Q    The "main" is different than the "only."  So

3    is it the main and only, or is it the main?

4         A    I'm not aware -- it's online in our system, as

5    well.  So someone could go look at them anytime they

6    saw fit.  But the main tool that we use to communicate

7    that is our recommitment process.

8         Q    Is that -- is the recommitment process a

9    PowerPoint presentation that's given once a year?

10        A    It used to be.  It's online now.

11        Q    Do you know of anyplace, other than in what

12   was a PowerPoint presentation and is now what's online,

13   where a director of operations can get information

14   about how to enforce wage-and-hour rules?

15        A    They can call employee relations anytime about

16   any question about wage and hour and get an answer.

17        Q    Right.  But I'm talking about something that's

18   written, that they could just look up, rather than

19   asking somebody a question.

20        A    Again, the main vehicle for those

21   wage-and-hour guidelines is the recommitment process.

22        Q    Is there -- is there -- is there any other

23   written material, other than the -- other than the

24   former PowerPoint presentation and now the online

25   recommitment documents?

Page 48

```
 1        objection as to the particular questions, because

 2        there may be some that I don't object to.  But

 3        objection -- relevance and scope -- on the last

 4        two.  Sorry for interrupting.

 5   BY MR. TRIEF:

 6        Q     Are there any documents or reports that you

 7   can use to determine -- you, as someone at Bahama

 8   Breeze in management -- to determine how much side work

 9   is being done at a restaurant?

10        A     Any document I can use to see how much is

11   being done?

12        Q     Yeah.

13        A     The -- each restaurant is different, has

14   different side work charts.  So it would vary from one

15   restaurant to the next, in terms of the scope of their

16   work.  But in terms of doing anything that I can see --

17        Q     Yes.

18        A     -- on a daily basis?

19        Q     Yes.

20        A     Other than what I see when I visit the

21   restaurants, no.

22        Q     And would that also have applied to Red

23   Lobster when you were there?

24        A     In the position similar to what I'm in now?

25        Q     Yes.
```

```
 1       A     Yes.

 2             MR. YBARRA:  Objection.  Relevance, scope.

 3  BY MR. TRIEF:

 4       Q     What is side work?

 5       A     Side work is a common restaurant-industry term

 6  that varies from one restaurant concept to another.

 7       Q     What does side work mean at Bahama Breeze?

 8       A     Side work at Bahama Breeze is work that is

 9  needed in order to enhance the guest experience.  So if

10  -- brewing coffee, iced tea, getting ice is side work.

11       Q     What is side work at Red Lobster?

12             MR. YBARRA:  Objection.  Relevance and scope.

13             THE WITNESS:  I would say they're similar

14        things.  Bahama Breeze and Red Lobster are totally

15        different types of restaurants, styles of

16        restaurants, so the scope and type of work can be a

17        little bit different.

18  BY MR. TRIEF:

19       Q     But the definition of side work is the same,

20  you're saying?  Or define it differently to me.

21       A     I would define it the same way when I was at

22  Red Lobster.  Someone brewing a pot of coffee was

23  direct work related to the guest.  It wasn't at the

24  table.

25       Q     Actually, I was asking about defining side
```

Page 50

1   work.

2        A     What does Red Lobster define as side work?

3        Q     Is there a difference in definition of side

4   work -- well, withdrawn.   What is the definition of

5   side work at Red Lobster?

6             MR. YBARRA:   Objection.   Relevance and scope.

7             THE WITNESS:   The definition of side work

8        would be work that was needed -- that was needed to

9        be done in order to maintain and enhance the guest

10        experience.

11   BY MR. TRIEF:

12        Q     And I think that was the same definition you

13   gave me for the definition at Bahama Breeze, correct?

14             MR. YBARRA:   Objection.   Asked and answered.

15             THE WITNESS:   I believe that was the same

16        answer.

17   BY MR. TRIEF:

18        Q     And at Red Lobster, was there anything you

19   could look at that would tell you how much side work

20   was being done?

21             MR. YBARRA:   Objection.   Relevance and scope.

22             THE WITNESS:   Again, the way the systems and

23        processes were set up, we know, from the time that

24        the team members come on to the time they leave,

25        what their assignments are.   And I would say the

Page 73

1    rules of Bahama Breeze, what additional methods do you

2    have to make sure that servers are being properly

3    treated as it relates to side work?

4            MR. YBARRA:  Objection -- excuse me.

5        Objection.  Asked and answered.

6            THE WITNESS:  Again, our company policy and

7        procedures are laid out to which we clearly define

8        what -- and, again, it's going to vary from one

9        restaurant to the next -- in terms of any work

10        that's related to side work, what those tasks are.

11            So you've shown this one.  There's probably 36

12        other ones that are totally different.  More or

13        less, you know, they vary.

14            But what we do know is that we, specifically,

15        teach our people that tasks that are performed that

16        are not directly related to the guest -- most of

17        those are actually performed before we open -- are

18        paid at minimum wage.  The system won't even allow

19        someone to try to pay somebody not at that wage.

20            If they're performed during the course of

21        working with their guest, the majority of these

22        things are directly related to working with their

23        guest.  You could debate that some are indirectly

24        related.

25            But I know, from all my years of experience in

Page 75

```
 1        and we pay them 12 bucks an hour to do that when

 2        they ask.

 3             So the task may be unrelated, but in which --

 4        how it's stated here, it is -- it may be indirectly

 5        related or directly related.

 6   BY MR. TRIEF:

 7        Q    How it's stated there, though -- the way it's

 8   stated in that document, there's nothing that's

 9   unrelated.

10             MR. YBARRA:  Objection.  Asked and answered.

11        Go ahead again, John.

12             THE WITNESS:  Yeah.  I believe that these are

13        -- depends on the situation.  So you have to

14        provide the context on each individual one of

15        these, whether -- what time, place, circumstances.

16   BY MR. TRIEF:

17        Q    How do you teach this?

18             MR. YBARRA:  Objection.

19             MR. TRIEF:  How do you teach that, depending

20        upon the time, the circumstances, that these may be

21        related or unrelated?

22             MR. YBARRA:  Objection.  Asked and answered.

23   BY MR. TRIEF:

24        Q    I know you've got the recommitment.  Any other

25   way?
```

1       A       The day-to-day operations of directors of

2   operations coming in and working with their teams.

3   General managers working with their teams.  When I go

4   to visit restaurants and my boss goes to visit

5   restaurants, when we're there, we stand side by side

6   with these team members every day, work with them,

7   watch them close restaurants, watch what they do.

8       Q       Have you done -- have you seen any

9   time-and-motion studies?

10      A       Have I ever seen a time-and-motion study?

11      Q       For Bahama Breeze.

12      A       I personally have been a part of our own

13  internal time-and-motion study.

14      Q       Have you done a time-and-motion study to

15  analyze side work at Bahama Breeze?

16      A       Not specifically analyzing side work.  I have

17  done some work -- the majority of it actually related

18  to the heart-of-house activities, which are all paid by

19  minimum wage.

20              But have I ever seen how long?  Just as I'm at

21  a restaurant, to try to maintain an idea about what we

22  ask people to do?  Yeah.  I mean, just last Wednesday,

23  in Lake Grove, New York, I clocked how long it took me

24  to go get two barrels of ice and bring it back to the

25  bar.

1      Q    Have you ever been involved personally in

2  which those investigations included waiting for the

3  first table to arrive before you clocked in?

4      A    At Bahama Breeze?

5      Q    At Bahama Breeze.

6      A    I had that allegation brought forth, among

7  several others issues.  And that, actually, after a

8  thorough investigation and working alongside an

9  employee relations representative and interviewing 15

10 to 20 team members, found that that was not true.

11     Q    Have you ever investigated that at Red

12 Lobster?

13     A    Many, many years ago.

14     Q    And how did you do that?

15     A    How did I do it?

16     Q    What was the procedure to see whether that was

17 true or not?

18     A    Well, you gather as much information from

19 timecard reports as you can get.  You look for those

20 types of things that I stated earlier, which is odd

21 times that people are clocking in.  Because the only

22 way our system works is every 15 minutes -- used to be

23 every 30 -- but every 15-minute increment.  So it would

24 not be normal to see 11:21 all the time.  And then you

25 go in and you meet with team members.  Seems like these

1    A    I don't know the context of what he's

2  referring to.  I look at that and I read, Why are we

3  not setting adequate hours for our silverware rollers

4  so that our servers are not having to roll silver?

5         You would have to ask him what he meant by

6  that.

7    Q    Silverware rollers are paid minimum wage,

8  correct?

9    A    That's correct.

10   Q    I'm going to show you Exhibit 5.

11        MR. YBARRA:  David, can I have a copy of

12   Exhibit 5, please?

13        MR. LICHTER:  Sorry.

14        MR. YBARRA:  You give the guy one job, and

15   what's he doing?  Writing you notes.

16 BY MR. TRIEF:

17   Q    This was sent to you, this e-mail?

18   A    Uh-huh.

19   Q    Remember the "yes"?

20   A    Yes.  I'm sorry.

21   Q    That's okay.  Do you know who Andy Santana is?

22   A    I do know Andy Santana.

23   Q    Who is he?

24   A    He's a restaurant manager for us.

25   Q    And someone was allowed to work off the clock?

1      A    That was the alleged incident at that time.

2      Q    And what did you determine?

3      A    I don't remember all of the details of this

4  particular case.  This was handled by Debra Franta, who

5  was my director of operations.  The reason she's cc-ing

6  Charlie is because he had -- Andy had transferred from

7  the Kendall restaurant -- I believe it was Kendall at

8  that time -- in Miami -- to the Waterford Lakes

9  opening.  So he was then working for Charlie, so she

10  was copying him on this.

11          And we had some allegations of some issues

12  there in which some of it was wage and hour, some of it

13  was other things.  But we fired the general manager,

14  and we fired one other restaurant manager.  And came

15  close to firing a third; however, we did not.  And Andy

16  was part of that team at that time.  We had no alleged

17  allegations against Andy prior to this one.

18      Q    And what happened to Andy?

19      A    We were not able to substantiate any of these

20  allegations at this point.

21      Q    Was he disciplined?

22      A    He became aware of the alleged issues.  He

23  was, I believe, given a form of counseling.  I don't

24  remember which level.  He was not terminated.  We could

25  not substantiate any of this.

1        They would discipline them in some way, shape

2   or form, have a discussion with them.  But other than

3   that, they would not call me over that, no.

4        Q    Anybody ever advise you of the discipline of

5   these people?

6        A    In this particular case, again, no.  That

7   means as far as our employee relations department and

8   director of operations were concerned, based on

9   whatever investigation was done, there was nothing that

10  needed to be brought to my attention.

11       Q    So if you don't know about it, it means it was

12  unimportant?

13       A    I didn't say that.

14       Q    Well, is people working without clocking in

15  significant?

16       A    If two team members don't clock in when they

17  show up for work, that is significant, but probably not

18  significant enough for someone to call me about it.  We

19  fixed it by paying them correctly and making sure they

20  clock in the next time they come to work.

21       Q    Randy Babitt.  Do you see his name as the

22. process approver on the front?

23       A    I do.

24       Q    What's Randy Babitt's role in this?  What's a

25  process approver, and what's his role?

1    showed you?  Substantially the same format?

2        A    Virtually identical.  Except if there are

3    changes, those changes are highlighted.

4        Q    Right.

5        A    Yes.

6        Q    Are the managers responsible for knowing and

7    complying with all federal labor laws?

8        A    Are the managers responsible for complying

9    with all federal labor laws?

10       Q    Let me say it again slowly.  Are the managers

11   responsible for knowing and complying with all federal

12   labor laws?

13       A    Our teams are responsibile for complying with

14   all federal labor laws.

15       Q    Specifically, manager now.  Are the managers

16   responsible for knowing and complying with all federal

17   labor laws?

18       A    That's what I said.  Our managers are required

19   to comply with all federal labor laws, yes.

20       Q    And are they given any written material that

21   specifically says what the labor laws are?

22            MR. YBARRA:  Objection.  Asked and answered.

23            THE WITNESS:  In that you'll find all that

24        material in our recommitments, in our operations

25        manuals, in our new team member -- for team

1            members, they have a team member handbook -- that

2            part of orientation they go through with a manager

3            and/or a general manager.  So they're constantly

4            reviewing that material.

5       BY MR. TRIEF:

6            Q    Is there anything in the commitment document I

7       just showed you that explains what the labor laws are

8       as it relates to side work?

9                 MR. YBARRA:  Objection.  The document speaks

10           for itself.  Go ahead.

11      BY MR. TRIEF:

12           Q    You said you're familiar with it?

13           A    Yes.

14           Q    Is there anything that deals with how to deal

15      with side-work issues under the labor law?

16           A    I believe they fall under -- some of the

17      bullet points in there specifically talk about that

18      people are appropriately paid for the work they're

19      performing.

20           Q    That's a general statement, correct?

21           A    Yes.

22           Q    Other than a general statement, something that

23      tells you how to address some of the side-work issues

24      we went over?

25           A    That, specifically, talks about those

1          responsibility to ensure employees are clocked in

2          while working.  Employees may not be scheduled as

3          on-call or any similar arrangement."

4     BY MR. TRIEF:

5          Q    And you believe that what you just read is the

6     closest thing in this particular document that relates

7     to side work?

8               MR. YBARRA:  Objection to your

9          characterization.  Asked and answered.  Go ahead.

10              THE WITNESS:  I believe that our policies and

11         procedures -- with this being the meat of that

12         context in terms of appropriately paying people for

13         the hours they worked and the job they're doing --

14         we do not have tipped employees performing work

15         outside of the federal wage-and-hour guidelines and

16         inappropriately paid.

17    BY MR. TRIEF:

18         Q    I'm sorry.  Let me rephrase it, because that

19    wasn't the question.  The question is:  The section

20    that you just read, is that the best section in the

21    recommitment that would address teaching the general

22    managers and managers how to deal with side work at the

23    restaurant?

24              MR. YBARRA:  Objection.  Asked and answered.

25              THE WITNESS:  In this particular one -- I

Page 135

1    Q    Tell me a circumstance where someone uses a

2   break key once or twice and they're terminated.

3    A    It would depend on why they were misusing the

4   break key --

5    Q    To save hours.

6    A    -- or if they knew they were misusing that

7   break key.

8    Q    To save hours.  I'm asking to assume that.

9   They were going to use the break key --

10   A    Who's saving hours?

11   Q    The employee.

12        MR. YBARRA:  Objection.  Foundation.  Calling

13        for speculation.

14  BY MR. TRIEF:

15   Q    You don't understand why someone would do

16  that?

17   A    I can't get in the mind of our team members

18  and why they choose to do things that they know are

19  clearly a violation of our policies.

20   Q    Well, doesn't Darden limit the number of hours

21  a server can work?

22   A    I have no idea what that statement means.

23   Q    Can a server at Bahama Breeze -- well, does

24  Bahama Breeze try to make sure that the servers don't

25  work overtime?

1       A    I have servers that worked 70 hours last week.

2   If that's what was needed to take care of the guests

3   and we don't have enough team members and they're

4   willing to do it.  We've got to take care of the

5   guests.

6       Q    So there isn't a policy of trying to make sure

7   servers don't -- unless there's an emergency -- work

8   more than 40 hours?

9       A    I mean, it's a common-sense practice in any

10  business that if you don't have to pay time and a half

11  to anyone -- server or heart-of-house team member --

12  that if you can do that, you shouldn't do that.

13           However, at Bahama Breeze, we've always had

14  overtime and we always will.  We have a business that

15  is a little bit cyclical and seasonal, and it makes

16  much more sense to pay somebody overtime versus hiring

17  five people that I may not need in three months.

18      Q    Is there ever an attempt to limit people's

19  hours to 30 hours a week?  Is there a business-sense

20  reason to do that?

21      A    We had a test in a handful of our new

22  restaurants that we opened with a test that -- where we

23  were testing, as a potential reaction to the Affordable

24  Care Act and how they designate full and part-time

25  employees, how that would impact our business, but that

**EXHIBIT 13**

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER


NICOLE ALEQUIN, TESHIURE AMOS,
et al,

        Plaintiffs,

vs

DARDEN RESTAURANTS, INC.,
et al,

        Defendants.

_____/


                    111 North Magnolia Avenue
                    Orlando, Florida
                    , 2014
                    TIME


DEPOSITION OF JEREMY WILLIAMS


        Taken on behalf of the Plaintiff before Laurie

Dippolito, Notary Public in and for the State of Florida

at Large, pursuant to Plaintiff's Notice of Taking

Deposition in the above cause.

Page 3

```
 1    THEREUPON:

 2              VIDEOGRAPHER:  My name is Clay McMillan of

 3         Veritext Reporting.  Today's date is Thursday,

 4         June 12, 2014.  The time is, approximately, 12:20

 5         p.m., eastern daylight time.

 6              This deposition is being held in the offices

 7         of Littler Mendelson, located at 111 North Magnolia

 8         Avenue, Suite 1250, in Orlando, Florida.

 9              The caption of this case is Nicole Aloquin, et

10         al versus Darden Restaurants, Inc., et al, and is

11         filed in the U.S. District Court, Southern District

12         of a Florida, Fort Lauderdale Division.  The case

13         number is 12-61742-CIV.  And the name of the

14         witness today is Mr. Jeremy Williams.

15              Will counsel present please identify

16         yourselves and the parties you represented?

17              MR. TRIEF:  Ted Trief and Elise Scheck**

18         Bonwick** for the plaintiffs.

19              MR. YBARRA:  And John Ybarra and Dawn Rodda on

20         behalf of defendants.

21              VIDEOGRAPHER:  And our court reporter today is

22         Ms. Laurie Dippolito of Veritext Reporting, and she

23         will now swear in our witness and we can proceed.

24              (The witness, Jeremy Williams, ws duly sworn.)

25              THE WITNESS:  I do.
```

Page 26

1   towels in the paper towel component of a restroom.  Is

2   that server duty, indirectly related to server duty,

3   not related at all?

4        A    I would say it would be indirectly related.

5        Q    Is there any duties that a server or bartender

6   would do in a restaurant that would not be related at

7   all to server duties?

8        A    I can't imagine there would be, no.

9        Q    So everything they do in the restaurant is at

10   least related to server duties?

11        A    I would say that, yes.

12        Q    Are you aware of either servers or bartenders

13   not clocking in to save hours?

14        A    I know, periodically, from time to time, there

15   are allegations of that nature that come about in my

16   area.

17        Q    Well, more than allegations, have you formed

18   the belief that servers or bartenders occasionally do

19   not include or clock in to record their hours so they

20   can save hours?

21        A    I haven't formed a belief about that, no.

22        Q    So you don't know whether that's widespread

23   activity or not?

24        A    Well, I would say it's absolutely not

25   widespread activity.

Page 27

1      Q     And you would say it's also not common?

2      A     I don't believe -- I don't believe it to be

3   common, no.

4      Q     How do you determine that, as someone in

5   employee relations?  You're not in the restaurant every

6   day, correct?

7      A     Correct.

8      Q     So how do you form an opinion as to how common

9   that conduct is, being here in Orlando in employee

10  relations?

11     A     My department's responsibility is to engage

12  the restaurants every single day.  We're responsible

13  for all 2000 restaurants.  So we interact daily with

14  our restaurant management teams and hourly employees.

15  And allegations of that nature are extremely uncommon

16  in our area.

17           And we have policies and procedures that

18  specifically prohibit that type of conduct, and we

19  would expect that to be followed and believe it to be

20  followed.

21     Q     When you say -- did you say extremely

22  uncommon?

23     A     They are uncommon in my area.

24           (Exhibit 1 was marked for identification.)

25           THE WITNESS:  Okay.

Page 52

1    avoid overtime all found to be justified, correct?

2       A    Yes.   They -- yes.   Under our wage-and-hour

3    policy, correct.

4       Q    With respect to servers or bartenders who were

5    not paid for orientation, did Darden make any attempt

6    to find those people who were owed the money but left

7    the business?

8       A    I don't recall.

9       Q    Did you believe that Darden owed an obligation

10   to pay the people who were not paid for orientation

11   even though they left Darden?

12            MR. YBARRA:  Objection.   Foundation.

13            THE WITNESS:  If we could conclusively

14        establish that there was money owed to the

15        individual, we would try and correct that for that

16        individual.

17   BY Mr. TRIEF:

18       Q    Even people who had left Darden?

19       A    Yes.

20       Q    Can you give me one example where someone who

21   was no longer employed by Darden and had not complained

22   was contacted by Darden and paid for back wages?

23       A    I can't give you a specific situation, but I'm

24   certain it's happened.

25            MR. TRIEF:  Can I have nine, please?

1    allegations that are contained in Exhibit 16 --

2    Exhibit 16 -- are not widespread, besides asking a

3    director of operations for that location to do

4    something?

5              MR. YBARRA:  Objection.  Mischaracterization

6         and asked and answered.

7    BY MR. TRIEF:

8         Q    I'm going to rephrase it.  Are there any steps

9    that employee relations takes or human resources takes

10   to be proactive and make sure that the kinds of things

11   which are alleged in Exhibit 16 are not occurring

12   throughout the chain?

13             MR. YBARRA:  Objection.  Argumentative and

14        asked and answered.  Go ahead.

15             THE WITNESS:  Absolutely.  We provide a

16        multitude of training for our employees, for our

17        managers, all the way up to high levels of the

18        company, that we are going to make sure our

19        policies are followed, they're clearly

20        communicated, they're recommunicated on an annual

21        basis, they're recertified on an annual basis.

22             We have mechanisms in place where if employees

23        feel there's a policy violation, they have multiple

24        avenues by which to bring those complaints forward,

25        including their direct supervisor, their

Page 92

```
 1     A     Prior to September 2012, it was standard

 2   protocol for our operators to regularly review reports

 3   of the restaurant that included that information, to

 4   ensure that the policies were being followed

 5   appropriately.

 6            They were, again, recommunicated annually on

 7   what those expectations were.  They certified that they

 8   understood them, that they were following them.  And,

 9   yes, that was happening and has happened -- I don't

10   even know when it began.  It's been happening ever

11   since I've been here.

12     Q     The specific question was audit --

13           MR. YBARRA:  Hold on, ted.  Are you done,

14        Jeremy, with your answer?

15           THE WITNESS:  Yes.

16   BY MR. TRIEF:

17     Q     The specific question was audit.  Before

18   September 2012, was there any auditing procedure at the

19   corporate level to look at schedules versus clock-in

20   data to see if people were waiting for the first table

21   to arrive?

22           MR. YBARRA:  Objection.  Asked and answer.  Go

23        again.

24           MR. TRIEF:  Just answer my question.  Don't go

25        again.  Let's be specific to my question.
```

1   waiting-for-the-first-table investigation.  Is that

2   correct?

3       A    Again, the expectation of my managers when

4   they are assisting an operator doing an investigation,

5   where they may provide them with questions, is they

6   need to clearly understand what the allegations are

7   that are being investigated, because they are always

8   unique.

9            And, therefore, if they use questions that are

10  typically used in an investigation of a particular

11  allegation, I'm okay with that.  But I am unaware where

12  we have had identical same questions in every single

13  investigation, because there might be allegations that

14  require additional questions, not as many questions.

15  But there, certainly, could be questions that are

16  similar in one investigation that were used in a

17  previous investigation.

18           MR. TRIEF:  Could you read my question again,

19      please?

20           (Question read by reporter.)

21           MR. TRIEF:  Can you answer that question yes

22      or no or say, "I can't answer yes or no"?

23           MR. YBARRA:  Objection.  Asked and answered.

24           THE WITNESS:  I don't recall, specifically,

25      the questions used in those investigations.

Page 142

1    BY MR. TRIEF:

2         Q    What is nontraditional side work?

3         A    So "side work" consists of -- for the servers

4    -- work that would either directly or indirectly impact

5    their ability to get a tip.  And so something that

6    would not would be not side work that they should be

7    doing under tip credit.

8         Q    Give me examples of things they shouldn't be

9    doing?

10        A    Well, I would say they shouldn't be on the

11   line, cooking a steak.  Or they shouldn't be, you know,

12   scrubbing bathroom toilets, scrubbing the floors in the

13   kitchen for three hours.

14             In this situation, I don't think they should

15   probably spend an inordinate amount of time breaking

16   down boxes to be taken out to the trash.

17        Q    Where did you get your information as to what

18   is the 20-percent rule, what is traditional side work,

19   what is not traditional side work?  Where did it come

20   from?

21        A    Well, I tell you, it's --

22             MR. YBARRA:  Objection.  That's been asked and

23        answered.  Go ahead.

24             THE WITNESS:  It's a very complicated, complex

25        situation to come up with a clear answer about

1        what's entitled to -- what is under it.

2              So what we do is we're very cautious about

3        that as an organization.  So all the duties that we

4        have in our job description and train our servers

5        and bartenders on are very careful to be aware of

6        that.  And so that's based on a wide variety of

7        guidance that's come about over the years.

8              I can't pinpoint one place, but it certainly

9        has come from legal counsel, it's come from

10       seminars, it comes from trying to stay abreast of

11       what's going on in this area.  That's how that

12       information is derived from.

13   BY MR. TRIEF:

14       Q    Don't -- I'm sorry.  Are you finished?

15       A    Yes, I am.

16       Q    I don't want to know what legal counsel said.

17   But are you saying that part of your training as to the

18   20-percent rule came from lawyers, from legal counsel?

19       A    I will say that this is such a complex area

20   that I don't have all the answers to this.  I'm

21   responsible for making sure that our policies are

22   enforced.  And when I want to make sure that we can

23   provide clear guidance to our operators, I'm seeking

24   resources wherever I can.  So sometimes those are HR

25   professionals.  Sometimes those are legal counsel who

**EXHIBIT 14**

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER

NICOLE ALEQUIN, TESHIURE AMOS,
et al,

     Plaintiffs,

vs.

DARDEN RESTAURANTS, INC,
et al,

     Defendants.

_____/

                           Littler Mendelson
                           111 N. Magnolia Avenue
                           Suite 1250
                           Orlando, Florida
                           Thursday, 9:19 a.m.- 11:28 a.m.
                           March 20, 2014

DEPOSITION OF DANIEL KIERNAN

    Taken on Behalf of the Plaintiffs before

Lisa Gerlach, Court Reporter, Notary Public

in and for the State of Florida at Large,

pursuant to Plaintiffs' Notice of Taking

Deposition in the above cause.

D. KIERNAN

Page 77

1

                                ERRATA SHEET

2

   RE:  Alequin, et al, vs. Darden Restaurants, et al
3  DEPO OF:  Daniel Kiernan
   TAKEN:  March 20, 2014

4

5     DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE

6

7       Page#    Line #    Change                  Reason
8        18        5     Should read in direct    Court Rpt Misunderstood

9

10

11

12

13

14

15

16

17

      Under penalties of perjury, I declare that I have read
18    the foregoing document and that the facts stated in it
      are true.

19

20    _4/17/14_____        ___Daniel Kiernan_____
      DATE                            DANIEL KIERNAN

21

22    Subscribed and sworn before me this _17th_ day of
      _April_____, 2014, by Daniel Kiernan who is personally
23    known to me.
      State of Florida      )
24    County of Orange      )  __Linda L. Ames._____
                                    NOTARY PUBLIC

25

Notary Public State of Florida
Linda L. Ames
My Commission EE 874712
Expires 04/09/2017

VERITEXT REPORTING COMPANY

1    THEREUPON,

2                        DANIEL KIERNAN,

3           A Witness herein, acknowledged after having

4    been duly sworn and testified upon his oath as

5    follows:

6                   THE WITNESS:  I do.

7                   DIRECT EXAMINATION

8    BY MR. TRIEF:

9        Q.  Good morning, Mr. Kiernan.

10       A.  Good morning.

11       Q.  Do you know who I am?

12       A.  Yes.

13       Q.  Have you ever had your deposition taken

14   before?

15       A.  Yes.

16       Q.  So I'm sure you know the basic rules, but let

17   me just briefly cover them.  First, if you understand

18   my question before I complete it, still let me

19   complete it before you answer it.  Okay?

20       A.  Yes.

21       Q.  If you tend to say yes or no, actually say

22   the word "yes" or "no" as opposed to shaking your

23   head.

24       A.  Yes.

25       Q.  If you don't understand a question that I'm

Page 12

1      Q.  Okay.  So the 20 percent rule, does that

2   apply to both indirect and direct or just direct?  How

3   does it -- how is it applicable?

4           MR. YBARRA:  Objection.

5           MR. TRIEF:  I'll rephrase it.

6           MR. YBARRA:  Thank you.

7   BY MR. TRIEF:

8      Q.  The 20 percent rule, if you can explain it

9   using the terms direct and indirect, it would be

10  helpful.

11     A.  I would apply that to indirect, but related

12  to.

13     Q.  Okay.  So not more than 20 percent of your

14  time can be spent on indirect service that is related

15  to the service?

16     A.  Yes.

17     Q.  Are there activities which are not either

18  directly or indirectly related to service that is

19  included in the sidework tasks?

20     A.  Sidework tasks for who -- for a server?

21     Q.  For a server.

22     A.  No, not that I'm aware of.

23     Q.  I'm just going to give you a couple of

24  examples.  If someone was assigned to be rolling

25  silver, is that indirectly related, directly related

Page 13

1    or not related at all?

2        A.   It is related.  It depends on when it's done

3    and who's doing it.  So it could be either directly

4    related or indirectly related.

5        Q.   Explain to me when it's directly related and

6    when it's indirectly related.

7        A.   If I were a busser or a server and we sat a

8    guest and they needed silverware to eat their food,

9    and I needed to put together a roll of silverware for

10   them, I would place the silverware on the napkin, I'd

11   role it and give it to them.  That would be directly

12   related.

13        If I was a busser and I'm scheduled in at,

14   let's say, 8:00 a.m. and my task it to roll 200 rolls

15   of silverware before we open, I would call that

16   indirectly related to serving the guest.

17       Q.   Removing the trash from the store to the

18   back, is that indirectly related, directly related or

19   unrelated?

20       A.   Who is doing it?

21       Q.   Server.

22       A.   It's not related.

23       Q.   If a server is sweeping or vacuuming parts of

24   the store, is that indirectly related, directly

25   related or not related at all?

1      A.  It depends.

2      Q.  Tell me how you determine that.

3      A.  If I'm waiting on a table and I dropped

4   cheese -- I grated cheese on the carpet right in front

5   of the guest -- I would think, as a server, if I swept

6   that carpet, that that's in direct service for my

7   guests for my tip, keeping it tidy and neat.  If I was

8   assigned to vacuum the dining room, I would say that

9   would be indirectly related.

10      Q.  If a server was assigned to clean the ledges,

11   would that be directly, indirectly or not related?

12      A.  It depends.  If it was in their immediate

13   area and it was a light tidying-up -- maybe a guest

14   splashed sauce up there or a light dusting in my

15   station -- I would call that direct.  If I was

16   assigned to clean the ledges in a significant portion

17   of the dining room as a cleaning duty, I would say

18   that's indirect.

19      Q.  How about cleaning the ice cream freezer,

20   same question?

21          MR. YBARRA:  The what, Ted?

22          MR. TRIEF:  Ice cream freezer.  Same

23      question.  I'm just going to go through

24      different tasks.

25      A.  Yes.

Page 15

1   BY MR. TRIEF:

2        Q.   What would you classify that as?

3        A.   You're asking me a question of something

4   that's not in the duty of sidework for servers.

5        Q.   But if a manager had assigned that?

6             MR. YBARRA:   Objection, foundation.

7   BY MR. TRIEF:

8        Q.   What would you call that?

9        A.   What would I call it?   I would call it

10  probably an inappropriate assignment.   It's not what

11  we assign our servers to clean.

12       Q.   And it would be unrelated to the tasks of a

13  server?

14       A.   It's not directly related.   We have a salad

15  alley position that cleans the alley.

16       Q.   It would be neither directly or indirectly

17  related, correct?

18       A.   Would it be directly or indirectly related to

19  service?

20       Q.   Yes.

21       A.   Cleaning the freezer?

22       Q.   Yes.

23       A.   No, it's not.

24       Q.   How about something called weekly dusting, is

25  that directly or indirectly related?

Page 16

```
 1        A.   Who's doing it again?

 2        Q.   Server.

 3        A.   Weekly dusting is done by a cleaner, which

 4   would be either a busser or utility.  Our expectation

 5   would be, any kind of dusting would be done at the end

 6   of the night per my station.  So if I had a lamp over

 7   my table and it needed to be dusted, I would dust that

 8   as a server in my immediate area.

 9             But weekly assignments, like dusting the

10   dining room, for example, would be assigned to bussers

11   or utility.

12        Q.   And it would be unrelated if it was weekly

13   dusting -- unrelated to server duties?

14        A.   If it's not a server in their station, yes.

15        Q.   And if a server in their station was doing

16   some light dusting, would that be indirectly or

17   directly related to serving?

18             MR. YBARRA:  Objection, asked and

19        answered.

20        A.   It would be indirectly related.

21   BY MR. TRIEF:

22        Q.   If a server would turn off the freezer and

23   put ice cream in a walk-in, is that related, unrelated

24   direct, indirect for a server?  All server questions

25   now.
```

Page 17

```
 1        A.  If a server was putting ice cream in the
 2   freezer?
 3        Q.  Was turning off the freezer and putting ice
 4   cream in a walk-in.
 5        A.  It's related in terms of having ice cream
 6   available and put away and available to servers to
 7   serve their guests.
 8        Q.  And thoroughly clean out the freezer, is that
 9   related or unrelated or is it indirect or direct?
10        A.  If a server were cleaning it?
11        Q.  Yeah.
12        A.  It's light cleaning -- indirect.
13        Q.  If a server would unplug the salad holder and
14   remove the salad, making sure there's enough salad for
15   the remainder of the night --
16        A.  When is it done -- at the end of the night?
17        Q.  Well, I'm reading from something that says
18   there's enough salad for the remainder of the night,
19   so I assume it's not at the end.
20        A.  Then repeat it.  I didn't know if you said
21   salad or what.
22        Q.  It's my fault.  Let me do it clearly and
23   slowly.  If a server was required to unplug the salad
24   holder, remove the salad making sure there's enough
25   salad for the remainder of the night -- if that task
```

1   was assigned to a server -- how would you classify it?

2        A.  It depends on when it's being done.  If it

3   was the end of the night, meaning that there were no

4   guests that need it, it would be indirect.  If it was

5   a time when guests needed it, it could be indirect

6   service of the guests.

7        Q.  And if a server was required to remove all

8   salad toppings from the well and place them on the

9   cart, is that direct or indirect?

10       A.  Indirect.

11       Q.  And if a server was required to clean all

12   ledges throughout the restaurant, is that direct,

13   indirect or not related?

14       A.  It's indirect, but we would not have a server

15   clean all the ledges in the restaurant.

16            Just a note -- most of those activities that

17   you called out are done by the salad alley closer.

18            (Exhibit 59 was marked for

19            identification.)

20            MR. YBARRA:  Ted, is this a section of a

21            document, a page of a larger document?

22            MR. TRIEF:  I believe so. .

23   BY MR. TRIEF:

24       Q.  If you look at the top right column where it

25   says "sections 50, 51 and 52?"

1        A.   Yes.

2        Q.   Do you see the next to the last line?   The

3    title of it is "Sidework for 20 servers."

4        A.   Yes.

5        Q.   Do you see it says, "Clean all ledges

6    throughout the restaurant"?

7        A.   Yes.

8        Q.   If that task was assigned to a server, would

9    that be direct, indirect or unrelated?

10       A.   I would say it's indirect.   I'd also add that

11   this -- I would not recommend that a restaurant make

12   up their own sidework like this that has a server

13   cleaning all the ledges.   But it would be indirect,

14   cleanliness of the dining room.

15       Q.   And what is wipe clean compris and empty

16   garbage?

17       A.   The compris is the point-of-sale system in

18   the dining room.   So that would mean wipe it with

19   probably a sanitizer wipe.   They touch it with their

20   fingers.   The empty garbage is a container probably

21   about this big, has a plastic bag in it.   And in there

22   would be the crumbled up receipts from the tables that

23   servers deposit next to the compris system.   In this

24   situation, they're asking the server to take those

25   empty receipts and put those in another trash can.

Page 20

1      Q.   Is that direct, indirect or unrelated?

2      A.   I would say keeping the dining room tidy

3  would be indirectly related.

4      Q.   Is it your understanding of the 20 percent

5  rule that, if the work is directly related to service,

6  that the 20 percent rule does not apply or it applies

7  to both direct and indirect?

8      A.   My understanding is, it would apply to

9  indirect.  I wouldn't count actions that are in direct

10  service for the guest to be applied against that.

11      Q.   Now, with respect to a bartender, is stocking

12  the bar direct or indirect?

13      A.   It depends on when it's being done.

14      Q.   Tell me.

15      A.   If you order a gin and tonic and I have no

16  gin, I'm going to go get the gin and stock it and that

17  would be in direct service of you.  If I'm an opening

18  bartender and I'm setting my bar, bringing up all my

19  liquor and wine, what I need for the shift before we

20  open, I would say that's indirect.

21      Q.   How about taking to-go orders, is that direct

22  or indirect?

23      A.   It is in direct service of guests if I'm

24  helping a guest.

25      Q.   And how about selling gift cards?

Page 21

1        A.   Direct service.

2        Q.   Filling ice bins?

3        A.   It depends on when you need it.  If I'm doing

4   it because I need to make a drink that requires ice to

5   service a guest, I would say that's direct.  If I'm

6   stocking an ice bin before we open, I would say that's

7   indirect.

8        Q.   How about cutting fruit for garnishes?

9        A.   It depends on when it's being done.  If you

10  want a gin and tonic with a lime on it, I need to cut

11  a lime.  That's in direct service.  If I'm cutting a

12  container of limes before we open, I would say that

13  that's indirect service.

14       Q.   How about setting up the bar?

15       A.   That would be indirect if it's being done, of

16  course, before we open.

17       Q.   And cleaning the bar area, what would you

18  call that?

19       A.   If you spill a drink in the bar area and I'm

20  helping you, I would say that's direct service.  If

21  I'm doing general cleaning at the end of the night,

22  for example, I would say that's indirect.

23       Q.   Now, does Darden Corporation that you work

24  for -- or Olive Garden -- provide such information to

25  its managers so that they can distinguish between

Page 22

```
 1    direct, indirect and unrelated sidework?
 2         A.  You had two questions in there.  You want to
 3    know if Darden does and you want to know if Olive
 4    Garden does?
 5         Q.  I can break it out if the answer is
 6    different.  If it's the same, I would keep it the
 7    same.
 8         A.  I'm speaking for Olive Garden.  Sorry.
 9    Repeat the question again.
10              MR. TRIEF:  Could you?
11              (The reporter read back the last
12         question.)
13              THE WITNESS:  I'll speak for Olive
14         Garden.  We do, in our discussions with our
15         ops leaders, as they need to make sure that,
16         as we assign sidework -- as you saw in the
17         document from 2011 -- but before that, we
18         would have to talk about what it is that
19         we're doing to service our guests and making
20         sure that we are assigning things in order to
21         do that and account for people's time.
22    BY MR. TRIEF:
23         Q.  Is there anything in writing that really goes
24    through a list of different tasks and indicates how
25    you would account for as indirect, as direct or as
```

Page 26

1    A.  Clearly, if we're not open and we're having a

2    meeting, that would be different than if I were

3    working my server shift and my last guest just left

4    and I tidied up my area.  Those are two different

5    circumstances.

6    Q.  So let me take them both.  If there's no

7    guest in the restaurant because the restaurant hasn't

8    opened, is any work that's being performed then work

9    that should be paid minimum wage?

10    A.  Not necessarily.  It can be an indirect --

11    work that's indirect, but related to service, in

12    preparation to.  It would fall under the 20 percent

13    and not require minimum wage.

14    Q.  Would any of the work ever be direct service

15    if there's no customers in the store?

16    A.  Not that I can think of.

17    Q.  After all the customers stop eating and

18    leave, there's still work to be performed, correct?

19    The server still performs work?

20    A.  Yes.

21    Q.  Does that work have to be paid at minimum

22    wage?

23    A.  No.

24    Q.  Is there any system in place at Olive Garden

25    that tracks the amount of time a server spends on

Page 27

1    sidework?

2        A.  A system in place?  I'll just -- the majority

3    of the tracking is done under the supervision of our

4    management teams -- general managers, director, RVPs

5    SVPs, myself, the executive team.  As far as getting

6    even closer to understanding how that breaks out, we

7    had performed a time-in-motion study that was done in

8    a number of different restaurants across our

9    divisions.

10           When we executed that, we looked at 44

11   different meal periods, documented all the movements

12   of our servers throughout their shift.  And so in that

13   documentation, we could break out every duty they do

14   from entering an order into the POS system, to

15   replenishing the side station, to idle time.

16           So based on that documentation, I would say

17   it's very close to about five percent of their time

18   that is spent on what we would call any type of

19   sidework that could be either direct or indirect

20   during their shift.  It's a fairly low number.

21       Q.  Was that in August of 2011?

22       A.  That sounds about right, 2011.  The thing I'd

23   add to that is, we haven't significantly changed their

24   job duties since then.  And we have done executive

25   follows of our servers, where we will connect

```
 1    ourselves to a server's hip from the beginning of the

 2    their shift all the way through the end of the shift,

 3    and would say our observations are very consistent

 4    with what we found in those time-in-motion studies.

 5             (Exhibit 61 was marked for

 6        identification.)

 7    BY MR. TRIEF:

 8        Q.  Is that a copy of that study you referred to?

 9        A.  Yes, it looks like it is.

10        Q.  Let's go back to Exhibit 60 for a second.

11    Put Exhibit 61 away for a moment.  We'll get to that

12    in a second.

13             In Exhibit 60, which is entitled, "Tip share

14    supplement," I see various brands listed.  Do you see

15    that on the first page?

16        A.  I see it.

17        Q.  So was this applicable to Red Lobster, Olive

18    Garden, Longhorn Steak, Bahama Breeze and Seasons 52,

19    as well as Capital Grille?

20             MR. YBARRA:  Objection, beyond the scope,

21        but go ahead.

22        A.  I haven't looked into specifically those

23    brands.  I see their logos on there.  I also believe

24    that there's some differences with how particular

25    positions were handled amongst brands.
```

Page 44

1    how they're doing.

2        Q.  I want to just go back to alley time for a

3    second.  So I know there's picking up the food.

4    That's alley time, correct?

5        A.  Yes.

6        Q.  Making a salad would be alley time.  Picking

7    up the dessert and adding garnishes are alley time?

8        A.  Yes.

9        Q.  What else is alley time?

10       A.  Picking up your entrees, placing soup in a

11   bowl and taking that out to your guests, grabbing

12   bread sticks to bring out to the guests.

13       Q.  And idle time is just standing around doing

14   nothing, I assume, correct?

15       A.  Yes.

16       Q.  What is the other?

17       A.  That would be anything else that's left, so

18   replenishment would fit under that.

19       Q.  What is replenishment?

20       A.  So I need straws for the side stations, so I

21   go get some straws and put it there.  Maybe I need to

22   put some coasters there or I need to put some lemons

23   there.  That would include anything else that's other,

24   not just replenishment.

25       Q.  This operations excellence service study, was

Page 45

1    this the first time a sort of time-in-motion study was

2    done at Olive Garden that you're aware of?

3         A.  I can't say -- that I'm aware of?  It's the

4    only one that I'm aware of, so I can only speak to

5    that.

6         Q.  Did you in any way participate in this study?

7         A.  I asked for it.

8         Q.  Were you the person who called for it?

9         A.  Yes.

10        Q.  Why did you call for it?

11        A.  We're looking always to improve service.  So

12   in my role back then, it was an operations excellence

13   role, and I was looking for ways to understand what

14   the challenges or barriers were in a server position.

15   How can we enable them to best focus on their guests,

16   to maximize their time with guests in the dining room?

17            So to do that, we had to look at all the

18   different tasks they performed so that we could then

19   zero in on which tasks, if any, we would add

20   additional support to enhance service levels.

21        Q.  Was any outside consultants used?

22        A.  No.

23        Q.  This was all strictly in-house?

24        A.  Per se.  It was done independently by our

25   internal audit team, which is not connected with us in

Page 46

1    operations.

2         Q.  But it's a Darden employee?

3         A.  Yes.

4         Q.  I'm asking whether there is any outside

5    consultants beyond Darden employees who were involved

6    in it.

7         A.  No.

8              MR. TRIEF:  Let's take a short break.

9              THE VIDEOGRAPHER:  We're going off the

10        record at 10:26.

11             (Brief recess.)

12             THE VIDEOGRAPHER:  We're back on the

13        video record.  The time is 10:36 a.m.

14        Counsel, you may proceed.

15   BY MR. TRIEF:

16        Q.  Does Olive Garden have people who make the

17   bread?

18        A.  Yes.

19        Q.  What's their title?

20        A.  Production worker.

21        Q.  Are they paid minimum wage?

22        A.  I'm sorry -- to add to that -- or they could

23   be a line cook.  It depends on where the bread is

24   made.

25        Q.  So is the production worker or line cook paid

Page 54

1    work.  It will give you labor projections at any given

2    time for the given week you're in or upcoming week, as

3    long as you input information.

4        Q.  Obviously you know you're not the first

5    Darden witness we've questioned.  I've been told by

6    others that the LMS system uses historical data to

7    predict future needs.  Is that correct?

8        A.  Yes.

9        Q.  And one of the future needs it predicts is

10   schedules, correct?

11       A.  Yes.

12       Q.  And the staff is evaluated by how close they

13   stay to those schedules, correct?

14       A.  I'm not sure I understand that question.

15       Q.  The manager is free at a restaurant to

16   disregard LMS and have more people than LMS

17   recommends, correct?

18       A.  When you say disregard -- one thing I

19   probably need to clarify is -- LMS, it's a computer

20   program.  It doesn't know a lot of things, so it

21   doesn't tell us a lot of things.  So managers need to

22   make decisions both using the tool to build the

23   schedule; they also have to -- they also have to think

24   about what it is telling them because, again, it's

25   information that may not sync up with what's

1    happening.

2           So managers will make decisions to have more

3    than LMS is calling for, because they know things that

4    the computer doesn't know.  Like, the computer might

5    not know a party of 40 just called and said they're

6    going to come in or they made a reservation for next

7    week.  So managers would be expected to make all those

8    adjustments both up and down depending on what we know

9    that the system doesn't know.

10         Q.  Thank you for clarifying that.  Part of the

11   evaluation process, though -- not the whole evaluation

12   process -- but part of it is how close managers stay

13   to the goals that are set for staffing in LMS.

14   Correct?

15         A.  When you say evaluation, are you talking

16   about a performance review.

17         Q.  Yes.

18         A.  So you're asking what part of a performance

19   review does labor management come in?

20         Q.  Not exactly.  I'm asking, does labor

21   management, as it relates to the LMS recommendations

22   as to staffing, have some significance in the

23   performance reviews of a manager?

24         A.  I wouldn't put it that way.  LMS

25   recommendations -- recommendations for how you staff

Page 56

1   different job functions is not directly related to

2   your performance.  Your performance is what's rated on

3   your evaluation.

4          So if we're talking about labor, then we're

5   talking about -- because you could manage labor

6   without LMS.  So in the end, it's what you -- how you

7   manage your controllable costs.  Labor is one aspect

8   of that.  It's not -- the evaluation is not linked to

9   what LMS is calling for specifically.

10          LMS calls for team members by job function.

11   So Monday lunch, you need 17 servers and at these

12   times.  If I schedule 17 servers at those times,

13   that's not necessarily what I'm evaluated on.  I'm

14   evaluated on what performance I deliver in labor.

15          That may or may not deliver me labor

16   performance -- that is, what is expected.  We might be

17   busier than expected; we might be slower than

18   expected; we might mismanage the shift.  The tool

19   itself might not have known things that you need to

20   know as a manager to schedule differently.  So it's

21   just not as easy to tie it in to what LMS is calling

22   for.

23      Q.  Does the evaluation process at least consider

24   how close you are to the LMS recommendations to some

25   degree?

1        A.   No, LMS doesn't come into it.   The evaluation

2   for labor performance in particular is based on how

3   your labor performance was.   Again, we don't bring LMS

4   into that equation.   So it's just based on how you

5   managed your labor versus an expectation.

6            I need to add one more thing to this -- two

7   parts to it.   One, it's versus the expectation; two,

8   the supervisor that's writing that performance

9   evaluation is expected to evaluate and decide whether

10  or not that rating should be applied or whether it

11  should be adjusted.   And I'll give you an example.

12           If I didn't meet my labor and I had a

13  significant miss on my evaluation, but I just went

14  through the worst winter in the northeast that we've

15  even had and I had challenges forecasting my business,

16  then, in the end, my supervisor is going to give me

17  the rating they think is appropriate.

18           So there's much more analysis of what the

19  overall performance is and what the conditions are

20  versus what the scheduling tool itself is asking for.

21       Q.   Does, eventually, the name of the server and

22  bartender get into the LMS system with the schedule

23  for that person?   Eventually, does the LMS know who is

24  in the restaurant at that particular time?

25       A.   Does it know who's in the restaurant at any

Page 62

1          If they were waiting for me and they were

2     there at eight minutes after 11:00, but they were

3     waiting -- that's not a good example because they can

4     punch in themselves.  But if they were waiting for me

5     for any reason and they couldn't punch in, then I

6     would do that adjustment.

7          An adjustment is to the start time.  Edit

8     covers out time and start time.

9          Q.  Where is the evidence of that?  Is that in a

10    punch edit report or some other document?

11         A.  Yeah, a punch edit reports would cover all of

12    the changes made to an employee's timecard.

13         Q.  Are there any programs that Olive Garden has

14    which provide some kind of warning when there's been

15    significant punch edits for a server or a bartender?

16         A.  Are there any programs?

17         Q.  For example, if, in the course of a one-month

18    period, there have been five alterations to the start

19    time.

20         A.  The review of the punch edit reports is the

21    best way to at least get a feel for extraordinary

22    activity.  That is reviewed by all the managers, the

23    GM, directors of operations.  When they visit

24    restaurants, that would be a part of their routine,

25    along with number of other documents that they look

Page 63

1    at.  So reviewing that document is a good start in

2    terms of asking questions.

3         Q.  Does any of the Darden systems provide a

4    warning to Olive Garden that a waiter or bartender is

5    approaching overtime hours?

6         A.  To Olive Garden -- to managers, let's say.  A

7    warning?  It's -- I don't know if we call it a

8    warning.  It's a report that's available to managers

9    that tells you at any given time during the week, for

10   any employee in the restaurant, how many hours they

11   have worked up to that point that you run the report.

12   It tells you how many shifts that they have remaining

13   and it tells you, based on what the system

14   anticipates, what their total hours for the week will

15   be.

16        Q.  Does it ever provide any other information,

17   like be careful, they're approaching over time?

18        A.  It doesn't say be careful.  I'm not aware of

19   any reports that say that.

20        Q.  So in order to predict future labor needs,

21   LMS looks at the past.  We established that earlier,

22   correct?

23        A.  Future labor needs, like what do you need for

24   next week?

25        Q.  Yeah, what should your schedules be for next

1    Olive Garden, unless I'm missing it.  I just wanted to

2    point that out.  It's an e-mail without a restaurant

3    number, name or brand.

4         Q.  Do you know Lawrence Killin?

5         A.  No.  Ask the question again.  I'll answer

6    your question.

7         Q.  I don't know myself, but I believe it's an

8    Olive Garden --

9         A.  We'll work under that assumption.

10        Q.  -- only because that's what my staff has put

11   on here and said it's an Olive Garden, but I can't

12   tell you otherwise?

13        A.  Just ask me your question.

14        Q.  Sure.  So what steps does Olive Garden take

15   so that this kind of conduct doesn't occur?

16        A.  I would say the -- there's a couple things.

17   One is, the first step to prevent conduct that's not

18   aligned with our policy is through education.  So all

19   of our managers, from the first day that they're

20   hired -- so when they begin their orientation -- we go

21   over very clear expectations related to all of our

22   policies, and wage and hour is a significant part of

23   that.

24             Those same managers, within about a ten-week

25   period, get the same review again during their

Page 67

```
1    training when they come to the support center.  So we
2    kind of double that up to make sure that our managers
3    are aware or to make sure that the first education was
4    done right.
5           In addition to that, we require that all of
6    our managers go through that again on an annual basis
7    in addition to the communication that we send out.  So
8    that would be one effort in making sure that
9    inappropriate decisions aren't made.  Maybe the most
10   powerful would be the consequence of severe discipline
11   or action and termination.
12       Q.  That's what I wanted to ask you.  If a
13   manager is found to allow servers or permit servers to
14   not clock in at the time they're scheduled to clock in
15   and wait for the first table, are they immediately
16   terminated if they do that?
17       A.  We don't immediately -- when you say
18   immediately, we don't immediately terminate anyone
19   like that minute.  I will tell you this.  Our
20   guideline, our standard, our policy on that is, any
21   violation of wage and hour are policies that we set
22   up, such as asking someone to wait to clock in or
23   doing any work off the clock whatsoever -- our policy
24   expectation are really clear -- it is disciplinary
25   action, up to and including termination.  When those
```

Page 68

```
 1    violations are found to have occurred, to my

 2    knowledge, it's almost always termination.  I can't

 3    speak for every case.  I'm not involved in the details

 4    of it.

 5              MR. TRIEF:  Let's take a couple minutes.

 6              THE VIDEOGRAPHER:  Going off the record

 7         at 11:10 a.m.

 8              (Brief recess.)

 9              THE VIDEOGRAPHER:  We are back on the

10         video record.  The time is 11:20 a.m.

11         Counsel you may proceed.

12    BY MR. TRIEF:

13         Q.  Are you aware of any investigations by the

14    Department of Labor, any state labor bodies or any

15    internal investigations by Olive Garden regarding

16    working off the clock?

17              MR. YBARRA:  Objection, beyond the scope

18         of this witness.  However, I'll allow him to

19         answer within the scope of his personal

20         knowledge.

21         A.  There was a couple of different questions in

22    there too.  The first one is related to the Department

23    of Labor.

24    BY MR. TRIEF:

25         Q.  I'll break it down.  I just thought I would
```



**Operations Excellence Server Study**
**August 19, 2011**

**Internal Audit Department**

This report is intended for internal use only, and is not to be distributed externally without prior consent from the SVP, Internal Audit and/or SVP, Finance.



Confidential

MATHIS DEFS 0108435



## Executive Summary 

**Objective**
Conduct a cycle time analysis of service areas to gain an understanding of the barriers to the current service model that prevent Olive Garden Servers from providing our guests with a well paced meal and to provide recommendations on process efficiency opportunities.

**Steps Performed**
- Identify a statistically significant sample of Servers that appropriately represents the Server population of Olive Garden restaurants
- Measure cycle time for service areas performed by sampled Servers
- Conduct cycle time analysis
- Identify and define process improvement opportunities
- Communicate results to the Olive Garden operations team

**Internal Audit Data Collection Team:**
Amanda Gufford
Jason Braly

**OG Operations Innovation Data Collection Team:**
Jessica Whiteley
Peter Folch

**Sampling Methodology**
- Sample is based on a 90% confidence interval and 10% tolerable error
- 44 server shifts sampled

**Divisions Observed**
- Chicago
- Dallas
- Denver
- Orlando

**Building Prototypes Sampled**
- P4
- P75

**Project Timeline**

| | |
|---|---|
| Project Start Date | 6/22/2011 |
| Data Collection Complete | 7/29/2011 |
| Data Entry Complete | 8/05/2011 |
| Data Analysis Complete | 8/12/2011 |
| Draft Report Complete | 8/19/2011 |
| Final Report to Olive Garden | 8/29/2011 |

3

Confidential

MATHIS DEFS 0105437

Page 3

## Inefficient Table Turns Decrease Potential Revenue Per Available Seat Hour

**Observation**
- Olive Garden's policy states that the bussing process should be completed within one minute of the guest leaving the table. During our observations, this service standard was not consistently met.

**Implications**
- Inefficient table turns negatively affect revenue per available seat hour since revenue is not earned between the time the guest leaves and the next guest is sat.
- Inefficient table turns negatively affect guest satisfaction because it increases guest wait times during high volume.



**Causes**
- It was observed that some Bussers will not start bussing a table until only silverware and glassware remain on the table. This significantly increases table reset time when servers have a full section.
- Bussers were noted by management as having a lack of motivation since tip sharing was introduced as a result of Busser pay decreasing due to the decreased hourly rate received.
- Bussers do not always operate with the same sense of urgency as the Servers to enhance the guest experience.
- Some Servers tip Bussers in excess of tip share to obtain "priority" service. It was observed that Bussers were more attentive to certain stations than others.
- Bussers generally do not deliver team support of service delivery by pre-bussing guest tables.

Confidential

MATHIS DEFS 0108439

## Guests Are Not Greeted In A Timely Manner

**Observation**
* Olive Garden's policy states that guests should be acknowledged by their Server within 30 seconds of being seated.  During our observation, this service standard was rarely met.

**Implications**
* Inefficient Server acknowledgement time negatively affects revenue per available seat hour  because no revenue is earned until the Server greets the guest.
* Negatively impacts the Server's ability to sell appetizers and add-ons.
* Inefficient Server acknowledgement time negatively affects guest satisfaction because it impacts the pace of the guest's meal and displays inattentiveness.

**Causes**
* Server did not notice new guests had been seated in their section.
* Server was busy attending to other guests.
* Server was busy bussing other tables.
* Server was on break or talking to other team members.

**Opportunities**
* Ensure all team members are actively contributing to the guest experience to enable the Servers to have time to perform acknowledgement within 30 seconds of guest arrival, (i.e., Bussers performing pre-bussing and replenishment activities).



Confidential

MATHIS DEFS 0106441

## Lack of Hand Washing Increases Food Safety Risks

**Observation**
- Olive Garden's policy states that hand washing must occur upon the start of a new shift or starting a new check and after smoking, eating, taking a break, sneezing, coughing, touching face and hair, and using the restroom. During our observations, it was noted that there was very little, if any, hand washing by the Servers. "Sani-Wipes" (sanitizer wipes) were used in some instances but not in accordance with policy.



**Implication**
- Poor personal hygiene is a major contributing factor to food borne illness. A food borne illness outbreak could severely damage Olive Garden's reputation and profits, and leave Darden liable for lawsuits.

**Causes**
- During our observations, hand washing and Sani-Wipe usage decreases during the dinner shift due to volume and time constraints.
- Servers do not clearly understand the food safety risks mitigated by proper hand washing/sanitation.

**Opportunities**
- Educate Servers of the food safety risks present at the restaurant, proper methods for mitigation, and the efforts of the Total Quality department to ensure food safety from "Field to Fork."
- Encourage restaurant management to more effectively enforce proper hand washing by Servers.

Confidential

MATHIS DEFS 0108443

Page 6

## Service Delays Negatively Effect Guest Satisfaction

**Observation**
- During our observations, we noted various activities that caused the service delays that impeded the Server's ability to serve their guests.

**Implication**
- Service delays are an ineffective use of a Server's time and can negatively affect guest satisfaction by impacting the pace of meal and Server attentiveness.

**Causes**
- POS Wait Time. In various instances, Servers were required to wait for access to the POS due to another Server using the terminal. Common occurrences were related to large party inputs and new Servers unfamiliar with the system.
- Waiting for a "Blue Card" swipe. Blue Card holders change depending on what employees are working the shift. Waits are caused when servers have to identify who the Blue Card holders are and then locate them to access and provide approval in the POS. A swipe is required for issues like combining guests together on a single check and check reprints.
- Waiting at the Bar. Servers wait on the Bartender to make mocktails and specialty drinks, including fruit juices, as well as make cash change for the Server's bank.
- Waiting for breadsticks. Breadsticks are kept on baking trays or in bins in the alley. During heavy volume, it is possible that breadsticks could run out which then requires Servers to wait for the next batch to be made. This was not noted as a significant or frequent issue.
- Waiting for soup. Soup is kept in bins in the alley. During heavy volume, various soups could run out which then requires Servers to wait for the next batch to be made. This was not noted as a significant or frequent issue.
- Entrée errors. In various instances, the culinary team did not prepare the guest meal correctly. This causes the Server to wait for the correct dish to be prepared in order to provide the correct dish quickly to the guest.

11

Confidential

MATHIS DEFS 0108445



# NOURISH & DELIGHT
## Everyone We Serve.

Confidential

MATHIS DEFS 0108447

Page 8

## Appendix 2 -- Sample Selection Strategy

- Sample Selection Strategy
  - Sample is based on a 90% confidence interval and 10% tolerable error
  - Observe 44 Server shift experiences within the following guidelines:
    - Equal number of lunch and dinner shifts
    - Equal number of P1 and P75 building prototypes
    - Equal number of weekday and weekend visits
    - Equally divided between four major markets with two to three different Director representations
  - One team member per visit, with a goal of two Server experiences per visit
  - Timing focused on Server activity, beginning with the Server's first guest seating and ending when the last guest's table has been reset
- Assumptions
  - Server experiences are consistent throughout the population
  - The four Regions observed are an accurate representation of the brand in the U.S.
  - Service partners can perform activities in efforts to assist the Server (i.e. Entrée delivery)

Confidential

MATHIS DEFS 0108449

Page 9

## Server Shift Time – P1 and P75
## U.S. Consolidated

Server time for lunch and dinner services by consolidated category for the U.S. in average minutes per shift and as a percentage of shift time for both P1 and P75. Consolidated categories are defined on the subsequent slide.



Confidential

MATHIS DEFS 0108451

Page 10

### Server Shift Time – P1 – Lunch vs. Dinner
### U.S. Detailed

Server time for lunch and dinner services by detailed category for the U.S. in average minutes per shift and as a percentage of shift time for the P1 building prototype.



Confidential

MATHIS DEFS 0108453

Page 11

## Server Shift Time – P1 – Lunch
## U.S. Detailed – Weekday vs. Weekend

Server time for weekday and weekend lunch services by detailed category for the U.S. in average minutes per shift and as a percentage of shift time for the P1 building prototype.



Confidential

MATHIS DEFS 0106455

Page 12

## Server Shift Time – P1 – Dinner
## U.S. Detailed – Weekday vs. Weekend

Server time for weekday and weekend dinner services by detailed category for the U.S. in average minutes per shift and as a percentage of shift time for the P1 building prototype.



Confidential

MATHIS DEFS 0108457

## Appendix 5 – P75 Results Detail

The data obtained during the restaurant observations was analyzed by prototype (P1/P75), time of week (weekday/weekend), time of shift (lunch/dinner), and Division (Chicago/Dallas/ Denver/Orlando). For ease of comparison, the following summaries have been prepared:

- Server Shift Time – P75 – Lunch vs. Dinner – U.S. Detailed
- Server Shift Time – P75 – Weekday Lunch vs. Weekend Lunch – U.S. Detailed
- Server Shift Time – P75 – Weekday Dinner vs. Weekend Dinner – U.S. Detailed

Confidential

MATHIS DEFS 0108459

Page 14

### Server Shift Time – P75 – Lunch vs. Dinner
### U.S. Detailed



Confidential

MATHIS DEFS D106461

Page 15

## Server Shift Time – P75 – Lunch
## U.S. Detailed – Weekday vs. Weekend

Server time for weekday and weekend lunch services by detailed category for the U.S. in average minutes per shift and as a percentage of shift time for the P75 building prototype.



Confidential

MATHIS DEFS 0108463

## Server Shift Time – P75 – Dinner
## U.S. Detailed – Weekday vs. Weekend

Server time for weekday and weekend dinner services by detailed category for the U.S. in average minutes per shift and as a percentage of shift time for the P75 building prototype.



Confidential

MATHIS DEFS 0108465

## Visits to Guest Tables

The average number of times that a Server physically visits their assigned guest's table during their lunch or dinner shifts are noted below, and are classified by Division and building prototype.

   

The average number of times that a Server physically visits any guest table during their lunch or dinner shifts are noted below, and are classified by Division and building prototype.

   

- Generally speaking, the Servers appear to visit guest tables more frequently in the P1 vs. the P75 prototype building regardless of shift.
- Servers in the Orlando Division make the most trips to guest tables, except for the P75 dining lunch where the Denver Division has the most visits to both their assigned guest and at guest tables.

2

Confidential

MATHIS DEFS 0106467

## Average Time –
## Guest Seated to Initial Beverage Delivery

The average amount of time that lapses between the guest being seated to the time they receive their first beverage during the lunch shift is noted below, classified by time of week, Division, and building prototype.

   

The average amount of time that lapses between the guest being seated to the time they receive their first beverage during the dinner shift is noted below, classified by time of week, Division, and building prototype.

   

- It appears that the Chicago Division provides their guests with their initial beverages the quickest, while the Orlando and Dallas Divisions appear to take the longest.
- In general, guests receive their initial beverage the fastest during the weekday lunch period.

Confidential

MATHIS DEFS 0108469

Page 19

## Alley Time - Soup

This analysis shows the amount of time a Server spent in the alley completing the service activity grouped by hourly time periods.



Confidential

MATHIS DEFS 0108471

Page 20

## Alley Time - Breadsticks



This analysis shows the amount of time a Server spent in the alley completing the service activity grouped by hourly time periods.



Confidential

MATHIS DEFS 0108473

## Analysis Results – P1 and P75 Consolidated

- On average, Servers spend a similar percentage of shift time on each service area regardless of prototype, volume, day of week, or Division
- Servers spend the majority of their shift performing the following non-consolidated service areas:
  - POS Entry (11% of shift)
  - Pre-Bussing (11% of shift)
  - Preparing and refilling soup, salad, and breadsticks (10% of shift)
  - Greeting/Order Taking (7% of shift)
- In general, Servers spend approximately 4% more time at the guest's table during the dinner shift
- Servers in the P1 building prototype spent more time at the guest's table and less in the Alley than Servers at a P75 building prototype.  Servers in the P1 dinner shift spent the least amount of time in the Alley overall, while servers with a P75 lunch shift spend the most overall.
- Out of all the soup, salad, and breadstick activities, the salad process takes the longest, with the weekend lunch shift having the highest times.  Bread does not appear to have a significant impact on the process.
- The Servers from the P1 dinner shift had the highest level of Service Partner time.  However, in general Service Partner time was low.
- On average, Servers that work a P1 lunch shift spend the most time pre-bussing, sometimes performing all pre-bussing duties for their table(s).  Servers that work a P75 dinner service spend the least amount of time pre-bussing.
- Regardless of shift, on average Servers are only truly idle for 10 minutes from the time their first guest is seated to the time that their last table was reset

2

Confidential

MATHIS DEFS 0108475

## Analysis Results – P1, continued...

- Service Partner activity is higher during the dinner service than at lunch, typically due to a higher instance of appetizer orders and the need for food runners
- POS activity is the highest at dinner, especially during the weekdays. "Blue Card" swipes, POS location, and order volume directly impact the amount of time spent at the POS. The Dallas Division typically spends the least amount of time at the POS, especially during weekend lunch. The Denver Division tends to spend the most amount of time at the POS, with the most time spent during weekday lunches.
- Very little time is spent by the Servers on appetizers, desserts, and alcoholic/specialty drinks
- To Go activities are performed more often during the dinner shift, most likely due to the larger portion sizes. Additionally, more time was spent on this activity on the weekends versus the weekdays (which is opposite of the P75 analysis).
- Servers at a P1 tend to be idle for an average of 50 minutes per shift, with the highest amount of idle time occurring during the weekend lunch shift.

Confidential

MATHIS DEFS 0108477

## Appendix 8 – General Observations

- The Alley
  - Pace of Meal. Servers indicated that they typically set their own pace of meal because they understand their guests needs (holding entrée orders, etc.).
  - Salad. At times the dedicated salad maker was a barrier to prepping the salad quickly. Most Servers indicated that they would prefer to make their salads themselves because it was faster than walking to the assigned salad maker.
  - Soup. Soup liner plates should be stored at waist level like the other dishes, this was a lot of bending and getting on knees to get these plates by the Servers.
  - Sweet Tea. Several Servers stated that the sweet tea sugar content is inconsistent now that they don't use the simple syrup sweetener. Servers put varying amounts of sugar or water in the mix and Servers stated that this is a frequent customer complaint issue. As a best practice, it was noted that one location the Servers prep a bucket of sugar water in advance to have available as needed for the sweet tea.

- Tip Share
  - Tip Share – Bussers. Although the Busser's tips are larger due to tip share, their overall take home pay has decreased and as a result they aren't as motivated to work quickly. There does appear to be a decline in Busser sense of urgency overall. There were multiple instances where Servers had to reset their own tables because there would have been a wait at the door stand if hadn't been bussed. It was noted that one Server bussed her own tables the entire shift. In another instance, the Busser was setting up dinner seatings in the back room while the Hosts reset the tables in the middle of lunch rush and guests were waiting. Servers are the face of the brand and should be supported with the same sense of urgency as they display to our guests.
  - Tip Share – Bartenders. Several Bartenders indicated that they didn't like the tip share because even though they are was receiving more in tips, they are receiving less in overall take home pay. Servers also stated that they are responsible for tip share during their shift even if they never had an item prepared at the bar.

Confidential

MATHIS DEFS 0106479

Page 24

## General Observations, continued...

- **Host Station**
  - Hosts. In general, Hosts appeared to have a lot of down time during non-rush times. On occasion, they will linger in the bar alley adding to the congestion in an already small area. Their time could be maximized by performing replenishment and bathroom cleaning duties.
  - Welcome Excellence System. Multiple General Manager's indicated potential issues wit the Welcome Excellence and Labor Management System reporting relationship. They also indicated that there are a lot of creative workarounds between these two reports. Several managers stated that it puts guests on false waits (when they enter the restaurant and really don't have to wait), which when analyzed requires additional handcount when in reality it devalues the labor vs. sales ratio. Additionally, seating efficiency is a little misleading in the Welcome Excellence System. Several managers stated that they would rather go back to the manual process that they had before.
  - 4 Table Stations. It was not uncommon to see multiple 4 table stations assigned to Servers. Per the Servers, this happens on a regular basis.

- **Building Design**
  - Prep Wall. The P75 prep wall (where they chop tomatoes, etc.) is directly against the guest bar area and causes a lot of loud noise. This is either a scheduling problem or a building design problem, as the Bartenders indicated a high level of customer complaints during the active prep periods.
  - Soda Fountain. There should be at least two soda dispensers in the main bar alley of the P75, or at a minimum ensure the one machine is centered in the middle of the drink stations to facilitate multiple Server use.
  - Ice Machine. Servers recommended installing ice machines where the soda fountains are located. Additionally, Bussers should be utilized to perform ice refills duties rather than the Servers.
  - Shelving Height. Some Servers have issues in reaching things that are stored on higher shelves in the alley and drink stations at the P75 and must request assistance from other Servers. (e.g. To Go boxes, Coffee creamer)

3

Confidential                                                    MATHIS DEFS 0108481

Page 25

## Appendix 9 – Interpreting a Boxplot



Confidential

MATHIS DEFS 0105483

Page 26

| | A | B | C |
|---|---|---|---|
| 1 | | Weekday Lunch | Weekend Lunch |
| 2 | Wine – Obtaining wine, offering wine, opening/pouring wine | | |
| 3 | Table Time – Greeting / Order Taking | | |
| 4 | POS Entry | | |
| 5 | Service Bar – Picking up Alcohol / Specialty Drinks from the Bar | | |
| 6 | Table Time – Appetizer / Dessert | | |
| 7 | Table Time – Soup / Salad / Breadsticks | | |
| 8 | Table Time – Entrée | | |
| 9 | Table Time – Check back | | |
| 10 | Table Time – Pre-Bus | | |
| 11 | Table Time – Initial Drink Delivery | | |
| 12 | Table Time – Drink Refills | | |
| 13 | Alley Time – Soup (New) | | |
| 14 | Alley Time – Salad (New) | | |
| 15 | Alley Time – Breadsticks (New) | | |
| 16 | Alley Time – Soup (Refill) | | |
| 17 | Alley Time – Salad (Refill) | | |
| 18 | Alley Time – Breadsticks (Refill) | | |
| 19 | Alley Time – Gathering menus, buying food for their tables | | |
| 20 | Alley Time – Assisting other servers, carrying/running other's food | | |

Confidential

MATHIS DEFS 0108486

| | A | B | C |
|---|---|---|---|
| 1 | | Weekday Lunch | Weekend Lunch |
| 2 | Hire – Clocking in/out, altering attire, opening/closing duties | 2% | 3% |
| 3 | Table Time – Greeting / Order Taking | 9% | 6% |
| 4 | POS Entry | 12% | 10% |
| 5 | Service Bar – Picking up Alcohol / Specialty Drinks from the Bar | 0% | 0% |
| 6 | Table Time – Appetizer / Contact | 0% | 1% |
| 7 | Table Time – Soup / Salad / Breadsticks | 5% | 5% |
| 8 | Table Time – Entrée | 1% | 2% |
| 9 | Table Time – Check back | 4% | 6% |
| 10 | Table Time – Pre-Bus | 9% | 14% |
| 11 | Table Time – Meal Drink Delivery | 2% | 3% |
| 12 | Table Time – Drink Refills | 2% | 3% |
| 13 | Alley Time – Soup (New) | 2% | 2% |
| 14 | Alley Time – Salad (New) | 3% | 2% |
| 15 | Alley Time – Breadsticks (New) | 2% | 3% |
| 16 | Alley Time – Soup (Hand) | 2% | 1% |
| 17 | Alley Time – Salad (Hand) | 2% | 1% |
| 18 | Alley Time – Breadsticks (Refill) | 1% | 1% |
| 19 | Alley Time – Gathering extras, staying food for their tables | 3% | 3% |
| 20 | Alley Time – Assisting other servers, trying/housing others' food | 4% | 4% |
| 21 | Service Partner Activity – Introduction to partner's group | 0% | 1% |
| 22 | Service Partner Activity – Refills | 0% | 1% |
| 23 | Service Partner Activity – Pre-Bus | 1% | 1% |
| 24 | Side Station Activities | 5% | 7% |
| 25 | Hand Washing and Sanitizer | 2% | 3% |
| 26 | Special Guest Request Activities | 1% | 1% |
| 27 | To-Go Activities | 2% | 1% |
| 28 | Replacement Activities | 7% | 4% |
| 29 | Meal Time Leftovers | 1% | 1% |
| 30 | Table Time – Check Drop | 3% | 4% |
| 31 | Table Time – Check Close | 2% | 4% |
| 32 | Idle Time | 10% | 2% |
| 33 | Getting Change | 0% | 2% |
| 34 | Delays – Guest Related | 0% | 0% |
| 35 | Non Cash Activities | 0% | 1% |
| 36 | Restroom break | 0% | 1% |

Confidential

MATHIS DEFS 0108488

Confidential

| | A | B | C | D |
|---|---|---|---|---|
| 28 | Reconditioned Laptops | | | |
| 29 | W15 Test Indicium | 5 | 2 | |
| 30 | Make Time + Check | 4 | 3 | |
| 31 | Make Time + Check | 1 | 2 | |
| 32 | Set Time | 7 | 5 | |
| 33 | Oiling Change | 6 | 8 | |
| 34 | Gutter + Gutter | 3 | 5 | |
| 35 | Hot Cold Antibiotic | 3 | 7 | |
| 36 | Restroom Break | 9 | 2 | |

MATHIS DEFS 0108490

Page 29

| | A | B |
|---|---|---|
| 1 | | P-01 Average Server Shift |
| 2 | Table Time | 36% |
| 3 | Alley Time | 24% |
| 4 | Pre-Bus Time | 13% |
| 5 | POS Time | 11% |
| 6 | Idle Time | 6% |
| 7 | Service Partner Time | 5% |
| 8 | Other | 5% |
| 9 | | To resize chart data range, drag lower right corner of range. |

Confidential

MATHIS DEFS 0108492

Page 30

| | A | B |
|---|---|---|
| 1 | | P-01 Average Server Shift |
| 2 | Table Time | 34% |
| 3 | Alley Time | 26% |
| 4 | POS Time | 12% |
| 5 | Pre-Bus Time | 11% |
| 6 | Service Partner Time | 6% |
| 7 | Idle Time | 6% |
| 8 | Other | 5% |

Confidential

MATHIS DEFS 0108494

**EXHIBIT 15**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 61742-CIV-ROSENBAUM/SELTZER

NICOLE ALEQUIN, TESHIURE AMOS,
et al.,

      Plaintiffs,

vs.

DARDEN RESTAURANTS, INC., et al.,

      Defendants.

_____/


                    111 North Magnolia Avenue
                    Orlando, Florida
                    April 29, 2014
                    2:08 a.m. - 5:25 p.m.


DEPOSITION OF STEPHANIE EDWARDS


      Taken on behalf of the Defendant before Nancy M. Wingo, RPR, RMR, Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition in the above cause.

Page 4

```
 1   THEREUPON:

 2            THE VIDEOGRAPHER:  My name is Russ White of

 3       Veritext.  The date is April 29, 2014, and the

 4       time is approximately 2:08 p.m.  This deposition

 5       is being held in the office of Littler, Mendelson,

 6       located at one 111 North Magnolia Avenue, Orlando,

 7       Florida.

 8            The caption of this case is Nicole Alequin,

 9       et al, versus Darden Restaurants, Incorporated, in

10       the United States District Court, Southern

11       District of Florida.  The name of the witness is

12       Stephanie Edwards.

13            At this time, will attorneys please identify

14       themselves, after which our court reporter, Nancy

15       Wingo of Veritext, will swear in the witness and

16       we can proceed.

17            MR. TRIEF:  Ted Trief and Janessa Wasserman

18       for the plaintiffs.

19            MR. LEHET:  Michael Lehet from Littler

20       Mendelson, on the behalf of defendants.  And with

21       me is Linda Ames from Darden's legal department.

22   THEREUPON:

23                 STEPHANIE EDWARDS,

24   a Witness herein, having first been duly sworn, was

25   examined and testified on her oath as follows:
```

```
 1              THE WITNESS:  I do.
 2                    DIRECT EXAMINATION
 3   BY MR. TRIEF:
 4        Q     Good afternoon.
 5        A     Good afternoon.
 6        Q     As you hear, my name is Ted Trief.  Do you
 7   understand who I am?
 8        A     I do.
 9        Q     Have you ever had your deposition taken
10   before?
11        A     I have not.
12        Q     I know your attorneys have probably gone over
13   things for you.  But just let me say for the record that
14   I'll be asking you some questions.  You may understand
15   the question, even before I finish it.  But, if you
16   would, wait until I'm done before you answer so we can
17   get a good and complete record.  Okay?
18        A     Yes.
19        Q     And you did a great job in that answer.
20   Because the next instruction would be if you're going to
21   say yes or you're going to say no, say the word rather
22   than the head shake.
23        A     Very good.  I will.
24        Q     If you don't understand a question I'm asking
25   you, please let me know.  I'm happy to rephrase it.  If
```

Page 27

1    closing sidework?

2         A     Rolling silverware, again, stocking sugar

3    caddies and salt and pepper shakers that are on the

4    table.  Again, I would have to reference the tool to

5    have the complete list.  But those are the things that

6    are the biggest components of, you know, insuring that

7    we are now closing down the restaurant and getting our

8    tables tidy and clean.  So hoking around the floor,

9    insuring that there's no crumbs and food debris

10   underneath the tables, so it's ready for the next

11   service shift.

12        Q     So you're -- so you're cleaning debris from

13   not only the tables of your own customers but from the

14   tables of others as well?

15        A     No, it would just be your individual station.

16        Q     With respect to directly related work,

17   incidental work and unrelated work, is that something

18   that the -- either the talents or the managers are

19   trained about?

20        A     Yes.

21        Q     Is there anything in writing that LongHorn

22   has prepared that explains to the managers what a

23   particular task is to be considered?

24        A     I don't have recollection of anything that's

25   in writing as specific as layering into those three

Page 28

```
 1    buckets like we just did, but there are certainly

 2    guidance that we provide, that the tasks that are within

 3    our service side charts that we know have been vetted

 4    through our operations, subject-matter experts, as well

 5    as our employment law subject-matter experts.  And those

 6    are the tasks that should be being performed when

 7    someone is working in a tip credit position.

 8        Q    But there isn't anything that you're aware of

 9    that's in writing that says, "This task is unrelated,

10    this task is incidental, this task is directly related?

11             MR. LEHET:  Form.

12             THE WITNESS:  Not layered out like that, that

13        I'm aware of, no.

14    BY MR. TRIEF:

15        Q    And would you agree that there are some tasks

16    that might be difficult to know whether they're -- they

17    fit in a particular category or not?

18        A    I don't -- I don't agree with that because I

19    think that we provide the appropriate tools for leaders

20    to follow.  And if those tasks aren't on those tools,

21    then they shouldn't be expecting them to do that work,

22    if they're in a tip credit job class.

23        Q    If a server was cleaning the blinds, or

24    cleaning the windows, is that directly related,

25    incidental or unrelated?
```

Page 36

1    explained to managers the way you just explained it to

2    me so they understand it?

3         A    Well, because we have tools, like our

4    sidework charts and like our training curriculum of

5    what's expected within those jobs that wouldn't be

6    inclusive of them doing tasks that are unrelated.  It

7    wouldn't be a part of that job function.  So we don't

8    necessarily deem it necessary to describe things that

9    they shouldn't be doing because we're providing them

10   with all the guidance and information on the things they

11   should be doing and that's what they should be adhering

12   to.

13        Q    But haven't you experienced inquiries from

14   people that make it clear to you that they don't

15   understand the distinction?

16             MR. LEHET:  Form.  Foundation.

17             THE WITNESS:  I think there's -- from time to

18        time, yes.  But I would always direct them back to

19        our materials and what is documented and what's

20        expected so they can insure that they've reviewed

21        the content and understand what the tasks are that

22        they should be doing.

23   BY MR. TRIEF:

24        Q    In the training program, is there any part of

25   that training program where the managers are told these

Page 38

1    closing sidework, would that closing sidework all be

2    counted to the 20 percent rule?

3              MR. LEHET:  Form.

4              THE WITNESS:  Yes.

5    BY MR. TRIEF:

6        Q    And you would agree that if that, if the

7    opening or closing sidework was done by a server or

8    bartender, that that would reduce the amount of running

9    sidework that they could do in order not to exceed the

10   20 percent rule?

11             MR. LEHET:  Form.

12             THE WITNESS:  I don't believe so, because

13        it's part of work that they're doing to service

14        their guests while they have guests seated at

15        their table.  Obviously, it all combines as a

16        total.  However, our tools and our documents are

17        built in a way that based upon the knowledge of

18        the subject-matter experts, that we wouldn't put

19        ourselves into a position where the total sum of

20        all the tasks would exceed that.  Because,

21        typically, you're not going to have somebody

22.       that's doing opening running and closing sidework,

23        because they wouldn't be working that lengthy of a

24        shift.

25

Page 80

1      A      I -- we meet weekly with our executive vice

2      president of operations and, obviously, they're my

3      partners on content.

4      Q      So you know how -- you know how the

5      restaurants are operated?

6      A      Of course.

7      Q      Well, in that e-mail you say, in the fourth

8      line down -- well, actually, go to the third line.

9      You're talking about that automatic setup now.

10     A      Uh-huh.

11     Q      And you say, "They are getting paid minimum

12     wage versus tip minimum wage which obviously protects us

13     from wage/hour violations."

14     A      Correct.

15     Q      Can you explain how implementing this, what

16     you call "functionality," protects you from wage and

17     hour violations?

18     A      Well, it's a proactive approach that if

19     someone's on the clock longer than they would be for an

20     extended period of time and they're not serving guests,

21     then, we could have -- we wouldn't, potentially, be in

22     violation of having them do tasks that fall outside of

23     that 20 percent.

24     Q      And so this reduces the risk, the system

25     reduces the risks that you'd be violating the law?

```
 1      A      Absolutely.

 2      Q      So shouldn't you implement that system?

 3      A      That's not my decision to make.

 4      Q      But that's -- that shouldn't be an issue of

 5   economics, is it?  Well, withdrawn.  Withdraw the

 6   question.

 7             And the protection lies within creating a

 8   violation of the 20 percent rule; is that agreed?

 9             MR. LEHET:  Form.

10   BY MR. TRIEF:

11      Q      Because that's what you're talking about,

12   that's the protection?

13      A      The protection allows it to be more seamless

14   for our managers so they don't have to worry about

15   clocking someone in and clocking someone out.  That's

16   the protection.

17      Q      But --

18      A      So they are not at risk.

19      Q      Well, they're not at risk for having the

20   servers or bartenders perform unrelated sidework, or

21   they're not at risk for violating the 20 percent rule or

22   something else?

23      A      This is specifically referring to bartenders

24   because they are completing server checkouts.  And so if

25   that task takes longer and they're no longer serving
```

Page 132

```
1                THE WITNESS:  No one within LongHorn training

2           provided that information.

3   BY MR. TRIEF:

4        Q    You heard of it occurring, though, from time

5   to time, did you not?

6                MR. LEHET:  Form.

7                THE WITNESS:  I have.

8                MR. TRIEF:  Let's take one minute, please.

9           We're almost done.  I just want to be sure.  We

10          can't be more than 10 minutes away.

11               THE VIDEOGRAPHER:  We are going off the

12          record at approximately 5:19 p.m.

13               (Brief recess taken.)

14               THE VIDEOGRAPHER:  We are going back on the

15          record at approximately 5:23 p.m.

16               MR. TRIEF:  I have completed my questions.

17                         CROSS-EXAMINATION

18   BY MR. LEHET:

19        Q    Miss Edwards, during your deposition

20   testimony today you used the term "unrelated tasks" or

21   "unrelated sidework"?

22        A    Uh-huh.

23        Q    What do you mean by "unrelated"?

24        A    When I think of unrelated work, it is things

25   like deep cleaning, it is things that would not be the
```

1    duty of the server when they're -- or a bartender or

2    service attendant -- when they're on their job as a

3    tipped credit employee.  If they're going to do those

4    tasks, they would clock in under a job code that would

5    provide them with minimum wage or greater.

6         Q    When you -- and previously you testified

7    about sidework charts?

8         A    Correct.

9         Q    Can there be a task that is not contained on

10   the sidework chart that would, nevertheless, be

11   incidental, as you had previously used that term?

12        A    I believe so, yes.  Those charts are not

13   all-inclusive.  Things come up on a shift and servers

14   are going to be asked to perform functions or tasks that

15   would enable them to deliver a great guest experience or

16   support their team in delivering a great guest

17   experience.

18        Q    You're not a lawyer are you?

19        A    I am not a lawyer.

20        Q    Are you personally aware of whether any

21   LongHorn bartenders performed the previously discussed

22   checkouts while receiving the tip credit minimum wage?

23        A    I am not personally aware of that, no.

24             MR. LEHET:  I have nothing further.

25             MR. TRIEF:  Thank you.  Nice meeting you.

**EXHIBIT 16**

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER


NICOLE ALEQUIN, TESHIURE AMOS,
et al,

     Plaintiffs,

vs.

DARDEN RESTAURANTS, INC,
et al,

     Defendants.
_____/


                       Littler Mendelson
                       111 N. Magnolia Avenue
                       Suite 1250
                       Orlando, Florida
                       Tuesday, 9:47 a.m.-11:34 a.m.
                       March 18, 2014



              DEPOSITION OF CHRIS IACIOFOLI


    Taken on Behalf of the Plaintiffs before

Lisa Gerlach, Court Reporter, Notary Public

in and for the State of Florida at Large,

pursuant to Plaintiffs' Notice of Taking

Deposition in the above cause.

Page 5

```
 1        R-O-D-D-A, representing in-counsel for the

 2        defendants.

 3             THE VIDEOGRAPHER:  Our court reporter

 4        today is Ms. Lisa Gerlach, also of Veritext

 5        Reporting.  Ms. Gerlach, will you please

 6        swear our witness?

 7   THEREUPON,

 8                      CHRIS IACIOFOLI,

 9             A Witness herein, acknowledged after having

10   been duly sworn and testified upon his oath as

11   follows:

12             THE WITNESS:  Yes.

13                      DIRECT EXAMINATION

14   BY MR. TRIEF:

15        Q.  Can I have your address?

16        A.  7710 Apple Tree Circle, Orlando, Florida,

17   32819.

18        Q.  Thank you very much.  Good morning.

19        A.  Good morning.

20        Q.  Have you ever had your deposition taken?

21        A.  No.

22        Q.  So, first, do you know who I am?

23        A.  You are the plaintiffs' counsel.

24        Q.  Okay.  I'll be asking you questions today.  I

25   suspect it will not last more than two hours.
```

Page 20

```
 1       Q.  I want to show you Exhibit 1.  Do you see

 2  that document?

 3       A.  Yes.

 4       Q.  Are you familiar with it?

 5       A.  I saw this document for the first time the

 6  other day.

 7       Q.  You see it says "Serving closing sidework?"

 8       A.  Yes.

 9       Q.  From whom was it generated?  Where does it

10  come from?

11       A.  It's my understanding that this document was

12  created at one of our restaurants.

13       Q.  And it is a Red Lobster restaurant?

14       A.  Yes.

15       Q.  And the sidework should be the same at every

16  Red Lobster restaurant?

17       A.  No.

18       Q.  Closing sidework should be the same?

19       A.  No.  We have 706 restaurants and we don't

20  dictate closing sidework from the corporate level.  We

21  train our managers on how to fairly pay their team

22  members and stay within the 20 percent guideline and

23  our restaurants will, if they have sidework, will

24  choose how to assign it.  And it could be different

25  from restaurant to restaurant.  It could be different
```

Page 35

1   tasks at a tip-producing -- at a tipped rate after

2   their last customer leaves?

3          MR. YBARRA:  Objection, asked and

4       answered.

5   BY MR. TRIEF:

6       Q.  Can you answer that question?  Are you able

7   to answer that question yes or no?

8          MR. YBARRA:  Objection, asked and

9       answered.

10      A.  I believe I answered that question.

11  BY MR. TRIEF:

12      Q.  Are you able to answer that question yes or

13  no?

14      A.  Yes.

15      Q.  What's the answer?

16      A.  The answer to that question is:  These items

17  are directly and indirectly tip-producing, and we

18  educate our managers on paying our team members fairly

19  and following our policies and procedures that we have

20  set forth as an organization, and those policies and

21  procedures have been written well within the letter of

22  the law.

23          So the answer to the question is that --

24  first off, we haven't defined that these are not

25  allowed to be completed by a server.  Our expectation

Page 36

1   is that these items that are on here, if a server were

2   to be completing them, would be directly or indirectly

3   tip-producing.  And if we were to consider -- if

4   somebody said they were not, they would fall under the

5   general prep and maintenance and a server would not

6   spend more than 12 minutes per hour, per shift

7   completing these tasks.

8        Q.  Since you said you could answer the question

9   yes or no, please answer the question yes or no.

10            MR. YBARRA:  Objection, asked and

11        answered.  You can't demand the witness

12        answer the question a certain way.

13        A.  Sir, I did not say that I would answer the

14   question yes or no.  You asked me if I could answer

15   the question yes or no and I responded, yes, I can

16   answer --

17   BY MR. TRIEF:

18        Q.  If you can answer it yes or no, please answer

19   it yes or no.

20            MR. YBARRA:  Objection, asked and

21        answered and you're just being argumentative.

22            MR. TRIEF:  If the witness can answer it

23        yes or no, I would like him to answer yes or

24        no.

25            THE WITNESS:  I cannot answer that

Page 59

1   manager?

2       A.   Forecast accuracy is part of our -- it has

3   been in the past.  I can't speak specifically if it's

4   part of performance review today.  But we typically

5   want our managers to be accurate with their forecast,

6   as it's an essential part of delivering a great guest

7   experience, because it forecasts how we schedule our

8   team members.

9       Q.   The LMS, though, is a forecasting estimate

10  that's at the corporate level, correct?

11      A.   No.  The LMS is a forecasting and scheduling

12  system tool, so to speak, that we provide to our

13  restaurants.  So this system itself may be housed in

14  some database somewhere, but each individual

15  restaurant has their own individualized Labor

16  Management System that they use to forecast and

17  schedule their business.

18      Q.   Understood.  But the forecasting part of that

19  is not being forecast at the local restaurant level;

20  it's being forecast someplace else, correct?

21          MR. YBARRA:  Objection, asked and

22          answered.

23      A.   I can't speak to where the calculation is

24  housed for the system.  All I know is that the

25  forecast is generated by the general manager in the

**EXHIBIT 17**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER

NICOLE ALEQUIN, TESHIURE AMOS,
et al,

     Plaintiffs,

vs.

DARDEN RESTAURANTS, INC,
et al,

     Defendants.

_____/

Littler Mendelson
111 N. Magnolia Avenue
Suite 1250
Orlando, Florida
Wednesday, 12:03 p.m.-1:03 p.m.
March 19, 2014

DEPOSITION OF MARK NORBERG

    Taken on Behalf of the Plaintiffs before

Lisa Gerlach, Court Reporter, Notary Public

in and for the State of Florida at Large,

pursuant to Plaintiffs' Notice of Taking

Deposition in the above cause.

1        swear in our witness.

2   THEREUPON,

3                      MARK NORBERG,

4        A Witness herein, acknowledged after having

5   been duly sworn and testified upon his oath as

6   follows:

7                THE WITNESS:  I do.

8                      DIRECT EXAMINATION

9   BY MR. TRIEF:

10       Q.   Good afternoon, Mr. Norberg.

11       A.   Good afternoon.

12       Q.   Do you know who I am?

13       A.   I heard you introduced.

14       Q.   Do you know who I represent?

15       A.   Yes.

16       Q.   Have you ever had your deposition taken

17   before?

18       A.   I have not.

19       Q.   Let me go over some basic rules.  First, even

20   if you know what my question is before I complete it,

21   wait until I'm done and then answer it after I've

22   completed it.  Okay?

23       A.   Okay.

24       Q.   If you intend to say "yes," say the word

25   "yes."  If you want to say "no," say the word "no."

Page 10

1    restaurant, the time of day, how many guests are in

2    the building.  It would really be difficult to define.

3         Q.  Are there any activities that you would

4    classify as not directly related to generating tips,

5    but the servers or bartenders are still required to do

6    them at a tipped wage?

7         A.  Anything that they're doing in the course of

8    service to our guests would be either directly or

9    indirectly related to generating their tips.

10        Q.  Right.  And I would like to have some

11   specific examples of those things that are indirectly,

12   that are not directly related, to generating tips.

13            MR. YBARRA:  Objection, asked and

14        answered.

15        A.  I would say that it would depend again upon

16   the time of the day and how many guests are in the

17   building and what they were doing.

18   BY MR. TRIEF:

19        Q.  You can't give me any examples that would not

20   depend upon those things?

21        A.  Not during the course of service when that's

22   when they're being paid a tipped wage.

23        Q.  Let me show you Exhibit 50.  You've read it?

24        A.  I have, yes.

25        Q.  Would you agree that servers and bartenders

Page 23

1   provide that goal?

2       A.  I'm not sure if there is.  It's communicated

3   frequently.  I know that there's probably some e-mails

4   that have that goal stated in it.  I don't know if

5   there's a document.

6       Q.  This document refers to using the new

7   sidework?

8       A.  Yes.

9       Q.  Can you explain what that is?

10      A.  Every one of our restaurants has the ability

11  to develop their own sidework for the servers.  They

12  have been working on a process that would help the

13  servers be able to finish as soon as their guests were

14  gone and let them go home.  Our goal is not to have

15  servers in the building if there's no guests to serve.

16  That's what LMS is designed to do.

17      Q.  And they're supposed to get the sidework done

18  while they're serving guests and not after the guests

19  leave, correct?

20      A.  There are some that they do after the guests

21  leave.

22      Q.  If they do sidework after the guests leave,

23  are they paid at minimum wage or are they still being

24  paid a tipped wage?

25      A.  Still being paid a tipped wage.

Page 24

1      Q.  So if there are no guests in the restaurant

2  before the restaurant -- withdrawn.  If there's

3  sidework being done before guests arrive, the servers

4  or bartenders are being paid at minimum wage.  But if

5  there are no guests in the restaurant before they

6  leave, they're still being paid a tipped wage?

7      A.  I didn't say there was no guests in the

8  restaurant.  I said as their guests leave.  So the

9  sidework is distributed based on guest count

10  decreasing.  And as the guest count decreases, we

11  close certain sections of the restaurant.  There are

12  certainly still guests in the restaurants up until the

13  end of that sidework being completed.  They just do it

14  as they're exiting.

15      Q.  Is there any sidework done when there are no

16  guests in the restaurant?

17      A.  That would be the opening sidework and very

18  possibly breaking down of the coffee and tea station

19  at the end of the evening after the last guest has

20  departed.

21      Q.  The people who do sidework after the last

22  guest has departed, does their pay change to minimum

23  wage?

24      A.  No, it does not.

25      Q.  Why not?

Page 26

1      Q.  And you're telling these managers that they

2  ought to be following the LMS-generated standard,

3  correct?

4      A.  Yes.  That is our best tool to help us manage

5  our labor costs.

6      Q.  It's important to manage labor costs to get

7  people off the clock as fast as possible, correct?

8      A.  At the end of the shift as guest counts

9  decline, our-number one goal is to be able to let our

10  team members go home.  We pay them to service the

11  guests.  Once we have no guests, particularly at the

12  end of the shift, our number-one focus is to make

13  them -- help them get off the clock as quickly as

14  possible.

15      Q.  Do you see the complaint by Caroline Zerboni

16  that she was caught short-handed at the beginning of a

17  shift?

18      A.  I don't see a complaint.  I see her noting

19  they were caught short-handed.

20      Q.  I'm showing you Exhibit 57 again.  It's an

21  e-mail exchange that you were a part of.

22      A.  Uh-huh.

23      Q.  Do you see there is an e-mail from Megan

24  Fortney indicating that she had a very difficult time

25  with the staffing?

1      Q.   Have you ever seen this before?

2      A.   I have not.

3      Q.   Do you know what it means to be getting

4  creative within times?

5      A.   I would imagine that they were looking at how

6  they could schedule people in later as guest counts

7  increased, as opposed to scheduling everyone in at one

8  time, but that would be speculation on my part.

9      Q.   Do you know what is meant by checking

10  clock-in-clock-out reports?

11      A.   That's one of our safeguards for managing our

12  labor.  Our management teams are constantly running an

13  employee-on-the-clock report to make sure everybody

14  that's working is clocked in.

15      Q.   Are the schedules kept on the LMS system?

16      A.   They are.

17      Q.   Are you able to compare the schedules with

18  the clock-in-clock-out data on any given day?

19      A.   The schedules could be checked against a

20  punch edit report every day.

21      Q.   Is the punch edit report the same as the

22  clock-in-clock-out data?

23      A.   The punch edit report is exceptions to the

24  clock-in-clock-out data.

25      Q.   Is there also a separate report that you can

1    run just on pure clock-in-clock-out data?

2         A.   There is.

3         Q.   Can you compare that clock-in-clock-out data

4    to the LMS schedules?

5         A.   If you chose to.

6         Q.   Is your office here in Orlando?

7         A.   No, it's not.  I actually have what is

8    described as a field-based position, so I spend five

9    nights a week in my restaurants.  I just flew in last

10   night from Kansas City.

11        Q.   Are you able to access the clock-in-clock-out

12   data and the schedules remotely?

13        A.   I can access the schedules remotely.  I do

14   not have access to the clock-in and clock-out data

15   remotely.

16        Q.   Do you also have an office in Orlando?

17        A.   I do not.

18        Q.   If you wanted to check in the

19   clock-in-clock-out data, how would you do that if you

20   could?

21        A.   I would have a restaurant fax it directly to

22   me.  I would also probably rely on my directors of

23   operations to be checking it.

24        Q.   If the schedules -- well, are there any red

25   flags that would appear, if you were comparing the

Page 30

1    schedules to the clock-in-clock-out data, which would

2    indicate off-the-clock work?

3         MR. YBARRA:  Objection.

4    A.  Red flags?

5         MR. YBARRA:  Objection, compound.  I

6         think it's argumentative, if I understand it,

7         but go ahead.

8         THE WITNESS:  If you could be a little

9         more clear with the question?  I'm not quite

10        sure what you're asking.

11   BY MR. TRIEF:

12   Q.  If the schedules -- I'm just going to give

13   you an example to have it make some sense.  So if the

14   schedule said that a server would come in for a

15   particular week, five days a week, at 11:00, and the

16   clock-in-clock-out data showed that each day the

17   server clocked in at 11:30, would that be any kind of

18   red flag indicating something is wrong?

19   A.  There would be.

20   Q.  Why?

21   A.  There would be a red flag.  The way that we

22   would see it or have visibility to that would be the

23   punch edit report.

24        First of all, the server would not be able to

25   clock in at 11:30 without a manager activate or swipe

Page 31

1    their card for them to do that.  That would, in turn,

2    generate a punch edit, which, in turn, would go onto

3    the punch edit report, which then has to be signed by

4    that manager and that team member acknowledging that

5    the punch was edited.  That is stored in the manager's

6    office and it's reviewed by our directors of

7    operations when they're in the restaurants doing

8    standard operations visits at least once a quarter.

9         We also have an internal audit that would

10   pick that up.

11        Q.  For how long a time is it that would prevent

12   the server from clocking in late?  If you're a minute

13   late, can you clock in -- five minutes late, can you

14   clock in?

15        A.  They have a window to clock in between five

16   minutes prior to their shift starting and ten minutes

17   after.

18        Q.  Are there any procedures or policies in place

19   that require somebody in the chain of command at

20   Seasons 52 to compare the schedules with either the

21   punch edit reports or the clock-in data?

22        A.  To compare the schedules to them?  No.  Our

23   policies and procedures are guided by the exceptions

24   to the punches, which would be the punch edit reports.

25   So if there was ever a deviation from that schedule,

Page 32

1    because the LMS system is tied into the point of sale

2    system -- that schedule is in the point of sale

3    system.  So any time it's deviated from by more than

4    the window that I just explained, it would generate a

5    report which then, in turn, would be audited.

6        Q.  Who does the auditing?

7        A.  We have an internal audit department.  We

8    also have a directors of operations on a quarterly

9    basis, in each one of our restaurants, doing what we

10   call a standard operations visit and that is part of

11   that process.

12            MR. TRIEF:  Let's go off the record for a

13        few minutes.

14            THE VIDEOGRAPHER:  Going off the record

15        at 12:46 p.m.

16            (Brief recess.)

17            THE VIDEOGRAPHER:  And we're back on the

18        video record.  The time is 12:53 p.m.

19        Counsel, you may proceed.

20   BY MR. TRIEF:

21        Q.  Mr. Norberg, did you discuss your testimony

22   during the break?

23            MR. YBARRA:  Objection, attorney-client

24        privileged communication.

25            MR. TRIEF:  Well, he shouldn't be

1         privileged communication.

2              MR. TRIEF:  I don't agree, but...

3    BY MR. TRIEF:

4         Q.  How would exceeding by more than 150 hours

5    the LMS standard be detrimental to the guest

6    experience?

7         A.  By exceeding the standard, it would actually

8    probably benefit the guest.  If you are 150 hours over

9    the standard -- is that what you're asking me?

10        Q.  Yes.

11        A.  That means that you're actually spending more

12   labor than the program is recommending.

13        Q.  Are you aware of any audit performed since

14   2009 that has resulted in a finding that Seasons 52

15   Restaurants were employing workers off the clock?

16        A.  I am not aware of one.

17        Q.  Are you aware of any findings from an audit

18   in 2009 where employees were manipulating their hours

19   through the use of the break key?

20        A.  I had heard of that happening in my current

21   position.  It was not something that I was aware of.

22   But as a director of operations, I know that there was

23   one instance where that occurred.

24        Q.  Do you understand that to be to avoid

25   overtime?

Page 35

1        A.  I'm not sure exactly what the understanding

2   was.  I know that it was discovered, it was thoroughly

3   investigated and there was disciplinary action taken

4   in that case.

5           MR. TRIEF:  I have no other questions.

6           MR. YBARRA:  I have just a couple of

7        questions before we excuse the witness.

8           MR. TRIEF:  Did you discuss these

9        questions with the client during break?

10          MR. YBARRA:  Counsel.

11          MR. TRIEF:  I just think, in the middle

12       of cross examination, having a

13       conversation with somebody is wrong.  I state

14       my objection to it.

15          MR. YBARRA:  Okay.  Thank you.

16                   CROSS EXAMINATION

17  BY MR. YBARRA:

18       Q.  Mr. Norberg, do you recall counsel asking you

19  questions about Deposition Exhibit 56?

20       A.  Yes, from Carolina Zerboni.

21       Q.  Ms. Zerboni makes reference to employees and,

22  quote -- let me make sure I quote it correctly --

23  getting people off the clock, quote, end quote.

24          Do you see that?

25       A.  I do.

**EXHIBIT 18**

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER

NICOLE ALEQUIN, TESHIURE AMOS,
et al,

     Plaintiffs,

vs.

DARDEN RESTAURANTS, INC,
et al,

     Defendants.
_____/

Littler Mendelson
111 N. Magnolia Avenue
Suite 1250
Orlando, Florida
Tuesday, 12:01 p.m.-2:22 p.m.
March 18, 2014

DEPOSITION OF DIANE PSARAS

Taken on Behalf of the Plaintiffs before

Lisa Gerlach, Court Reporter, Notary Public

in and for the State of Florida at Large,

pursuant to Plaintiffs' Notice of Taking

Deposition in the above cause.

1    THEREUPON,

2                        DIANE PSARAS,

3        A Witness herein, acknowledged after having

4    been duly sworn and testified upon her oath as

5    follows:

6                THE WITNESS:  I do.

7                     DIRECT EXAMINATION

8    BY MR. TRIEF:

9        Q.  Good afternoon, Ms. Psaras.

10       A.  Good afternoon.

11       Q.  Do you know who I am?

12       A.  I do.

13       Q.  You understand I represent the plaintiffs in

14   the case?

15       A.  I do.

16       Q.  Have you ever had your deposition taken?

17       A.  I have not.

18       Q.  So just a few rules I want to go over with

19   you.  One is, please, wait until I complete the

20   question before you answer it.  As I see now, you're

21   shaking your head actually before I finish, but wait

22   until I'm done.

23           The second thing is, if you're going to agree

24   with me say "yes."  If you're going to disagree, say

25   "no."  But try not to use the head shakes.  All right?

Page 11

1      Q.   An employee might complain they were forced

2   to work off the clock, correct?

3      A.   It could be a rare occasion where an employee

4   could complain about that.

5      Q.   What would be the procedure for handling that

6   complaint?  How would that then be channeled through

7   the business?

8      A.   There are multiple procedures.  They could go

9   directly to their supervisor.  They can go to their

10  supervisor's supervisor.  They can go to their RVP.

11  They can go to their senior vice president.  They can

12  call the employee relations hotline.  They can use the

13  open-door policy for virtually anyone within the

14  company.

15     Q.   Does it make a difference how the complaint

16  comes in as to how the complaint is investigated?

17  Does it all get funneled to the same place and the

18  same investigation occurs or does it depends on how it

19  comes in?

20     A.   It depends on how it comes in.

21     Q.   Take me through the various ways that it

22  would be handled differently.

23          MR. YBARRA:  Objection to form.

24     A.   If you can be a bit more specific, I could be

25  a bit more specific.

Page 12

```
 1   BY MR. TRIEF:

 2       Q.  If it comes in through a supervisor or the

 3   supervisor's supervisor, is it handled the same way?

 4       A.  No, not necessarily.

 5       Q.  If it comes in through the supervisor, is it

 6   handled the same way each time?

 7       A.  Not necessarily.

 8       Q.  What's the procedure for investigating an

 9   employee's complaint of working off the clock?

10       A.  A general procedure would be that in fact

11   employee relations and/or HR professional and/or a

12   director of operation is involved in the investigation

13   of a situation involving that of a restaurant, but

14   that varies based on where in fact that complaint came

15   into.  That varies based on who is implicated.  That

16   varies based on what the circumstance is and the

17   severity as to who would be engaged in that process.

18       Q.  Are there any written guidelines concerning

19   how to investigate an off-the-clock complaint?

20       A.  Yes.

21       Q.  What is that document called?

22       A.  Through guidelines -- general guidelines

23   that -- I honestly can't tell you the name of the

24   document.  It's a policy of how you go about

25   investigating.
```

1    answered.  Go ahead.

2        A.  Depends on the circumstances.  It depends on

3    who the individual is calling out.  It depends on what

4    the circumstances are.

5    BY MR. TRIEF:

6        Q.  So you need examples in order to answer the

7    question?

8        A.  I'm happy to understand your example.

9        Q.  Well, if five employees at a particular

10   restaurant claim they were working off the clock and

11   called in through the DiSH system or wrote into the

12   DiSH system, does that make sense -- or had a written

13   complaint?

14       A.  Into the DiSH system?

15       Q.  Is there an employee communication system in

16   Darden?

17       A.  Yes.

18       Q.  Is it called DiSH?

19       A.  That's one vehicle.

20       Q.  Let's assume they just complained they were

21   working off the clock using DiSH.

22       A.  Uh-huh.

23       Q.  What would happen -- what would be the

24   procedure for that to follow up?

25       A.  That complaint would go to employee relations

Page 16

```
 1    and the employee relations team would then make

 2    contact with the employees and speak to them directly,

 3    and in fact then reach out to the appropriate director

 4    for that particular restaurant and review the issues

 5    that were called out and have that discussion.

 6              And depending on the circumstance, they would

 7    look at a variety of documents internally to determine

 8    the validity of some of the complaints.  And, in fact,

 9    while documents are good, they're inconclusive, so

10    they must go into the restaurant and investigate.

11              The director will go into the restaurant and

12    complete a thorough investigation to include talking

13    to employees and managers.

14         Q.   What documents internally would be looked at?

15         A.   Depends on the circumstance.

16         Q.   In the circumstance I just gave you.

17         A.   I'm not sure I recall the circumstance of the

18    complaint.

19         Q.   I think we gave an example of five employees

20    using the DiSH network indicating that they were

21    working off the clock?

22         A.   So in that circumstance, they could be

23    looking at their clock-in-clock-out reports.  They

24    could look at the time of the bill being opened and

25    closed.  They could look at a manager's swipes, a
```

Page 39

1   against no off-the-clock work.

2   BY MR. TRIEF:

3       Q.   Is there a recognition that a manager might

4   be participating or be complacent in allowing

5   off-the-clock work?

6           MR. YBARRA:   Objection, foundation, calls

7       for speculation.

8       A.   We have consistent policies.   We teach those

9   policies regularly.   We have an annual follow-up with

10  respect to those policies and we expect our leaders to

11  follow them.   If we find that they haven't followed

12  them, we take immediate action.   Generally that leads

13  to termination.

14  BY MR. TRIEF:

15      Q.   Is there any recognition that a manager might

16  be complacent in off-the-clock work?

17      A.   No.

18      Q.   With respect to the payroll records of --

19  withdrawn.   With respect to the sample plaintiffs or

20  the sample -- or the restaurants where they work -- is

21  there a tool that Darden uses -- sorry -- Red Lobster

22  uses -- that warns someone that the employee may be

23  exceeding regular-pay time going into overtime?

24      A.   I'm sorry.   Repeat that one more time.

25      Q.   It may be my fault.   Let me rephrase it.

Page 53

1              Have you ever seen this before?

2       A.  I've seen similar documents.  I don't know

3  that I've seen this particular one.

4       Q.  Are these questions that are recommended to

5  be asked of both employees with respect to the first

6  document --

7       A.  19.

8       Q.  -- 19, and managers with respect to 20?

9       A.  This is the guideline that I spoke to earlier

10 with respect to the general guidance given for the

11 process of investigation.

12      Q.  Do you know what would cause these questions

13 to be asked of employees and managers?

14          MR. YBARRA:  Objection, compound.

15      A.  So -- sorry.  Which question -- what was the

16 question?

17 BY MR. TRIEF:

18      Q.  The question is, what would cause a series of

19 questions like this to be asked of employees and

20 managers?  I put it together because I think it would

21 arise for the same set of circumstances.

22          MR. YBARRA:  Objection to your

23      characterization and your testimony on the

24      record, Ted.

25          Go ahead and answer the question that he

1        asked, if you can.

2        A.  If a situation arose that came to employee

3   relations' attention, for instance, they would provide

4   the director with guidance as it relates to the

5   appropriate questions to ask.

6   BY MR. TRIEF:

7        Q.  Do you know why these guidelines were

8   created?

9        A.  To support the directors as they went in, to

10  have a consistent approach in being able to ask the

11  questions.

12       Q.  How long did these guidelines exist?

13       A.  These guidelines are created any time there's

14  a situation, so they may vary from circumstance to

15  circumstance.  There's just kind of a general form as

16  you can see.

17       Q.  So how long has the general form existed?

18       A.  That I can't speak to.  Well before my time.

19  It's been in place since I've been with the company

20  five-and-a-half years.

21            MR. TRIEF:  We'll take a short break --

22            two minutes to talk to David and I'll give   .

23            you a picture for the rest of the day.

24            THE VIDEOGRAPHER:  Going off the record

25            at 1:47.

Page 55

```
 1            (Brief recess.)

 2            THE VIDEOGRAPHER:  We're back on the

 3       video record.  The time is 1:59 p.m.

 4       Counsel, you may proceed.

 5  BY MR. TRIEF:

 6       Q.  Do you happen to have or is there available

 7  an organizational chart of Red Lobster?

 8       A.  There is an organizational chart, but I don't

 9  have one with me.

10       Q.  Would I call it anything other than an

11  organizational chart of Red Lobster or does it have

12  another name?

13       A.  No.  I think organizational chart.

14       Q.  Are you familiar with any state

15  investigations -- we talked about Department of Labor

16  investigations -- but I'm specifically referring to

17  state investigations, not federal investigations, of

18  wage-and-hour complaints at Red Lobster?

19       A.  I can't recall.  State investigations at Red

20  Lobster?

21       Q.  Correct, yes.

22       A.  I can't recall.

23       Q.  Is there any kind of procedure that is a

24  proactive procedure by Red Lobster to determine

25  whether people are working off the clock?  That's
```

Page 56

1   opposed to getting a complaint in from either an

2   employee, manager, Department of Labor -- something

3   proactive that's done by Red Lobster to see if it's

4   occurring?

5        A.   We proactively communicate and train our

6   leaders and our employees on our policies.  We

7   proactively communicate the expectation to each of the

8   employees and/or managers of, if in fact they are

9   aware of anything happening that is not in compliance

10  with our policies and procedures, the expectation is

11  that they bring those forward.

12            We proactively make available multiple means,

13  vehicles, for them to use by way of calling to our

14  attention anything that they are concerned about.  We

15  absolutely reiterate annually those expectations to

16  our leaders and we ask them to sign off on the fact

17  that they've reviewed those policies again.

18            And when the rare occasion occurs, when

19  something comes up that we find out that someone has

20  not acted in accordance with our policies, we act on

21  it immediately.  And, generally, if there's a finding,

22  there is a termination.

23        Q.   I was trying to exclude the communication

24  part of it, either Red Lobster communicating their

25  desire to comply with wage and hour laws or a

Page 57

1   complaint coming up from below.  I was talking in

2   terms of maybe something in the order of spot checks,

3   audits, where you go into a restaurant unannounced,

4   you'd look at the schedules, you'd look at the

5   clock-in-clock-out data, you'd talk to the employees

6   without any formal complaint.

7          Is there anything like that that goes on?

8       A.  Yes.  The managers -- we communicate to the

9   managers that they're required to do spot checks both

10  on clock-in and clock-out to look at reports, to check

11  on employees to ensure that they have clocked in, to

12  look at reports to see if there's any irregularities.

13         We also require our directors of operations

14  who are in the restaurants frequently -- 90 percent of

15  their time -- that, when they're in the restaurants,

16  they are also required to do spot checks and review.

17  And our audit process -- our internal audit process --

18  also includes that as a matter of course.

19      Q.  Does a director of operations have more than

20  one restaurant?

21      A.  Yes.

22      Q.  Have you had occasions that you can recall

23  where directors of operations indicated to you that

24  people were working off the clock?

25      A.  Not -- not that I can recall.  If it came out

Page 59

1    discipline.  And those folks generally lose their

2    jobs, which is very painful for the restaurant.

3         Q.  When you say those folks, are those folks

4    that you're referring to the servers and bartenders?

5         A.  Anyone who would have acted deliberately in

6    violation of our policy would be subject to

7    termination.

8         Q.  What would happen to the managers at the

9    locations in which people were working off the clock?

10   Would they be terminated too for carelessness or would

11   they continue to remain on the job?

12        A.  It would depend on their involvement.

13        Q.  So if there was a number of people working

14   off the clock at a restaurant and it was under the

15   manager's watch, that manager wouldn't lose his job

16   necessarily?

17        A.  It would depend on their involvement.

18        Q.  Right.  If you could show complacency, but it

19   still was happening at their restaurant, they may not

20   be fired?

21        A.  It would truly depend on the circumstance and

22   their involvement.

23        Q.  There's no automatic rule that would cause

24   the manager to be fired if his employees were working

25   off the clock under his watch or her watch?

1      Q.   That's not my question.

2           MR. YBARRA:   Hold on.   Objection,

3      argumentative.   Just ask her the question.

4      She's answered it.

5           MR. TRIEF:   That is not my question.

6  BY MR. TRIEF:

7      Q.   My question is, if a person is working off

8  the clock and Darden discovers they're working off the

9  clock, would they not be entitled to backpay for that

10  off-the-clock time in each and every instance?

11          MR. YBARRA:   Objection, asked and

12     answered.   Go ahead.

13     A.   The employee is entitled to pay for any time

14  that they have worked in our restaurant.

15  BY MR. TRIEF:

16     Q.   And if they're working off the clock, they're

17  not getting paid for their time by definition.

18  Correct?

19     A.   If they're working off the clock, they will

20  be paid for their time if we should find out about

21  that situation.

22     Q.   Each and every time they were working off the

23  clock, they must be paid, correct, for that

24  off-the-clock time?

25          MR. YBARRA:   Objection, asked and

**EXHIBIT 19**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION
CASE NO. 12-CV-61742-ROSENBAUM/SELTZER

AMANDA MATHIS, et al.,          :
      Plaintiffs,              :
                          :
      vs.                      :
                          :
DARDEN RESTAURANTS, INC., :
GMRI, INC. RARE              :
HOSPITALITY INTERNATIONAL,:
INC., RARE HOSPITALITY       :
MANAGEMENT, INC., CAPITAL :
GRILLE HOLDINGS, INC. N&D :
RESTAURANTS, INC., DARDEN :
SW, LLC, AND FLORIDA SE,     :
INC.                         :
      Defendants.              :


Thursday, April 24, 2014


Videotaped testimony of VAUGHN

CLEMENT, taken at Littler Mendelson, 1601

Cherry Street, Philadelphia, Pennsylvania,

commencing at 9:10 a.m., before Janice L.

Welsh, Court Reporter and Notary Public; in

and for the Commonwealth of Pennsylvania.

Page 4

1

2                    VIDEOTAPE OPERATOR:  We are now

3      on the record.  Please note that the

4      microphones are sensitive and may pick up

5      whispering and private conversations.  Please

6      turn all cell phones off and place them away

7      from the microphones as they tend to interfere

8      with the deposition audio.  Recording will

9      continue until all parties agree to go off the

10     record.

11                    My name is Robert Kowalchik

12     representing Veritext Corporate Services.  The

13     date today is April 24, 2014 and the time is

14     approximately 9:11 a.m.

15                    This deposition is being held

16     at Littler Mendelson, located at 1601 Cherry

17     Street, Philadelphia, Pennsylvania.

18                    The caption of this case is

19     Amanda Mathis, et al versus Darden

20     Restaurants, Inc., et al.  This case is filed

21     in the United States District Court Southern

22     District of Florida, Ft. Lauderdale Division,

23     Case number 12-CV-61742-Rosenbaum/Seltzer.

24                    The name of the witness is

25     Vaughn Clement.  At this time the attorneys

1

2   please will identify themselves and the

3   parties they represent, after which our court

4   reporter, Janice Welsh representing Veritext,

5   will swear in the witness and we can proceed.

6          MS. SCHILLING:  Jennifer

7   Schilling from Littler Mendelson on behalf of

8   defendants.

9          MR. PISAREVSKY:  Alex Pisarevsky

10   for the plaintiffs.

11                 - - -

12          VAUGHN CLEMENT, after having

13      been first duly sworn, was examined and

14      testified as follows:

15                 - - -

16                 EXAMINATION

17                 - - -

18   BY MR. PISAREVSKY:

19   Q.    Good morning, Mr. Clement.

20   A.    Good morning.

21   Q.    My name is Alex Pisarevsky.  I'm one of

22   the lawyers for the plaintiffs.  We're here

23   today for your deposition in this lawsuit.

24   Have you ever had your deposition taken

25   before?

                       VAUGHN CLEMENT

1

2    Q.    How much time would you say on average?

3    A.    I would say -- this is speculation

4    depending on the day and the topics that

5    needed to be covered, but a minute to three

6    minutes.  I would say three is on the long

7    side.

8    Q.    Do servers at your restaurants have

9    opening duties that they need to perform

10   before they can start taking tables?

11   A.    They do not.

12   Q.    Have you ever heard of the term running

13   side work?

14   A.    I have.

15   Q.    Can you tell me what that is?

16   A.    We don't -- I have heard the term

17   before.  It's generally used to describe

18   duties that the server would do throughout the

19   shift, but at the Olive Garden we assign those

20   duties to our bussers and other job codes.

21   I'm not saying a server would never grab a

22   bucket of ice, or not help with glasses, but

23   we have other people -- we have other

24   processes and systems in place to make sure

25   that that's not something they're doing on a

Page 74

```
 1                   VAUGHN CLEMENT

 2   regular basis.

 3   Q.    Who makes the bread sticks or the bread

 4   at the restaurant?

 5   A.    Culinary team members.

 6   Q.    Do you know what is involved in making

 7   bread?

 8   A.    I do.

 9   Q.    Can you tell me?

10   A.    I can.

11              MS. SCHILLING:  Is this going to

12   be a secret proprietary sauce because I have

13   always wanted to figure out how to make those

14   delicious bread sticks?

15              THE WITNESS:  No.  It's a basic

16   process.  We take the bread out of the bag.

17   In comes in prepacked.  We put the bread on

18   pans, and put it in the oven, set a timer,

19   halfway through we rotate the bread sticks

20   around so they get browned on both side, they

21   cook nice and evenly, we pull the bread sticks

22   out of the oven when they're done, we brush

23   them with butter and sprinkle them with

24   seasoning salt or garlic salt.

25   BY MR. PISAREVSKY:
```

1                    VAUGHN CLEMENT

2    So, is labor and profitability -- labor is not

3    specifically on there, but is profitability on

4    there, yes, but it's not a predominant

5    component.

6    Q.    Have there ever been any wage an hour

7    issues at any of the restaurants in your

8    region?  You know what, not ever, but within

9    the past five years?

10                  MS. SCHILLING:  Objection,

11   vague.  If you understand the question you can

12   answer.

13                  THE WITNESS:  Can you give me an

14   example of what type of issues you're

15   referring to?

16   BY MR. PISAREVSKY:

17   Q.    Working off the clock.

18   A.    Not to my knowledge.  I know there was a

19   circumstance where a dishwasher -- a new

20   dishwasher didn't clock in, and I believe

21   there was a language barrier issue.  He didn't

22   understand.  We didn't discover it for, I

23   believe, it was almost two weeks.  When we

24   discovered that happened we paid him

25   immediately.  It was the manager that brought

Page 97

1                    VAUGHN CLEMENT

2    times were not correct.  We did an

3    investigation and determined that there were,

4    indeed, some clock out times that were not --

5    their team members were being clocked out

6    incorrectly.  So, we compensated our team

7    members for that.

8    Q.    Do you recall which restaurant that was

9    at?

10   A.    I do.  Olive Garden 1819.

11   Q.    Where is that?

12   A.    Collegeville, Pennsylvania.

13   Q.    Can you explain, when you say that these

14   people were saying they were being clocked out

15   incorrectly, what specifically they were

16   talking about?

17   A.    Sure.  Team members were to my

18   understanding -- to my knowledge in every case

19   they had failed to clock out after they had

20   dropped their cash.  So, at the end of their

21   shift they count their money, they turn in

22   their cash, and then they're required to clock

23   out.  They have to do that themselves.  Each

24   of these situations I investigated was a

25   matter of the team member not clocking out and

1                     VAUGHN CLEMENT

2    his last name.  I'm sorry.

3    Q.     Do the managers below the GM have

4    specific titles?

5    A.     They have departments, but they're

6    basically peers.

7    Q.     Do they have -- like is there one

8    manager that typically deals with the bar, one

9    that deals with the servers?

10   A.     Correct.  We have a staffing and

11   scheduling manager, manager that writes the

12   schedules and coordinates the hiring.

13   Q.     Who was that?

14   A.     That was at that point Amanda.  I'm

15   sorry, it was Joe at that point.  We have a

16   service manager that's responsible for the

17   waiters and waitresses and the hosting, and

18   then we have a culinary manager responsible

19   for the kitchen.

20   Q.     Who was the culinary manager?

21   A.     That would be Amanda.  Joe was the

22   staffing and training.

23   Q.     Were any of the managers disciplined for

24   this?

25   A.     Yes.

Page 116

1                    VAUGHN CLEMENT

2    Q.    Tell me who?

3    A.    All of them.

4    Q.    Tell me how?

5    A.    They were terminated.

6    Q.    Each manager?

7    A.    Yes.

8    Q.    When were they terminated approximately?

9    A.    After our investigation.  I would have

10   to look at the records to get the exact date,

11   but after we completed our investigation.

12   Q.    Do you know approximately how long that

13   took?  Was it a month?

14   A.    The investigation?  A week and a half, a

15   week.  It took a week total.

16   Q.    So, essentially within a month all of

17   these people were terminated, the managers?

18   A.    That's correct.

19   Q.    You mentioned previously that during the

20   investigation you interacted with ER, employee

21   relations, in some way?

22   A.    I did.

23   Q.    Can you describe that for me?

24   A.    They have access to data -- the same

25   data I have, but they're able to process it

```
 1                    VAUGHN CLEMENT

 2    BY MR. PISAREVSKY:

 3    Q.    I'm showing you exhibit eight.  Tell me

 4    if that email refreshes your recollection as

 5    to what restaurant that was?

 6    A.    I remembered which restaurant it was.  I

 7    just didn't remember the exact date.

 8    Q.    Does this seem right based on the email

 9    August of 2011, Olive Garden 239?

10    A.    It seems accurate.

11    Q.    I take it the director of operations for

12    that restaurant was Michael Lamborn?

13    A.    That's correct.

14    Q.    Tell me what you did when you

15    investigated that restaurant.

16    A.    I visited the restaurant, I talked to

17    team members, collected statements, I also

18    pulled schedules, and looked at time cards to

19    see if there was a variance between the time

20    that they were scheduled to start and what

21    their actual clock in was, and I also talked

22    to managers and collected statements from

23    managers, including the general manager.

24    Q.    What was the purpose of looking at the

25    schedules and the time cards to see if there
```

Page 129

```
 1              VAUGHN CLEMENT
 2   A.    It's against our policy.
 3   Q.    Do you have any idea why an employee
 4   would not want to clock in until they got
 5   their first table?
 6            MS. SCHILLING:  Objection to the
 7   extent it calls for speculation.
 8            THE WITNESS:  I could guess.  It
 9   would be a guess.  So they could work more
10   hours.
11   BY MR. PISAREVSKY:
12   Q.    Work more hours?  If an employee didn't
13   have a table, what rate would they be getting
14   paid at?
15   A.    If they didn't have a table they would
16   be getting paid the tip credit wage from the
17   time they clocked in.
18   Q.    What would they be doing?
19   A.    Waiting for a table.  Typically we
20   schedule our in times -- you know, we talked
21   about LMS.  We look at that historical data
22   and we try to get that as close as possible to
23   bringing them in so they're not having that
24   time standing around and having nothing to
25   do.  We want to maximize their time so they
```

Page 130

1                    VAUGHN CLEMENT

2    can make the most money that they can.

3                 I think that system worked

4    pretty well.  It's not perfect, but I think

5    it's generally fairly accurate.  It really

6    avoids our team members standing around for

7    long periods of time at the beginning of their

8    shift.  Generally they come in, they get

9    signed in, and they're getting seated right

10   away.

11   Q.    What if it's a slow day?

12   A.    What is the question?

13   Q.    You said that generally team members

14   come in, they sign in, and they get a table

15   right away.

16   A.    Sure.

17   Q.    Is that the case on slow days too at the

18   restaurant?

19   A.    Generally on slow days we have less team

20   members.  We don't bring the same number of

21   people in.

22   Q.    What if you have an unanticipated slow

23   day?

24   A.    We schedule less people.

25   Q.    Unanticipated.

Page 135

                        VAUGHN CLEMENT

1

2    page where you spoke to nine or ten

3    employees.  It says, the majority of them

4    stated they do not clock in until they get

5    their first table to save hours or watch their

6    hours.

7    A.    Yeah.  You asked me earlier why a server

8    may do that, and I believe that's what I

9    responded.

10   Q.    Do you think a server might want to save

11   hours trying to avoid going into overtime?

12   A.    Yes.

13   Q.    Why would that server want to do that?

14   A.    Because once they hit overtime they

15   don't get to work unless it's necessary.  I

16   can tell you that I have servers that get

17   overtime in my region.  If that's what we need

18   to do to take care of the guests then we spend

19   the overtime.  If it's not necessary then we

20   try to be smart about how we spend that

21   money.  If it's not needed to serve the

22   guests, and they're high in hours, we may ask

23   them if they want to take the day off and we

24   may call them off later in the week.  But

25   that's unusual.

Page 162

1                     VAUGHN CLEMENT

2    A.     I'm there.

3    Q.     You'll see it looks like the third

4    section, for lack of a better word, down says

5    in bold letters, now that I am required to tip

6    out bussers, does that mean they will be doing

7    all of my running side work duties during my

8    shift?  Who is it that tips out bussers?

9    A.     The service team.

10   Q.     Do the bartenders?

11   A.     I don't believe so.

12   Q.     Do servers have less running side work

13   now, and when I say now I mean after the

14   implementation of tip share, than they did

15   before?

16   A.     I don't have running side work posted in

17   my restaurants.  So, I can't speak to what

18   happens in other areas, but they certainly

19   help -- teamwork, they help with things as

20   necessary, but there's not a running side work

21   list of duties that they have to perform

22   that's utilized in my restaurants.  .

23   Q.     You're saying that was the same before

24   the tip share as after the tip share?

25   A.     Right.  We have teamwork.  Again, we

**EXHIBIT 20**

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 61742-CIV-ROSENBAUM/SELTZER

NICOLE ALEQUIN, TESHIURE AMOS,
et al,

     Plaintiffs,

vs.

DARDEN RESTAURANTS, INC.,

     Defendants.

_____/


                   111 North Magnolia Avenue
                   Orlando, Florida
                   9:37 a.m. - 1:01 p.m.
                   April 30, 2014


DEPOSITION OF CHARLES DAVIS


     Taken on behalf of the Defendant before Nancy M. Wingo, RPR, RMR, Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition in the above cause.

Page 4

1    THEREUPON:

2              THE VIDEOGRAPHER:  My name is Clay McMillan

3         of Veritext of Veritext Reporting.  Today's date

4         is Wednesday, April the 30th, 2014, and the time

5         is approximately 9:37 a.m., Eastern Daylight Time.

6              This deposition is being held in the offices

7         of Littler Mendelson, located at 111 North

8         Magnolia Avenue, Suite 1250, in Orlando, Florida.

9              The caption of this case is Nicole Alequin,

10        et al, versus Darden Restaurants, Inc., et al.  It

11        is filed in the U.S. District Court, Southern

12        District of Florida, with the Case Number of

13        12-61742-civ.

14             The name of the witness today is Mr. Charles

15        Davis.

16             Will all counsel present, please identify

17        yourselves and the parties that you represent.

18             MR. TRIEF:  Ted Trief and Janessa Wasserman

19        for the plaintiffs.

20             MR. YBARRA:  And John Ybarra from Littler

21        Mendelson and Linda Ames from Darden on behalf of

22        defendants.

23             THE VIDEOGRAPHER:  Our court reporter is

24        Nancy Wingo, Veritext Reporting.  She will now

25        swear in our witness and then we can proceed.

Page 5

1      THEREUPON:

2                      CHARLES DAVIS,

3      a Witness herein, having first been duly sworn, was

4      examined and testified on his oath as follows:

5                  THE WITNESS:  I do.

6                      DIRECT EXAMINATION

7      BY MR. TRIEF:

8          Q      Good morning, Mr. Davis.

9          A      Good morning.

10         Q      Do you know who I am?

11         A      Yes, I do.

12         Q      Have you ever had your deposition taken?

13         A      No.

14         Q      Pardon me?

15         A      No, I have not.

16         Q      Okay.  I'm just going to go over some

17     instructions with you.  One is, keep your voice up.

18     Second is, if you intend to answer one of my questions

19     yes or no, would you say the word yes or no?

20         A      Yes.

21         Q      If you understand the question I'm asking you

22     before I complete it, please let me complete it anyway

23     so that we get a good record.

24         A      Yes, sir.

25         Q      If you don't understand a question that I'm

1    you're saying?

2         A     Okay.  The question you just asked me, you

3    asked me if there was any work that a server or

4    bartender would do that was related to what a server

5    would do.

6         Q     Let me -- okay.  Let me clean it up.  Thank

7    you.

8         A     Okay.

9         Q     There's work that's performed in a restaurant

10   by a server and/or a bartender correct?

11        A     Correct.

12        Q     Would all work that a server and/or a

13   bartender would do in a restaurant be related to their

14   work?

15        A     Yes, I would say so.

16        Q     Is there any work that they would be asked to

17   do by Olive Garden that would not be related to their

18   tip producing activity?

19        A     No.

20        Q     So there can never be a time, as far as you

21   understand it, that a server or bartender is doing work

22   while they're under the -- the server or bartender code

23   that would be unrelated to their server or tip-producing

24   duties?

25        A     I can't say never, because I'm not aware of

Page 14

 1    every situation.  But I can tell you that we, as a

 2    policy, don't ask people to do things that are not

 3    related to taking care of their guests.

 4         Q     And that would be never, correct?

 5               MR. YBARRA:  Objection.  Asked and answered.

 6               THE WITNESS:  Never, I can't --

 7    BY MR. TRIEF:

 8         Q     As far as you know?

 9         A     I can't answer for never.

10         Q     Never as far as you know?  I'm sorry.  I made

11    a --

12         A     Never as far as I know.

13         Q     I want to ask you if you ever heard of the

14    concept of "off the clock?"

15         A     I have heard that concept, yes.

16         Q     And what do you understand it to mean?

17         A     That would mean that somebody worked without

18    getting paid.

19         Q     How does that happen?

20         A     It can happen in a number of ways.

21         Q     Tell me.

22         A     You know, I would say that somebody may

23    forget to clock in or clock out and it may not get

24    caught or may not be brought to our attention.  It may

25    be a situation -- I've seen employees purposefully take

Page 89

1    correct?

2              MR. YBARRA:  Objection.  Mischaracterization

3         of his testimony.  Go ahead.

4    BY MR. TRIEF:

5         Q    You say, "Told."  You mean told by someone in

6    management?

7         A    That Tom had told them, "Don't do it."

8         Q    And is Tom in management?

9         A    Tom's a general manager.

10        Q    So the distinction would be that they were

11   told by management, at least one, maybe two, and the

12   others were not, correct?

13             MR. YBARRA:  Objection.  Objection.

14        Mischaracterization of his testimony and objection

15        asked and answered.  Go ahead again.

16             THE WITNESS:  I could not substantiate that

17        those employees knew our policy.  They had told me

18        they were doing it because they saw other people

19        doing it and that, as far as they knew, it wasn't

20        wrong.  We didn't feel like it was fair to

21        terminate those employees in that situation.

22   BY MR. TRIEF:

23        Q    Do you know a person named Nilson?

24        A    I do.

25        Q    Who is Nilson?

Page 90

1      A      Nilson Noshimento was a server at the

2  Altamonte, Florida, restaurant.

3      Q      And did you find that he used the break key?

4      A      Yes, I did find that he used the break key.

5      Q      On how many occasions?

6      A      He used it on one day that I could find.

7      Q      What happened to him?

8      A      He was terminated.

9      Q      He was terminated the same time that Lisa

10  Long was terminated, correct?

11      A      The same week, yeah.

12      Q      Was he given a warning?

13      A      No, he was not.

14      Q      Was there any particular distinction in his

15  circumstances than there was with respect to the Olive

16  Garden people?

17      A      Clearly.

18      Q      What was the distinction?

19      A      The distinction that what they all did was

20  wrong.  But none of them would  say that managers knew

21  about it or none of them would say that they had been

22  addressed by managers.  You know, when the manager gets

23  involved, that certainly is a -- it's a factor I have to

24  consider.  In his case, he said, "No, I knew it was

25  wrong to do it and I did it.  Nobody ever told me to do

Page 91

1     that."

2         Q     Is that the only distinction?

3         A     In this case, that was the distinction.

4               MR. TRIEF:  Okay.  Good time for a break.

5               THE VIDEOGRAPHER:  Stand by, please.  We are

6         also at the end of this tape, so I'm going to go

7         ahead and change tapes during the break.

8               MR. TRIEF:  Feel free.

9               THE VIDEOGRAPHER:  This is the end of Disk

10        Number 1.  We're going off the record at 11:33

11        a.m.

12              MR. TRIEF:  Mark that, please.

13              (Davis Exhibit 12, E-mail, marked for

14    Identification.)

15              THE VIDEOGRAPHER:  Here begins Disk Number 2

16        in the deposition of Mr. Charles Davis.  We're

17        back on the record at 11:42 a.m.  Counsel, you may

18        proceed.

19    BY MR. TRIEF:

20        Q     Would you take a look at Exhibit 12.  It's an

21    e-mail, February 7th, 2010.

22        A     Okay.

23        Q     In the e-mail, there's a statement, "I

24    witnessed."  Do you see that?  It's in the second line.

25    "The defining moment I witnessed."  Do you see that?

1      Q      And it always happened while you were at

2      Olive Garden, too?

3      A      It did.

4      Q      Did it happen any other times?

5      A      Not that I'm aware of.

6      Q      But, again, the question was monitoring.  So

7      were you finding that there was a monitoring problem of

8      the timecards as it relates to break key issues?

9      A      I was concerned that there might be.

10      Q      And were you concerned that there might be

11      beyond the Olive Garden incident and the incident at, I

12      think, Restaurant 3002?

13      A      Correct.  I was concerned that there might be

14      a bigger issue.  Sometimes when something actually

15      happens, it's a wake-up call for everybody, "Hey, we

16      need to be looking very carefully."

17      Q      And so was there a wake-up call for you when

18      the Olive Garden situation occurred?

19      A      Back in 2012?

20      Q      Yes.

21      A      Yeah, absolutely.  I'd never seen it done

22      before.

23      Q      Did you implement any procedures to monitor

24      timecards differently than had ever been done before?

25             MR. YBARRA:  Objection.  Asked and answered.

Page 103

1              THE WITNESS:  We just -- we didn't implement

2         something new.  It was emphasis on a system that

3         we already had in place.

4    BY MR. TRIEF:

5         Q     Were punch edit reports being reviewed and

6    signed off with the opening paperwork every day?

7         A     They were being reviewed and signed off on

8    every day.

9         Q     And so why did you add that as Item No. 5?

10        A     Because folks were signing them, but I didn't

11   feel as though that they were doing a thorough enough

12   job, though, of looking at them.

13        Q     And what did the punch edit reports show you?

14        A     The times that people have to be clocked in

15   or folks that forgot to clock out that needed to be

16   clocked out.  Or -- it also -- it doesn't show break

17   issues, if that's what you're getting at.  It shows if

18   you have to change somebody's shift because they were

19   under their wrong job code.  Those would be the types of

20   things that are in there.

21        Q     Would it help determine whether someone was

22   waiting for the first table to arrive?

23        A     It would.

24        Q     How?

25        A     So if you have to manually clock somebody in,

**EXHIBIT 21**

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER


NICOLE ALEQUIN, TESHIURE AMOS,
et al,

        Plaintiffs,

vs

DARDEN RESTAURANTS, INC.,
et al,

        Defendants.

_____/


                                111 North Magnolia Avenue
                                Orlando, Florida
                                May 7, 2014
                                10:21 a.m. - 12:59 p.m.



DEPOSITION OF LAURA SORENSON


        Taken on behalf of the Plaintiff before Laurie

Dippolito, Notary Public in and for the State of Florida at

Large, pursuant to Plaintiff's Notice of Taking Deposition in

the above cause.

1          (Exhibit 1 and Exhibit 2 were marked for

2     identification.)

3     THEREUPON:

4          VIDEOGRAPHER:  My name is Clay McMillan of

5     Veritext Reporting.  And today's date is Wednesday,

6     May 7, 2014.  The time is 10:21 a.m., Eastern

7     daylight time.  And this deposition is being held

8     in the offices of Littler Mendelson, located at 111

9     North Magnolia Avenue, Suite 1250, Orlando,

10    Florida.

11         The caption of this case is Nicole Alequin, et

12    al versus Darden Restaurants, Inc., et al, and is

13    filed in the U.S. District Court, Southern District

14    of Florida, Fort Lauderdale Division.  And the name

15    of our witness today is Ms. Laura Sorenson.

16         Will counsel present please identify

17    yourselves and the parties that you represent?

18         MR. TRIEF:  Ted Trief and David Lichter for

19    the plaintiffs.

20         MR. YBARRA:  John Ybarra and Horace Dawson on

21    behalf of Defendant Darden.

22         THE COURT:  And the court reporter today is

23    Ms. Laurie Dippolito of Veritext Reporting, and she

24    will now swear in our witness, and we can proceed.

25         (The witness, Laura Sorenson, was duly sworn.)

```
 1              THE WITNESS:  I do.

 2                    DIRECT EXAMINATION

 3   BY MR. TRIEF:

 4       Q    Good morning.

 5       A    Good morning.

 6       Q    Do you know who I am?

 7       A    I do.

 8       Q    Have you ever had your deposition taken

 9   before?

10       A    I have.

11       Q    About how many times?

12       A    Only one.

13       Q    And what was it about?

14       A    It was a case for Federated Department Stores,

15   when I was employed with them.  It involved a leased

16   employee who was transporting product from one location

17   to another.  Unfortunately, in driving from Point A to

18   Point B, cut across several lanes of traffic, was

19   involved in an accident that left someone permanently

20   paralyzed.  Very sad case.

21       Q    And it was at deposition, not trial?

22       A    It was deposition.

23       Q    And is this the only other time you've

24   testified?

25       A    It is.
```

Page 12

1       A    No.

2       Q    When you arrived at the company.

3       A    I received a handbook that had information on

4   wage and hour in it.

5       Q    I want to cover what Stephanie Edwards' role

6   would be in training people on wage-and-hour issues.

7   Could you tell us, as a director of training, does she

8   get involved in teaching about wage-and-hour issues?

9       A    I've only had training under my responsibility

10  for the last couple of months.  But it's been my

11  understanding, so far, that, no, she is not involved in

12  that.  Her role is primarily focussed on training with

13  regards to menu rollouts.

14      Q    So who is involved in training Darden

15  personnel on wage-and-hour issues?

16      A    We have a Learning Center of Excellence that

17  designs training programs that would be applicable

18  across all brands.  So you may have some individuals

19  within that department that are involved in

20  designing/training that's used in orientation.

21           And then the employee relations function may

22  be involved in designing some of the training that goes

23  in the handbooks.  And, also, our annual recommitment

24  process, which we use to reinforce the training on

25  these important topics.

Page 20

1    duties that would be tip-producing versus

2    non-tip-producing.

3        Q    Was that the first time that was done at the

4    director-of-operations level?

5        A    I've -- I've only been to one director

6    conference.  That was my first director conference.

7    And that topic was covered, but I'm not sure what was

8    covered in previous director conferences.

9        Q    Is there some work that is so unrelated to

10   tip-producing work that if you ask somebody -- if you

11   ask a server or bartender to do that kind of work, that

12   you would have to pay them minimum wage to do it?

13       A    My understanding is that we only ask our

14   servers and bartenders to perform tip-producing work,

15   or in a small amount of cases, work that would be

16   related to tip-producing work.  And that's where it

17   would be under 20 percent.

18       Q    But I'm asking you -- I understand if it's

19   related to tip-producing work, the 20-percent rule

20   applies.  I think that was your definition, correct?

21       A    Yes.

22       Q    Suppose it's completely unrelated to

23   tip-producing work.  Does the 20-percent rule apply?

24            MR. YBARRA:  Objection.  Foundation, calls for

25            speculation.

**EXHIBIT 22**

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION


NICOLE ALEQUIN, et al.,          CASE NO.: 0:12-CV-61742-

      Plaintiffs,              ROSENBAUM/SELTZER

   v.

DARDEN RESTAURANTS, INC.,

et al.,

      Defendants.

_____/


VIDEOTAPED DEPOSITION OF

JOHN LEWIS COOPER


May 15, 2014

10:12 a.m.


Littler Mendelson, P.C.

3344 Peachtree Road - Atlanta, Georgia


Reported by: Anna Cheak, RPR

Page 7

1          and we can proceed.

2               MS. RAMSEY:  I'm Amy Ramsey.  I

3          represent the Defendants.

4               MR. PISAREVSKY:  Alex

5          Pisarevsky, for the Plaintiffs.

6    Whereupon,

7                    JOHN LEWIS COOPER

8    being first duly sworn, was examined and testified

9    as follows:

10                      EXAMINATION

11   BY MR. PISAREVSKY:

12        Q    Good morning, Mr. Cooper.

13        A    Good morning.

14        Q    As I imagine you know by now, I'm the

15   Lawyer for the Plaintiffs in this lawsuit.  We are

16   here today for your deposition.  Have you ever had

17   your deposition taken before?

18        A    A very long time ago.  I don't remember the

19   details of it.

20        Q    Do you remember what kind of case it was?

21        A    I don't even remember the -- it's more than

22   20 years.

23        Q    Do you remember if it was business or

24   personal?

25        A    It was business.

1   server does is a hundred percent related to what they

2   do?

3        A    Yes.

4        Q    Can you tell me what that means?

5        A    It means that what they do every day -- and

6   I view my servers as my sales team, and I want my

7   servers to spend their time with guests.

8             And you speak to any server in my region

9   that knows me or that's worked for me any length of

10  time, my statement every day is your pocket is

11  directly related to -- connected to mine.

12            You make money, I make money.  My job is to

13  teach you how to make money.  So I work very hard on

14  making sure that my servers are spending their time

15  working on making money.  That means being my best

16  sales force out there they can possibly be.

17            So that's my challenge to my team.  That's

18  what I try to pursue every single day.  Everything

19  that I ask them to do is related to them making more

20  money.

21        Q    When you say making more money, what do you

22  mean?

23        A    Money that they make in tips, and -- yes,

24  and that's how they increase their income.

25        Q    Are you familiar with the tipped wage?

Page 34

1    to do those three things, and that happens every day

2    in our business.

3        Q    So an experienced server gets stuff done

4    faster basically?

5        A    An experienced server will take less time

6    to do what is being asked to do, what they're being

7    asked to do.

8        Q    Are you aware of any limit that the law

9    places on how much time servers and bartenders can

10   perform certain tasks for while they were being paid

11   the tipped wage?

12       A    No, sir.

13       Q    Are you aware of any policy at Darden or at

14   Bahama Breeze that limits the time that servers and

15   bartenders can spend performing tasks at the tipped

16   wage?

17       A    Our policies at Bahama Breeze are designed

18   to make sure that our servers spend minimal time

19   doing anything outside of what they should be doing,

20   which is to take care of their guests.  So there's

21   no -- I've not been given -- this is an hour that you

22   spend doing this or two minutes you spent doing that,

23   no, sir.

24       Q    You're not aware of any specific limit?

25       A    I'm not aware of any exact -- I don't

1      A     Those were just discussions with the entire

2    group validating and making sure that as a group we

3    knew what the expectations were that servers were not

4    spending time doing things that they should not be

5    doing.

6           So the focus is on making sure that servers

7    are spending time with their guests, and everything

8    that they do needs to be related to spending time

9    with their guests.

10      Q     When did that conversation happen, about?

11      A     That has that happened since he's been with

12   us.  He's been talking about that since he's been

13   with us.

14      Q     So how long is that?

15      A     He's been with us for two-plus years, and

16   he's been talking about it since he's been with us,

17   so...

18      Q     So approximately in -- some point in 2012

19   Mr. Wilkerson started?

20      A     No, no.  He's -- I thought he was more like

21   2011.  Maybe it was '12.  But, yeah, he's been there

22   a couple years for sure.

23      Q     Prior to the time that Mr. Wilkerson

24   started, did you have any discussion relating to the

25   time that servers or bartenders could spend doing