**EXHIBIT 81**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 12-61742-CIV-ROSENBAUM/SELTZER

NICOLE ALEQUIN, *et al.*,

  Plaintiffs,

v.

DARDEN RESTAURANTS, INC., *et al.*,

  Defendants.

)
)
)
)
)
)
)
)
)

## DECLARATION OF ALI SAAD, PH.D.

I, ALI SAAD, Ph.D., declare:

1. I have been retained by counsel as an expert witness on behalf of Defendants, including Darden Restaurants, Inc., to provide my opinions in this matter.  I am making this declaration on the basis of my own, first-hand knowledge (except as to matters declared on information and belief, of which I have been informed and do believe) and, if called upon to do so, could and would competently testify to my findings and analysis.

## I. ASSIGNMENT

2. In connection with the matter of *Alequin, et al. v. Darden Restaurants, Inc.*, I was retained by counsel for defendant Darden Restaurants, Inc. ("Darden") to provide opinions relating to how much time Servers and Bartenders who work at the Bahama Breeze, LongHorn Steakhouse, Olive Garden, Red Lobster and Seasons 52 restaurant concepts spend performing various job duties.  It is my understanding that Plaintiffs have claimed that the

proportion of these duties classified as "general preparation and maintenance," also referred to as "duties related to tip producing duties" or "related duties" exceeds the threshold proportion allegedly required in order for Darden to qualify for the so-called "tip credit" in setting its hourly wages for Servers and Bartenders at the five restaurant concepts involved.  I was also asked to address, where possible, Plaintiffs' claim that they are required to engage in off-the-clock work.  Under my direction, Resolution Economics developed and conducted a nationwide direct in-person observational study of 193 Servers and 35 Bartenders.  The study was designed to assess how these Servers and Bartenders allocate their work time among the various tasks they perform, and whether they engage in off-the-clock work.

3.   I was also asked to address various other issues based on computerized data produced by Darden for an agreed upon Court ordered representative sample of employees.

4.   Finally, I was asked to respond to the reports submitted on March 28, 2014 by Plaintiffs' experts, Dr. Madansky and Mr. Cutler.

5.   What follows is organized into several sections.  Section II presents my qualifications, Section III summarizes my opinions, Section IV describes the observational study of Servers and Bartenders and presents the results of that study, Section V presents an analysis of off-the-clock work, Section VI summarizes the analysis of Darden's computerized data, Section VII contains my response to the reports of Dr. Madansky and Mr. Cutler, and Section VIII contains conclusions.

## II.   QUALIFICATIONS

6.   I am the Managing Partner of Resolution Economics LLC, a firm whose activities include performing economic and statistical analyses in connection with litigation and other

consulting matters.  Before beginning my consulting career I worked in academia as a member of the faculty in the Economics and Finance department at Baruch College of The City University of New York.  While there I taught labor economics, micro and macro economics, econometrics, and economic history.  In connection with my consulting, I have extensive experience providing statistical and economic analyses in connection with class action employment cases, including discrimination and wage and hour matters, and I have also published and lectured on these topics.  I have conducted a number of observational studies such as the one reported on herein, and I have conducted many statistical analyses relating to many different types of employment claims.  I have also been involved in numerous sampling and survey projects and my work has often called for the analysis of survey data in the context of various types of labor economics issues.   In connection with my work, I am frequently called upon to design and opine on scientific statistical sampling approaches.  I hold a Ph.D. in Economics from The University of Chicago, and a BA degree in History and Economics from The University of Pennsylvania.  I have been qualified as an expert witness in both Federal and State Courts.  My hourly rate for services rendered is $650.  My resume is attached to this report as Appendix 1.


**III.**	**SUMMARY OF OPINIONS**

7.	It is my understanding that the primary legal issue in this matter revolves around making determinations about the percentage of work time that class members spend performing duties that are: (1) tip producing; (2) related to tip-producing duties; and (3) unrelated to duties of "tipped" occupations.  Companies generally do not compile and retain detailed empirical data regarding the tasks their employees engage in on a day to day basis.

Consequently, in order to address the issues in this case, one must design and implement a data collection methodology using generally accepted scientific principles.  Under my direction, Resolution Economics designed and implemented data collection through a nationwide work tasks observation study of randomly selected Servers and Bartenders.  The sample design was based on the work locations at which the agreed upon "discovery sample" employees currently or previously worked.  A total of 192 Servers, representing 285 shifts, and 35 Bartenders, representing 74 shifts were observed during the course of the study, at a total of 45 restaurants.  Overall, 1,800 hours of Server and Bartender work time was observed.  The primary study was supplemented through the observation of an additional 12 Servers and three Bartenders, each of whom are opt-in class members.  This accounts for an additional eight restaurants and 74 hours of work time observed.

8.   The observation study of Darden Servers and Bartenders found that overall these employees spend less than 20% of their time on tasks that can be considered general preparation and maintenance work, which are related to the tip-producing duties but which themselves may not be directly related to producing tips.  Hereinafter, this category of duties shall be referred to as "related duties."  More specifically, for the 285 observed Server shifts, the percentage of time allocated to related duties across all five restaurant concepts was 6.9%.[1]  For the 74 Bartender shifts observed, the percentage of time allocated to related duties was 13.5%.[2]  Furthermore, I find that Servers and Bartenders spend negligible amounts of time (less than a few minutes per shift on average) on duties that would be considered potentially "unrelated" to their tipped occupations.

---

[1] The 95% confidence interval is 5.7% to 8.2%.
[2] The 95% confidence interval is 10.9% to 16.2%.

9.   Looking only at employees for whom full work weeks were observed, the percentage of time allocated to related duties was 6.2% for Servers, while for the 18 Bartenders for whom full work weeks were observed, the average percentage of time allocated to related duties was 14.5%.[3]

10. The observation study also captured Servers and Bartenders prior to their clock-ins and after their clock-outs.  The data shows that Servers and Bartenders were not observed spending more than a few minutes of time working prior to their clock-in, or after their clock-out.  For the period before shifts began, the average time observed between the first potential work activity and clock-in was 4.12 minutes for Servers and 2.17 minutes for Bartenders, and the median for both Servers and Bartenders was 0 minutes.  Virtually none of the time observed prior to clock-in was comprised of work tasks – the activity was mostly casual conversations with various people (primarily co-workers), washing hands, putting away coats, and so on.  For the period after clock-out, the average time between clock-out and the last potential work activity was 1.13 minutes for Servers and 0.91 minutes for Bartenders, and the median was 0.40 minutes for Servers and 0 minutes for Bartenders.  Again, the time was occupied primarily by personal interactions.

11. A comparison of the data results for the observed opt-in Plaintiffs to the data results of the non-opt-ins shows that there is no statistically significant difference between the two groups.  The distribution of work activities for opt-ins to the lawsuit was substantially the same as for non-opt-ins.

12. Several analyses of Darden's electronic human resources data produced during discovery ("Discovery Sample Data") were also performed.  The electronic data provide

---

[3] The 95% confidence intervals are 5.4% to 7.1% for Servers and 11.9% to 17.2% for Bartenders.

information on the employment history and selected other information for each employee who occupied the position of Server or Bartender for whom data were available during the study period.  Based on the analysis, there are clear differences in the day to day work experiences of Servers and Bartenders across and within each of the Darden concepts.  There are substantial differences in the proportion of tip credit wage work during which guest checks are open across positions, across concepts, and even across shifts worked by the same employee over time.  There is variation in the average dollar amount per guest check and in tip percentages.  All of these observations suggest that there is a great deal of variability in what goes on during shifts worked at these restaurants.

13. An analysis of the weekly hours worked by Servers and Bartenders using company electronic data shows that there are very few weeks worked that were 40 or more hours in duration.  In fact, for four out of five concepts, fewer than 5% of weeks worked were longer than 40 hours.  For all concepts, fewer than 25% of weeks worked were longer than 35 hours.

14. I have also reviewed the reports submitted on behalf of Plaintiffs by Dr. Madansky and Mr. Cutler.  Most of Dr. Madansky's report consists of a series of hypothetical exercises he could carry out at some future point in time, including an as yet unfielded survey, where virtually no empirical work is presented.  There are numerous problems with the survey instrument that he presents.  The survey language is highly biased and leading, and the ordering of response items is confusing.  Also, because of the particular way the survey is constructed, the central response task requested of respondents, wherein they are asked to allocate their work time into 20 or so task buckets, while being required to have the time add up to a preset amount of time provided from the Darden records to each

respondent, would be impossible to complete without a calculator, or even a spreadsheet model, and would most likely result in highly artificial, incorrect and inconsistent results.

15. The one empirical analysis Dr. Madansky presents uses the company electronic data to estimate time allegedly worked off-the-clock. His attempt relies upon a series of flawed, implicit assumptions that either Dr. Madansky is unaware of or has ignored. There are several smaller other issues in Dr. Madansky's report, which I address in detail below.

16. In his report, Mr. Cutler opines on the likely efficacy of a survey. It is unclear to me whether or not he was involved in the design and testing of the survey, or if he simply reviewed the survey after it was designed by Dr. Madansky. Mr. Cutler makes no reference to any of the design aspects of the survey instrument, nor does he evaluate the survey using any of the standard scientific methods that survey researchers typically use. He also inappropriately compares the proposed survey instrument to a very different and simplified government questionnaire in opining that the survey would be a "valid means" of assessing the amount of time Servers and Bartenders spent on various job activities. In short, there is no basis presented by Mr. Cutler that the survey proposed in Dr. Madansky's report would be viable, and based on my understanding of Mr. Cutler's training and experience, it would appear he is not qualified to pass judgment on the scientific merits of a survey.

## IV.    THE OBSERVATIONAL STUDY

17. A nationwide observational study of the work activities of Darden Servers and Bartenders at the Bahama Breeze, LongHorn Steakhouse, Olive Garden, Red Lobster and Seasons 52 concepts was conducted by Resolution Economics during the period of January through March 2014. A total of 53 restaurants within the five relevant Darden concepts were

visited.  The sections below gives further detail about the study design, set up and implementation.

### A.  SAMPLE SELECTION AND STUDY LOGISTICS

18. A total of 192 Servers and 35 Bartenders were observed during the course of the study.  The study subjects were chosen by a random sampling procedure.  The intent of the sampling plan was to select for direct observation current Darden employees who were working in restaurants in which opt-in Plaintiffs worked.  Thus the study was conceptually restricted to locations at which one or more of the approximately 19,000 opt-in employees had worked.  As with any sampling plan, the purpose was to obtain representative information regarding the overall population in a cost effective manner. [4]   For a sampling plan which involves both a large target population and broad geographic scope, this meant restricting the sample size as well as addressing the geography in a sensible manner such that the logistics of observers could be more easily managed.  The overall geographic scope was the continental United States, not including the states that do not allow the tip credit wage.[5]

19. Given that travel to more widely dispersed restaurants would involve significantly higher cost, it was decided to sample restaurants based on metropolitan areas.  In order to align with the Discovery Sample referenced above, the sampling frame further limited the target restaurant population to those in which the opt-in Discovery Sample class members

---

[4] William G. Cochran, in his influential book *Sampling Techniques, 3rd edition,* (Wiley & Sons, New York), discusses the issue of costs and sample design in detail.

[5] It is my understanding that states that do not allow the tip credit are: Alaska, California, Minnesota, Montana, Nevada, Oregon, and Washington.  Since these states pay at least minimum wage for all time worked it does not matter how much time employees in these states spend performing tip-producing, related, or unrelated duties.

worked.  These 757 individuals[6] worked in 460 different restaurants[7] – roughly 25% of all Darden restaurants in the five concepts combined.[8]  Next, because the distribution of restaurants varied by concept and geography, the sample was stratified so that a sample that is representative of all restaurants could be drawn.  By concept, the 455 restaurant locations are distributed as follows, 138, or 30.3%, are LongHorn, 138, or 30.3%, are Olive Garden, 130, or 28.6% are Red Lobster, 27, or 5.9% are Bahama Breeze, and 22, or 4.8% are Seasons 52.  By geography, the 455 restaurants were mapped to one of the four US Census-designated regions of the country.  A total of 230, or 50.6% of the restaurants are located in the South region, 119, or 26.1% are located in the Midwest region, 83, or 18.2% are located in the Northeast region, and 23, or 5.1% are located in the West region.  Only 32, or 7.0% of the 455 restaurants are not located within a Census-designated Metropolitan Statistical Area or Consolidated Metropolitan Statistical Area ("MSA").  The sample was stratified to mirror the 455 restaurants in the discovery sample.  A target sample size of 45 restaurants was chosen for observation.  This group of 45 locations was stratified into eight "buckets": two each for the largest three concepts (LongHorn, Olive Garden and Red Lobster) and one each for the smaller two concepts (Bahama Breeze and Seasons 52).  For each of the larger three concepts, ten restaurants were randomly selected from the top MSA markets, and three

---

[6] The Discovery Sample called for the selection of 768 employees.  Eleven of these were "placeholders", since a number of putative opt-ins (approximately 1,500) had not initially been sent opt-in forms.  They were later sent forms, but their opt-in responses were not received prior to the study commencing.  Ultimately approximately 150 of these 1,500 employees opted in to the lawsuit, from which 11 were chosen for purposes of the data production for the Discovery Sample.  Thus the observation study frame was limited to the locations within which one or more of the 757 initially selected discovery sample members worked.

[7] Five of these 460 restaurants were excluded from the study because they were the pilot study sites.

[8] The pilot study sites were not included in the sample frame population.

restaurants from the bottom MSA markets.[9]  Three restaurants were randomly selected from each of the Bahama Breeze and Seasons 52 concepts.  This resulted in a total of 13 each for LongHorn, Olive Garden and Red Lobster, each representing about 28.9% of the sample, and 3 each for Bahama Breeze and Seasons 52, each representing about 6.7% of the sample.  The sample of 45 restaurants was distributed among the four Census regions as follows: 21 (46.7%) in the South, 10 (22.2%) in the Midwest, 11 (24.4%) in the Northeast, and 3 (6.7%) in the West.  This stratification allowed us to capture a representative cross section of restaurants from the discovery sample of 455.[10]

20. Finally, the individual employees for observation were selected.  During the week preceding each observation, Resolution Economics received a schedule with the planned shift times for each Server and Bartender for the upcoming Monday through Sunday work week.  These schedules were then entered into a database.  Because Servers and Bartenders do not always work five days during a week, it was determined that one employee would be observed for a full work week (considered the "primary" employee), for however many days

---

[9] Top market definitions are as follows:
LongHorn top market areas include: 1) Atlanta, GA, 2) Boston-Worchester-Lawrence, MA-NH-ME-CT, 3) New York-Northern New Jersey-Long Island, NY-NJ-CT-PA, 4) Washington-Baltimore, DC-MD-VA-WV, 5) Philadelphia-Wilmington-Atlantic City, PA-NJ-DE-MD, and 6) Orlando,FL.
Olive Garden top market areas include: 1) New York-Northern New Jersey-Long Island, NY-NJ-CT-PA, 2) Dallas-Fort Worth, TX, 3) Chicago-Gary-Kenosha, IL-IN-WI, 4)  Houston-Galveston-Brazoria, TX, 5) Washington-Baltimore, DC-MD-VA-WV, 6) Boston-Worchester-Lawrence, MA-NH-ME-CT, 7) Orlando,FL, 8) Philadelphia-Wilmington-Atlantic City, PA-NJ-DE-MD, 9) Atlanta, GA, 10) Detroit-Ann Arbor-Flint, MI, 11) Phoenix-Mesa,AZ, and 12) Denver-Boulder-Greeley, CO.
Red Lobster top market areas include: 1) New York-Northern New Jersey-Long Island, NY-NJ-CT-PA, 2) Washington-Baltimore, DC-MD-VA-WV, 3) Chicago-Gary-Kenosha, IL-IN-WI, 4) Atlanta, GA, 5) Detroit-Ann Arbor-Flint, MI, 6) Orlando,FL, 7) Dallas-Fort Worth, TX, 8) Houston-Galveston-Brazoria, TX, 9) Philadelphia-Wilmington-Atlantic City, PA-NJ-DE-MD, 10) Fort Lauderdale-Miami,FL, 11) Phoenix-Mesa, AZ, 12) Denver-Boulder-Greeley, CO.
[10] The stratification weights are 3.3, 4.9, 4.7, 35, 29.7, 27.7, 9 and 7.3 for LongHorn top markets, Olive Garden top markets, Red Lobster top markets, LongHorn bottom markets, Olive Garden bottom markets, Red Lobster bottom markets, Bahama Breeze, and Seasons 52 respectively.

that turned out to be, and additional single shifts of other employees around the primary employee's schedule would also be observed.  Relying on each restaurant's work schedule, all of the Servers and Bartenders scheduled for the upcoming week were randomly ordered. The observers were instructed to select the first employee from this randomly ordered list as their primary employee to observe for the week.  If there were any current opt-in employees at a given location, those were selected to be observed ahead of any other employees, in order to capture as much data about opt-in class members as possible.[11]  Also, if any employee was not available for observation (for example, they changed their shift or called in sick), the observers were instructed to select the next employee from the randomly ordered list as their primary employee.  To supplement the full week data, observers were also given a randomly ordered list of employees for each day of the work week.  The observers were instructed to select the first available employee from the list each day, so long as it did not interfere or overlap with the schedule of their primary employee.

21. The method of observation was continuous time – that is, each work day observed was viewed in its entirety.  So-called "work sampling," which relies upon periodic and intermittent snapshots of employee activities, was not utilized.  Thus, an observer would tap a button on the computerized device when a task started, and would tap a different button when another task began.  What each task was, as well as its duration, would be recorded to the device's internal storage.  There were 93 unique tasks, so the software was arranged in a series of pages.

22. During the planning phase of the project, Resolution Economics researched the job duties of Servers and Bartenders at Darden restaurants.  As part of this information

---

[11] There are very few currently employed opt-ins available to be observed, which is why they were given precedence when they were in locations that were selected for observation.

gathering process, Resolution Economics reviewed documentation related to restaurant operations, including training manuals, as well as job descriptions and other documents. Based on this review, as well as experience from prior studies at restaurants, an initial list of tasks performed by Servers and Bartenders was created.

23. The next step in the process was the fielding of a pilot study. In October 2013, the pilot study was conducted in five locations in the Phoenix, Arizona and Las Vegas, Nevada metro areas. One restaurant from each concept was selected, and a total of 12 Server shifts and 12 Bartender shifts were observed. The primary reason for the pilot study was to ensure that all activities were being properly captured, and that the observers were properly trained prior to the start of the study. In addition to training in the office, all observers were trained on-site so that they not only would become familiar with the various tasks performed by the Servers and Bartenders, but also so that they would code all activities in a consistent manner and gain facility with the hand-held device used to conduct the study. An experienced project manager or team leader spent a full day in the field with each observer throughout the pilot.

24. Observers were instructed not to interact with subjects, and were also instructed to maintain a distance such that they could observe tasks, but not interfere with the work being performed. Interaction with employees was discouraged, and observers were instructed not to initiate any communication themselves. As noted, the tasks observed were determined up front, based on pre-testing, reviews of Darden manuals and other documentation, as well as experience from prior studies involving restaurants. All observers were regular full time employees of Resolution Economics, trained and familiar with the specialized software developed for purposes of the study. A formal training manual was prepared and provided to

each observer, and was used during the training process.  That manual is attached as Appendix 2.  The software was loaded onto hand-held computer devices, and all designations made by observers as to what tasks were being performed were saved into computerized data, with no data entry required at any time.  Included was a provision to add "other" tasks if none of the pre-loaded options were applicable.  The data was electronically transmitted from the field to the home office daily by each observer, where it was compiled and analyzed.  During the course of the study, approximately 249,000 individual tasks performed by Servers and 88,000 tasks performed by Bartenders were captured.  These approximately 337,000 tasks were turned into a database, which formed the basis for the quantitative findings reported on herein.

25. Restaurants within geographic proximity to one another were generally observed in or about the same week.  Before the observations began, Darden corporate employees would notify regional and restaurant management of the upcoming study.  The restaurant General Managers were then contacted and notified by Resolution Economics that an observation would occur in their restaurant within the week before observation.  The logistics, not the purpose, of the study was explained to them at that time – i.e., that an observer would be shadowing employees in their restaurant.  They were told that the labor study was commissioned by Darden, and that it was not an evaluation tool.  The employees observed were not told of the litigation purpose of the observation study, nor was Resolution Economics identified by name to restaurant managers or observed employees.

26.   Upon commencing a particular observation episode, observers met their observation subject at the beginning of their first shift.  They then shadowed the individual

during the entire shift, or for all shifts during the week if the individual was the primary subject.  Observers had access to the back of the house, as well as the various offices.

27.   The hardware technology utilized was a hand-held Samsung Galaxy Note 2 Android devices, and the data was captured using specialized, proprietary work study software designed by Resolution Economics that relied upon a touch screen interface.  As noted, the study was conducted in continuous time, in that one activity was followed directly by the next.  Measurements began when the employee entered the facility, and ceased when the employee left.  Each activity, no matter how brief, was recorded.

28. The task list[12] was structured as follows:  first, the observer selected where the activity was taking place (e.g., "Front of House"), next, what the primary activity was (e.g., "Customer Interaction"), and finally, a more specific task (e.g., "Greeting Customer").  There were also fields for "other" activities that may not have been on the task list, although such activities occurred infrequently.[13]  Descriptions of these activities were entered, and they were reviewed and coded separately.  By following a protocol of continuous observation, observers obtained detailed data on Servers' and Bartenders' movements and activities.  The level of detail is reflected in the duration of the activities captured.  For Servers, the average duration of an activity was 19.79 seconds, and for Bartenders, it was 18.27 seconds.  Looking at it another way, 249,253 individual activity segments were captured for Servers and 87,797 individual activity segments were captured for Bartenders.

29. Activities were not categorized or coded anywhere in the software or training manuals as "tip-producing," "related," or "unrelated," so observers had no knowledge of what particular activities represented from this perspective.  Only later during the data

---

[12] See Appendix 3 for a list of tasks.
[13] There were 377 "other" tasks out of over 337,000 tasks observed.

analysis stage was each activity coded into categories such as tip-producing, related, unrelated, or other.

30. As is typical for the casual dining restaurant concept, the Darden concepts in this case experience substantial turnover.  As such, and as noted above, there are relatively few opt-ins among current employees who could be subject to observation.  In the random selection of observational targets, very few current opt-ins were selected.  In order to supplement the study and obtain additional data for opt-in class members, Resolution Economics observed an additional 15 current opt-in employees at 8 restaurants during the last week of the study.  Each of these employees was observed for one full shift.  They were observed in the same manner as those observed during the main part of the study.

31.   The next several sections describe the findings of the primary observational study.

**B.  ANALYSIS OF THE WORK ACTIVITY OF DARDEN SERVERS AND BARTENDERS**

32. In order to determine how much time Darden Servers and Bartenders spend on tip-producing activities, versus related duties or other activities, each activity was categorized into one of four categories after the data was compiled: tip-producing, related, unrelated, and other.  I understand Plaintiffs' argument to be that Darden may take a tip credit for all time spent performing tip-producing duties, for time spent performing related duties if that time does not exceed 20% of the employees' time, and that Darden may not take the tip credit for time that the employee must spend performing duties that are unrelated to the tipped occupation.[14]

---

[14] Second Amended Collective Action Complaint, paragraphs 6-7.

33. To assist in the categorizing of tasks that are performed by Servers and Bartenders in restaurants, I started by consulting three sources of information. The first source was the Federal Government's Bureau of Labor Statistics Occupational Outlook Handbook for Food and Beverage Serving and Related Occupations. This reference guide (and many others like it) is frequently relied upon by labor economists for a variety of different research needs. The description for waiters and waitresses and Bartenders, quoted directly from the reference guide, is as follows:

**Waiters and waitresses** take orders and serve food and beverages to customers in dining establishments.

Duties

Waiters and waitresses typically do the following:

o Greet customers, present menus, and explain daily specials to customers

o Answer questions related to menu items

o Take food and beverage orders from customers

o Relay food and beverage orders to the kitchen staff

o Prepare drinks and food garnishes

o Carry trays of food or drinks from the kitchen to the dining tables

o Remove dirty dishes and glasses, and clean tables after customers finish meals

o Prepare itemized checks and take payments from customers

o Clean and set up dining areas, refill condiments, roll silverware into napkins, and stock service areas

Waiters and waitresses, also called Servers, are responsible for ensuring that customers have a satisfying dining experience. The specific duties of Servers vary considerably with the establishment in which they work.

In casual-dining restaurants that offer simple fare, such as salads, soups, and sandwiches, Servers are expected to provide fast, efficient, and courteous service. In fine-dining restaurants, where more complicated meals are prepared and are often served over several courses, waiters and waitresses provide more formal service. They emphasize personal, attentive treatment at a more leisurely pace.

Waiters and waitresses often meet with managers and chefs before each shift to discuss the menu or specials, review ingredients for potential food allergies, or talk about any food safety concerns. They also discuss coordination between the kitchen and the dining room and review any customer service issues from the previous day or shift.

In addition, waiters and waitresses usually check the identification of customers to ensure that they meet the minimum age requirement for the purchase of alcohol.

**Bartenders** mix drinks and serve them directly to customers or through wait staff.

<u>Duties</u>

Bartenders typically do the following:

o   Greet customers, give them menus, and inform them about daily specials

o   Take drink orders from customers

o   Pour wine and serve draft and bottled beer and other drinks and beverages

o   Mix drinks according to recipes

o   Check identification of customers, to ensure that they are of legal drinking age

o   Clean bars, tables, and work areas

o   Operate cash registers, collect payments from customers, and return change

o   Manage bar operation and order and maintain liquor and bar supplies

Bartenders fill drink orders either directly from customers at the bar or through waiters and waitresses who place drink orders for dining room customers. Bartenders must know a wide range of drink recipes and be able to mix drinks correctly, quickly, and without waste. They also must work well with waiters and waitresses and other kitchen staff to ensure that customers receive prompt service.

Some establishments, especially busy establishments with many customers, use equipment that automatically measures, pours, and mixes drinks at the push of a button. Bartenders who use this equipment, however, still must become familiar with the ingredients for special drink requests and be able to work quickly to handle numerous drink orders.

Bartenders in some establishments also use carbonated beverage dispensers, cocktail shakers and other accessories, commercial strainers, mist and trigger sprayers, and ice shaver machines.

In addition to mixing and serving drinks, Bartenders stock and prepare garnishes for drinks and maintain an adequate supply of ice, glasses, and other bar supplies.

They also may wash glassware and utensils and serve food to customers who eat at the bar. Bartenders are usually responsible for ordering and maintaining an inventory of liquor, mixers, and other bar supplies.

Some Bartenders run their own bar or catering business. In addition to their standard bartending duties, they also are responsible for hiring, training, and supervising their staff, budgeting for and ordering supplies, and setting prices.

34. The second source of work duty information was the Federal Government O-Net Code Connector website, which is a website focused on assisting human resources professionals in determining the occupation associated with a particular set of job duties.[15] According to O-Net, the occupational code 35-3031.00 corresponds to the title "Waiters and Waitresses" which has the general description of "Take orders and serve food and beverages to patrons at tables in dining establishment."  The O-Net site lists two categories of activities, under the headings "Tasks", and "Detailed Work Activities."  Under the "Tasks" heading the following activities were listed:

o   Check with customers to ensure that they are enjoying their meals and take action to correct any problems.

o   Collect payments from customers.

o   Write patrons' food orders on order slips, memorize orders, or enter orders into computers for transmittal to kitchen staff.

---

[15]  The "about" section of the O-Net website describes itself as follows:  "O*NET program is the nation's primary source of occupational information. Central to the project is the O*NET database, containing information on hundreds of standardized and occupation-specific descriptors. The database, which is available to the public at no cost, is continually updated by surveying a broad range of workers from each occupation. Information from this database forms the heart of O*NET OnLine, an interactive application for exploring and searching occupations. The database also provides the basis for our Career Exploration Tools, a set of valuable assessment instruments for workers and students looking to find or change careers. The Occupational Information Network (O*NET) is being developed under the sponsorship of the US Department of Labor/Employment and Training Administration (USDOL/ETA) through a grant to the North Carolina Employment Security Commission Labor Statistics." (Source: O-Net Website - www.onetcenter.org/).

- o Prepare checks that itemize and total meal costs and sales taxes.

- o Take orders from patrons for food or beverages.

- o Check patrons' identification to ensure that they meet minimum age requirements for consumption of alcoholic beverages.

- o Serve food or beverages to patrons, and prepare or serve specialty dishes at tables as required.

- o Present menus to patrons and answer questions about menu items, making recommendations upon request.

- o Clean tables or counters after patrons have finished dining.

- o Prepare hot, cold, and mixed drinks for patrons, and chill bottles of wine.

Under the "Detailed Work Activities" header, the following activities are listed:

- o Check with customers to ensure that they are enjoying their meals and take action to correct any problems.

- o Collect payments from customers.

- o Write patrons' food orders on order slips, memorize orders, or enter orders into computers for transmittal to kitchen staff.

- o Prepare checks that itemize and total meal costs and sales taxes.

- o Take orders from patrons for food or beverages.

- o Check patrons' identification to ensure that they meet minimum age requirements for consumption of alcoholic beverages.

- o Serve food or beverages to patrons, and prepare or serve specialty dishes at tables as required.

- o Present menus to patrons and answer questions about menu items, making recommendations upon request.

- o Clean tables or counters after patrons have finished dining.

- o Prepare hot, cold, and mixed drinks for patrons, and chill bottles of wine.

- o Roll silverware, set up food stations or set up dining areas to prepare for the next shift or for large parties.

- o Inform customers of daily specials.

- o Stock service areas with supplies such as coffee, food, tableware, and linens.

o Explain how various menu items are prepared, describing ingredients and cooking methods.

o Prepare tables for meals, including setting up items such as linens, silverware, and glassware.

o Remove dishes and glasses from tables or counters, take them to kitchen for cleaning.

o Assist host or hostess by answering phones to take reservations or to-go orders, and by greeting, seating, and thanking guests.

o Perform cleaning duties, such as sweeping and mopping floors, vacuuming carpet, tidying up Server station, taking out trash, or checking and cleaning bathroom.

o Bring wine selections to tables with appropriate glasses, and pour the wines for customers.

o Perform food preparation duties such as preparing salads, appetizers, and cold dishes, portioning desserts, and brewing coffee.

o Escort customers to their tables.

o Garnish and decorate dishes in preparation for serving.

o Fill salt, pepper, sugar, cream, condiment, and napkin containers.

o Describe and recommend wines to customers.

o Provide guests with information about local areas, including giving directions.


35. The O-Net description for Bartenders, which is occupational code 35-3011.00, is as follows: "Mix and serve drinks to patrons, directly or through waitstaff." The Bartender duties listed under the "Tasks" heading are as follows:

o Collect money for drinks served.

o Check identification of customers to verify age requirements for purchase of alcohol.

o Clean glasses, utensils, and bar equipment.

o Balance cash receipts.

- o Attempt to limit problems and liability related to customers' excessive drinking by taking steps such as persuading customers to stop drinking, or ordering taxis or other transportation for intoxicated patrons.

- o Stock bar with beer, wine, liquor, and related supplies such as ice, glassware, napkins, or straws.

- o Serve wine, and bottled or draft beer.

- o Take beverage orders from serving staff or directly from patrons.

- o Clean bars, work areas, and tables.

- o Mix ingredients, such as liquor, soda, water, sugar, and bitters, to prepare cocktails and other drinks.

Under the Detailed Work Activities heading, the following activities are listed:

- o Collect money for drinks served.

- o Check identification of customers to verify age requirements for purchase of alcohol.

- o Clean glasses, utensils, and bar equipment.

- o Balance cash receipts.

- o Attempt to limit problems and liability related to customers' excessive drinking by taking steps such as persuading customers to stop drinking, or ordering taxis or other transportation for intoxicated patrons.

- o Stock bar with beer, wine, liquor, and related supplies such as ice, glassware, napkins, or straws.

- o Serve wine, and bottled or draft beer.

- o Take beverage orders from serving staff or directly from patrons.

- o Clean bars, work areas, and tables.

- o Mix ingredients, such as liquor, soda, water, sugar, and bitters, to prepare cocktails and other drinks.

- o Serve snacks or food items to customers seated at the bar.

- o Slice and pit fruit for garnishing drinks.

- o Ask customers who become loud and obnoxious to leave, or physically remove them.

- o Arrange bottles and glasses to make attractive displays.

- o  Plan, organize, and control the operations of a cocktail lounge or bar.

- o  Order or requisition liquors and supplies.

- o  Supervise the work of bar staff and other Bartenders.

- o  Plan bar menus.

- o  Prepare appetizers such as pickles, cheese, and cold meats.

- o  Create drink recipes.

36. The third source of information relied upon to categorize work tasks was from the testimony of deposed class members who answered questions related to their work duties.  I have reviewed the depositions of 14 Named Plaintiffs and one Opt-In, who were deposed during the pre-certification phase of discovery, in order to gain a better understanding of what they consider activities that affect their tips.  I used these depositions to gain a better understanding of how the Servers and Bartenders working at the Darden restaurant concepts at issue in this case expressed whether or not certain tasks affect customer service and tip levels, and not necessarily to determine, for purposes of my analysis, whether a certain activity should be coded as "tip-producing" or "related."

37. It appears that a number of deponents agree that a significant portion of the "side work" that they perform has an effect on the service that they provide to their customers, as well as the tips that they receive.  For example, in the deposition of Lisa Long (404:6-20), we see:

Q: Okay.  So in other words, that's a long way around of asking you, all the things that you do as parts of your side work and even that your colleagues, your mates in your station or elsewhere, all of that, if it's not done correctly is part -- I'm sorry – if it's not done correctly, adversely affects your service for your customers?

A:  Yes.

Q: And your tip?

A: Yes.

Q: And all of that side work that I have just ran through is a critical part of your service to your customers, set aside everybody else, your service to your customers?

A: Yes.

Similarly, in the deposition of Amanda Mathis (272:8-273:11), we see:

Q: So just looking at -- so in other words, all the things I ran through, all of that, the preparation of that: The ice tea, the hot tea, the soda, the butter, the bread, the silverware, the plates, the ice, the coffee, all of those things are things that are prepared by your Server or members of your Server team as part of the serving side work, isn't it?

A: Yes.

Q: And so all of that work that you do at LongHorn is part of the serving side work, whether it's running or it's opening or it's closing, all of those things, in a sense, they end up on your customer's tables, don't they?

A: Yes.

Q: And if not done properly, they adversely affect your service to your customers?

A: Yes.

Q: And if not done properly, they all can, if done properly, they all adversely affect your tip; and, therefore, your take-home compensation, don't they?

A: Yes.

Natalie Vaccaro's deposition presents a similar account:

Q: Do you believe that having coffee brewed and ready to go for your guests is important to serving them --

A:    Yes.

Q:    -- and earning a good tip?

A:    Having coffee brewed already?  I mean, my service is what earns my tip.  But it's nice to have -- it's nice to have those things.  Yeah.

Q:    Having it brewed and ready to go so you could not only serve it but serve it promptly?

A:    Yeah.

Q:    So do you believe that having it brewed and ready to go for you is important to earning a tip --

A:    Yes.

Q:    -- a good tip?  And the same thing with having the tea brewed and ready to go and available to take out to your guests, that's important to guest service?

A:    Yes.

Q:    And earning a good tip?

A:    Yes.

Q:    Same thing for having the silverware rolled and available to take out to your guests is necessary -- do you believe that's important to providing good service to your guests?

A:    Yes.

Q:    And receiving a good tip?

A:    Yes.

Q:    Same thing with regard to the ice, having the ice bin full and ready to go so that you can load up the glasses and provide the beverages to your guests promptly, do you believe that is important to guest services?

A:    It's important to guest services.  I don't believe that it is a reflection on my tip.

Q:    Why not?

A:    Well, your service -- yes.  As long as it's there and it's available, it's going to help you, of course, to earn your tip.  That things are on the table that are supposed to be on there.        But if there is not -- I mean, in my opinion it really is your service that is -- would it be perfect if everybody had done their side work all the time?  Absolutely.  But -- -

Q:    Do you believe you can --

A:    It can improve your tip having things ready and available.  Yes.  I don't think that that is what makes me my tip at the end of the day.

Q:    Do you think it's part of it?

A:    I think it helps.

Q:    Same question with regard to having the lemons cut and ready and available to take out to your guests, that allows you to more effectively serve your guests than you would otherwise if they weren't available?

A:    Yes.  All of that helps.

Q:    That impacts or could impact your tip?

A:    Yes.

Q:    Same thing with regard to having the cups and glasses stocked and ready to go so you can take those out to your guests?

A:    Yes.

Q:    So that's important to customer service in your opinion?

A:    To customer service?

Q:    To your ability --

A:    It helps me.

Q:    -- to efficiently serve your guests?

A:    It helps my job.  It helps make things smoother for myself personally.  I don't think it -- I mean, yeah.  I guess it's all a chain.  But I think that your service is what gets -- I guess I'm kind of confused on that.  Yes, I think having those things available definitely helps out.

Q:    With regard to your service?

A:    With regard to your service, yes.  If it's there, it's always nice.

Q:    Which in turn would or could impact your tip?

A:    It could.  Yes.

Q:    Your guest services?

A:    Yes.

Q:    Do you hold the same belief or opinion with regard to having the tea -- well, we already discussed that. With regard to having the wine available to have open so you could take it to your guests more efficiently or more promptly?

A:    Yes.  All of those things.

Q:    That those -- that is important to guest services --

A:    It's important.

Q:    -- to your ability to serve your guests --

A:   Yes.[16]

38. Many of the tasks that Plaintiffs call "side work" are in context considered by them important to providing service to their customers, as well as those of fellow Servers and Bartenders.  For example, suppose that the silverware rack near a Server station is out of forks, and a customer has asked a Server for a new fork.  The Server can either go to the back of the restaurant and bring back one fork for the customer, or the Server can bring back many forks and refill the silverware rack, so that other Servers are not slowed down by the lack of forks.  In this sense, when customers are present, tasks such as these could reasonably be considered as core to the Servers' and Bartenders' duties.  This is demonstrated through several of the Plaintiff deponents' testimony.  For example, Nakeysha Roberson is asked the following:

> Q: I believe that you told me that the silverware that's stocked in the  alley can include forks for dessert and spoons  for coffee or dessert; is that right?
>
> A   Yes.
>
> Q   Okay.  And if those aren't stocked in the service alley, does somebody have to go get those from the dish area?
>
> A   Yes.
>
> Q   And as a Server, will that slow down your ability to provide quick service if you have to go to dish area for those items on an as-needed  basis?
>
> A   Yes.[17]

Rebecca Phillips also makes this point:

> Q: We started talking about these steps of service.  We talked about one of the -- not the first thing, but one of the first things that you do is you take a beverage order and if the guests want drinks  that you go and get a cup, a glass, fill it with ice,  fill it with the drink and take that out with the  straws, and these are items that are in the service  cafe.  And

---

[16] Deposition of Natalie Vaccaro, 187:7-191:1
[17] Deposition of Nakeysha Roberson, 57:21-58:9

correct me if I'm wrong, but these are items that are to be stocked as part of someone's side work, correct?

A: Yes.

Q: Do you think it's important that these items are stocked in order for you to serve your guests?

A: Yes.

Q: Why?

A: Because if they're not readily available it takes us extra time to go back into the kitchen area and get them.

Q: And would that also apply to things like the bread plates and the appetizer plates?

A: Absolutely. Yes.

Q: To the coffee cups, coffee, creamer, straws?

A: Yes.

Q: To the dessert plates?

A: Yes.

Q: To the smallware?

A: Yes.

Q: To the to-go containers?

A: Yes.

Q: Do you believe that it's important to be able to promptly and efficiently serve your guests as you walk through these steps of service?

A: Yes.

Q: And do you believe that your ability to do those things successfully impacts your ability to earn a good tip?

A: Can you say that question, please?

Q: Sure.[18]

The same idea is evident in Amanda Mathis' deposition testimony:

---

[18] Deposition of Rebecca Phillips, 136:22-138:13.

Q:    So when you look at Server side work, Deposition Exhibit Number 2, just looking at number one, the stocking of the ice and the lemons, the keeping of the soda machine areas clean, so you get the soda and it's clean and doesn't have stuff in it.  Go down to number two, in making the tea and the coffee and keeping it clean and restocking the spoons and creamers and milk and tartar -- we didn't even get into the dairy products -- all of that running side work, for example, all of that is critical to your customer service, isn't it, for you and your teammates? … Isn't it?

A:    Yes.

Q:    Same thing on the closing, if the ice isn't -- if the ice isn't filled, if the cups aren't stocked, if the straws aren't there, if the filters aren't there for the tea and the hot tea bags and the creamers, if the spoons aren't polished, if we don't have clean coffee pots and urns, all of that affects you as a Server and it affects your service to your customers and your tips, doesn't it?

A:    Yes.

Q:    In fact, everything on the Server side work board or 99 percent of it has the same impact on you as a Server at LongHorn Steakhouse and on your customers, on their service and on your tips, doesn't it?

A:    Yes.[19]

Natalie Vaccaro also agrees, in her deposition:

Q: … Well, let me just ask you, if you have a customer that orders a beverage and you go back and you don't have the glassware stocked and ready to go and you have to have --

A:    It makes my job easier, yes, to have it there.

Q:    But in that circumstance you agree that there would be a delay in your ability to provide that beverage to the guest, correct?

A:    Yes.

Q:    And your goal is to provide prompt and efficient services, correct?

A:    Yes.

Q:    And we don't know what every guest is going to do, but your inability to provide the best possible service could impact your tip?

A:    Sure.  Yes. …[20]

---

[19] Deposition of Amanda Mathis, 273:12-274:21.
[20] Deposition of Natalie Vaccaro, 191:3-19.

39. Based on all of the above I categorized the various activities captured during the study as "tip-producing," "related," "unrelated," and "other."   The Bureau of Labor Statistics Occupational Outlook Handbook and O-Net occupation descriptions, and deposition testimony, together are the basis for my estimate, for purposes of this analysis, of what may constitute "tip-producing," "related," and "unrelated."  However, I am not providing any opinion regarding how these duties ultimately should be categorized, as this is context and fact-specific.  I also understand that there may be some disagreement between the parties as to which tasks should be considered "tip-producing," "related," or "unrelated," which is ultimately up to the discretion of the Court.   The activities categorized as "other" are activities that do not fit into any of the prior three categories, such as taking breaks, chatting with other employees about non-work-related matters, and making personal phone calls. The categories are identified in Appendix 3 of this report.

### C.  CALCULATION OF THE TIME SPENT ON WORK ACTIVITY BY DARDEN SERVERS AND BARTENDERS

40. Darden has various practices that govern employee rates of pay depending on the specific duties being performed, which affects the analysis of the data.  Based on information provided to Resolution Economics by Counsel for Darden, the following are Darden's specific pay practices by brand:

- o  Bahama Breeze and Seasons 52 – Servers and Bartenders receive minimum wage before the restaurants open to customers, but not after closing.

- o  Olive Garden and Red Lobster– Servers and Bartenders receive minimum wage before the restaurants open to customers.   Bartenders also receive minimum wage beginning 30 minutes after closing.

      o   Olive Garden and Red Lobster do not (and have never taken) the tip credit for

         Bartenders in the following states: Delaware; Kentucky; Maine; Michigan; New

         Hampshire; North Dakota; and Wyoming.

      o   LongHorn—Servers and Bartenders receive the tip credit wage for the entire shift.

Thus, for certain portions of their work shifts, many Darden employees receive minimum

wage pay and not the tip-credit wage.  I have confirmed this through the timekeeping data,

which shows employees being paid minimum wage as described in the above pay practices.

The analyses below take into account these practices, so that when measuring the percentage

of time Servers and Bartenders spend on the various categories of duties, we are only

examining the times during their shifts when employees are paid the tip credit wage. A visual

depiction of these rules can be found in Exhibit 1.

      41. In calculating the percentage of time spent on "related" and "unrelated" duties,

and whether or not Servers and Bartenders spend more or less than 20% of their time

working on such duties, I calculated the "related" and "unrelated" duties as a percentage of

all time worked at the tip credit wage.  The reason for this is that because the Servers and

Bartenders are working under the tip credit regime during this time, the fraction of time spent

on "related" and "unrelated" time should take into account all of this time worked, including

the "other" time.  This is because in every occupation, there will always be some "non-

productive" time spent by employees.[21]  It is my understanding that Plaintiffs' claim that the

20% test should be based on "related" duties as a percentage of "related" plus "tip-

producing" duties only.  While I disagree from a labor economics perspective with Plaintiffs'

approach, I nevertheless also conducted my analysis under this approach.  The results are

---

[21] This time would include casual conversations with fellow employees, eating, retrieving items from cars, storing clothing, making personal phone calls, and sending/receiving text messages.

impacted slightly, in that the percentage of related and unrelated tasks rises because the denominator is smaller due to the removal of "other" time.  However, the percentages of related plus unrelated time out of this alternative total shift time continue to be under 20%.  A summary of results under this alternative scenario can be found in Appendix 4.

42. Based on an analysis of the data captured during the study, the average amount of time that Servers spend, across all shifts, on tip-producing tasks is 83.5%, on related duties it is 6.9%, on unrelated duties it is 0.019%, and on other activities it is 9.6%.  The time that Bartenders spend, across all shifts, on tip-producing tasks is 75.2%, on related duties is 13.5%, on unrelated duties is 0.01%, and on other activities is 11.3%, as shown in Exhibit 2.[22]

43. While I am not certain whether the FLSA legal test for tip-credit is a weekly test, I have also looked at the results on a weekly basis, in the event that it is. Based on an analysis of the full-week data captured during the study, the average amount of time that Servers spend, across all weeks, on tip-producing tasks is 84.5%, on related duties it is 6.2%, on unrelated duties is 0.039%, and on other activities it is 9.3%.  The time that Bartenders spend, across all weeks, on tip-producing tasks is 74.0%, on related duties, 14.5%, on unrelated duties, 0.015%, and on other activities, 11.5%, as shown in Exhibit 3.  There is no statistically significant difference between the results based on weekly data, as compared to the shift-level data.

44. Out of the 285 Server shifts observed, 272, or 95.4%, had less than 20% time observed on related and unrelated duties.  Out of the 74 Bartender shifts observed, 67, or 90.5% had less than 20% time observed on related and unrelated duties.  Exhibit 4 shows the

---

[22] The results presented in the report are weighted, based on concept.

percentage of time spent by Servers performing related and unrelated duties during every observed shift, and Exhibit 5 shows the same for Bartenders.  As seen in the exhibits, considerable variability exists in the amount of time that each Server and Bartender spends on related and unrelated duties during each shift.

45. Exhibit 6 shows the amount of time by concept spent by Servers on related and unrelated duties.  At Bahama Breeze, Servers were observed to have spent 5.2% of their time on related and 0.052% on unrelated duties, for a total of 5.3%.  At LongHorn, the time observed was 11.8% for related and 0.029% for unrelated, for a total of 11.8%, at Olive Garden it was 2.3% for related and 0% for unrelated, for a total of 2.3%, at Red Lobster it was 5.2% for related and .025% for unrelated, for a total of 5.2%, and at Seasons 52, it was 14.4% for related and 0% for unrelated, for a total of 14.4%.  There is clearly considerable variability between concepts in how much time Servers spend on related duties.  Exhibit 7 shows the time by concept observed for Bartenders on related duties.  At Bahama Breeze, the figure is 15.5% for related and .037% for unrelated, for a total of 15.5%, at LongHorn, it is 13.5% for related and .004% for unrelated, for a total of 13.5%, at Olive Garden it is 15.4% for related and 0.003% for unrelated, for a total of approximately 15.4%, at Red Lobster it is 12.0% for related and 0.022% for unrelated, for a total of 12.0%, and finally, at Seasons 52, it is 12.0% for related and 0% for unrelated, for a total of 12.0%.

46. Exhibit 8 summarizes the top 20 tasks for Servers, represented as a percentage of applicable time worked.  Seventeen of these tasks are on tip-producing activities, two on related duties, none on unrelated duties, and one on other activities.  The task with the most observed time in the study for Servers was: "Interacting, chatting with or greeting customers," accounting for 12.2% of time.  The second most commonly observed task was:

"Travel, walk or wait on floor; monitor guest," accounting for 11.9% of time.  The third most commonly observed task "Serve/carry food or beverage," accounting for 10.1% of total shift time.

47. Exhibit 9 shows the top 20 tasks for Bartenders.  Fourteen of these tasks are on tip-producing activities, four on related duties, none on unrelated duties and two on other activities.  The two most common tasks for Bartenders are: "Prepare or Make Drink when customers are present," and "Interacting, chatting with or greeting customers," accounting for 15.1% and 9.7% of shift time, respectively.

48. Exhibit 10 summarizes the percentage of time that Servers spent handling food or beverage items, by shift.  As the exhibit shows, there was large variation between individuals, ranging from a low of 4.5%, to a high of 39.5%.  Additionally, there was wide variability in the composition of the specific food and beverage-related tasks that they performed.  For example, by shift, some Servers spent more than 70% of their food and beverage time on "Serve/carry food or beverage," while others spent less than 20% on this same activity. Exhibits 11 through 15 depict this same information, broken down by concept.  Even within concept, there is wide variation in how much time is spent, and how time is allocated among the component food and beverage activities among individual Server shifts.

49. There is also wide variation in the time spent handling food and beverage items for Bartenders, from a low of 10.5%, to a high of 51.9%.  (Exhibit 16)  There is also wide variation in the distribution of specific tasks within this task category.  For example, while some Bartenders spent less than 10% of their food and beverage-related tasks on "Serve/carry food or beverage," others spent almost 60% of the time on this same activity.

50. Exhibit 17 presents a summary of the percentage of time by shift that Servers spent on traveling and monitoring customers.  There is wide variability in the individual times, ranging from a low of 1.8% to a high of 47.4%.  Exhibit 18 presents the same information for Bartenders.  The same pattern of variability is seen, ranging from a low of 6.8% to a high of 29.8%.

51. Exhibit 19 presents a summary of the percentage of time by shift that Servers spent interacting with other staff.  The figures range from a low of 3.0% to a high of 33.0%.  Exhibit 20 presents the same information for Bartenders.  The same pattern of variability is seen, ranging from a low of 3.0% to a high of 18.8%.

52. Exhibit 21 summarizes the percentage of time spent by Servers on various related cleaning tasks, such as vacuuming, sweeping, cleaning dishware, and so on.  Most Servers spend relatively little time on cleaning tasks, as seen in the exhibit, but again, there is wide variation between individual shifts.  Exhibits 22 through 26 show this same information for Servers, broken down by concept.  Even within concept, there is wide variation in how much time Servers spend on cleaning tasks, as well as how they allocate their cleaning time among the various component activities by shift.  Note that the figures for LongHorn are consistently higher, because LongHorn does not use a pre-shift Server setup wage.

53. Exhibit 27 covers cleaning work observed for Bartenders.  What is interesting to note here is that in most shifts, the majority of "cleaning" for Bartenders is actually spent on cleaning glassware.  It is my understanding, as well as my observation that Bartenders often clean and polish glasses at the bar for waiting customers, as part of drink preparation.  In this sense, it is a tip-producing activity, in that dirty or spotted glasses hanging in plain view, or a

lack of clean glasses will affect tips.  Plaintiff testimony is consistent with this interpretation.[23]

54. In addition to noting the variability in the observation data, there is an interesting and idiosyncratic issue with respect to what Plaintiffs refer to as side work.  After reviewing the depositions, it may be difficult to accurately measure, on a class-wide basis, how much time Servers and Bartenders spend on side work, using company data.  This is because in at least two of the fifteen depositions reviewed, there is apparently a practice for employees to pay other employees to perform their side work.  Specifically, when Stephen Doneth is asked, "I mean is it -- I mean, you have definitely got -- have some work experience in the industry.  I mean, is this -- your own opinion is that these people can get out of work sooner and spend less time at the end of the day doing side work so they were going to kind of skimp on it?"  To this, he responds, "Typically some people are lazy and they don't want to do the work.  Sometimes they do, sometimes they want to get out.  They want to go to a party or want to do something and they want to get out, so that's where sometimes you get people to pay somebody 20 bucks to do their side work."[24]  Further, when Amanda Emerson is asked, "Give me some examples of things you have observed that suggest there were Servers trying to get out of the side work," she responds, "People would pay other people to do their side work, do certain portions of their side work.  A shift captain if they, you know, preferred somebody better, they would kind of glance over what they did instead of really going into detail."[25]  Ms. Emerson gives further detail in the following exchange:

Q: … You mentioned that some Servers would pay others to do the work for them?

---

[23] For example, see Deposition of Amanda Mathis, 271:2-11; Deposition of Lisa Long, 399:22-23; Deposition of Stephen Doneth, 178:25-179:9; Deposition of Brad Henry, 70:11-16 and 238:6-239:12.
[24] Deposition of Stephen Doneth, 189:22-190:10.
[25] Deposition of Amanda Emerson, 124:11-18.

A:    Yes.

Q:    Who did that?

A:    A lot of people did that.  A lot of people did that.

Q:    Did you ever do that?

A:    Yes.

Q:    How much would you pay somebody to handle your side work?

A:    Depends on what it was.  For example -- I will give you an example.  If you wanted somebody to clean your last table so you wouldn't have to wait around for the guests to leave, you would pay them -- you would either pay them 5 bucks to clean your table or you could do a trade where you would do one of their tables in exchange for them doing one of your tables.

Q:    Okay.  Now, where did this concept of paying people to do the side work begin or with whom did it begin if you know?

A:    I have no idea.  It was like that from when I came in.[26]

If two of the 15 deponents claim to have participated in this internal marketplace for swapping and paying coworkers to do side work to leave early, it is likely that it occurred in other locations.  How is it possible, then, to determine, without direct observation, precisely who performed how much side work, when some employees paid others to do their side work for them?  Certainly company records would not help here. Such a practice would create further variability and differences between putative class members, requiring more individualized inquiry to determine when "side work" was performed, for how long, and by whom.

####    D. VALIDATION AND CONFIRMATION OF OBSERVATION STUDY MEASUREMENTS USING COMPANY DATA

---

[26] Deposition of Amanda Emerson, 125:21-126:18.

55. Wherever possible, it is helpful to validate the results of an observation study against other independent sources of data.  In this case, the company point of sale ("POS") data for the observed Servers and Bartenders can be used for certain comparisons to the observation study data.  When we compare electronic company POS clock-ins, clock-outs and customer order openings or closings to the observation study data, there is a greater than 97.2% match rate of the observation data to the POS data.[27]  This is an indication that the observation study results accurately captured these activities of the Servers and Bartenders, and supports the notion more generally that the observation study data was accurately captured.

56. In addition to measuring how much time Servers and Bartenders spent on specific duties related and unrelated duties, it is useful to look at the results of the observation study as a whole, and see if they fit in with what is known about how the Darden restaurants operate.  For example, does the observation study data show that there is an increase in customer interaction and serving of food during typical lunch and dinner periods?  By looking at the data in this way, it is possible to validate the data gathered through the study by comparing it to known or measurable characteristics.

57. Exhibit 28 depicts the amount of time spent by Servers on tip-producing, related, unrelated and other activities, by hour of the day.  Tip-related activities increase during the lunch and dinner periods, while unrelated and other tasks decrease during the same time periods.  Conversely, during the periods before, between, and after the peak meal periods, there is a clear increase in unrelated and other activities.  Exhibit 29 depicts the pattern for Bartenders, which is similar.  The activities performed by Servers and Bartenders hour by

---

[27] The window for agreement was five minutes.

hour that are captured in the observation study comport with what tasks Servers and Bartenders would be expected to do during the relevant times of the day.

58. Exhibits 30 through 34 show the same information as above, but on a concept-by-concept level. Exhibit 30 shows an hour-by-hour breakdown of time spent on tip-producing, related, unrelated, and other activities for Servers at Bahama Breeze.  It shows that Server duties rise and stay high while the restaurant is open to customers, while the other activities stay low while the restaurant is open.  Exhibit 31 summarizes results for Servers at LongHorn Steakhouse.  Here, we see a rise in Server duties during lunch and dinner periods, while the remaining activities remain relatively low while the restaurant is open.  Note the increase in related duties as the restaurant winds down in the evening.  Exhibit 32 displays the time spent by Servers at Olive Garden, with similar increases in Server duties during lunch and dinner. There is a slight rise in "other" tasks between lunch and dinner, representing the non-productive time primarily comprised of Servers chatting and interacting with other employees, and we see a rise in this same activity after the restaurant closes.  For Servers at Red Lobster, represented in Exhibit 33, the pattern appears to be different – it appears that Servers perform a high level of tip-related duties throughout the entire time the restaurant is open, with little in terms of the other three types of tasks, indicating that there is a likelihood that customers patronize the concept more evenly throughout the day.  Finally, Exhibit 34 shows that at Seasons 52, the pattern is completely different than at the other four concepts. What the data shows here is that there is a large spike in Server duties during lunch and dinner, with a marked decrease during the lull between the two periods, which is also marked by an increase in related duties.  This shows that because the Seasons 52 concept is different, and is generally higher-end than the other two, and tends to be located in more urban areas,

there is a large drop in customer traffic between lunch and dinner.  In fact, in one Seasons 52[28], all Servers but one were not working between approximately 2:00 and 5:00 pm.  Due to decreases in customer traffic between lunch and dinner, there is an increase in the related duties for the few Servers who work during this period.

59. Exhibits 35 through 39 repeat the daily profile analysis for Bartenders.  Exhibit 35 shows the hour-by-hour time spent on the four categories of activities by Bartenders at Bahama Breeze.  The exhibit shows that there is a spike in Bartender duties during the lunch period, a marked decrease between lunch and dinner, also showing an increase in related duties, followed by an increase during the dinner period, until the restaurant closes.  Exhibit 36 deals with Bartenders at LongHorn and shows a pattern of increased Bartender duties during lunch and dinner, but without any noticeable increase in related duties between the lunch and dinner periods, as seen for the Bahama Breeze Bartenders in the previous exhibit.  In Exhibit 37, which shows the timeline for Bartenders at Olive Garden, we see yet another pattern: the highest amount of time spent on Bartender duties occurs during dinner, with a lull right after dinner, between 8 and 9 pm, and an increase in related duties, followed by a sharp increase in Bartender duties again between 9 and 11 pm.  Bartender duties remain high from lunch until dinner, with no sharp decrease between the two periods.  Exhibit 38, showing Bartender time at Red Lobster, also demonstrates a different pattern.  There is a peak in Bartender duties at lunch, followed by a decrease (with an increase in "other" activities, likely interaction with other employees), followed by a long period of high Bartender duty time through restaurant closing.  Finally, Seasons 52 shows a different picture for its Bartenders.  It shows that Seasons 52 is more of a bar destination throughout the day

---

[28] At the Phoenix, Arizona location.

than the other concepts, illustrated by a fairly steady high level of Bartender duties throughout the day, and a low level of the other three categories of duties while the restaurant is opened.

60. As illustrated in the preceding exhibits, there is wide variation between concepts, as well as between Servers and Bartenders in how much time is spent on tip-related duties and related duties throughout the day.  There is also substantial variation between concepts in how much time is spent on these duties throughout the day, possibly owing to the inherent differences in the concept designs as well as their respective target clientele.  Any averages over the five concepts necessarily mask such differences.

### E.  SUPPLEMENTAL OPT-IN SAMPLE RESULTS

61. As noted above, because the opt-in class members represent a small fraction of all Darden employees, and due to the relatively high turnover in the restaurant industry, there are a limited number of opt-in Plaintiffs *currently* working at the restaurants.  Because a study goal was to capture the tasks performed by Servers and Bartenders at restaurants worked at by the discovery sample Plaintiffs, I randomly selected restaurants from the discovery sample restaurants, as described above.  This yielded relatively few current opt-in Plaintiffs to observe.  In addition, two of the opt-ins selected for observation in the principal study declined to be observed.  In contrast, only one non-opt-in out of over 200 declined to be observed.[29]  I supplemented the sample of opt-ins by randomly selecting three metropolitan areas in which current opt-in class members work.  From that list, I selected the top two or

---

[29] One opt-in, in the Detroit, Michigan area, declined to be observed because she felt "uncomfortable" in being followed.  The other opt-in, in the Rochester, New York area, declined to be observed because s/he gets "anxious."  The one non-opt-in who declined to be observed was in the Newark, Delaware area. After discussing it with her manager, the manager notified our observer that the non-opt-in did not feel comfortable having someone observe her.

three restaurants in each metropolitan area, and observed an additional 15 opt-in class members who worked in 8 different restaurants.  Each was observed for one shift.

62. Exhibits 40 through 44 present the results of all of the current opt-ins observed during the study.  Exhibit 40 shows the percentage breakdown of shift time by category of observed activity for only the opt-ins observed in the study.  For opt-in Bartenders, the time spent on related duties was 14.0%, compared to the full observation sample value of 13.5%.  The time spent on unrelated duties for opt-in Bartenders was 0.017%, compared to the full sample value of 0.01%.  For opt-in Servers, the time spent on related duties was 6.0%, compared to the full observation sample value of 6.9%.  The time spent on unrelated duties for opt-in Servers was 0%, compared to the full sample value of 0.02%.

63. Exhibit 41 shows the amount of time, by shift, that opt-in Servers spent on related and unrelated duties.  Out of all 28 opt-in shifts observed, 25 had less than 20% of time spent on a combination of related and unrelated tasks.  Exhibit 42 contains the same information for Bartenders.  Here, seven out of the eight shifts observed contain less than 20% of time spent on a combination of related and unrelated tasks.  Exhibit 43 shows the amount of time spent on related and unrelated activities for Servers, by concept, whereas Exhibit 44 shows the results for Bartenders.

64. In addition to looking at only the current opt-ins, an analysis of only the non-opt-ins who were observed in the full sample observation study was performed.  Exhibits 45 through 49 provide a summary of these results.  Exhibit 45 shows the percentage breakdown of shift time by category of observed activity for the non-opt-ins only observed in the study.  For non-opt-in Bartenders, the time spent on related duties was 13.4%, compared to the opt-in value of 14%.  The time spent on unrelated duties for non-opt-in Bartenders was 0.009%,

compared to the opt-in value of 0.017%.  For non-opt-in Servers, the time spent on related duties was 7.1%, compared to the opt-in value of 6.0%.  The time spent on unrelated duties for non-opt-in Servers was 0.02%, compared to the opt-in value of 0%.

65. Exhibit 46 shows the amount of time, by shift, that non-opt-in Servers spent on related and unrelated duties.  Out of the 269 shifts observed, 257 had less than 20% of time spent on a combination of related and unrelated tasks.  Exhibit 47 shows the same information for Bartenders.  Here, 63 out of the 69 shifts observed contain less than 20% of time spent on a combination of related and unrelated tasks.  Exhibit 48 shows the amount of time spent on related and unrelated activities for Servers, by concept, whereas Exhibit 49 shows this for Bartenders.

66. A comparison of the results of the opt-in Plaintiffs to the results of the non-opt-ins shows that there is no statistically meaningful differences between the opt-in shifts and the non-opt-in shifts observed in the study.[30]

## V.   ANALYSIS OF OFF-THE-CLOCK WORK CLAIM

67. In addition to being able to capture the amount of time that Servers and Bartenders spend on various activities during their workday, the observation study is able to capture whether Servers or Bartenders perform work before clock-in or after clock-out. Because observers were instructed to follow their subjects from the moment they entered the restaurant until the moment they left, the study captured all of the time during which the subjects were in the restaurant.  Observers were instructed to note the first time an employee performs any activity, including a work activity before clocking in, and the last time an

---

[30] No statistical significance at the 0.05 level.

employee performs an activity after clocking out. In addition, POS clock-ins and clock-outs were captured during the course of the study. This allowed us to determine how much time, if any, Servers and Bartenders spent outside of the time during which they were clocked in, and to determine if this activity included work tasks.

68. The analysis was performed on two time segments: first, the amount of time spent between the first observation of the employee and the first clock-in, and second, the amount of time spent between clock-out and last observation. Exhibit 50 shows the amount of time that Servers and Bartenders spend during these two time segments. For Bartenders, the average time spent between the first observation and clock-in is 5.52 minutes, while the median is 0.77 minutes. For Servers, the average is 4.66 minutes, and the median is 1.41 minutes. The average time that Bartenders were observed between clock-out and their last activity was 4.48 minutes, and the median was 2.99. For Servers, the average was 4.65 minutes and the median was 2.34 minutes. However, these figures most likely overstate any time potentially *worked*, as it was observed that employees typically come in early and chat with coworkers, or stay late as they wait for a ride, or socialize with co-workers. For example, in one observed case in Atlanta, an employee's car was broken, so she received a ride from someone, and arrived at her restaurant almost an hour early. However, she was not working during any of the time prior to her clock-in. The activity log shows her interacting and chatting with other employees, as well as traveling around the restaurant.

69. Thus, the more appropriate way to measure any potential off-the-clock *work* would be to look at the time between the first work activity performed and the clock-in, and between the clock-out and the last work activity performed. Exhibit 51 presents a summary of these results. For Bartenders, the average time spent between the first observed work

activity and clock-in is 4.12 minutes, and the median is 0.00 minutes.  For Servers, the average is 2.17 minutes and the median is 0.00 minutes.  Note that the median is that number at which half the population of employees is observed.  Thus, more than half the employees' first observed activity was to clock-in.  The average time that Bartenders were observed between clock-out and last work activity was 1.13 minutes, and the median was 0.40.  For Servers, the average was 0.91 minutes and the median was 0.00 minutes.  This time may still be overstated if, for example, and employee briefly wiped a table two minutes before clocking in, and performed no additional work prior to clocking in.  Despite this, the vast majority of observed Servers and Bartenders spent essentially no time performing any work activities outside of the time in which they are working on the clock.

70. There were several outlier weather events during the course of the observation study which may have influenced the amount of time that employees spent at the restaurants either before or after their shifts.  During the observations in the Atlanta metro area during the week of January 27, 2014, there was a large "freak" snow storm that blocked roads and prevented easy transportation.  Second, during the observation week of February 3, 2014 in the Denver area, there was a significant snow storm which prevented easy transportation.  Therefore, some of the outliers that were observed are likely due to these uncommon weather events.

71. The observation data contradicts the claim that there is systematic and widespread off-the-clock work occurring at the beginning and the end of shifts.  The fact that there might be a small number of outliers who might have performed off-the-clock work is statistically inconsistent with the notion that a class claim exists for these allegations.  Furthermore, given the varying idiosyncratic reasons for gaps between arriving and clocking in, there would be

no way to systematically discern who did and did not have a viable off-the-clock claim without talking to employees.

## VI.   ANALYSIS OF ELECTRONIC DATA – THE DISCOVERY SAMPLE

72. I was asked to analyze Darden's electronic human resources data produced during discovery.  The electronic data provide information on the employment history of each employee who occupied the position of Server or Bartender for whom data were available during the study period.[31]  These data were processed and restructured in order to construct analytical files appropriate to study the characteristics of shifts worked by the Servers and Bartenders at each concept restaurant, and to conduct the other analyses reported on herein.

### A.   DATA RECEIVED

73. The analysis presented below relies on the following data files, which I received from Counsel:

### DASH_POS ("POS")

74. The file provides all of the POS and related timeclock data related to Servers' and Bartenders' shifts.  The data include a time stamp for every clock-in and clock-out, for each job performed each day.  These data also include a time stamp for every check that is opened, and another when each check is closed, along with the check number.  POS data were received reflecting 33,511 total shifts for 242 unique Darden employees.[32]

---

[31] In the Discovery Sample, employees were grouped into two categories: "Servers" and "Other."  The "Other" category included Bartenders and employees who worked as both a Server and Bartender.  For ease of exposition we refer to them as Bartenders, and in the analysis, we do focus on Bartender work, since the data permit that.

[32] POS data were not available for all of the 768 employees in the Discovery sample.  POS data are maintained at the restaurant level, and are not systematically kept for particular amounts of time.  Of the 768, 305 had terminated prior to the start of the data file (March 30, 2012).  Of the 242 for whom we received POS data, six did not work at any of the five concepts at issue during the relevant time period

*HR*

75. The human resources data file is transactional and includes data on hire and termination dates, transfers, leaves of absence, and other human resources actions, along with the effective date of each transaction.  The HR file is used to generate a daily incumbent file, with one record for each day of the worker's employment, which is then used to attach HR information to each shift based on employee ID and date.

***Daily Sales, Tips, and Hours ("Daily")***

76. These data provide information on the hours worked, pay rates, sales, and tip amounts, each day under each job code for which the employee punched for.  When the daily data are condensed into weekly pay periods, the data reconcile with the payroll file which is at the weekly level.

### B.  Jobs Under Study

77. The analyses below focus only on the jobs of Servers and Bartenders.  All analyses are conducted separately for the two groups of employees.  As noted, the main duty for Servers is to service tables of customers.  Servers open checks, take orders, and are generally responsible for the full servicing of each table to which they are assigned.  On the other hand, Bartenders not only mix drinks and provide service to customers ordering items in the bar area, they also are responsible for mixing drinks for the Servers to deliver to their tables.  When a customer orders something from the bar, the Bartender opens a check under their employee ID at the bar POS.  But when the order is for drinks to be delivered to a table in the restaurant, the order comes to the Bartender via a different ticket system, and is not separately logged into the POS system by the Bartender.  It is my understanding that the

---

and one was terminated at the start of the data and had only one time record.  These seven employees were dropped from the analysis leaving 235 employees with POS data.

drink orders filled for Servers are taken into account in determining the amount of tips the Bartender will receive for the shift. For some shifts, a Bartender may not open any checks at all during their shift, and work solely mixing drinks for the Servers' tables. It is not unusual to see a Bartender with zero sales in the data on a given day, but still receiving tips for that shift. It is important to remember that the tasks Bartenders are undertaking during their work day may not be well reflected in the data on checks opened at the bar. For Servers, the check data are more relevant from a correspondence to tasks perspective.

78. The employees in the sample worked under a variety of different job titles, though most were directly related to serving and bartending. Some Discovery Sample employees worked as both Server and Bartender on the same day; in the analyses presented below these employees are considered to be part of the Bartender job group. In addition to the Server and Bartender jobs, the sample employees worked under several other job codes. Examples of these include "Runner," "Host," "Takeout," and various "training" job titles. The full set of job titles that appear in the shifts worked by the sample employees is shown in Exhibit 52.

79. A possible measure of time worked correlated to tip-producing tasks by Servers is the ratio of time checks are open to total tip-credit time worked. The idea would be that if a Server has one or more active tables, all their time is spent in service to those tables. In order to analyze the proportion of tip credit wage time worked, every segment within a shift must be flagged with an indicator as to whether the segment was paid at the tip-credit wage or at the "full hourly wage" which is minimum wage or higher. As described above, Darden provided a set of "rules" describing their pay procedures with regard to tip credit wages. For shifts worked within the states that do not allow tip-credit wages at all and where Darden does not take the tip credit- Alaska, California, Minnesota, Montana, Nevada, Oregon, and

Washington – all shift segments are categorized at the full hourly wage.  In addition, per Darden's policy, Bartenders working at Olive Garden and Red Lobster do not receive tip credit wages in Delaware, Kentucky, Maine, Michigan, New Hampshire, North Dakota and Wyoming.  In the remaining states, there are a variety of practices that govern when the tip credit wage is paid and when the full hourly wage is paid.  These practices are described in Exhibit 1.

80. The data shows that these practices are administered via the job codes.  For example, at Red Lobster and Olive Garden locations within states that allow the tip credit, Servers and Bartenders receive the full minimum wage for all work done before the restaurant opens.  In the POS data, work prior to restaurant opening at these locations is under the job codes "Server Set Up" and "Bartender Set Up."  When the restaurant opens, usually at 11:00am, the employee is clocked out of the "Server Set Up" and "Bartender Set Up" jobs and clocked in as "Server" or "Bartender."  The "Set Up" job codes are not used at restaurants located in states in which only the full minimum wage is paid.[33]

81. As noted above, there are several other job titles under which employees work. These job titles were classified as tip credit or full minimum wage based on the actual rates of pay for each segment taken from the Daily data file.  This provides a full job title to pay type mapping, which is then used to determine how each shift segment was paid.  The total amount of time worked at tip credit pay can then be calculated for each shift worked.

82. Darden's system of having different job codes associated with different jobs, or in tip credit states and in certain brands, different codes associated with types of work (i.e.

---

[33] Plaintiffs' expert Mr. Cutler takes issue with the practice of automatically converting to the tip credit wage.  To suggest that the conversion be completely individualized is somewhat foolish from a business perspective.  In any event, Mr. Cutler's misunderstanding of what constitutes related and unrelated work appears to be why this practice concerns him.

Server or Bartender "set up") provides employees with the ability to more accurately record the general nature of the tasks they perform during different segments of their shifts.

### C. CONSTRUCTING THE DATA FILE FOR ANALYSIS

83. The analysis data file was created by merging information from the POS, Daily, and HR data files.  The time punches in the POS data file were first re-arranged to reflect shifts on a daily basis.  Each daily record included all clock-in and clock-out times, and the times of each check opening and closing.  Check openings and closings were matched by check number.  Next, the duration of each shift segment was calculated and a flag was attached to each segment defining it as paid by tip credit wage or minimum wage.[34]   The total time covered by open checks and the proportion of tip credit wage time covered by open checks are calculated, as is the number of checks opened during the shift.  The amount of time during which no checks were open was calculated, as well as an implicit "break time" reflected by the amount of time between clock-out and another clock-in on the same day.

84. Next, the information in the Daily file regarding sales and tips was merged with the daily POS shift data.  Data from the HR file reflecting the restaurant concept, department (store) number and state in which the restaurant is located were also added.

### D. DISCOVERY SAMPLE ANALYSIS

85. Exhibit 53 shows the distribution of the 768 employees in the full Discovery sample by concept, and Exhibit 54 shows the proportion of employees requested in the sample for which we received POS data.  The high proportion of employees at Seasons 52 in the POS data is due to the fact that Seasons 52 restaurants maintained the most historical POS data among all concepts.  Seasons 52's POS data began in April 2012; no other concept

---

[34] Note that even though we refer to minimum wage, not all non-tip credit wages are at the federal minimum wage rate.  Minimum wage here means time paid at the federal minimum wage rate *or above*.

has data in the POS file prior to October 2012.  Exhibit 55 uses the Daily data to calculate the total number of shifts worked by all 768 Discovery sample members, and Exhibit 56 shows the proportion of those shifts which are available for analysis in the POS data I was provided with.

### E.  OPEN CHECK ANALYSIS

86. Of particular interest is the proportion of tip-credit wage rate time that is worked during which one or more customer checks are open.  It is reasonable to assume that all or substantially all of the work being performed during the time with open checks is work focused directly on guest(s).  The proportion of open check time can thus be considered a lower bound on the amount of time spent on tip generating tasks, since there may also be tip generating work performed when a check is not yet open, or has been closed with customers still present.  For example, greeting guests, or refilling coffee after the check is closed is tip-related, but will be outside the time when a check is open.  The analysis covers only the 199 employees for whom I was provided POS data who worked in concepts and locations that were subject to tip credit wages.

87. Exhibit 57 shows the proportion of "open check time" that occurs during the portions of Servers' shifts which are worked at the tip credit wage at each concept, and Exhibit 58 shows the same for Bartenders.  There are clearly differences in the results between the Servers and Bartenders, particularly at the Bahama Breeze, Olive Garden, and Red Lobster concepts.  At all concepts besides Seasons 52, Servers have a higher proportion of open check time during the tip-credit wage portions of their shifts than do Bartenders. This is consistent with the observation above, that the drinks Bartenders make for delivery to

Servers' tables are not accounted for with open checks that they open themselves, since many, if not most drinks are ordered on checks opened by Servers.

88. Next, I looked at how open check time was distributed with regard to the number of checks open. Exhibits 59 and 60 show the proportion of tip credit wage time with none, one, two, three, four, five to nine, and ten or more checks open at the same time. Among Bartenders, it appears that those working at Seasons 52, Bahama Breeze, and Longhorn are more likely to have 5 or more checks open during their shift. Olive Garden and Red Lobster Bartenders rarely have more than two checks open. This is likely related to differences in the nature of the jobs between concepts as a function of differences in the concepts. Olive Garden and Red Lobster Bartenders may spend more of their time making drinks for Servers, and may have fewer customers placing orders directly at the bar. The distribution of open checks among Servers is more consistent, in relative terms, across concepts.

89. One driver of the number of checks opened during a shift is the amount of time that customers spend at the bar or at a table in the restaurant. The more frequently a table is "turned over," the more tables the Server can serve during the shift and accordingly the larger is the number of checks the Server has the opportunity to open. Looking at the average amount of time that a check was open displays large differences across concepts. Bartenders' checks at Seasons 52 are open for almost an hour on average, while at Olive Garden and Red lobster bar checks stayed open on average for less than a half hour (Exhibit 61). Not surprisingly, as shown in Exhibit 62, Servers' checks tend to be kept open longer – a meal at a table generally takes more time than a drink and/or meal served at the bar. There are still differences in the amount of time Servers' checks were open, with an average check duration of 78 minutes at Seasons 52 but only 51 minutes at Olive Garden.

90. One can also look at the total number of checks opened over the course of the entire shift.  Note that the total number of checks will also be affected by the length of the shift – working a longer shift provides the time to open more checks.  Thus the comparison of total checks opened is weighted by shift duration.  Looking at Exhibits 63 and 64, again, not surprisingly, Bartenders at Olive Garden and Red Lobster open fewer checks, on average, over the course of their shifts.  This is consistent with the other findings above, and suggests that Bartenders at those concepts may be doing a somewhat different job than Bartenders at the other concepts.

91. We can use the observation data to examine what employees are doing when they have no customers of their own present.  Exhibits 65 through 67 show Servers' and Bartenders' activities while they have no customers of their own, based on the observation data.  Exhibit 65 focuses on the top 20 tasks before their first customer arrives. Employees tend to spend the majority of their time on general restaurant interaction with other employees and on travel, walking or waiting on floor, accounting for 31% and 30.9% respectively of the time before their first check is opened.  Three out of the top 20 tasks are tip-Producing activities, accounting for a total of 33.2%. These tip producing tasks include travel, walk or wait on floor and monitor guests, serving and carrying food or beverages to customers and placing or modifying orders in the POS system. Even though the observed employee did not have any customers of his/her own at the time, it can be expected that he or she would occasionally help other employees and spend most of their time on helping to monitor their customers, as well as waiting for new customers. Ten tasks out of the 20 are related duties, such as stocking beverages/liquor and ice, setting up coffee, tea, ice or soda

machines, carrying and stocking dishware and utensils, accounting for 22.7%. The remaining seven tasks are "other" duties, accounting for 38.1%.

92. Exhibit 66 shows the top 20 tasks after the Server or Bartender's last customer has left. Here, again, traveling or walking the floor and general restaurant interaction with other employees are the top two tasks, accounting for 21.5% and 19.5% respectively. Four out of the top 20 tasks, or 28.3% are tip-producing activities. Ten tasks are related duties, accounting for 27.3% and the remaining six tasks are other duties which total to 39.6% of their time after the employee's last customer has left.

93. A similar distribution of activities is depicted in Exhibit 67, which shows the top 20 tasks for employees during the day when they have no checks of their own open. Traveling or walking the floor and general restaurant interaction are the top two tasks, accounting for 26.4% and 18.9%. Six tasks are tip-producing activities, accounting for 47.7%. 10 out of the top 20 tasks or 21.6% are related duties and 4 are other duties, accounting for 23.4%.

## F. VARIABILITY ANALYSIS USING THE DISCOVERY SAMPLE DATA

94. Using the discovery sample data, I next looked within the different restaurant concepts to determine from a data perspective how similar or different the experiences of Servers and Bartenders were who worked in the same concept.

95. Exhibits 68 through 77 present open check time as a proportion of tip-credit wage time worked for Servers and Bartenders at each concept separately. In these charts, each horizontal line reflects the average proportion of open check time over one employee-week of shifts. All of the concepts show wide variation in the percent of open check time for Servers and Bartenders working at each concept. Consequently, the average across all

employees working at a particular concept may not provide a good reflection of the experiences of individual employees during any particular week.  For example, at Bahama Breeze time with open checks as a percent of tip credit wage time ranged from a low of less than 30% to a high of 100%.

96. I also looked at the issue of open check time as a percent of tip credit wage time at the individual employee level.  As discussed in detail in the sections above, Named Plaintiffs have testified that there were large differences in their work experiences during different shifts.  To illustrate the nature of this variation, Exhibits 78 through 82 show the percent of tipped wage time with open checks for five randomly selected individual employees.  It is evident that the proportion of tipped time with open checks shows considerable variability, even at the individual employee level.

97. All of the restaurants under study are open for both lunch and dinner.  Some employees work the lunch shift, some the dinner shift, and some work both.  Customer behavior may differ between the two time periods, and the nature and duration of the meal may differ as well.  For example, the likelihood that alcoholic beverages are ordered is probably higher at dinner than at lunch.  So it is quite possible that a Server or Bartender's performance of job duties differs depending on the shift.  Since, as discussed above the Bartender job includes making drinks for Servers' tables as well as opening their own checks for food and drinks to be consumed at the bar.  The analysis below is therefore conducted only on Servers.

98. Each of the restaurant concepts is open all day, and does not close between lunch and dinner.  It is therefore necessary to determine in the data what time lunch ends and dinner begins in order to tell which type of shift is being worked.  Based on the distribution of

clock-in times in the data, I have assumed that employees who punched in after 2:00pm were working dinner shifts.

99. Exhibit 83 shows the average check duration by concept for lunch and dinner shifts. As would be expected, customers spend more time at dinner than at lunch. I also looked at the weighted number of checks open at any given time, which is generally higher for dinner as compared to lunch, except in the case of Red Lobster where Servers have a slightly lower number of dinner checks, when compared to lunch.

100. The Proportion of tipped time with open checks also differs between lunch and dinner, as shown in Exhibit 84. Servers on the dinner shift have a greater amount of their time at the tipped wage taken up with open customer checks, except at Red Lobster where lunch shows more open check time.

101. There are also meaningful differences across concepts and shifts with regard to the dollar amount spent by customers – both on the basic check and on Servers' tips. Exhibit 85 shows the average sales and Exhibit 86 the average tip per check by shift and by concept. Not surprisingly, dinners generate larger checks on average than do lunches. It is also quite evident that checks at Seasons 52 are much larger than checks at the other concepts, both for lunch and for dinner. Tip percentages also demonstrate variation. As shown in Exhibit 87, lunch and dinner shifts appear to generate similar tip percentages within concepts – but among all concepts Seasons 52 Servers receive a higher tip percentage than Servers at the other restaurants.

102. I also looked at the weighted average number of checks open throughout the day. Exhibit 88 shows the weighted number of checks open by concept during each 15-minute interval of the day. The basic bi-modal shape of the distribution of checks is evident

across all concepts, which could be expected since most restaurants will tend to be busier at lunchtime and dinnertime than in between.  But there are still differences in the patterns of how busy Servers are throughout the day depending on at which concept they work.  Servers at Bahama Breeze appear to be busier between lunch and dinner than the other concepts. Red Lobster and Olive Garden Servers have relatively few checks open during the dinner hours compared to the other concepts.  Interestingly, at all concepts Servers appear to have more checks open on average around lunchtime as compared to dinnertime.

### G.  HOURS WORKED PER WEEK BASED ON DISCOVERY SAMPLE DATA

103.      In order to address a potential overtime claim, I investigated the average hours worked by job and concept. For this exercise, I relied on the "daily file," rather than the POS data, since this dataset contains complete information on total daily hours worked for the Discovery Sample employees.[35] Exhibit 89 shows that the average hours worked per shift varies not only by concept, but also by job title. Overall, Bartenders appear to have longer shifts than Servers. At Seasons 52, Bartenders work, on average, 6.9 hours per shift, whereas Servers work 6.2 hours per shift.  At Bahama Breeze, Bartenders have an average shift length of 7.5 hours, while the Servers' shifts last 6.1 hours on average.  At LongHorn, Bartenders' average daily shifts are 6.7 hours long, whereas Servers' average shifts are 5.2 hours long. At Olive Garden, the average shifts are 6.8 hours and 5.5 hours for Bartenders and Servers, respectively.  Finally, at Red Lobster, Bartenders work an average of 6.0 hours per shift, while Servers work 5.5 hours per shift on average.

104.      Exhibit 90 shows the average hours Servers and Bartenders work on a weekly basis. Employees at Seasons 52 work the greatest number of hours per week:

---

[35] This analysis excludes weeks during which the employee worked as both Server and Bartender.

Bartenders work 27.0 hours per week on average and Servers work 26.6 hours per week. Bahama Breeze Bartenders work an average of 26.3 hours per week, and Servers work an average of 23.4 hours per week.  LongHorn Bartenders work an average of 25.4 hours per week, and Servers work an average of 20.2 hours per week.  At Olive Garden, the average number of hours worked per week is 26 for Bartenders and 21.6 hours for Servers. Red Lobster employees, on the other hand, appear to work the least number of hours per week: 22.9 hours for Bartenders and 22.6 hours for Servers.  These results indicate that on average, the number of hours worked per week are well below the overtime threshold of 40 weekly hours. Exhibit 91 shows the average and median weekly hours worked by concept for Bartenders and for Servers. For both job titles, the medians are very close to the mean, which indicates a symmetric distribution around the mean.

105.     Exhibits 92 and 93 illustrate the percentages of weeks worked by Servers and Bartenders that were shorter than 30, 35 or 40 hours. Of the hours worked per week by Servers at Seasons 52, 60.7% are shorter than 30 hours, 77.9% are shorter than 35 hours and 90.5% weeks are shorter than 40 hours. For Bahama Breeze, 70.6% of Servers' weeks are shorter than 30 hours, 84.1% of their weeks are shorter than 35 hours and for 95.5% of all weeks they work less than 40 hours. Servers at Longhorn have the highest amount of weeks shorter than 30 hours: 84.5% and 93.5% of their weeks worked are shorter than 35 hours. Only 1.6% of workweeks for Long Horn Employees are longer than 40 hours. For Olive Garden and Red Lobster Servers, 78.1% and 76.7% of weeks respectively are shorter than 30 hours. 89.2% of weeks are shorter than 35 hours for both restaurants and approximately 97% of weeks are below 40 hours.   Exhibit 93 shows the same numbers for Bartenders.  This data suggests that there are few weeks where overtime claims may exist.

## VII.  RESPONSE TO MADANSKY AND CUTLER REPORTS

106.      I have reviewed the March 28, 2014 reports of Dr. Albert Madansky and Mr. William Cutler submitted in this matter on behalf of Plaintiffs.  Dr. Madansky subsequently provided a set of documents which I understand to be his backup materials.  The documents were provided to me on April 15, 2014, one day prior to the filing date for this report.  As such, I have not had the opportunity to fully review these materials.  However, my preliminary review of these documents indicates that the materials provided are incomplete and do not constitute a complete set of backup materials detailing all of Dr. Madansky's calculations.

107.      Most of Dr. Madansky's report consists of a series of hypothetical exercises he could or might carry out at some future point in time.  There is virtually no empirical work presented.  The main focus of Dr. Madansky's report is a discussion of a *proposed* survey of the 768 employees who were part of the Darden Discovery sample.  At the time the report was submitted, Dr. Madansky stated that "We are administering a survey to both 'Servers' and 'Others.'  The current version of the survey instrument for Servers… is now being pilot tested on the named Plaintiffs."[36]  No information was provided about when Dr. Madansky expects the "Server" pilot testing to be finished, his plans to pilot test the "Others" survey, or when he plans to field the general survey and perform his statistical analysis on the survey results.  My opinions below thus relate only to the proposed survey instrument that is presented in appendices to Dr. Madansky's report.  I may revise or add to my opinions if I am provided with additional data or information from a subsequent fielding of Dr. Madansky's survey(s).

---

[36] Madansky report, paragraph 9.

108.     Dr. Madansky has proposed that a written survey be administered to a sample of the opt-ins in this case.  He has included as appendices A and B the written survey instruments that he proposes be used.  He states that these are being pilot tested as of the date of his report, March 28, 2014.  There are numerous problems with the survey instruments, such that there is virtually no chance that the outcome will be reliable or even usable.  As described below in detail, some of these problems are likely insurmountable.  The survey language is highly biased and leading, and the ordering of response items is confusing.  Worse still, because of the particular way the survey is constructed, the central response task requested of respondents, wherein they are asked to allocate their work time into 20 or so task buckets, would be impossible to complete without a spreadsheet model.  A calculator would be of little to no use in completing this critical and central response task.  Furthermore, if the respondents constructed their own spreadsheet models, the process they would then engage in would most likely result in highly artificial, incorrect and inconsistent results.  The reasons why will be described in detail below.

109.     The other empirical analysis Dr. Madansky proposes is to use the company electronic data to estimate time allegedly worked off-the-clock.  This attempt is simply wrong on its face, as it relies upon a series of implicit assumptions that either Dr. Madansky is unaware of or has ignored.  He proposes to use the difference between an employee's scheduled start time and their first clock-in as a measure of off-the-clock work, under the assumption that employees are always present and working when scheduled.  There are also several other problems with Dr. Madansky's report, which are described below.  I turn to the detailed critique next.

**A.  SCHEDULED START TIME VS. CLOCK-IN TIME**

110.       In paragraph 4 of his report, Dr. Madansky performs a calculation comparing the scheduled start time with the clock-in time for a sub-sample of employees for whom he received work schedules.  Dr. Madansky claims that differences between the scheduled start time and the actual clock-in time were evidence of "considerable pre-shift activity" for the employees he studied.  However, this conclusion is based on a lack of understanding of how work schedules operate within Darden, and at restaurants generally.

111.       Schedules are not always reliable indicators of the days and times an employee actually works.  In practice, restaurant employees can swap shifts, request to come in late, are asked to come in early, or don't conform to pre-conceived scheduling for any number of reasons.  Thus the work schedule is not a reliable indicator of who will be working when.  In the observation study I conducted of Servers and Bartenders working in Darden restaurants, I had work schedules for all employees for the weeks during which observations were taking place at each of the locations visited.  It was frequently the case that actual work times observed and the scheduled times differed for individual employees.  Since the manager's task is to schedule a quantum of work, they may essentially be indifferent as to who will perform that work, and if employees want to trade shifts, they are free to do so.  Our observers saw evidence of this. Thus the name on the schedule and the name of the person who worked the shift can and do differ.

112.       Another issue is that Dr. Madansky simply assumes that if the person was there at the scheduled start time that they would begin work immediately.  That was not what our observers saw.  Instead, when time elapsed between first arriving at the restaurant and clocking in, that time was typically not associated with work tasks, as described in Section V, above.

113.     Dr. Madansky's approach to off-the-clock work is based on assumptions. The empirical evidence presented above is not based on assumptions, but instead is based on direct observation of the time between the first work tasks and clock-in, when the first work task is not clocking in, as well as the time between clock-out and the last work task, when the last work task is not clocking out.  The analysis shows there is virtually no off-the-clock work taking place, either before or after shifts.

### B. POPULATION OF OPT-INS AND SUPPLEMENTAL OPT-INS

114.     In paragraph 5 of his report, Dr. Madansky provides a table showing the distribution of the 19,268 opt-ins and another table with the distribution of the opt-ins *adding* another 140 from the supplemental notice (all of whom are under the "other" category).  But the numbers in Dr. Madansky's table that includes the additional opt-ins are smaller than the numbers in his table that does not include them.  This does not make sense.  The addition of 140 supplemental opt-ins should cause the total number of opt-ins *increase*, not decrease. The numbers show a smaller opt-in sample of "others" at Olive Garden (1,869 v. 1,858), Red Lobster (1,744 v. 1,737), and Bahama Breeze (105 v. 102) and accordingly, in the Totals (19,268 v. 19,247).  As discussed in the section above, Dr. Madansky provided me with what appears to be a limited and incomplete set of backup materials.  In my limited review of these materials, I have not found the information I would require to ascertain the error(s) that lead his population numbers to fall when the supplemental opt-ins are ostensibly added.

### C. SURVEY HOURS VS. "DARDEN HOURS"

115.     In paragraph 11 of his report, Dr. Madansky presents a methodology for reconciling the *on-the-clock* hours that are to be reported on the survey with the paid *on-the-clock* hours as recorded in Darden's POS system.  He provides an example in which a survey respondent reports seven hours of total work, but the Darden records show only six, and goes on to explain that he would use the fraction of total hours worked in each of the four categories of the survey to "allocate the total hours taken from the Darden daily clock-in/clock-out time records."  This suggests that at the time he wrote paragraph 11, he intended to ask open-ended questions about on-the-clock hours worked in the survey, apply the proportions of work reported in each of the four categories to the paid on-the-clock hours in the Darden time records, and then use the "allocated" Darden hours in his damage calculations.

116.     It is evident that it is not what he later decided to do because later in the report when the specifics of the survey are discussed he proposes using a different methodology for capturing hours worked.  The survey presented in Appendix A states to the respondent that "The [survey] table already has your average on-the-clock hours and number of shifts from Darden time records."  So the survey that is apparently currently being piloted will explicitly tell the respondent what Darden's records show as their paid on-the-clock hours, and ask those stated hours to allocate them across tasks.  This is quite different from the proposed methodology in paragraph 11, which simply asks respondents how many hours they worked on activities in each category without providing guidance from the numbers in Darden's time records.

117.     Why the change?  First, if open-ended questions are asked about on-the-clock hours worked, it is possible that the survey hours reported will not match the Darden's

records of actual paid on-the-clock hours. Dr. Madansky acknowledges this explicitly with the example he presents in paragraph 11 showing how he would translate "survey hours" into "Darden hours." This calls into question the validity of the hours worked information reported in the survey. Thus, instead of using the methodology presented in paragraph 11, the survey was apparently changed to fill in the total paid on-the-clock hours prior to mailing to the respondent, and then asking them to allocate their hours worked between the activities such that they exactly sum up to the totals in Darden's records. The survey now being piloted instructs: "The last row of the table Average On-The-Clock Hours on page 5 has, from Darden time records, your average on-the-clock hours when clocked in as a Server paid at Server wage. Please divide these hours among the various tasks. We are asking you to allocate ONLY the amount of time that Darden records show you clocked in under the title "server" at server wage." Paragraph 11 appears to refer to a previous incarnation of the survey that was abandoned due to the likelihood that respondents would "mis-remember" the amount of on-the-clock hours they were paid for.

118.    If Dr. Madansky had instead prepared the survey using the technique described in paragraph 11, he would have had the opportunity to obtain a measure of survey validity by comparing the respondent's reports of on-the-clock tip credit hours with those recorded by Darden. By providing respondents with the amount of tip credit time in Darden's records rather than asking them how much tip credit time they worked, Dr. Madansky cannot perform this potentially useful validation. The concept of survey validity examines how well the survey measures what it is intended to measure. The generally accepted method to evaluate survey validity compares the survey responses to available "gold standard" administrative records or data obtained through direct observation of the

subjects.   Dr. Madansky has no such data, and therefore is unable to assess the validity of his survey with respect to hours worked.[37]

### F. SAMPLE SIZE AND RESPONSE RATE

119.      Dr. Madansky's survey proposal suggests that he plans to field the survey to all 768 employees in the Discovery sample.  But most of his survey concerns classifying work paid at the tip credit wage versus minimum wage.  It seems that Dr. Madansky does not recognize the fact that not all Discovery Sample Darden employees at the five concepts at issue here are subject to tip credit wages.  Practices within the Darden brands vary with respect to who receives tip credit pay and when, some of which are determined by state law.  For example, Darden employees working in Alaska, California, Minnesota, Montana, Nevada, Oregon, and Washington are NEVER paid a tip credit wage.  Likewise, Darden does not take a tip credit for Bartenders in Delaware, Kentucky, Maine, Michigan, New Hampshire, North Dakota, or Wyoming.  So most of the survey would be inapplicable for those employees.  The population to whom the full survey could be sent is therefore less than 768, since the 768 was selected from a complete nationwide population of opt-ins, not just those opt-ins in the tip credit states, or in states where Darden pays Bartenders the tip wage credit.

120.      If Plaintiffs intended to conduct a survey at the time the Discovery Sample was designed, it is unclear to me why they did not request a larger sample of employees to

---

[37] However, if Dr. Madansky does eventually field his survey and provide me with the data, I propose to validate the survey responses using the data obtained from my observation study, which provides detailed accounts of the tasks undertaken by Servers and Bartenders throughout their shifts.  Dr. Madansky could likewise conduct his own validation analysis using the observation data I have produced.

study.[38]  As was made clear during the discovery sample selection process, certain statistical parameters were established, such that study of the sample, and the subsamples for restaurant, concept, and job would yield useful and potentially generalizable statistical findings.  These findings were ostensibly intended to be derived from the data and documents that Darden was ordered to produce for the discovery sample.  Given that no survey has a 100% response rate, and that typically written surveys have a much lower response rate, even in litigation settings, knowing *a priori* that a survey was to be used, a much larger sample should have been insisted on.  Yet Plaintiffs pressed for a much smaller sample.  This is difficult to reconcile, and the result is likely to be that once the survey is fielded, a low response rate will prevent the results, even if they were reliable and valid, from being extrapolated to the larger opt-in population at acceptable levels of statistical confidence.[39]

121.     In his paragraph 20, Dr. Madansky mentions the concept of "response rate of the survey" but provides no indication of what he thinks that response rate might be and how it might affect his data and analysis.  In surveys of this kind (mailed, or telephone using a script), response rates tend to be low. Dr. Madansky, a recognized survey expert with many

---

[38] In fact, while a sample size of 768 was eventually agreed on by both parties, Plaintiffs initially pressed for a much smaller sample of about 350.  If the plan was to do a survey, Plaintiffs' experts should have advised them that a larger, not a smaller sample, was required.

[39] Literature regarding survey design states that mailed surveys often achieve lower response rates than other survey methods.  For example, Floyd Fowler, an established survey researcher, states, "Rather, the main difficulty is inducing respondents to perform the task of filling out the questionnaire without the intervention of an interviewer.  Writing a letter is not a very effective way to convince a high percentage of people to do something.  Personal contact is significantly more effective than a letter." *Survey Research Methods, Second Edition*, p. 45.  Ronald Czaja and Johnny Blair state, "Unit nonresponse is the principal source of nonsampling error in mail surveys, which usually achieve lower response rates than either interview-administered general population surveys or surveys of many special populations… For both mail and web surveys intense followup contacts are essential to obtaining acceptable response rates." *Designing Surveys: A Guide to Decisions and Procedures, Second Edition* p. 228-229.  Groves, et al, state, "Hox and Leeuw (1994) undertook a meta-analysis of 45 studies that explicitly compare response rates obtained from mail, telephone, or face-to-face surveys.  They conclude that, on average, face-to-face surveys have the highest response rates, followed by telephone, then mail." *Survey Methodology*, p. 153.

years of survey design experience, should be well aware that response rates for his proposed survey will likely be less than 50%.[40]  Once the non-tip credit employees are taken out and the sample is divided into "Servers" and "Others," the survey will only be fielded to a small number of employees at each concept.  The data available for analysis will further be reduced (perhaps by as much as 50%) due to response rate issues.  Dr. Madansky acknowledges in paragraph 22 that "the true margins of error will vary and depend on the response rate of each of the bucket samples."  He should know that these margins of error are likely to be large given the small amount of data that will be available for analysis, and the resulting precision of the population estimates will be extremely low, and likely to be of little value, given the wide variation likely to be found in the survey results.

122.     While he does acknowledge the issue of response rate, Dr. Madansky has provided no discussion of how he will deal with response *bias*.  He fails to include any discussion on the likely biased nature of non-response.  That is, the non-responding persons are unlikely to be random.[41]  Instead they are likely to be self-selected in some unknown and perhaps unknowable manner.  Since survey respondents are generally self-selected, one must always consider how representative the respondents are relative to the population from which they came.  Thus, understanding the impact of non-response bias upon the survey results is always a key factor in the decision to extrapolate results to the full population.

123.     Non-response bias is a form of bias where the decision to respond or not respond to a survey is correlated with *how* the subject responds, consequently leading to

---

[40] Fowler explains, "If one simply mails questionnaires to a general population sample without appropriate follow-up procedures, the rate of return is likely to be less than 50%." *Survey Research Methods, Second Edition*, p. 45.
[41] Fowler, Floyd J. (1993) *Survey Research Methods*. Second Edition.  Thousand Oaks and London: Sage Publications, Inc., page  43.

systematically biased estimates of overall population values.  For example, suppose a researcher sought to estimate the average height of the population, but the survey's design and/or administration somehow caused a disproportionate share of shorter people not to respond, or that shorter people responded at lower rates because the wording of the survey offended them.  The resulting average would not measure the true average height of the population, but instead would be a biased measure of the population average.   To counter the effects of non-response bias, survey researchers spend considerable efforts to determine the attributes of respondents and non-respondents.  Using this information, researchers can sometimes estimate the nature and direction of the non-response bias, which can then be accounted for using statistical techniques.    While survey researchers have devised various scientific methods to account for non-response bias, Dr. Madansky has not proposed any analysis of the characteristics of respondents and non-respondents.  Indeed, he fails to address the issue of non-response bias entirely.  As stated by Floyd Fowler, a well-known survey researcher, "One usually does not know how biased nonresponse is, but it is seldom a good assumption that nonresponse is unbiased." [42]   For example, in the case of a survey related to litigation, it is possible that individuals who have a larger "stake" in the case might be more likely to respond.  In the matter at issue here, those would be employees who believe they have a larger amount of improperly compensated or uncompensated time.  If that is the case, the survey results will overstate damages as well as liability, since the information obtained from the sub-sample of survey respondents will not be reflective of the population it was intended to represent.

---

[42] Fowler, Floyd J. (1993) *Survey Research Methods*. Second Edition.  Thousand Oaks and London: Sage Publications, Inc., page  43.

### E. SERVER QUESTIONNAIRE

124.    In this section I will discuss the many problems with the Server questionnaire that appears in Appendix A of Dr. Madansky's report. All of these points are directly relevant to the Bartender questionnaire in Appendix B, and thus no separate discussion will be needed for the Bartender questionnaire.

### i. Leading Questions

125.    It is important to structure survey questions carefully. Questions should be phrased neutrally so as not to "lead" the respondent towards a particular answer. A question that presumed that something happened when it may or may not have actually occurred is a particularly extreme form of a leading question. Much of the language used in Dr. Madansky's survey is leading, some of it to quite a large degree.

126.    The survey instructs respondents to "Please complete the shaded area of the table *Average Work Hours* on page 2 to show, on average, your pre-shift off-the-clock hours, post shift off-the-clock work hours, and total work hours." This question explicitly presumes that both pre-shift and post-shift off-the-clock work has in fact occurred, and all the respondent need do is identify how much there was. Nowhere do the instructions inform the respondent that they may have not worked any pre- or post-shift off-the-clock work, and that the correct response to any of the questions could be zero hours. In fact, out of the more than 20,000 opt-in consent forms that were completed, over 6,700 opt-ins, or about one third answered "No" for the off-the-clock claim.[43] This survey would not allow these individuals

---

[43] In addition, the opt-in consent forms show that out of the more than 20,000 responses, 13,398 respondents indicated having no overtime claim, and 2,506 indicated that they did not have any sidework claim. Certain individuals who lived and worked in states where there was no tip credit payment allowed actually indicated that they have a sidework claim, which shows the potential for confusion among the opt-ins.

to report the same answer by forcing them to indicate how much time they spent working off-the-clock.  A proper survey instrument would not address the question in this leading manner, but instead would ask first something like "Did you have occasion to be at the restaurant for time during which you were not clocked in?" If the answer is yes, the survey could follow, for example, with "While you were there but not clocked in, did you perform any work during that time?" Additional follow up questions would address when the off-the-clock work occurred, and how much of it there was.  But this survey starts out by asking the respondent to fill in the amount of their off-the-clock hours on a table.  This is simply a version of a commonly used example for leading questions: "How often do you beat your dog?", or perhaps "When did you stop beating your dog?"   Finally, the instructions also state that "For a shift, total average work hours **must equal** the sum of pre-shift off-the-clock hours, on-the-clock hours, and post-shift off-the-clock hours."  This again leads the respondent towards the conclusion that he/she must have in fact worked off the clock.

127.     The way in which the categories are described on the table respondents are asked to complete is also extremely leading.  "Pre-shift Off-the-Clock Hours" are described as "average amount of time from arriving at the restaurant to first clock-in for shift."  But time is only considered "off the clock" if the person is actually engaged in work.  Dr. Madansky does not make any attempt to find out what they were doing before clocking in. Were they eating?  Talking? Cleaning?  If they are not working, there is no off-the-clock work being performed.  And as discussed in detail above, there are numerous reasons why an employee might arrive early for their shift that have nothing to do with performing off-the-clock work.  Interestingly, "Post-shift Off-the-Clock Hours" are defined for the respondent as "average work hours from last clock-out to leaving the restaurant."  Here, the definition

specifies "work hours" rather than simply the "amount of time" stated in the pre-shift question.  But the respondent is still led towards the presumption that some non-zero amount of off-the-clock work time must have occurred.

128.      The next section of the survey instrument, which is about the specific activities performed pre-shift asks "Next, we would like to know about your average work hours by task for your pre-shift off-the-clock time."  Again, there is a direct presumption that off-the-clock time is being worked – the term "_your_ pre-shift off-the-clock time" (emphasis added) further reinforces this.  Again, Dr. Madansky could easily have asked a series of questions first to assess whether pre-shift off-the-clock work ever occurred, and if it did, how frequently.  It is unclear to me why he chose not to.  Dr. Madansky's survey does not allow him to know how many of an employee's shifts had off-the-clock work and how many did not.  He also cannot distinguish the average amount of pre-shift off-the-clock time worked since the averages respondents enter are supposed to account for both shifts with and without off-the-clock time.  Given that Dr. Madansky's own analysis of schedules compared to clock-in times shows that in only 15.5% of days did he find a difference, it is puzzling that his survey is worded the way it is.  Clearly, Dr. Madansky knows that off-the-clock work even defined his way, is not performed on a routine basis, yet his survey leads the respondent to think it is a routine event.

129.      Finally, from a practical perspective, suppose a respondent recalls that indeed they did not work off-the-clock on each and every shift.  Suppose they want to account for the "zeroes" in their answers.  How would they do this?  There is no instruction whatsoever, and some might think the question wants the answers to include the zeroes,

others might think of the questions as intended to get at the average for shifts when they did work off-the-clock only.  Confusing at best.

### ii.  List of Work Activities

130.     Dr. Madansky's Server survey next asks about time worked on the clock. As discussed previously, the survey is designed to contain on the form for each respondent their average paid on-the-clock "Darden hours" worked.  The respondent is then instructed to allocate those "Darden hours" across 21 different tasks, and that the sum of the allocated hours must equal the "Darden hours" at the bottom of the table.

131.     Upon inspection, it is immediately apparent that the list of 21 tasks is very unbalanced.  "Balance" in this context refers to the survey having similar numbers of tasks in each of the activity categories (Server work, related duties, unrelated duties, and other activity).  Here, out of the 21 tasks listed, only two – "Server Duties" and "Idle Time" are defined as Server work.  The result of this will likely cause the amount of Server work to be underestimated.[44]  And the placement of the "idle" time category at the end of the survey is such that the respondent would give it minimal weight, or perhaps even miss the category entirely.

132.     It is unclear to me why Dr. Madansky did not develop a more balanced list of tasks that included more Server work tasks.  Looking at the "Glossary of Task Descriptions" that appears at the end of the survey, there are seven different tasks that are listed under Server duties (and many more if one reviews the O-Net source discussed above), such as "Take and deliver food and drink orders," "Operate POS system to enter food and

---

[44] Note also that the instructions ask the respondent to "complete Shaded Area" which strongly suggests that there should be some time allocated to each task.  There is no reminder that some respondents might spend zero time on a particular task, or that a particular task could be left blank if no time was ever spent performing it.

drink orders," and "Bread/Water Service."  Yet all of these tasks are lumped into one line as "Server work" on the survey.  But the "non-table related duties," such as "Bread," "Ice," and "Beverage" all appear as separate line items to be individually considered by the respondent.

133.     The extensive list of work activities also makes the survey very difficult to complete in the "zero sum" world Dr. Madansky has created for respondents.  Respondents must make sure that the amount of time they report spending on all of these tasks sums exactly to the number shown from the Darden records.  It would be virtually impossible to make a first pass down the list and have the individual task times sum to the total time that Darden records supply at the bottom of the table.  So the respondent is then forced to go back over the list, adding some time here, dropping some time there, until the numbers add up to Darden's total.  This would be extremely difficult to do without entering all of the information into a spreadsheet; attempting the task with just a calculator would be very time consuming.  To attempt to fill out the form with no calculation aid whatsoever would be incredibly tedious and prone to errors.  The entire process would reduce to an artificial exercise in balancing and re-balancing, not one of using cognitive recall to respond to the survey.  In my opinion, this is one of the worst survey instruments I have yet seen from the perspective of clarity and likelihood of successful completion.  I would suspect that many respondents would throw it away in frustration.

### iii. Categories of Activities

134.     Another problem with Dr. Madansky's survey occurs with the categorization of survey tasks.  Several tasks appear under more than one category.  It would be difficult for respondents to know how to classify a particular task if the survey explicitly

categorizes some tasks in multiple categories.[45]  This makes the survey even more confusing, and leads to results which cannot be interpreted.  For example, the list of "Server Setup Duties" includes "restock ramekins" as a subtask.  However, this same subtask appears on the activity lists of two other tasks within "Non-Table Related Duties" specifically the tasks "Bread" ("Stock: bread, butter, knives, ramekins…") and "Glassware" ("Stock: glasses (from dish area), coffee mugs, ramekins…").  Likewise, the subtask "Stocking Glasses" appears on both the "Server Setup Duties" list ("Stocking, such as: glasses…") as well as "Non-Table Related Duties" under "Glassware" ("Stock: glasses).

135.      While the tasks for Bartenders are different from those for Servers, the Bartender survey contains the same problem of tasks being classified in multiple categories. Here, the task "Take and deliver food and drink orders" appears as under "Bartender Duties, but the task "Food Running" also appears as its own line item as a Related Duties task.  As "Food Running" basically amounts to food delivery, one would expect respondents to experience confusion about how to classify the amount of time they spent on food delivery duties.

136.      Perhaps Dr. Madansky intended the same activity to be categorized differently depending on when it is performed, but there is no indication of a time element in the discussion in his report or in the survey instructions.  In any event, the unclear task categorizations as they appear in his March 28, 2014 report are likely to be confusing and could cause the survey to be an unreliable and inaccurate instrument.

### iv.  Timing of Activities

---

[45] The instructions are even more confusing taken with the exhortations to "**not double count hours**."

137.     Dr. Madansky completely ignores the issue that *when* a particular task is performed could influence whether it is related or unrelated to tips.  As discussed above, Named Plaintiffs testified that duties performed in the course of servicing a table are generally related to tip amounts.  For example, rolling silverware for a table, when no pre-rolled silverware is available, may impact the tip from that table.  If the Server does not roll the silverware and there are no silverware rolls to deliver promptly to the table the guest experience could be negatively impacted.  In this context, some tasks that are performed in direct relation to an open check can be categorized as tip-producing tasks even though they might be considered not tip-producing when performed before or after closing, or when no guest checks are open.  Dr. Madansky's does not permit separate categorization of tasks performed in direct service to an open table as opposed to tasks performed when no customers are present.

### v. Multitasking

138.     Another issue which is ignored in Dr. Madansky's survey is multitasking. It is frequently the case that Servers are engaged in more than one task at once.  For example, in order to properly serve a table, a Server must continuously monitor the progress of the meal in order to properly serve the guests.  This is a requirement of the job – if the Server does not monitor the table, they cannot provide excellent service. But "monitor tables" is a task that does not appear as part of "Server duties," and in fact it does not appear anywhere in Dr. Madansky's report.  The closest category I can find is "Idle Time," but in fact if one is monitoring tables, they are not idle and I do not know how respondents might interpret the term "Idle Time."  Indeed, idle time is defined in Dr. Madansky's survey glossary as "down time" and "break."  Neither of these constitutes monitoring.  This is a critical issue, since one

of the largest time components my observers measured for Servers in particular was monitoring. Anyone who has been in a table service restaurant has observed Servers periodically standing and watching their tables.

139.     It is also possible, that Servers who are "monitoring tables" are also engaged in other work at the same time. Rather than stand "idly" by watching guests eat, Servers may perform other types of duties that might not directly relate to their guests. For example, consider the task of cleaning a side station. But Dr. Madansky's proposed survey has no way for respondents to report this type of "multitasking" activity. And due to the nature of the job – that customers must be monitored in order to ensure excellent service - serving and bartending jobs are exactly the types of work which are likely to involve significant multitasking.[46] This is another serious flaw with the survey Dr. Madansky proposes.

140.     The proposed survey also fails to account for other Server activities, such as time spent on the floor waiting to assist guests, waiting for an order, talking to other associates, or merely traveling around the restaurant.  This time is not "idle" time and comprises a significant portion of the day, as my observation study demonstrates. The term "idle" is also a biased term.  Essentially, the survey asks employees to report the amount of time they spent doing nothing while they are supposed to be working. Given the negative connotation of the "idle" label, it is likely that most respondents will under-report time in this category.

---

[46] Some Plaintiffs and opt-ins have testified that they do certain duties, like replenishment, concurrently with guest service (For example, in her deposition, Nakeysha Roberson states that side work, such as dish pit duties, is "stuff done throughout the whole shift." [96:20-21] Amanda Mathis, in reference to doing sidework, states that "It's a continuous thing.  You just do it throughout your shift." [215:15-16]), suggesting that multitasking is common in these jobs.

### vi.  Survey Requires Respondents to "Do math"

141.        With a survey as complicated and confusing as the one proposed by Dr. Madansky it is unavoidable that respondents will make errors.  One of the errors I believe is likely is that the time on different tasks will not in fact add up to total "Darden time" (i.e. mathematical errors).  Dr. Madansky does not consider this possibility and therefore does not address how he might account for this type of error being made by his respondents.  It is possible that this will be illuminated after he completes his pilot study.  At this time, I have no understanding as to how Dr. Madansky plans to deal with respondent math errors. Although I do not think Dr. Madansky's reconciliation discussion regarding "survey hours versus Darden hours" I criticize above applies here, perhaps it does.  If so, he certainly does not provide the connection.

### vii. Dr. Madansky's survey requires respondents to report tasks in 6-minute minimum increments of time for each activity, even if it took less than 6 minutes

142.        The survey instructions remind respondents of how minutes translate into hours by telling them that "It might be useful to know that **6 minutes = 0.1 hours**, 12 minutes = 0.2 hours, 18 minutes = 0.3 hours, 24 minutes = 0.4 hours, 30 minutes = 0.5 hours, 36 minutes = 0.6 hours, 42 minutes = 0.7 hours, 48 minutes = 0.8 hours, 54 minutes = 0.9 hours, and 60 minutes = 1 hours"[47] (sic).  This suggests that the smallest increment of time that the respondent can report for any particular task is 6 minutes, or 0.1 hours.  However, Plaintiffs in their depositions reported that many of the tasks they performed took mere seconds and not more than a few minutes.  Some examples of this testimony are:

Stasha White, Vol. I, at 107:3-107:17, on Mar. 26, 2013:

---

[47] Cutler Server Questionnaire, page 1 of 10.

Q:   Okay.  So some of the time you're getting soup bowls and cups would be because you have had a guest order soup and you need to bring them soup in a bowl and you have to go get a bowl, right?

A:   Well, if it's not in its designated area and we ran out, we would have to go get some bowls.  Not necessarily from the back.  We could also pull some bowls where the salad area is.

Q:   Okay.  If you have to get some from the salad area, how long does that take?

A:   It's seconds.  It's right by the soup area.

Q:   Okay.  And if you have to get it from the back, how long does that take?

A:   It can -- less than 60 seconds.

Q:   Okay.

And later at 137:6-137:22:

Q: And you said you would also need to make sure your sugar caddie is full.  What does that entail?

A:   Making sure all the sugars are in the caddies so they can be put in the teas, lemonades or coffees so they are ready and available for the guest's needs.

Q:   Okay.  So how many times per shift would you fill up a sugar caddie?

A:   It all depends on how much the guest had used on the last table.  So it all depends. Sometimes you didn't have to touch it, sometimes you did.   Sometimes you only had to do it once and sometimes you had to do it twice and sometimes you didn't have to do it. It all just depends on how much sugar the guest used.

Q:   So when you have to bring some sugar, how long does that take you?

A:   Less than 60 seconds.

Trish McNutt, at 39:15-39:24 on Apr. 5, 2013:

Q .  Okay.  When you say you "make tea," do you have to brew big pitchers of tea?

A:  We had to brew each one twice, and then we had to mix the sugar in for the sweet tea. It's a four-minute brew time, so it was -- it took eight minutes for each.

Q:   Okay.  But you wouldn't just stand there; you would hit the button and go doing something else, right?

A:   Of course.

And Jonathan McDougal, Vol. I, at 95:21-96:8, Feb. 18, 2013:

Q:  Okay.  And that -- what you call the lobster talk that you would have with the manager there one-on-one somewhere in the restaurant or if there were a couple, how long did that take?  Did it take a minute?  Did it take 30 seconds?
MR. PISAREVSKY:  Object to the form. Compound question. You can answer.
A:   It varied.  Generally I would say on average three to five minutes depending on -- the lobster talks weren't necessarily to go over the promotions.  They were to go over what we were out of, what we needed to sell more of, parties coming in and things like that.

143.      Clearly, some of the work activities being performed at the restaurants take only small bit of time, with some taking only a few seconds.  It is unclear how respondents would enter their time for tasks such as those reported by Deponents, such as stocking sugar or retrieving bowls, which took less than 60 seconds.  And Dr. Madansky's instructions provide no guidance whatsoever on how respondents should proceed in those cases.

### vii. Restricting "on-the-clock" time to "tip credit wage time"

144.      Another particularly confusing aspect of Dr. Madansky's survey is the manner in which he describes the "tipped wage."  In the survey instructions, he states "Server wage or tipped wage is the wage after the employer takes the tip credit.  We want to know about your **average work hours** during shifts when you **worked primarily as a server at server wage**."   But the paid on-the-clock hours that Dr. Madansky intends to fill in on each survey are not the hours which were worked "primarily" as a Server at Server wage – they are the hours which were worked *exclusively* as a Server at Server wage.

145.      The survey also fails to inform or remind people that if they worked in particular positions at certain concepts, they were paid the minimum wage for certain setup and closing activities (see Exhibit 1 in the Observation Study section).  Dr. Madansky understands this distinction – in his footnote 2 he states that "Server setup duties are being

paid at both minimum wage and tipped wage.  The survey specifically asks about Server

setup duties at the tipped wage."  But the survey fails to remind respondents that some of

their work time may have been paid at the minimum wage on days where they primarily

worked as a Server.  The survey instructs respondents that "Server wage or tipped wage is

the wage after the employer takes the tipped credit.  We want to know about your **average**

**work hours** during shifts **when you worked primarily as a server at server wage** at

<**restaurant**> from <**start_date**> to <**end_date**>"[48] and later reiterates that they would like

to know about "average work hours by task for when you are clocked in as a server paid at

server wage."  But the survey does not remind respondents that their workday may include

some hours paid at the Server wage and some hours paid at the minimum wage.

146.      Thus, it is not possible to know whether Servers and Bartenders would be

including any minimum wage time when they report how long they spent on setup and

closing activities.  For example, Bartenders at Red Lobster (locations that are not located in a

no tip credit state) receive full minimum wage before the restaurant opens and beginning 30

minutes after the restaurant closes.  It is unclear to me whether a Bartender who works for an

hour after closing will be able to accurately distinguish the work they did in the first 30

minutes after closing from the work done in the second 30 minutes after closing.  But this is

exactly what each respondent is required to do in order to accurately respond to the survey

questions.

### viii. Recall Issues and Accurate Survey Completion

147.      The survey provides each respondent with a start date and end date for the

time period their responses are supposed to cover.  The time period will not necessarily begin

---

[48] Madansky Server Questionnaire, page 1.

on their hire date, so respondents may also have to make mental judgments about work they performed before vs. work performed after the statute of limitations start date.  Since the statute of limitations date has no particular meaning for respondents, it is unlikely that they will be able to accurately distinguish whether there are differences in the way their work was conducted before and after that date.

148.     In addition, the period in question begins in 2009, and many of the surveyed employees no longer work at a Darden restaurant.  The survey asks respondents to provide highly detailed estimates - down to the fraction of an hour – of exactly how they allocated their time across 21 different tasks and subtasks.  And some of these tasks are performed "monthly, weekly, or not every shift" and respondents are asked to "average out the time spent on these tasks across all shifts."  It is highly questionable whether or not it is possible to accurately recall infrequent tasks performed at a job completed several years ago.

149.     Furthermore, practices likely have changed over time, as deponents have testified.  For example, Stasha White states that , "I actually had a manager come to me, I believe it was maybe 2011, and tell me that you guys have to start clocking in now because his manager told him that we have to do it.  So I was told at one point we have to start clocking in."  (256:18-23)  When Nakeysha Roberson offers the following:

> Q:  Do you remember how long it has been since you've performed any work of any kind off the clock at LongHorn?
> A: No.
> Q: Is there anything you can think of that would refresh your recollection with respect to how long it's been since you've worked off the clock at LongHorn?
> A: Maybe since he's been there.  He's real strict about not working off the clock.
> Q: Okay, so you're referring to Brian White as being strict about not working off the clock?
> A: Yes.[49]

---

[49] Deposition of Nakeysha Roberson, 179:20-180:9.

150.      Besides off-the-clock work, practices for doing side work may have

changed over time, as Trish McNutt indicates:


Q:   And then how much time would you have to spend doing any type of closing side work
in the alley after some of those duties were assigned to the alley coordinator?
A:   It's kind of split too, to make things a little more complicated.  At one point the closing
Server did not have to do drink station, but then they changed it so the Server did have to do
the drink station.  That was the closing Server.
Q:   Okay.  Do you remember at what point that changed?
A:   Probably the last three months that I worked there.[50]

151.      The above testimony shows that practices may have changed over time in

the respondents' locations, which could serve to further cloud accurate recall in survey

responses.

### ix.  List of Job Duties

152.      Dr. Madansky assumes that he has accurately captured the entire universe

of job tasks that a Server or Bartender might encounter on the job.  He provides no

explanation as to how he constructed the list of tasks.  His list of materials received or relied

upon includes a couple of documents entitled "Operations Excellence," as well as excerpts

from several depositions.  It does not appear that Dr. Madansky consulted any employee

handbooks or actually spoke to any Darden employees when constructing this list, so it is

unclear on what his list of tasks is based.

### x. Plaintiff Deponents State that Recalling How Much Time Was Spent on Specific Activities would be Difficult if Not Impossible

153.      The deposed Named Plaintiffs and Opt-Ins themselves admitted that it

would be difficult, if not impossible, to estimate the time they spent on "side" work.  For

---

[50] Deposition of Trish McNutt, 164:13-166:22.

example, Amanda Mathis is asked, "How long did your running side work take during the course of the night?"  She  responds, "It's hard to put a number on that – Because you're just doing it as you're back there."[51]  Similarly, when Janine Redmon is asked, "Do you -- as you recall as you sit here today, do you recall any specific day and how much time side work -- how much time you spent on running side work?" she replies, "No."[52]  When Jonathan McDougal is asked, "So there would be no way if I picked some date out of your book for the two years -- for the year you were at Shadeland, there would be no way we could tell exactly how much time you spent doing side work on that day, right?" he responds, "No, sir"[53] In fact, Nakeysha Roberson, during her deposition, admits that it is impossible to estimate the amount of time spent on any specific side work tasks:

> Q: (By Ms. Ramsey) Okay. And with respect to the other duties that we've described, you've given some range of minutes, but I understood you are talking about doing it to do it one time. So on the dressings, how much – dressings and related items, how much time would you spend during a shift handling dressings and related items?
> A:  You do it during the whole shift.
> Q: So is it impossible to say how much it could take during a shift?
> A:  Yes, it is.
> Q: Okay. How about for ice? Can you say how long it could take during a shift?
> A:  No.
> Q: Okay. And how about for the bread?  Could you say how long you spend on it during a shift?
> A:  Throughout the whole shift?
> Q: Yeah.
> A:  Throughout the whole shift?
> Q: Yeah.
> A:  Yeah.
> Q: So it's just periodically throughout the shift, on an as-needed basis?
> A:  Yes.
> Q: So as you sit here, you couldn't really say how long that would take you?
> A:  No.

[51] Deposition of Amanda Mathis, 178:8-13.
[52] Deposition of Janine Redmon, 214:5-9.
[53] Deposition of Jonathan McDougal, 170:23-171:5.

Q: And with respect to the glassware, can you say how long it would take you during the whole shift to tend to glassware replenishment?

A: No.

Q: And with respect to the tea, can you say how long you'd spend during your shift keeping the tea brewed and ready?

A: No.

Q: And with respect to the coffee, can you say how long you'd spend during a shift keeping the coffee brewed and ready?

A: No.

Q: And with respect to the dish pit duties, can you say how long you spend during a shift keeping the dish pit duties done?

A: No.[54]

154.    Furthermore, when Ms. Roberson is asked, "And as you sit here today, could you estimate how much time you've spent performing duties that are unrelated to your tip-producing duties?" She replies, "No." And when asked, "As you sit here today, could you estimate how much time you've spent performing duties that are merely related to tip-producing duties but not themselves tip-producing?" She also replies, "No."[55]

Lisa Long testifies in a similar manner in her deposition:

Q:    Okay.  So could you give me an estimation at all as to how much of your closing side work you would typically do after the restaurant closes then?

A:    I couldn't.  I -- it's been a while since I have closed.

Q:    Okay.  Regardless of when it happens, and, again, you may tell me it's been too long since you closed, but regardless of whether you start it before or after, how long did your closing side work take on those few occasions you did it, do you recall?

A:    It would -- no.  Because it would depend on what station I was in.[56]

Amanda Emerson's testimony echoes the previous deponents:

Q:    Okay.  Again, you can't give me an estimate of the range of time it would generally take for the Servers who were working outside to accomplish these tasks?

A:    No, I cannot.

Q:    It would depend on the flow of business, the season, the day, et cetera?

A:    Yes.

Q:    The Servers you were working with, their experience level?

A:    Yes.

---

[54] Deposition of Nakeysha Roberson, 94:20-96:15.
[55] Deposition of Nakeysha Roberson, 175:2-16.
[56] Deposition of Lisa Long, 343:13-24.

Q:   How hard working they are or how lazy they are?
A:   Yes.[57]

155.     Named Plaintiffs themselves admit that they would have difficulty

estimating how much time they allocated to the various tip-related activities that they

performed.  Thus, any results obtained from the survey, if it were to be fielded, would likely

be inaccurate.

### F.  REPORT OF WILLIAM CUTLER

156.     Mr. Cutler also provided a report in which he opines on the likely efficacy

of a survey.  It is unclear to me whether or not he was involved in the design and testing of

the survey discussed in Dr. Madansky's report, or if he simply reviewed the survey after it

was designed by Dr. Madansky.  Dr. Madansky's report makes no reference to input from

Mr. Cutler.  Mr. Cutler apparently has no formal training or experience in survey design,

survey administration, or in the analysis of survey data.[58]

157.     Despite the issues enumerated above, Mr. Cutler felt that it was

appropriate to opine on page 24 of his report that "In my professional opinion and within a

reasonable degree of professional certainty, I believe that the use of the Darden survey is a

valid means through which the activities of named Plaintiffs and Opt-ins that are at issue in

this lawsuit may be evaluated to determine Darden's compliance with the applicable

provisions of the FLSA and the applicable DOL guidelines and regulations."[59]

158.     Apparently, Mr. Cutler is willing to give his "professional opinion" while

being unaware of the survey's design flaws, unaware of whether or not the survey could

---

[57] Deposition of Amanda Emerson, 123:18-124:6.
[58] See Appendix 2 to Cutler Report, "Curriculum Vitae," and Deposition of William J. Cutler, Jr., in the matter of *Fast v. Applebee's International, Inc*., Case No. 06-4146-CV-C-NKL (W.D. Mo.), November 20, 2008.
[59] Cutler report, p. 24.

generate valid and reliable results, and without considering the issue of non-response.  Mr. Cutler's statement further suggests that he is making a conclusion for all class members rather than only those who responded to the survey.  Again, as noted above, such a conclusion is improper and lacks any scientific foundation.

159.     Mr. Cutler explains that his opinion that the survey is a "valid means" of assessing the amount of time Servers and Bartenders spent on various job activities is partially based on the existence of a "questionnaire" called "Form WH-42" which is used by Compliance Specialists in the Wage and Hour Division of the Department of Labor.   He states that Form WH-42 was used "to obtain wage-related data from employees" which was then "analyzed and used by Compliance Specialists to determine an employer's compliance with the FLSA."  He then claims that "The use of the Darden Survey form in the subject case is similar to and consistent with the approach taken by DOL, WHD Compliance Specialists in their use of an "Employee Mail Interview Form" questionnaire, Form WH-42, to obtain work-related information from an employee in determining compliance with the FLSA by an employer."[60]

160.     However, a quick inspection of Form WH-42, which Mr. Cutler includes as Appendix 20 to his report, reveals that Form WH-42 is in no way "similar to" or "consistent with" Dr. Madansky's proposed survey.  The WH-42 form is only two pages long, and seeks very simple and straightforward information regarding very basic job duties, hours worked, and pay.  The language is simple and does not use jargon that requires additional information.  There are no mathematical calculations required and no glossary of terms to review and understand prior to filling out the questionnaire.

---

[60] Ibid.

161.     In contrast, Plaintiffs' survey is a full ten pages long.  It includes several pages of complicated instructions, and uses various terminology designed by the survey developers which is not familiar language to the intended respondents.  The invented terminology is so complicated that the document includes a three page "Glossary of Task Descriptions."  Various other significant problems with the Madansky survey are discussed in detail above.  There is no similarity whatsoever between form WH-42 and the survey proposed by Dr. Madansky and endorsed by Mr. Cutler.  There is no scientific connection between Form WH-42 and Dr. Madansky's survey.

162.     Mr. Cutler's report also specifically references his testimony in the matter of *Fast v. Applebee's International, Inc*., Case No. 06-4146-CV-C-NKL (W.D. Mo.), November 20, 2008 regarding the questionnaire used by Plaintiffs in that case.  The *Fast* matter also concerned restaurant employees and the amount of time they spent on "general and maintenance activities" – i.e. non tip-producing duties.  I have reviewed Mr. Cutler's deposition testimony related to the report he filed in *Fast*.  Based on that testimony, I find Mr. Cutler's endorsement of Plaintiffs' proposed survey in the case at issue here to be surprising.

163.     As discussed above, the determination of whether a task is tip-producing or not depends not only on the task itself, but the context in which the task is performed.  Some tasks that might otherwise no be tip-producing may become tip-producing when performed in direct service of a table.  The discussion above presents the example of rolling silverware for a table because no prepared silverware rolls are available.

164.     Mr. Cutler's testimony in *Fast* demonstrates that he is well aware of this contextual issue regarding categories of tasks.   Several times during his deposition Mr.

Cutler provided testimony regarding the classification of "cleaning and clearing tables" while customers were present, immediately after customers have left the table, and when customers were not present.  For example, at page 85:3-86:1

> Q:   – you believe that those things that are listed in section 1, number 1, to prepare the dining area, which includes rolling silverware, cleaning – clearing/cleaning tables, vacuuming, sweeping, cleaning and stocking side stations, it's your belief that those activities fall within the category of general preparation and maintenance work, correct?
> A:   Yes, with the understanding that we're dealing with section 1, which is the average time spent before serving guests.
> Q:  Right.  And so when a Server does those activities before serving any guests, it is your belief that those activities constitute general preparation and maintenance work?
> A:  That's correct.
> Q:  On the other hand, when you have guests to serve, what I believe you're saying is that clearing and cleaning tables is not general preparation and maintenance work?
> A:   I'm saying that's part of their general serving of the customer.

And at page 88:10-17

> Q:   Where does cleaning and clearing tables go among these categories during the time that there were guests to serve?
> A:   While there were guests to serve, that would be incorporated within during the time the individual had guests.  And it would be part of their activities that would be involved in serving the guests.

And pages 91:25-92:17

> Q: Okay.  Despite that fact that the clearing and cleaning tables has been removed from question 5, your expectation would be that people filling out this form would put that activity in response to question 5?
> A:  Right.  Because the attempt with this particular question is to isolate and identify those types of activities that would not have been involved in directly serving the customer.  And that would be rolling silverware, vacuuming and sweeping, and cleaning and stocking side stations, et cetera."
> Q:  And clearing and cleaning tables?
> A:  No.  The clearing and cleaning of tables, like I've already said, you know, would be incorporated within the – during the time they had guests to serve."

And page 97:4-17

> Q:  What I believe the answer to be is that when a Server cleans and clears the table that that Server's guest just used —A:  Mm-hmm.
> Q: – that activity falls under question number 4?
> A:  Yes.
> Q: That's correct?
> A:  Yes.

Q:  Whereas if a Server cleaned and cleared tables before they had any guests or after they had any guests, that would be a question 1 or question 8 activity?
A:   Yes.

165.        But Mr. Cutler does not speak to the fact that Dr. Madansky's survey provides no distinction regarding when a task is performed, and if it is performed when guests are present or not.  In his survey, cleaning the table after customers leave can only be categorized as a "related duty" listed under "closing table duties" – there is no option to categorize cleaning the table as a Server duty.  Having reviewed Mr. Cutler's testimony in *Fast*, it is unclear to me why he did not specifically address this issue with Dr. Madansky's proposed survey.

## VIII.   CONCLUSIONS

166.         To complete my assignment in this case, I and my team designed and implemented a nationwide observation study of the work activities of Servers and Bartenders at the five Darden restaurant concepts at issue in this case.  The study was designed and tested over a period of several months, and implemented over a period of two months.  The focus of the study was two-fold: first, to quantify the percentages of time spent in various work activities, categorized according to the issues in this case, and second, to measure the extent and amount of off the clock work time performed by Darden Servers and Bartenders.

167.        Work tasks were classified into several buckets: directly tip-producing, related duties, unrelated duties, and "other" activities.  The latter are not classified as "duties," since the bulk of the "other" time was not comprised of work time, but was instead time spent chatting with co-workers, making personal calls and texts, taking breaks, etc.  Overall, the study covered 53 restaurants, 242 different employees, and 374 shifts of work,

which included almost 1,900 hours of shift time.  Over 340,000 individual activities were recorded by the observers.

168.     The proportion of time spent on related and unrelated tasks while on the tip-credit wage across all concepts combined was 6.9% for Servers and 13.5% for Bartenders.  The percentage of unrelated time across all concepts was 0.019% for Servers and 0.010% for Bartenders.  By concept, the Server percentages of related plus unrelated time were 2.3%, 5.2%, 11.8%, 5.3%, 14.4%, for Olive Garden, Red Lobster, LongHorn, Bahama Breeze and Seasons 52, respectively.  In the same order, the figures for Bartender were as follows: 15.4%, 12.0%, 13.5%, 15.5%, 12.0%.  In no case did the percentage of time spent on unrelated tasks by concept and job within concept exceed 0.052%, and in 3 instances there was zero time associated with unrelated tasks.

169.     The observation data display considerable variability along a variety of dimensions.  Shifts vary in length, while the proportions of time spent on related plus unrelated time by shift and by employee also varied considerably.  As reported on in detail above, digging into the specific work tasks reveals wide variations between employees, and between concepts.

170.     The observation study was also used to address the question of off-the-clock work.  The data captured included time from the moment employee entered a location until the time they left.  Clocking in at a POS location was also captured by the observers, as were the times of the first and last work activities.  These data were analyzed, and showed that little to any time was observed working off the clock.  Most of the shifts showed no off the clock work: that is, the first activity observed was a punch-in, and the last activity observed was a punch-out.  Overall, the average pre-shift time between the first work activity

and clock-in was 2.17 minutes for Servers and 4.12 minutes for Bartenders, and the median was zero minutes for both Servers and Bartenders.  Overall, the average post shift time between clock-out and last work activity was 0.91 minutes for Servers and 1.13 minutes for Bartenders, and the median was zero minutes for Servers and 0.40 minutes for Bartenders.

171.    Darden keeps track electronically of when its employees clock in and out, as noted above.  I requested and received from Darden the clock in and out data for each of the observed employees, in order to compare the observed times to the electronically recorded times.  Both sources utilize an internet time clock convention, so there was no need to reconcile differing time systems.  In virtually all cases, the observed time punches reconcile with the company database.

172.    A sample of 768 opt-ins nationwide was selected pursuant to the Court's order in this case.  This sample is referred to as the "discovery sample."  A variety of electronic and other records were ordered to be produced by Darden for these employees.  I have studied some of this information.  This data shows considerable variability between employees within and across restaurant concepts, along a variety of metrics.  These metrics included hours worked, open customer checks, tip levels, percentage of shift time covered by open checks, and others.

173.    Plaintiffs' expert Dr. Madansky's report is essentially a hypothetical exercise of what he proposes to do but has not yet done.  Most of his report deals with a survey which was in the pre-test phase at the time his report was filed.  I am unsure whether he will ultimately field and report on his survey, or whether he will be permitted under the deadlines for experts in this case to do so.  Notwithstanding, my opinion is that his survey has so many flaws that it would ultimately be found unreliable.  It is full of highly leading

questions, and has several other fundamental flaws that would render it virtually impossible to successfully field.  Regarding leading questions, Dr. Madansky's survey instrument presumes that off-the-clock work has occurred, and simply asks respondents to state how much.  This in spite of another flawed analysis in which Dr. Madansky uses the discovery sample data and "shows" that there are 15% of shifts where off-the-clock work too place.  If he knows that at least 85% of shifts do not have off-the-clock work, why is the survey worded such that it presumes this sort of work happened on "the average" or even the majority of shifts?  The biggest structural flaw in Dr. Madansky's survey is that he asks respondents to allocate 21 tasks by the average number of hours they take for a typical shift, while simultaneously requiring that these tasks must sum to a number of hours Dr. Madansky will provide the surveyed employees from the Darden records.  Imagine trying to allocate 21 tasks where they must add to, say, 5.4 hours.  You would end up in an endless iterative process of balancing and rebalancing, whereby you would be more concerned with making it all add up by adding and taking away time here and there, than with the actual recall process of how much time you spent completing various tasks.  This is a fatal flaw in my opinion, and I do not believe such a survey can be successfully fielded and result in reliable information.

174.     Plaintiffs' expert Mr. Cutler endorses the Madansky survey discussed above, with no detailed explanation, and certainly no consideration of the scientific process required to evaluate a survey instrument.  Mr. Cutler has no survey expertise, from what I can see, and his likening of a two page "questionnaire" used by the DOL to a scientific survey instrument is like saying that cars and bikes both have wheels, and therefore they are the same.  Mr. Cutler also appears confused regarding the definition of an unrelated duty,

since his Opinion Number 8 classifies a series of tasks as unrelated, even though they are essentially all included as part of the duties of Servers and Bartenders as defined in the Bureau of Labor Statistics and O-Net job descriptions.  If these duties were unrelated to the occupations of the Servers and Bartenders discussed in those government sources, they would not have been listed among the tasks at all, since they would have been included among the tasks of some other occupation.

I declare under penalty of perjury that the foregoing is true and correct.


Ali Saad, Ph.D.
Date: April 16, 2014

# Summary of Tip Wage and Minimum Wage Coverage
## By Restaurant Concept and State



Note: These pay practices apply to all states other than Alaska, California, Minnesota, Montana, Nevada, Oregon, or Washington.   In these states, all time is compensated at minimum wage or higher.

**Exhibit 1**

**- Data from Observation Study -**

## Percentage Breakdown of Shift Time by Category of Observed Activity

**- Full Sample, All Observed Shifts -**



**Exhibit 2**

**- Data from Observation Study -**

## Percentage Breakdown of Shift Time by Category of Observed Activity

**- Full Week Observations Only -**





**Exhibit 3**

- Data from Observation Study -

# Percentage of Related and Unrelated Time

### - By Observed Server Shift -
### - Full Sample, All Observed Shifts -



**Exhibit 4**

**- Data from Observation Study -**

**Percentage of Related and Unrelated Time**

**- By Observed Bartender Shift -**

**- Full Sample, All Observed Shifts -**



**Exhibit 5**



**- Data from Observation Study -**
**Percentage of Observed <u>Server</u> Time**
**Spent on Related and Unrelated Activities**
**- By Concept -**
**- Full Sample, All Observed Shifts -**

**Exhibit 6**



- Data from Observation Study -
## Percentage of Observed <u>Bartender</u> Time
## Spent on Related and Unrelated Activities
- By Concept -
- Full Sample, All Observed Shifts -

**Exhibit 7**



-Data from Observation Study-
## Servers: Top 20 Tasks Observed
-Observed Hours-
-Sample 45 Excluding Minimum Wage Pay Time-

Exhibit 8

-Data from Observation Study-
## Bartenders:  Top 20 Tasks Observed
-Observed Hours-
-Sample 45 Excluding Minimum Wage Pay Time-



**Exhibit 9**

- Data from Observation Study -
# Summary of the Percentage of Time Darden Employees
## Spend Handling Food or Beverage Items
### - Servers -



**Exhibit 10**



**- Data from Observation Study -**

**Summary of the Percentage of Time Darden Employees**

**Spend Handling Food or Beverage Items**

**-Bahama Breeze -**

**- Servers -**

**Exhibit 11**

- Data from Observation Study -

# Summary of the Percentage of Time Darden Employees
# Spend Handling Food or Beverage Items

**- Long Horn -**

**- Servers -**



**Exhibit 12**

**- Data from Observation Study -**

## Summary of the Percentage of Time Darden Employees
## Spend Handling Food or Beverage Items
### - Olive Garden -
### - Servers -



**Exhibit 13**

# - Data from Observation Study -

## Summary of the Percentage of Time Darden Employees
## Spend Handling Food or Beverage Items

### - Red Lobster -

### - Servers -



**Exhibit 14**

**- Data from Observation Study -**

## Summary of the Percentage of Time Darden Employees
## Spend Handling Food or Beverage Items
**- Seasons 52 -**
**- Servers -**



**Exhibit 15**

**- Data from Observation Study -**

# Summary of the Percentage of Time Darden Employees
## Spend Handling Food or Beverage Items
### - Bartenders -



**Exhibit 16**

- Data from Observation Study -
## Summary of the Percentage of Time Darden Employees Spend Traveling or Monitoring
- Servers-



**Exhibit 17**



- Data from Observation Study -
## Summary of the Percentage of Time Darden Employees Spend Traveling or Monitoring
- Bartenders-

**Exhibit 18**

**- Data from Observation Study -**

# Summary of the Percentage of Time Darden Employees
# Spend Interacting with Other Staff

**- Servers -**



**Exhibit 19**

**- Data from Observation Study -**

# Summary of the Percentage of Time Darden Employees Spend Interacting with Other Staff

**- Bartenders -**



**Exhibit 20**

- Data from Observation Study -
## Summary of the Percentage of Time Darden Employees
## Spend on Cleaning Tasks
- Servers -



**Exhibit 21**

- Data from Observation Study -

# Summary of the Percentage of Time Darden Employees
## Spend on Cleaning Tasks
### - Bahama Breeze -
#### - Servers -



**Exhibit 22**

**- Data from Observation Study -**

## Summary of the Percentage of Time Darden Employees
## Spend on Cleaning Tasks
### -Long Horn -
### - Servers -



**Exhibit 23**

**- Data from Observation Study -**

**Summary of the Percentage of Time Darden Employees**

**Spend on Cleaning Tasks**

**- Olive Garden -**

**- Servers -**



**Exhibit 24**

**- Data from Observation Study -**

## Summary of the Percentage of Time Darden Employees
## Spend on Cleaning Tasks
### - Red Lobster -
### - Servers -



**Exhibit 25**

- Data from Observation Study -
# Summary of the Percentage of Time Darden Employees
## Spend on Cleaning Tasks
### - Seasons 52 -
### - Servers -



**Exhibit 26**

**- Data from Observation Study -**

## Summary of the Percentage of Time Darden Employees
## Spend on Cleaning Tasks
**- Bartenders -**



**Exhibit 27**

- Data from Observation Study -

# The Percentage Breakdown by Category of Time Spent By Servers Over the Day Shows that as the Share of Server Duties Increases and Decreases, Other Categories Move in the Opposite Direction



Note: All concepts in tip credit states except Long Horn pay minimum wage or above for time worked by servers and bartenders prior to the restaurant opening. In most cases, restaurants open at 11am.

**Exhibit 28**

- Data from Observation Study -

## The Percentage Breakdown by Category of Time Spent By Bartenders Over the Day Shows that as the Share of Bartender Duties Increases and Decreases, Other Categories Move in the Opposite Direction



Note: All concepts in tip credit states except Long Horn pay minimum wage or above for time worked by servers and bartenders prior to the restaurant opening. In most cases, restaurants open at 11am.

**Exhibit 29**

**- Data from Observation Study -**

## The Percentage Breakdown by Category of Time Spent By Servers Over the Day Shows that as the Share of Server Duties Increases and Decreases, Other Categories Move in the Opposite Direction

**- Bahama Breeze -**



Note: All concepts in tip credit states except Long Horn pay minimum wage or above for time worked by servers and bartenders prior to the restaurant opening. In most cases, restaurants open at 11am.

**Exhibit 30**



- Data from Observation Study -

## The Percentage Breakdown by Category of Time Spent By Servers Over the Day Shows that as the Share of Server Duties Increases and Decreases, Other Categories Move in the Opposite Direction

### - LongHorn Steakhouse-

Note: All concepts in tip credit states except Long Horn pay minimum wage or above for time worked by servers and bartenders prior to the restaurant opening. In most cases, restaurants open at 11am.

**Exhibit 31**

- Data from Observation Study -

# The Percentage Breakdown by Category of Time Spent By Servers Over the Day Shows that as the Share of Server Duties Increases and Decreases, Other Categories Move in the Opposite Direction

## - Olive Garden-



Note: All concepts in tip credit states except Long Horn pay minimum wage or above for time worked by servers and bartenders prior to the restaurant opening. In most cases, restaurants open at 11am.

**Exhibit 32**



- Data from Observation Study -

## The Percentage Breakdown by Category of Time Spent By Servers Over the Day Shows that as the Share of Server Duties Increases and Decreases, Other Categories Move in the Opposite Direction

### - Red Lobster-



Note:  All concepts in tip credit states except Long Horn pay minimum wage or above for time worked by servers and bartenders prior to the restaurant opening. In most cases, restaurants open at 11am.

**Exhibit 33**

**- Data from Observation Study -**

# The Percentage Breakdown by Category of Time Spent By Servers Over the Day Shows that as the Share of Server Duties Increases and Decreases, Other Categories Move in the Opposite Direction

### - Seasons 52-



Note: All concepts in tip credit states except Long Horn pay minimum wage or above for time worked by servers and bartenders prior to the restaurant opening. In most cases, restaurants open at 11am.

**Exhibit 34**

- Data from Observation Study -

# The Percentage Breakdown by Category of Time Spent By Bartenders Over the Day Shows that as the Share of Bartender Duties Increases and Decreases, Other Categories Move in the Opposite Direction

## - Bahama Breeze-



Note: All concepts in tip credit states except Long Horn pay minimum wage or above for time worked by servers and bartenders prior to the restaurant opening. In most cases, restaurants open at 11am.

**Exhibit 35**

- Data from Observation Study -

## The Percentage Breakdown by Category of Time Spent By Bartenders Over the Day Shows that as the Share of Bartender Duties Increases and Decreases, Other Categories Move in the Opposite Direction

### - LongHorn Steakhouse -



Note: All concepts in tip credit states except Long Horn pay minimum wage or above for time worked by servers and bartenders prior to the restaurant opening. In most cases, restaurants open at 11am.

**Exhibit 36**



- Data from Observation Study -

## The Percentage Breakdown by Category of Time Spent By Bartenders Over the Day Shows that as the Share of Bartender Duties Increases and Decreases, Other Categories Move in the Opposite Direction

- Olive Garden-

Note: All concepts in tip credit states except Long Horn pay minimum wage or above for time worked by servers and bartenders prior to the restaurant opening. In most cases, restaurants open at 11am.

**Exhibit 37**

- Data from Observation Study -

## The Percentage Breakdown by Category of Time Spent By Bartenders Over the Day Shows that as the Share of Bartender Duties Increases and Decreases, Other Categories Move in the Opposite Direction

- Red Lobster-



Note: All concepts in tip credit states except Long Horn pay minimum wage or above for time worked by servers and bartenders prior to the restaurant opening. In most cases, restaurants open at 11am.

Exhibit 38

**- Data from Observation Study -**

## The Percentage Breakdown by Category of Time Spent By Bartenders Over the Day Shows that as the Share of Bartender Duties Increases and Decreases, Other Categories Move in the Opposite Direction

### - Seasons 52 -



Note:  All concepts in tip credit states except Long Horn pay minimum wage or above for time worked by servers and bartenders prior to the restaurant opening. In most cases, restaurants open at 11am.

**Exhibit 39**

- Data from Observation Study -

# Percentage Breakdown of Shift Time by Category of Observed activity

### - Only Opt ins -



**Exhibit 40**

- Data from Observation Study -
## Percentage of Related and Unrelated Time
- By Observed Server Shift -
- Opt-ins Only -



**Exhibit 41**



- Data from Observation Study -
## Percentage of Related and Unrelated Time
- By Observed Bartender Shift -
- Opt-ins Only -

Exhibit 42



**- Data from Observation Study -**
**Percentage of Observed <u>Server</u> Time**
**Spent on Related and Unrelated Activities**
**- By Concept -**
**- Only Opt-ins -**

**Exhibit 43**



**- Data from Observation Study -**
**Percentage of Observed <u>Bartender</u> Time**
**Spent on Related and Unrelated Activities**
**- By Concept -**
**- Only Opt-ins -**

**Exhibit 44**



**- Data from Observation Study -**

**Percentage Breakdown of Shift Time by Category of Observed activity**

**- Non-Opt-ins Only -**

**Exhibit 45**



- Data from Observation Study -
## Percentage of Related and Unrelated Time
- By Observed Server Shift -
- Non Opt-ins Only -

**Exhibit 46**

## - Data from Observation Study -
## Percentage of Related and Unrelated Time
### - By Observed Bartender Shift -
### - Non Opt-ins Only -



**Exhibit 47**



- Data from Observation Study -
### Percentage of Observed <u>Server</u> Time
### Spent on Related and Unrelated Activities
- By Concept -
- Only Non-Opt-ins -

**Exhibit 48**

**- Data from Observation Study -**
**Percentage of Observed <u>Bartender</u> Time**
**Spent on Related and Unrelated Activities**
**- By Concept -**
**- Only Non-Opt-ins -**



**Exhibit 49**

# An Analysis of the Time Spent Between the First Observation and Clock-In and the Last Observation and Clock-Out Shows that Servers and Bartenders Do Not Spend Significant Amounts of Time During these Periods

| | Bartenders | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Average | Minimum | 5th Percentile | 25th Percentile | Median | 75th Percentile | 95th Percentile | Maximum |
| **Time Between First Observation and Clock-In** | 5.52 | 0.00 | 0.04 | 0.26 | 0.77 | 2.85 | 48.57 | 94.49 |
| **Time Between Clock-Out and Last Observation** | 4.48 | 0.00 | 0.50 | 1.51 | 2.99 | 4.54 | 14.72 | 20.78 |

| | Servers | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Average | Minimum | 5th Percentile | 25th Percentile | Median | 75th Percentile | 95th Percentile | Maximum |
| **Time Between First Observation and Clock-In** | 4.66 | 0.00 | 0.00 | 0.26 | 1.41 | 4.62 | 18.80 | 85.39 |
| **Time Between Clock-Out and Last Observation** | 4.65 | 0.00 | 0.23 | 1.08 | 2.34 | 5.33 | 14.73 | 105.30 |

Note: Clock-In and Clock-Out Times are based on First and last POS interactions.

**Exhibit 50**

# An Analysis of the Time Spent Between the First Work Activity and Clock-In and the Last Work Activity and Clock-Out Shows that Servers and Bartenders Do Not Spend Significant Amounts of Time During these Periods

| | Bartenders | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Average | Minimum | 5th Percentile | 25th Percentile | Median | 75th Percentile | 95th Percentile | Maximum |
| **Time Between First Work Activity and Clock-In** | 4.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.59 | 17.52 | 94.49 |
| **Time Between Clock-Out and Last Work Activity** | 1.13 | 0.00 | 0.00 | 0.00 | 0.40 | 2.30 | 3.91 | 4.84 |

| | Servers | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Average | Minimum | 5th Percentile | 25th Percentile | Median | 75th Percentile | 95th Percentile | Maximum |
| **Time Between First Work Activity and Clock-In** | 2.17 | 0.00 | 0.00 | 0.00 | 0.00 | 1.49 | 9.68 | 84.32 |
| **Time Between Clock-Out and Last Work Activity** | 0.91 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 5.47 | 20.23 |

Note: Clock-In and Clock-Out Times are based on First and last POS interactions.

**Exhibit 51**

# Summary of the Frequency of Job Titles in the POS Data

| Job Title | Number of Person Days |
|---|---|
| Alley Coordinator | 108 |
| Bartender | 32 |
| Bartender AM | 1,676 |
| Bartender PM | 2,563 |
| Bartender Set-up | 2,229 |
| Bartender Tip Share | 4,229 |
| Busser/Food Runner | 5 |
| CA Service Asst. | 58 |
| Certified Culinary Prof | 322 |
| Culinary Trainee | 3 |
| FOH Key | 2 |
| Host/ess | 124 |
| Kitchen | 32 |
| Professional- Service | 340 |
| Runner | 454 |
| Runner Tip Share | 70 |
| Server | 21,449 |
| Server Breaker-CA OR WA only | 130 |
| Server NY 1st | 10 |
| Server Set-up | 1,449 |
| Server Trainer | 92 |
| Server Training | 54 |
| Service Certified Trainer | 42 |
| Service Training | 40 |
| Service/Hospitality Trainee | 101 |
| Takeout | 5 |
| To-Go Specialist | 317 |
| Trainee-BH | 39 |
| Trainee-FH | 377 |
| Training Servers | 41 |

**Exhibit 52**



- Data from Discovery Sample -
### Number of Employees By Concept
-All Employees in the Sample-

Note: Employees who worked in multiple concepts are counted multiple times

**Exhibit 53**



**- Data from Discovery Sample -**
**Percent of Employees In POS Data By Concept**



**Exhibit 54**



- Data from Discovery Sample -
## Number of Shifts By Concept
- All Employees in the Sample -

**Exhibit 55**



**- Data from Discovery Sample -**
**Percent of Shifts In POS Data By Concept**



**Exhibit 56**



- Data from Discovery Sample -
**Proportion of Tip Credit Wage Time With Checks Open**
- Servers -

**Exhibit 57**





- Data from Discovery Sample -
## Proportion of Tip Credit Wage Time With Checks Open
### - Bartenders -

Percent of Time Checks Open

- Seasons 52: 74.8%
- Bahama Breeze: 63.5%
- LongHorn Steakhouse: 79.3%
- Olive Garden: 43.8%
- Red Lobster: 54.3%

**Exhibit 58**

**- Data from Discovery Sample -**

## Distribution of Time with Various Numbers of Checks Open

**- Servers -**



**Exhibit 59**

- Data from Discovery Sample -

# Distribution of Time with Various Numbers of Checks Open

## - Bartenders -



**Exhibit 60**



- Data from Discovery Sample -
## Average Duration of Checks Open Per Shift in Minutes
- Bartenders -

**Exhibit 61**



- Data from Discovery Sample -

**Average Duration of Checks Open Per Shift in Minutes**

- Servers -

**Exhibit 62**

- Data from Discovery Sample -
## Weighted Average Number of Checks Open
- Bartenders -



**Exhibit 63**



**- Data from Discovery Sample -**

**Weighted Average Number of Checks Open**

**- Servers -**

**Exhibit 64**



**Top 20 Tasks Before Employee's First Customer Has Arrived**

Legend:
- Tip - Producing
- Related Duties
- Unrelated Duties
- Other

| Task | Percent |
|------|---------|
| Other back of house task | 0.4% |
| Count out tips,count cash drawer etc.; Does NOT include customer order interaction | 0.5% |
| Other food supplies interaction task | 0.5% |
| Prepare table by placing silverware/plates/napkins/condiments on table | 0.6% |
| Other front of house task | 0.7% |
| Dish or plate food, soup ,salad, etc. or prepare drink. Not for customer | 0.9% |
| Personal call or text | 0.9% |
| Employee has entered the cooler; freezer or liquor cabinet | 1.1% |
| Place customer order or close out customer order on POS system. Modify customer… | 1.1% |
| Serve/carry food, beverage, or condiments to customers; carry food or beverage; fill… | 1.2% |
| Rolling silverware into napkin | 1.2% |
| General types of cleaning/includes vacuuming/sweeping/moppingin customer area,… | 1.9% |
| Review/ Write notes.Perform paperwork. Does not include taking order | 2.0% |
| Employee is clocking in /out | 2.2% |
| Carry dishware/utensils. Stock dishware/utensils | 2.6% |
| Carry/set up tea,coffee,ice, soda or other machines | 4.1% |
| Stock beverages/liquor; stock ice | 4.8% |
| Stock food supplies or other supplies; unpacking food or supplies; move or carry… | 5.5% |
| Travel, walk or wait on floor; Monitor guest | 30.9% |
| General restaurant interaction | 31.0% |

Tasks (y-axis) vs Percent of Pre-Customer Time (x-axis)

**Exhibit 65**



Top 20 Tasks After Employee's Last Customer Has Left
Washing dishware/glassware by hand or machine; 0.7%
Clear food from plates 0.8%
Stock food supplies or other supplies; unpacking food or supplies; move or carry... 1.3%
Personal call or text 1.3%
Stock beverages/liquor; stock ice 1.4%
Washing dishware/glassware by hand or machine; 1.8%
Prepare table by placing silverware/plates/napkins/condiments on table 2.0%
Carry/set up tea,coffee,ice, soda or other machines 2.0%
Review/ Write notes.Perform paperwork. Does not include taking order 2.0%
Clean/wipe down equipment (refrigerator,tea machine, ice, coffee machine, etc..) 2.1%
Employee is clocking in /out 2.2%
Remove plates/utensils/dirty napkins/wipe down table after customers have left 2.4%
Rolling silverware into napkin 3.4%
Place customer order or close out customer order on POS system. Modify customer... 3.6%
Carry dishware/utensils. Stock dishware/utensils 3.9%
Employee is outside restaurant 6.8%
Count out tips,count cash drawer etc.; Does NOT include customer order interaction 7.8%
General types of cleaning/includes vacuuming/sweeping/moppingin customer area,... 8.5%
General restaurant interaction 19.5%
Travel, walk or wait on floor; Monitor guest 21.5%
Tasks
0% 5% 10% 15% 20% 25% 30% 35%
Percent of Pre-Customer Time
Tip - Producing
Related Duties
Unrelated Duties
Other

Exhibit 66

# Top 20 Tasks During the Day When Employee Has No Checks Open



**Exhibit 67**

**- Data from Discovery Sample -**

## Percent of Tip Credit Wage Time With Checks Open

**Servers at Seasons 52**

**- By Person-Week -**



**Exhibit 68**

**- Data from Discovery Sample -**

## Percent of Tip Credit Wage Time With Checks Open

### Servers at Bahama Breeze

**- By Person-Week -**



**Exhibit 69**

- Data from Discovery Sample -

## Percent of Tip Credit Wage Time With Checks Open

### Servers at Long Horn Steakhouse

**- By Person-Week -**



Employee-weeks

**Exhibit 70**

- Data from Discovery Sample -
## Percent of Tip Credit Wage Time With Checks Open
### Servers at Olive Garden
- By Person-Week -



**Exhibit 71**

**- Data from Discovery Sample -**

## Percent of Tip Credit Wage Time With Checks Open

**Servers at Red Lobster**

**- By Person-Week -**



**Exhibit 72**

- Data from Discovery Sample -
## Percent of Tip Credit Wage Time With Checks Open
### Bartenders at Seasons 52
- By Person-Week -



**Exhibit 73**

- Data from Discovery Sample -
# Percent of Tip Credit Wage Time With Checks Open
## Bartenders at Bahama Breeze
### - By Person-Week -



**Exhibit 74**

- Data from Discovery Sample -
## Percent of Tip Credit Wage Time With Checks Open
### Bartenders at Long Horn Steakhouse
- By Person-Week -



**Exhibit 75**

- Data from Discovery Sample -

## Percent of Tip Credit Wage Time With Checks Open

### Bartenders at Olive Garden

- By Person-Week -



Exhibit 76

**- Data from Discovery Sample -**

# Percent of Tip Credit Wage Time With Checks Open

### Bartenders at Red Lobster

**- By Person-Week -**



**Exhibit 77**

- Data from Discovery Sample -
## Percentage of Tippable Time with One or More Open Checks
### Seasons 52
### Server: Lisa Decillis
- By Date -



Exhibit 78

- Data from Discovery Sample -

## Percentage of Tippable Time with One or More Open Checks

### Bahama Breeze
### Server: Thomas Pare
- By Date -



**Exhibit 79**

- Data from Discovery Sample -

# Percentage of Tippable Time with One or More Open Checks

## Long Horn Steakhouse
## Server: Steve Gomez
### - By Date -



Exhibit 80

- Data from Discovery Sample -
## Percentage of Tippable Time with One or More Open Checks
### Olive Garden
### Server: Elise Cruz
- By Date -



**Exhibit 81**

- Data from Discovery Sample -

## Percentage of Tippable Time with One or More Open Checks
### Red Lobster
### Server: Benjamin Lockley
### - By Date -



**Exhibit 82**



- Data from Discovery Sample -
## Average Check Duration in Minutes
- By Shift Type and Concept -
- Servers -

Exhibit 83

- Data from Discovery Sample -

## Percentage of "Tippable Time" with Open Check

- By Shift Type and Concept -

- Servers -

"Tippable Time" defined as (Time with Checks Open)/(Duration of Tip Credit Shift)



**Exhibit 84**



- Data from Discovery Sample -
## Average Sales Per Check
- By Shift Type and Concept -
- Servers -

**Exhibit 85**

-Data from Discovery Sample-

**Average Tip Amount Per Check**

**- By Shift Type and Concept -**

**- Servers -**



**Exhibit 86**



- Data from Discovery Sample -
## Tips as a Percentage of Sales
- By Shift Type and Concept -
- Servers -

**Exhibit 87**



Exhibit 88

**- Data from Discovery Sample -**
## Average Hours Worked Per Shift
**- By Concept and Job Title -**



**Exhibit 89**



**- Data from Discovery Sample -**
**Average Hours Worked Per Week**
**- By Concept and Job Title -**

**Exhibit 90**

**- Data from Discovery Sample -**
# Average and Median Hours Worked per Week

| Concept | Servers | | Bartenders | |
|---|---|---|---|---|
| | Average | Median | Average | Median |
| *Seasons 52* | 26.61 | 27.17 | 25.11 | 26.23 |
| *Bahama Breeze* | 23.41 | 23.26 | 26.97 | 27.18 |
| *LongHorn* | 20.22 | 19.71 | 26.28 | 26.74 |
| *Olive Garden* | 21.60 | 21.53 | 25.42 | 26.84 |
| *Red Lobster* | 22.59 | 22.72 | 26.02 | 27.12 |

**Exhibit 91**

**- Data from Discovery Sample -**
## Percentage of Server Weeks Shorter than 30, 35 and 40 Hours
**- By Concept -**

| Concept | Percent of Weeks with less than 30 Hours Worked | Percent of Weeks with less than 35 Hours Worked | Percent of Weeks with less than 40 Hours Worked |
|---|---|---|---|
| *Seasons 52* | 60.68% | 77.88% | 90.50% |
| *Bahama Breeze* | 70.63% | 84.11% | 95.53% |
| *LongHorn* | 84.46% | 93.45% | 98.37% |
| *Olive Garden* | 78.14% | 89.21% | 97.34% |
| *Red Lobster* | 76.71% | 89.21% | 97.10% |

**Exhibit 92**

**- Data from Discovery Sample -**

# Percentage of Bartender Weeks Shorter than 30, 35 and 40 Hours
**- By Concept -**

| Concept | Percent of Weeks with less than 30 Hours Worked | Percent of Weeks with less than 35 Hours Worked | Percent of Weeks with less than 40 Hours Worked |
|---|---|---|---|
| *Seasons 52* | 62.21% | 79.48% | 93.14% |
| *Bahama Breeze* | 62.91% | 82.08% | 94.99% |
| *LongHorn* | 59.74% | 81.14% | 97.80% |
| *Olive Garden* | 60.78% | 77.53% | 95.90% |
| *Red Lobster* | 74.66% | 90.56% | 98.79% |

**Exhibit 93**



9777 Wilshire Blvd
Suite 600
Beverly Hills, CA 90212
Office.310.275.9137
Fax.310.275.9086

# ALI SAAD, MANAGING PARTNER

Dr. Saad is the Managing Partner of Resolution Economics LLC.  He has a Ph.D. in Economics from the University of Chicago.  Prior to Resolution Economics, Dr. Saad was a partner at Deloitte & Touche LLP and at Altschuler, Melvoin and Glasser LLP.   Before that he was in the litigation consulting group at Price Waterhouse, first in New York, and then in Los Angeles.  Prior to his consulting career, Dr. Saad served as an Assistant Professor of Economics at Baruch College of the City University of New York (CUNY).

## Professional Experience

Dr. Saad's experience is extensive in the areas of statistical and economic analysis of liability and damages related to employment litigation matters, as well as consulting on a variety of non-litigation employment issues. He is experienced in designing, implementing, and analyzing surveys and observation studies related to exempt / non-exempt status, hours worked, uncompensated time, meal and rest breaks, and other wage and hour issues. He has also performed statistical and damages analyses for a broad range of litigation matters including breach of contract, insurance coverage, environmental claims, patent infringement, antitrust and real estate financing disputes.  Dr. Saad has testified a number of times at deposition and trial.

## Employment Matters

Dr. Saad provides a variety of services related to employment litigation.  His experience is extensive in conducting statistical and economic analysis related to issues of liability for employment discrimination matters. He also has designed and conducted many surveys and observational studies related to wage and hour issues. Dr. Saad has also performed analyses of economic damages in both class action and single plaintiff matters.

## Statistical Analysis of Discrimination Matters

Assignments representative of Dr. Saad's experience in performing analyses in connection with employment discrimination matters include the following:

- Consulting and expert witness services in national class action race discrimination matter involving issues of pay, promotion, work assignment, and a variety of other challenged employment practices.  Services included creating databases from diverse and voluminous source materials, and conducting extensive statistical analyses.

- Consulting and expert witness services in national class action gender discrimination matter involving issues of job assignment and promotion.  Services included creating databases from diverse and voluminous source materials, and conducting extensive statistical analyses.

- Consulting and expert witness services in a class action case alleging that contracts were misleading. Services included processing and analyzing large quantities of data, and performing statistical analysis of

**APPENDIX 1**



the criteria determining class membership.

- Consulting and expert witness services in connection with a major class action alleging gender discrimination in pay and promotion at a large high-tech employer.  Services included creating analytical databases, and developing economic and statistical arguments concerning the relationship between productivity-related variables, pay/promotion, and gender.

- Consulting and expert witness services in an antitrust and discrimination matter in which a group of businesses alleged violations of antitrust and discrimination laws by another group of businesses. Services included data construction, and statistical analysis related to issues of liability.

- Consulting and expert witness services on behalf of plaintiffs' counsel in a series of cases alleging race discrimination in hiring.  Services included creating analytical databases, studying the relationship between race and hiring, and examining the features of the external labor market.

- Consulting and expert witness services in connection with a class action claim of discrimination based on age in connection with a series of layoffs resulting from the combination of two large retail chains.  Services included creating analytical databases, studying the relationship between layoff and age, and examining the relationship between age and workforce composition over.

- Consulting and expert witness services in connection with EEOC allegations of race discrimination in recruiting, hiring, and initial placement at a large service providing company.  Services included developing databases from diverse paper and electronic sources, and providing statistical arguments concerning the relationship between race and various other factors.

- Consulting and expert witness services to defendant's counsel in connection with a major class action alleging gender discrimination in multiple employment practices at a national retail chain.  Services included developing a database from voluminous paper documents, and conducting analysis related to hiring, initial placement, and initial pay.

- Consulting and expert witness services to defendant's counsel in connection with an EEOC investigation of racial discrimination in hiring by a major service providing organization.  Services included developing a database, and conducting statistical analysis related to hiring.

- Consulting services to defendant's counsel in connection with a U.S. Department of Labor OFCCP investigation of pay equity at a high-tech company.  Services included design and oversight of a statistical analysis of pay equity, assessment of the OFCCP methodology, and participation in conciliation discussions between the company and the OFCCP.

- Consulting and expert witness services to defendant's counsel in connection with an allegation of age discrimination in terminations resulting from a series of mass layoffs.  Services provided included developing statistical arguments concerning the relationship between age and termination.

- Consulting services to defendant's counsel in connection with a Department of Justice investigation regarding allegations of racial profiling by a large city police department.  Analyzed departmental data related to over 130,000 traffic stops, pedestrian stops, and other types of police contacts that occurred in

**APPENDIX 1**



four selected weeks in 1997 and four selected weeks in 1999.  Cross-referenced traffic stops data with other information sources including human resources data, precinct level paper records, and the officer discipline system to test various hypotheses.

- Consulting services and expert testimony to defendant's counsel in connection with a multi-plaintiff matter alleging race and gender discrimination in promotion and placement into coveted positions by a large city police department.  Performed statistical analysis of promotion and placement into coveted positions.  Quantified economic damages for several plaintiffs under failure to promote and wrongful termination theories.

- Consulting services in a case against a city government alleging discrimination in recruiting and hiring of police and firefighters.  Services included using Census and other large-scale data sources to assess labor market characteristics by detailed geographic location, and conducting extensive analysis of the impact of employment tests on hiring.

- Consulting and expert witness services to defendant's counsel in a matter where plaintiff alleged that defendant's hiring practices discriminated against women.  Services included converting diverse paper source materials into a usable database, and developing statistical evidence concerning plaintiff's allegation.

- Consulting services in several class action recruiting and hiring matters.  Services included use of detailed census and other data to estimate labor market availabilities by geographic location, and analyzing employment practices in light of these availability findings.

- Consulting services to a major bank involved in an analysis of its fair lending practices.  Services included using bank data on applicants for mortgages and other loans, and adding various demographic and geographic information to assess if the bank made loans on the basis of race, or controlling for other, observable factors could explain patterns in loan making.

- Consulting services on behalf of defendant's counsel in a major class action matter involving allegations of gender discrimination in promotion. Services included building analytical database from many sources, using the database to conduct extensive statistical analysis of plaintiffs' allegations, and estimating damages resulting from non-promotion for approximately 3,000 women occupying different jobs over a ten-year period.

- Consulting and expert witness services on behalf of defendant's counsel in two related cases alleging age discrimination in termination.  Prior to plaintiffs' vesting for certain long term benefits.  Services included using defendant's human resource data to test plaintiffs' specific allegations, developing statistical arguments concerning the relationship between age and termination, and performing analyses of plaintiff's damages in each case.

- Consulting services on behalf of plaintiff's counsel in distribution of award in an age discrimination matter with 75 plaintiffs.  Services included developing a method to efficiently compute damages for all plaintiffs, and working with counsel, an arbitrator, and a committee of plaintiffs to explain the process to the plaintiff group.

**APPENDIX 1**



## Wage and Hour Matters

Assignments representative of Dr. Saad's experience in wage and hours matters include:

- Consulting and expert witness services to defense counsel in a national class-action wage and hour matter alleging that several thousand loan originators at a large financial institution were misclassified under FLSA. Conducted statistical analyses of hours worked records, compensation data, plaintiffs' declarations, and other data to determine if select groups of plaintiffs would be representative of the class.

- Consulting and expert witness services to defense counsel in a wage and hour matter alleging that several thousand General Managers and Assistant Managers at a large office supply retailer were misclassified as exempt employees. Services included designing and conducting a survey to examine whether class members were appropriately classified, analyzing the company's labor model and human resources data, and conducting statistical analyses related to a variety of class certification issues.

- Consulting and expert witness services to defense counsel in a wage and hour matter alleging that several thousand Assistant Managers at a large general merchandise retailer were misclassified as exempt employees. Services included designing and conducting both a survey and an observational study, to examine whether or not class members were appropriately classified. Services also included conducting extensive statistical analyses of the data collected by the survey and the observational study, and preparing materials for use in class certification proceedings.

- Consulting services to defense counsel in a class action matter alleging failure to pay overtime wages to independent sales and service representatives for a large national tool franchiser. Services included designing and implementing an hours survey to determine whether the additional hours worked claimed by some plaintiffs was representative of the additional hours worked by the class as a whole. Determined that the problem were isolated to certain geographic areas rather than nationwide.

- Consulting and expert witness services to defense counsel in a wage and hour matter alleging that several hundred store managers and assistant store managers at a chain of retail discount stores were misclassified. Services included creating and implementing a survey to examine whether class members were classified appropriately and conducting statistical analyses related to commonality of class-members and other class certification issues.

- Consulting services to defense counsel in a multi-plaintiff wage and hour matter alleging that the defendant employer failed to compensate security guards for uniform changing time and other claims of off-the-clock work. Services included designing and conducting an observation study to measure time associated with various activities.

- Consulting services to defense counsel in wage and hour matter alleging that store managers at a chain of convenience store/ gas station operations were misclassified as exempt workers. Services included designing and conducting a random sampling scheme and observational study to evaluate the amount of time that class members spent on exempt and non-exempt duties.

**APPENDIX 1**



- Consulting services to defense counsel in a class-action wage and hour matter alleging uncompensated meal periods and breaks, unpaid overtime wages, and minimum wage violations at a field maintenance company. Services included creating a database of hours worked from paper and electronic records, and then providing damages estimates based on a variety of assumptions and legal theories.

- Consulting services to defense counsel in a class action matter alleging a variety of wage and hour violations for hourly workers at a chain of warehouse stores. Services included analyzing data to test allegations of improper time adjustments, missed meal and rest periods, uncompensated split shifts, reporting time violations, overtime and regular rate issues, and off-the-clock work.

## Employment Damages

Assignments representative of Dr. Saad's experience estimating economic damages include the following:

- Consulting services to plaintiff's counsel in a case involving a breach of employment contract allegation by a high-level executive in the emerging communications industry. Services included damages analysis based on valuation of stock options and estimation of future earnings.

- Consulting services to defendant's counsel in a case involving a wrongful termination allegation by a high-level executive in the telecommunication industry. Services included damages analysis based on valuation of stock options using the Black-Scholes Option Pricing Framework and a Monte Carlo Simulation Model.

- Consulting and expert witness services on behalf of defendant's counsel in a matter brought by a former executive who alleged wrongful termination and age discrimination against a major defense contractor following a reduction in force. Critiqued work product of the opposing expert, evaluated mitigation issues, calculated loss of earnings damages and valued losses related to stock options.

- Consulting and expert witness services on behalf of defendant's counsel in a medical malpractice action where the underlying damages issue was valuing an income stream from a closely held cash business. Performed accounting of plaintiff's financial records to determine the existence and the extent of fraud. Created financial models to calculate damages under a variety of scenarios.

- Consulting and expert witness services to defendant's counsel in a wrongful termination matter brought by senior executive of a high-tech company who alleged age discrimination. Performed analysis of mitigation factors, calculated loss of earnings, and valued future stock options.

## Commercial Litigation

Dr. Saad has assisted clients in a variety of commercial litigation matters, including patent infringement, insurance coverage, antitrust, breach of contract, and real estate financing. Assignments representative of Dr. Saad's experience in these areas include the following:

- Consulting and expert witness services in a series of cases involving the real property title insurance industry. Services included performing extensive statistical analyses in connection with both liability and damages issues.

**APPENDIX 1**



- Consulting and expert witness services in a case alleging breach of loan commitment to a commercial real estate concern.  Services included constructing financial models, developing economic arguments relating to fixed versus variable rate loans, and assisting counsel in deposing the opposing expert.

- Consulting and expert witness services in a case involving a breach of contract allegation in the computer hardware industry.  Services consisted of performing a damages calculation, and rebutting the opposing expert's analysis.

- Consulting and expert witness services in a case alleging that one entity caused another entity's property to be misused.  Services included database creation, and statistical analysis related to issues of causation.  Results indicated that there was a statistically significant relationship between defendant's actions and plaintiff's economic condition.

- Consulting services on behalf of defendant's counsel in a breach of contract matter in the context of natural resource raw materials shipping.  Services included developing economic arguments regarding the but-for pricing of both the shipping service as well as the material being shipped.

- Consulting and expert witness services on behalf of defendant's counsel in a major insurance coverage case, in which the underlying claims resulted from tens of thousands of asbestos claims. Services included developing strategy for dealing with large amounts of paper information, creating a database for analysis, and performing a variety of statistical analyses.

- Consulting services on behalf of plaintiff's counsel in an antitrust matter in the consumer electronics product market.  The antitrust practice alleged was predatory pricing.  Services included preparing a damage analysis.

- Consulting services on behalf of defendant's counsel in a patent infringement matter in the computer hardware industry.  Services included researching transfer pricing issues and analyzing complex company P&L data in preparation for damages calculation.

- Consulting services on behalf of defendant's counsel in a real estate financing dispute.  Dispute revolved around the financing of a major New York office property.  Services included analysis of interest rates and their relationship to potential damages at various points in time, as well as the construction of a financial model of the property with the but-for financing in place.

- Consulting services on behalf of plaintiff's counsel in an antitrust matter involving allegations of non-competitive practices and predatory pricing in the home cable television market.  Services included an analysis of "raising rivals costs", as well as a statistical analysis of pricing of complex products over time.

**APPENDIX 1**

## Summary of Employment Experience

**Resolution Economics LLC:**
Managing Partner, October 1998 to date.

**University of Southern California**
Adjunct Associate Professor in the Department of Economics**,** January 1999 to September 2001.

**Deloitte & Touche, LLP:**
Partner, Dispute Consulting Services, (Los Angeles), 1998.

**Altschuler, Melvoin and Glasser LLP:**
Partner, Economics and Litigation Services, (Los Angeles), 1995 to 1998.

**Price Waterhouse LLP:**
Senior Manager, Manager, Litigation and Corporate Recovery Services Group, (New York and Los Angeles), January 1989 – November 1989, June 1990 to 1995.

**Olympia & York Companies (USA):**
Assistant VP and Senior Economist, (New York), November 1989 - June 1990.

**Baruch College, City University of New York (CUNY):**
Instructor and Assistant Professor of Economics, Department of Economics and Finance, 1982-1988; Center for the Study of Business and Government, Research Associate, 1983-1986; U.S. Small Business and Veterans Administrations, Consultant, 1985-1986.

## Education

Ph.D., Economics, The University of Chicago.

B.A., History, Economics, The University of Pennsylvania

## Publications

*Financial Success and Business Ownership among Vietnam and other Veterans* (with S. Lustgarten) SBA - 7210 - VA - 83, 1986.

"Schooling and Occupational Choice in 19th Century Urban America", <u>Journal of Economic History</u>, vol. 49, no. 2, June 1989.

"Employment Discrimination Litigation", chapter in <u>Litigation Services Handbook</u>, ed. by Roman Weil, et al., 1995, 2001, 2006, and 2012.

"Employment Discrimination", chapter in <u>Litigation Support Report Writing</u>, ed. by Jack P. Friedman, et al, 2003.

**APPENDIX 1**



Paul Grossman, Paul Cane, and Ali Saad, "Lies, Damned Lies, and Statistics: How the Peter Principle Warps Statistical Analysis of Age Discrimination Claims", <u>The Labor Lawyer</u>, vol. 22, no. 3, Winter/Spring 2007, pp. 251-268.

Saad, Ali, "Beyond the Peter Principle – How Unobserved Heterogeneity in Employee Populations Affects Statistical Analysis in Age Discrimination Cases: Application to a Termination/RIF Case", AELC Conference Volume, 2007.

Saad, Ali, "Filling the Data Vacuum in Wage and Hour Litigation: The Example of Misclassification Cases, Emphasis on Class Certification", SIOP Annual Conference Proceedings, 2009.

## Academic Honors

Finalist, Allan Nevins National Doctoral Dissertation Award
NIMH Doctoral Fellowship, The University of Chicago
Magna Cum Laude, The University of Pennsylvania
Honors in History, Economics, The University of Pennsylvania
Omicron Delta Epsilon, Honor Society in Economics

## Professional Affiliations

American Economic Association
American Statistical Association
American Bar Association (associate membership)

**APPENDIX 1**

resolution economics LLC

# Ali I. Saad, Ph.D.
## Attachment to Resume

**Testimony, Expert Reports, and Declarations:**

In the matter of <u>Kaanaana, et al., v. Barrett Business Services, et al.,</u> Case no. BC497090, (Superior Court for the State of California, County of Los Angeles CCW), regarding the use of statistical analysis in an employment matter.  Report filed January 24, 2014.

In the matter of <u>Alequin, et al., v. Darden Restuarants, Inc., et al.,</u> Case no. 12-61742-CIV-ROSENBAUM/SELTZER, (United States District Court for the Souther District of Florida), regarding statistical sampling.  Declaration filed December 16, 2013.

In the matter of <u>Sawin, et al., v. The McClatchy, et al.,</u> Case no. 34-2009-00033950-CU-OE-GDS, (Superior Court for the State of California, County of Sacramento), regarding the use of statistical analysis in an employment matter.  Report filed November 1, 2013, deposition December 5, 2013.

In the matter of <u>Andrews, et al., v. Lawrence Livermore National Security, LLC,</u> Case no. RG09453596, (Superior Court for the State of California, County of Alameda), regarding statistical analysis in an employment discrimination matter), Deposition October 16, 2013, Trial testimony December 12, 2013.

In the matter of <u>Rahmon Momoh v. CPUC,</u> Case no. CGC-12-519287, (Superior Court for the State of California, County of San Francisco), regarding the use of statistical analysis in an employment discrimination matter.  Report filed June 28, 2013.

In the matter of <u>Robert Zator and Carlos Garcia, et al., v. Sprint/United Management</u> Case no. 37-2009-00098691-CU-OE-CTL, (Superior Court for the State of California, County of San Diego), regarding the use of statistical analysis in a PAGA claim related to expense reimbursements.  Report filed June 26, 2013.

In the matter of <u>Benjamin Paparella, et al. v. JPMorgan Chase Bank,</u> Case no. 30-2010-00370146-CU-OE-CXC, (Superior Court of the State of California, County of Orange), in connection with plaintiffs' proposed trial management statistical sampling plan.  Report filed July 3, 2013, Deposition August 8, 2013.

In the matter of <u>Romo, et al. v. GMRI, Inc, dba Olive Garden, et al.,</u> Case no. EDCV 12-00715 JLQ-SPX, (United States District Court, Central District of California), in connection with statistical analysis in a wage and hours claim.  Report filed July 11, 2013, Deposition August 21, 2013.

In the matter of <u>Leona Counter-Young v. Pacific Maritime Association,</u> Case no. BC 479455, (Superior Court of the State of California, County of Los Angeles), in connection with class action employment matter.  Report filed April 5, 2013.

In the matter of <u>Fitzgerald, et al., v. California State Automobile Association, et al.,</u> Case no. C – 10-03173, (Superior Court for the State of California, County of Contra Costa), related to statistical analysis in connection with class action employment matter.  Report filed March 7, 2013.

In the matter of <u>Sankey, et al., v. Aeropostale West, Inc.,</u> Case no. BC457468, (Superior Court of the State of California, County of Los Angeles), in connection with class action employment matter.  Report filed May 27, 2012.

**APPENDIX 1**

resolution economics LLC

In the matter of <u>Cortina, et al., v. North American Title Company,</u> Case no. 07 CE CG 01169 JH, (Superior Court of the State of California, County of Fresno), in connection with class action employment matter. Reports filed May 11, 2012 and June 25, 2012.

In the matter of <u>Hall, et al., v. Rite Aid Corporation,</u> Case no. 37-2009-000 87938-CU-OE-CTL, (Superior Court of the State of California, County of San Diego), in connection with class action employment matter. Deposition January 20, 2012.

In the matter of <u>Jones, et al., v. National Council of the YMCA of the USA,</u> Case no. CV 09—CV-6437, (U.S. District Court for the Northern District of Illinois), related to statistical analysis in connection with class action employment matter.  Reports filed December 14, 2011 and March 15, 2012; deposition January 18, 2012 and March 28, 2012.

In the matter of <u>Hageman, et al., v. Accenture LLP,</u> Case no. CV 10—CV-01759, (U.S. District Court for the District of Minnesota), related to statistical analysis in connection with class action employment matter. Report filed November 17, 2011, deposition December 12, 2011.

In the matter of <u>Ely, et al., v. Davey Tree Surgery, et al.</u> Case no. RG08398173, (Superior Court for the State of California), related to statistical analysis in connection with class action employment matter.  Report filed November 16, 2011.

In the matter of <u>Gover, et al., v. Best Buy, Inc.,</u> Case no. CV 10-9988 VBF (RZx), (U.S. District Court for the Central District of California), related to statistical analysis in connection with class action employment matter.  Report filed July 8, 2011, deposition July 26, 2011.

In the matter of <u>Ealy, et al., v. Pinkerton Government Services, Inc.,</u> Case no. 10-CV-775-PJM, (U.S. District Court for the District of Maryland), related to statistical analysis in connection with class action employment matter.  Report filed June 14, 2011.

In the matter of <u>Ealy, et al., v. Pinkerton Government Services, Inc.,</u> Case no. 10-CV-775-PJM, (U.S. District Court for the District of Maryland), related to statistical analysis in connection with class action employment matter.  Report filed June 14, 2011.

In the matter of <u>Holland, et al., v. Securitas Security Services USA, Inc.,</u> Case no. BC-394-708 (Superior Court of the State of California for the County of Los Angeles), related to statistical analysis in connection with class action employment matter.  Report filed May 18, 2011.

In the matter of <u>Holton, et al., v. Marvell Semiconductor,</u> Case no. 106 CV 073295, (Superior Court of the State of California, Santa Clara County), related to use of statistical analysis in connection with class action matter involving wage and hour issues.  Declarations filed December 15, 2010, June 23, 2011.

In the matter of <u>Rudwall v. BlackRock, Inc.,</u> Case no. CGC-89-492419 (Superior Court of the State of California, County of San Francisco).  Report filed February 25, 2011.

In the matter of <u>Arroyo, et al., v. Accenture, LLP, et al.,</u> Case no. 10-CV-3013 (JSR), (U.S. District Court for the Southern District of New York), related to statistical analysis in connection with class action employment discrimination matter.  Expert Report filed January 23, 2011.

**APPENDIX 1**

resolution economics LLC

In the matter of <u>Sanchez, et al., v. HVM/LQ Management, et al.</u>, Case no. 30-2010-00419222-CU-OE-CXC, (U.S. District Court for the Central District of California, Southern Division), related to motion to remove class action matter involving wage and hour issues.  Declaration filed January 21, 2011.

In the matter of <u>Onofre, et al., v. Children's Hospital of Orange County, et al.</u>, Case no. 00180057, Dept CX103, (Superior Court of the State of California, Orange County), related to statistical analysis in connection with class action matter involving wage and hour issues.  Report filed November 16, 2010.

In the matter of <u>Chaaban, et al., v. The Wet Seal, Inc., et al.</u>, Case no. 07CC01290, (Superior Court of the State of California, Orange County, Civil Complex Center), related to statistical analysis in connection with class action matter involving wage and hour issues.  Report filed October 19, 2010, declaration filed Nov. 3, 2010. Deposition November 9, 2010.

In the matter of <u>Harris, et al., v. Vector Marketing Corporation, et al.</u>, Case no. CV 08 5198 EMC, (U.S. District Court Northern District of California), related to statistical analysis in connection with class action matter involving wage and hour issues.  Report filed September 22, 2010, deposition October 1, 2010.

In the matter of <u>Bloom v. JP Morgan Securities, Inc</u>, Case no. 09-CV-03418 WHA, (US District Court for the Northern District of California, San Francisco Division).  Report filed September 23, 2010.

In the matter of <u>Falcon Stainless, Inc., v. Rino Companies, et al.</u>, Case no. SACV 08-926 AHS (MLGx), (U.S. District Court for the Central District of California), related to analysis of economic damages in commercial dispute.  Declaration filed August 26, 2010.  Deposition testimony November 2, 2010.  Trial testimony February 18, 2011.

In the matter of <u>Steele, et al., v. Calportland, et al.</u>, Case no. BC400148, (Superior Court of the State of California, Los Angeles County), related to statistical analysis in connection with class action matter involving wage and hour issues.  Report filed August 23, 2010.

In the matter of <u>Pryor, et al., v. Overseas Administrative Services, Ltd., et al.</u>, Case no. 1100052926, (Jams Class Action Arbitration), related to analysis in connection with class action matter involving wage and hour issues.  Report filed July 19, 2010.  Deposition testimony August 19, 2010.

In the matter of <u>Silva, et al., v. See's Candy Shops, Inc.</u>, Case no. 37-2009-00100692-CU-OE-CTL, (Superior Court of the State of California, San Diego County), related to statistical analysis in connection with class action matter involving wage and hour issues.  Reports filed June 30, 2010, June 20, 2011.

In the matter of <u>Chandra Berg, et al., v. Zumiez, Inc.</u>, Case no. BC408410, (Superior Court of the State of California, Los Angeles County), related to statistical analysis in connection with class action matter involving wage and hour issues.  Reports filed June 15, 2010.  Deposition testimony July 20, 2010

In the matter of <u>Jacob Ahroner v. Israel Discount Bank of New York, et al.</u>, Index no. 602192/03, (Supreme Court of the State of New York, County of New York), related to statistical analysis in connection with allegation of employment discrimination. Report and affidavit filed as part of legal motion March 1, 2010.

In the matter of <u>Marshall Enderby, et al., v. The California Public Utilities Commission,</u> Case no. CGC-07-464877 (Superior Court of California, County of San Francisco, Unlimited Civil Jurisdiction), related to statistical and economic analysis in connection with allegations of age discrimination in promotions. Reports

**APPENDIX 1**

filed December 14, 2009, July 2, 2010, August 17, 2010, and January 10, 2011.  Deposition testimony September 3, 2010.  Trial testimony March 26, 2012.

In the matter of <u>Naidu v. The California Public Utilities Commission, et al.,</u> Case no. CGC-08-481152 (Superior Court of California, County of San Francisco, unlimited Civil Jurisdiction), related to statistical and economic analysis in connection with allegation of age discrimination in promotion. Report filed January 11, 2010.

In the matter of <u>The Wackenhut Wage and Hours Cases,</u> Judicial Council Coordinated Proceeding no. 4545, (Superior Court of California, County of Los Angeles), related to statistical and economic analysis in connection with issues of class certification. Report filed November 30, 2009.

In the matter of <u>Vonda Norris-Wilson, et al., v. Delta-T Group, Inc., et al.,</u> Case no. 37-2009-00085524-CU-OE-CTL (Superior Court of California, County of San Diego), related to statistical and economic analysis in connection with class certification. Report filed November 19, 2009.

In the matter of <u>Temi Bambose, et al., v. Delta-T Group, et al.,</u> Case no. 2:09-CV-00667-MAM (U.S. District Court for The Eastern District of Pennsylvania), related to statistical and economic analysis in connection with conditional class certification in an FLSA matter. Report filed August 31, 2009.

In the matter of <u>George McReynolds, et al., v. Merrill Lynch, Inc</u>., Case no. 05 C 6583 (U.S. District Court for The Northern District of Illinois), related to statistical and economic analysis related to liability and to issues of class certification. Report filed November 14, 2008.

In the matter of <u>Ronald Stillman, et al., v. Staples, Inc</u>., Civil Action no. 07 CV 849 (KSH) (PS) (U.S. District Court for The District of New Jersey), in connection with issues of liability.  Report filed August 25, 2008, deposition on October 23, 2008.  Trial testimony February 9 and 10, 2009.

In the matter of <u>Thomas Mangano v. Verity, et al.</u> Case No. 1-07-CV-079221 (Superior Court of California, County of Santa Barbara), in connection with economic damages.  Report filed March 27, 2008, deposition on May 9. 2008, trial testimony on May 22, 2008.

**APPENDIX 1**



**Bartender/Server Positions
OBSERVATION TRAINING GUIDE**

Resolution Economics
January 2014

*** THIS PAGE LEFT BLANK INTENTIONALLY ***

**APPENDIX 2**

# <u>C O N T E N T S</u>

<u>Page No.</u>

**I.      INTRODUCTION**
    Project organization ……………………………………….……    4
    Restaurant organization ………………………………………….    5
    Work activity categories ………………………………………...    6

**II.     PROJECT APPROACH AND PROTOCOL**
    Observation guidelines ………………………………………….    7

**III.    DATA GATHERING PROCESS**
    Introduction to the Dell Streak/Note 2………………………………...    10
    Starting Timekeeper software …………………………………….    14
    Collecting data …………………………………………………...    16
    Backing up data …………………………………………………    18


**APPENDICES**
    Appendix 1:  Project "Hot Line" Contact Information ………………    19
    Appendix 2:  Data Transfer Protocol ………………………………    20
    Appendix 3: Work Category and Activity Summary Sheet………………...    21

**APPENDIX 2**

**I. INTRODUCTION**

This training guide is intended to familiarize the Darden Observation Project field observers with the observation process and to provide guidance and information related to performing their observation duties.  Although the training guide provides information related to several aspects of conducting the observation study, it is intended to serve as a supplement to the training and field testing provided to project staff and management.

The objective of this study is to gain an understanding of how Bartenders and Servers allocate their work time among the various tasks they perform.  Central to this process is the identification and recording the amount of time that the Bartenders and Servers allocate to various kinds of work activities.   In the study, observers will shadow selected Bartenders and Servers for a full work week.  The shadowing process will consist of observing the identified employees, and recording how much time they spend performing the various work tasks/activities during the course of their work week.

**Project Organization**

The project's organizational structure consists of a Project Manager, Team Leader, Field Observers, and a Technical Advisory Committee.   Their individual duties and responsibilities include:

- <u>Project Manager</u>:  Overall day-to-day responsibility for organizing and leading the project staff; organize/assign team members to identified restaurants and Bartenders or Servers; monitor observation process of team members; resolve scheduling, logistical and related issues.

- <u>Team Leader</u>:  Guide team members in the field; ensure that observation process is running smoothly; answer questions and resolve issues related to the observation process; manage the daily data backup and upload process.

- <u>Field Observers</u>:   Conduct field observation of assigned employees and restaurants; code work activities observed; perform backup of observation data.

- <u>Technical Advisory Committee</u>:   Provide technical review and oversight of project, e.g. research design, sampling strategy, and analytical framework.

**APPENDIX 2**

## Restaurant Organization

In this study, we will be focusing on five of the Darden restaurant "concepts." Specifically, we will perform observations at the following restaurants:

- Bahama Breeze
- LongHorn Steakhouse
- Olive Garden
- Red Lobster
- Seasons 52

You may be assigned to one or more of the various restaurant concepts. Each restaurant is typically headed by a General Manager, who is assisted by Assistant Managers. The restaurant staff also typically includes servers, bartenders, bussers, cooks, and hosts. As mentioned before, we will focus on the servers and bartenders.

Restaurant Layout:

The size and layout of each restaurant may vary, but most restaurants/concepts have common features. Generally, each restaurant can be divided into "Front of House" (FoH), which is the part of the restaurant to which the general public has access, and "Back of House" (BoH), which includes areas that the general public would not normally access, including the kitchen, offices, and storage rooms. For the purposes of this study, the areas are grouped as follows:

Front of House:

Restaurant: this is the part of the "front of house" where customers come to sit and dine. This area includes the areas around dining tables, the hosting stand, any side stations, as well as surrounding areas. Also included are any outdoor dining areas, such as balconies and patios.

Bar Area: this is the area behind the bar where bartenders stand, and the surrounding area where restaurant patrons sit to drink and/or dine. It may include some high tables in the immediate vicinity of the bar.

Back of House:

Back of House: for purposes of this study, Back of House includes all areas in the BoH, such as the kitchen and food preparation area, but specifically excludes any offices, which are grouped separately. The Back of House includes the kitchen and cooking, expo/alley, food preparation, dish washing and surrounding areas. It also includes restrooms, maintenance areas, closets, storage rooms and freezers.

**APPENDIX 2**

<u>Office</u>:

This includes any areas that serve a function of an office.  This is where management and employees come to perform administrative and human resource tasks, among other activities.


**<u>Work Activity Categories</u>**

For the purposes of this study, the work activity of a Bartender or Server is divided and can be coded into several broad categories.  First, the activities are broken down by area of the restaurant (e.g., Front of House, Back of House, Office, etc.), then by activity type (e.g., Travel/Monitor, Customer Interaction, etc.), and then, where applicable, by more detailed type of activity work.  Comprehensive training will be provided as to what the different activities are and how to recognize a given activity, including on-the-field training by one of the Project Managers or Team Leaders.  See *Appendix 2* for a comprehensive list of the activities and their descriptions.

**APPENDIX 2**

## II.   OBSERVATION PROJECT APPROACH AND PROTOCOL

The focus of the observation is the *individual* Bartender or Server.  Field observers will "shadow" an identified individual Bartender or Server for all work hours during his/her scheduled work week.  Using the work activity code identified, field observers will observe and record the specific work activity the individual is performing on a continuous basis.

- Focus:  Identified individual Bartender(s) or Server(s) in designated restaurant;

- Observation Period:  All work activity of identified individual(s) during one work week, typically 5 or 6 work days;

- Coding Approach: Continuous: Record all work activity the Bartender or Server is performing each work shift;

- Bartender/Server Knowledge:  Bartenders and Servers in the sample selected for observation will be notified that their work activities are being observed;

Project Managers and Team Leaders will assign field observers in their respective teams with the observation schedule, restaurant location/type and individual(s) to be observed.

## Observation Guidelines

It is critical to observe and accurately code the work activities identified accurately, unobtrusively, and without bias.  The following guidance is provided to assist field observers in this effort:

- Unobtrusive:  When observing work activity, be as unobtrusive as possible**.**  Do not interfere with the work activities of the individual being observed; rather, observe his/her activity at a distance that allows you to observe and understand what activities are being performed.  Please stand out of the way of any active walkways or doorways.

- No Feedback:  When observing, do not provide the Bartender or Server observed with **any** verbal (or non verbal) feedback that would in any way indicate approval/disapproval of the activity observed.  Maintain a neutral posture at all times.  Also, you must avoid in engaging in any conversation with the Bartender or Server, including small-talk (besides a "hello" or "good-bye").  A helpful tip is to maintain a reasonable distance from the Bartender or Server to avoid unnecessary interaction.  If the Server or Bartender continues to try to speak with you, please remind him/her that you are not allowed to interact with them, and increase your observation distance whenever possible.  Also, minimize

**APPENDIX 2**

unnecessary interaction with other employees to avoid affecting the flow of work in the restaurant.

- Dress:  Clothes that are not conspicuous and consistent with restaurant patronage usually work, so neat business casual attire is expected.  Suggested attire includes a collared shirt and slacks for men, and a blouse and long pants for women. Clothing to avoid: open-toe shoes, athletic attire, low-cut or ripped clothes, skirts or shorts, and open-shoulder tops.  Please use good judgment and discretion.  If in doubt, ask a Project Manager.

- Coding: Using the coding guide, encode the observed activity in only *one* work activity category; do not attempt to code the same activity in multiple categories. It is important to understand the nature and objective of the work task being performed in order to code it correctly.  Do not attempt to guess the intent of the Bartender or Server's activity; simply code what is being observed.  If necessary, use the Notes function to add notes about an activity, but use this function sparingly.

- Purchase/gratuities:  Avoid making any unnecessary purchases, or accept any gratuity, at any restaurant location you observe as part of the project.  Purchasing a meal or snack during your subject's break is acceptable, and actually recommended, but please place your order as a regular customer, be seated by the host, and avoid having the Bartender or Server you (or anyone else) are observing take or bring your order.  Remember—you must avoid influencing the behavior of any individual being observed.

- Introduction:  Upon arrival at the restaurant, introduce yourself to the restaurant management, as well as the Bartender or Server that you will be observing. Indicate that you are on a project commissioned by Darden. The objective is to obtain a better understanding of the work performed by Bartenders and Servers and that you will be following and observing his/her work activities for the week or the day (depending on your observation assignment).

- Verification: If the Bartender or Server requests verification of the project or your status, they should contact the General Manager of their restaurant.  See *Appendix 1* for more information.

- Work/Meal Breaks:  As a general rule, work/meal breaks should be taken at the same time as the individual you are observing.

- Questions: If you do not understand a work activity that is being performed, or that is ambiguous and needs clarification, do *not* seek clarification by asking questions.  Make every attempt to accurately determine every activity you observe, but if absolutely necessary, use one of the "Other" categories and make a notation in the handheld tablet of the activity observed.  You must enter a descriptive note of the activity whenever you select "Other."

8

**APPENDIX 2**

- <u>Schedule Changes:</u> Should the person who you are selected to observe not be available for observation due to a schedule change or illness, please contact the Team Leader for the assignment of an alternate employee to observe.  You may also be given this information in advance.

- <u>Subject Refusal</u>:  While this should happen rarely, if ever, should a subject refuse to be observed, please remind him/her that he/she has been randomly selected, and that the location was randomly selected, and that the results of the observation study will in no way affect their performance rating or work.  If they continue to firmly refuse, then please contact a Team Leader for an alternate assignment.

Should a field observer have a question and/or require assistance while conducting field observations, the primary contact should be a Team Leader.  However, if a Team Leader is not available, contact the Project Managers or other Resolution Economic staff as required.  *See Appendix 1* for project staff contact information

**APPENDIX 2**

## III.   DATA GATHERING PROCESS

We will be using the Dell Streak ("Streak") or Samsung Galaxy Note 2  ("Note 2") handheld devices to record the observation data.  Both utilize the same operating system and activity capture software, but you should familiarize yourself with the basic operations of both types of devices.

## **Introduction to the Dell Streak**

The following diagram below illustrates some of the components and features of the Streak:



10



*Dell Streak features*

Features

1. Headphone connector
2. Volume Up/Down button
3. Power and Sleep/Wake button
4. Camera button
5. Back button
6. Menu button
7. Home button
8. Microphone
9. 30-pin connector
10. Proximity sensors
11. Earpiece
12. Front-facing camera lens
13. Ambient light sensor

11

**APPENDIX 2**

## Introduction to the Samsung Galaxy Note 2

The following diagram below illustrates some of the components and features of the Note 2:





12

**APPENDIX 2**

<u>Charging</u>

Before each use, make sure that the device is fully charged.  To charge, connect the supplied power cord to the side of the Dell Streak (see diagram, left) or the bottom of the Note 2 (see diagram, right).  If the main menu screen is on, the battery level indicator will show a white thunderbolt across the battery ( ).



<u>Operation</u>

To turn on the Dell Streak, press and release the Power button on the lower right of the device (Feature 3, ).  To turn on the Note 2, press and hold the Power button on the upper right side of the device.  The devices are completely touch screen.  The screen allows you to select items (options, entries, images, and icons), start applications, press buttons, and input text with your finger tips.  To return to the main menu screen at any time during operation hit the Home button (lower left of Streak, , or center Home button  on Note 2).

<u>Menu screen</u>

On the main menu screens, the current time is displayed in the upper right corner.  <u>Make sure that you adjust the time to the appropriate time zone that you are in before beginning any observations.</u>

The battery level is indicated on the device's screen.  While the battery is charging, a lightning bolt will be displayed across the battery.  During your observations, be sure to periodically check the battery level.

The home screens contain commonly used programs.  If you need any of the other programs that are available, they are accessible through the app drawer – the center icon in the dock at the bottom of the screen.

The main method to input text on the Dell Streak is the virtual keyboard located on the device.  The default keyboard on the Dell Streak is a "Swype" enabled keyboard.  For faster text entry you can simply drag your finger across the letters instead of typing them individually.  You can also use it as a regular keyboard if you prefer.

13

**APPENDIX 2**

To scroll down the screen, use your finger to drag the screen contents upward.

<u>SD Memory Expansion Slot</u>

Your may have a Secure Digital ("SD") memory card which fits into the expansion slot (located under the back cover). The SD card (or on-board memory) will be used to back up your observations daily. (See below on how to backup your observations at the end of each day.) While the card is removable, it is generally simpler to use the Streak or Note 2 as a card reader.



*SD Card*

## **<u>Timekeeper Software</u>**

The software we are using to record the activities of the Bartenders and/or Servers in this study is called Timekeeper. It is specifically created for time and sampling observation studies on portable computer devices.

<u>Launching the Application</u>

To start the Timekeeper application, tap the Timekeeper icon on the home screen. If for some reason the icon is not visible, you can also launch Timekeeper from the App list.

<u>Creating a New Study</u>

**For each day of observations, you should create a new study**. That is, each day of observation will be its own study unit. This is done by following these steps:

After starting the Timekeeper application, select your name in the prompt screen titled "Please identify observer".

After selecting your name, enter the password provided to you by the Project Manager using the keypad and hit the "Login" button.

After login you will see the screen where you will create a new study for each shift you observe titled "Please select study". Touch the bottom center menu button ( or ) and select the "(+) Add" button to add a new study.

**APPENDIX 2**

The following fields will appear:

      **NAME:** The name of your study.

      **DESCRIPTION:** Typically used to note any additional information about the study.

      **PROJECT:** The Timekeeper project loaded for the study being performed.

      **OBSERVER:** The observer performing the study.

      **TIMEZONE:** The time zone in which the study is being performed.

The convention for naming studies in the **NAME** field should be the location identifier or number provided by the Project Manager for your restaurant (e.g., 1234), an underscore, followed by the date without spaces (e.g., 070111 corresponding to 7/1/2011), an underscore, followed by your initials in capital letters (e.g. RE); a completed field may look something like the following: "1234_070111_RE".

Leave the **DESCRIPTION** field blank unless instructed otherwise by the Project Manager.  In the **PROJECT** dropdown list, select "DARDEN".  Verify that you selected the correct observer name in the **OBSERVER** field.  Lastly, verify that the correct time zone is selected.  After completing this task, select the "Continue" button located at the bottom of the menu.

You will now be at the "Study details" menu.

<u>The Study Details Menu</u>

This screen captures all additional information that is pertinent and specific to your study. It requests the following information:

      **RESTAURANT:** Re-enter the restaurant number (this will be provided to you).

      **OBSERVED:** Enter the name of your Bartender or Server, First Name then Last Name.

      **TITLE:** Enter "BAR" or "SER".

Finally, select the "Add" button located at the bottom of the menu.  Your study will now appear as created.

15

**APPENDIX 2**

**Collecting Data**

When you are ready to start gathering data, select the study you created in the study menu screen. This will take you to the main activity group menu of the study:

This is the Grid view of the Capture screen, from where you will capture the data. This is the first level, or main group menu of the activities that you can record. The boxes that you see on the screen are called elements. Each element corresponds to the activity or area of activity being observed. For example, although "Front of House" is not an activity, once you select it, a subgroup menu will appear that will allow you to select a "Front of House" activity that is being observed. Please see *Appendix 2* for a listing of the menu groups and subgroups and the corresponding activities.

Once you select one of these elements, the timer will begin. The timer is located in the lower right portion of the screen. Note that the timer starts once you select any main group element (e.g., "Front of House"), even if you have not yet selected any subgroup elements (e.g., "Cleaning"). This gives you time to choose the specific activity that you are observing. Once you select the subgroup activity, it will record it to the current activity. After you select the subgroup, the grid will return to the main group menu screen. Once the Bartender or Server moves on to another activity, you simply repeat the above process. The previous activity will automatically stop, and the new selected activity will begin recording.

At the bottom of the Capture screen is a preview screen of the Log view. It displays information about the current or "Last" activity selected including the sequence, activity description, and duration.

In order to access the Log view of the Capture screen, select the menu button ( or ). Then select the left most button in the menu titled "View activity log". This log displays a list of all previous observations that have been recorded by you. If you need to change an activity designation, this is the screen from which you will do it. When you open up a new study the preview screen will display "[No Description]" and this screen will be empty. Do NOT use the "End activity" or "Stop study" buttons located to the right of the "View activity log" button while performing an active study.

You can see previous activities in the Log view of the capture screen (and this is where you may change an activity designation. See below). You can alternate between Log and Grid views of the Capture screen without interrupting the observations. Only at the end of a shift, hit "End activity" to stop the last activity being recorded; then hit "Stop study". This will end the observation recording process for the day.

**APPENDIX 2**

<u>Activity Descriptions</u>

Refer to *Appendix 2* for a description of all activity groups and subgroups, along with their descriptions. However, you may also read an activity description without selecting an activity by touching and holding your finger on the relevant activity box at the subgroup label. A grey box, showing the description of the activity will appear on the screen. To remove the description without selecting the activity, simply select the "Details:" in the "Activity action" menu. A description will appear and you may either select the activity or return to another menu to select a different activity.

<u>Changing an Activity Designation</u>

If, for some reason, you realize that you recorded an activity incorrectly, you can change it in the Activity Log view of the Capture screen. To do this, enter the Activity Log view of the Capture screen as described above. (You may also scroll through the activities log list by using your finger and flicking the list upward or downward) Tap on the row of the incorrectly coded activity with your finger to view the time and duration of the activity. After verifying that this is the correct activity you would like to change, press and hold down on the column until a "Log action" menu is displayed. Select "Edit log activity". The element grid will appear. You may now recode the incorrect activity by selecting the intended activity. The new activity designation will now appear in the Log view of the capture screen and an update message will appear. In order to return to the Grid view and continue the coding process, touch the Back button (⬅ or ↩). This process will be fully covered during training.

Recording Activities that Do Not Fit Into Any of the Listed Activities

Although you should try to best fit an activity into one of the listed activities in the group or subgroup menus, you may find that the Bartender or Server is performing an activity that does not belong in any of the sub-groupings shown. In this case, you will select the button marked "Other" from one of the subgroup menus. You will then be prompted by an empty field titled "Attach note". Next, type in a brief description of the activity that the Bartender or Server is performing in the blank field provided. Select "Add" when finished. If you do not have enough time to type in a sufficient description, you may edit the field entry while you are recording a subsequent activity. You may do this by performing the same steps you perform when editing an activity however you must select the "Edit log note" button when the "Log action" menu is displayed. This will allow you to type a more detailed description, or change the one you originally typed.

17

**APPENDIX 2**

**Backing Up Data**

At the end of each shift simply select "End activity" to indicate that the subject is no longer being observed, then the "Stop study" button.  Each screen button appears when touching the center menu button under the Capture Screen ( or ).  The "Stop study" button will end time capture and return you to the main study menu.  Your data is automatically stored on the device while the study is taking place.  To ensure that the study is backed up onto the SD card, select and hold down the study you performed that day in the study menu screen.  When prompted by the "Study action" menu select "Export Study".  This step will store your study observations onto the card, and allow you to send the study file.

Connect your device directly to your computer using the same USB cable you used to charge your device.  First, connect the USB cable to your computer then connect it directly to the device.  A prompt screen will appear on your device indicating "USB connected".  On the Dell Streak, select the "Turn on USB storage" button to allow access to your study file and touch "OK".

Your computer should indicate that you've established a connection with a removable disk or USB drive.  If prompted by your web browser, select the "Open folder to view files" option.

You will not be able to use the time capture functions of the Timekeeper software while USB storage is turned on.  If for some reason you need to turn it off, simply place your finger on the USB symbol ( ) at the top left of the screen and drag down.  In the "Ongoing" section of the menu, select "Turn off USB storage".  The same process will allow you to turn it back on after you are done.

18

**APPENDIX 2**

**Appendix  1**

**PROJECT "HOT LINE" CONTACT INFORMATION**
*The following contact information is provided as a resource for project staff requiring assistance.  The primary contact for field observers should your Team Leader.*



**Darden Verification Contacts**
Should an employee request verification that you are authorized to work on this project, s/he should contact their General Manager.  If the General Managers require verification, they should contact Dawn Rhoda, at Darden Corporat ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
ONLY provide this contact to GMs and not to any other employees.

**APPENDIX 2**

**Appendix 2**

**E-MAILING DATA BACKUP DAILY**

Please send your data at the end of EACH DAY to the following Project Managers/Team Leaders:

To:
Alex Rodriguez: arodriguez@resecon.com

Cc:
Emil Czechowski: eczechowski@resecon.com
Roy Yurong: ryurong@resecon.com

You can accomplish this in the following way using your laptop:

1. Connect to the internet using your computer.

2. Open up Internet Explorer (or another web browser) and log into your ResEcon e-mail account at http://mail.resecon.com

3. Create a new e-mail message addressed to the individuals above.  A subject line or additional descriptions about your observations is not necessary.  DO NOT INCLUDE ANY OTHER INFORMATION OR CORRESPONDENCE IN YOUR E-MAIL.

4. Select "Attach File" to attach your study to the e-mail:
    a. Open the USB folder (the folder visible after connecting the handheld tablet).
    b. Open the "Timekeeper" folder.
    c. Select the file labeled "study" followed by the same name as your study (e.g., "study_1234_070111_RE.sql") and attach this file.  Notice that the study has a ".sql" file extension.

5. Send the e-mail.

20

**APPENDIX 2**

# Appendix 3

## Work Category and Activity Summary Sheet

**APPENDIX 2**

Activity for Darden Observation Study

| Location | Primary Task | Sub Task 1 | Sub Task 2 | Description |
|---|---|---|---|---|
| Front of House | Travel/Monitor | | | Travel, walk or wait on floor; Monitor guest |
| | Customer Interaction | Greet/Chat/Interact with customer | | Interact/chat/greet customers at table or other areas of the restaurant to ensure guest satisfaction; includes taking order |
| | Employee Interaction | | | General restaurant interaction |
| | Telephone | Taking to go order | | Employee taking to go order |
| | | Work related | | Employee on phone |
| | | Non-Work related | | Personal call or text |
| | Pre-Bussing | | | Remove plates/utensils/dirty napkins wipe down table or bar while customer is still present |
| | Bussing | | | Remove plates/utensils/dirty napkins/wipe down table after customers have left |
| | Prepare/set table | | | Prepare table by placing silverware/plates/napkins/condiments on table |
| | Food Interaction | Serve/carry food or bev | | Serve/carry food, beverage, or condiments to customers; carry food or beverage; fill beverages |
| | | Dish or plate food/prep drink | For Customer | Dish or plate food, soup ,salad, etc. or prepare drink |
| | | | Not for Customer | Dish or plate food, soup ,salad, etc. or prepare drink. Not for customer |
| | | Prepare condiments | | Check or refill salt, pepper, ketchup, mustard, hot sauce or other condiments |
| | | Garnish/arrange food | | Decorate food/drinks to make more visually appealing; add dressing to salads, cheese, pepper, etc. |
| | | Stock Food/ingredients | | Stock food supplies or other supplies; unpacking food or supplies; move or carry supplies; includes stocking beverages/liquor; stock ice |
| | | Stock Beverages/Ice | | Stock beverages/liquor; stock ice |
| | | Carry to go order | | Carry to go order to/for customer |
| | | Inventory | | Take inventory of liquor, food, etc |
| | | Other | | Other food supplies interaction task |
| | Object Interaction | Carry menu/check | | Carry menu or check to and from customer |
| | | Carry to go box/bag | | Carry to go box or bag to/from customer |
| | | Rolling silverware | | Rolling silverware into napkin |
| | | Carry/organize dishware or utensils | For Customer | Carry dishware/utensils to or for customer |
| | | | Not for Customer | Carry dishware/utensils. Stock dishware/utensils |
| | | Carry/organize furniture | For Customer | Carry/move/organize  tables/heat lamps/high chairs specifically for customers. |
| | | | Not for Customer | Carry/move/organize  tables/heat lamps/high chairs. Not specifically for customers. |
| | | Carry/set up equipment | | Carry/set up tea,coffee,ice, soda or other machines |
| | | Fix/maintain equipment | | Fix/maintain tea,coffee,ice, soda or other machines |
| | | Review/Write Notes | | Review/ Write notes.Perform paperwork. Does not include taking order |
| | | Other | | Other object/equipment interaction |
| | POS interaction | General POS | | Place customer order or close out customer order on POS system. Modify customer order |
| | | Clock In/Out | | Employee is clocking in /out |
| | Clean | Wash dish/glassware | | Washing dishware/glassware by hand or machine; |
| | | Clear dishware | | Clear food from plates |

APPENDIX 2

Activity for Darden Observation Study

| Location | Primary Task | Sub Task 1 | Sub Task 2 | Description |
|----------|--------------|------------|------------|-------------|
| | | Clean equipment | | Clean/wipe down equipment (refrigerator,tea machine, ice, coffee machine, etc..) |
| | | General cleaning | | General types of cleaning,includes vacuuming, sweeping, mopping in  customer area, server station and server alley |
| | | Clean Other | | Other cleaning |
| | Wash Hands | | | Employee is washing hands |
| | Cash Handling | | | Count out tips,count cash drawer etc.; Does NOT include customer order interaction |
| | Other | | | Other front of house task |
| Back of House | Travel/Monitor | | | Travel, walk or wait on floor; Monitor guest |
| | Employee Interaction | General interaction | | General restaurant interaction |
| | Telephone | Taking to go order | | Employee taking to go order |
| | | Work related | | Employee on phone |
| | | Non-Work related | | Personal call or text |
| | Pre-Bussing | | | Remove plates/utensils/dirty napkins wipe down table or bar while customer is still present |
| | Bussing | | | Remove plates/utensils/dirty napkins/wipe down table after customers have left |
| | Food Interaction | Serve/carry food or bev | | Serve/carry food, beverage, or condiments to customers; carry food or beverage; fill beverages |
| | | Dish or plate food/prep drink | For Customer | Dish or plate food, soup ,salad, etc. or prepare drink |
| | | | Not for Customer | Dish or plate food, soup ,salad, etc. or prepare drink. Not for customer |
| | | Prepare condiments | | Check or refill salt, pepper, ketchup, mustard, hot sauce or other condiments |
| | | Garnish/arrange food | | Decorate food/drinks to make more visually appealing; add dressing to salads, cheese, pepper, etc. |
| | | Stock Food/ingredients | | Stock food supplies or other supplies; unpacking food or supplies; move or carry supplies; includes stocking beverages/liquor; stock ice |
| | | Stock Beverages/Ice | | Stock beverages/liquor; stock ice |
| | | Carry to go order | | Carry to go order to/for customer |
| | | Inventory | | Take inventory of liquor, food, etc |
| | | Other | | Other food supplies interaction task |
| | Object Interaction | Carry menu/check | | Carry menu or check to and from customer |
| | | Carry to go box/bag | | Carry to go box or bag to/from customer |
| | | Rolling silverware | | Rolling silverware into napkin |
| | | Carry/organize dishware or utensils | For Customer | Carry dishware/utensils to or for customer |
| | | | Not for Customer | Carry dishware/utensils. Stock dishware/utensils |
| | | Carry/organize furniture | For Customer | Carry/move/organize  tables/heat lamps/high chairs specifically for customers. |
| | | | Not for Customer | Carry/move/organize  tables/heat lamps/high chairs. Not specifically for customers. |
| | | Carry/set up equipment | | Carry/set up tea,coffee,ice, soda or other machines |
| | | Fix/maintain equipment | | Fix/maintain tea,coffee,ice, soda or other machines |
| | | Review/Write Notes | | Review/ Write notes.Perform paperwork. Does not include taking order |
| | | Other | | Other object/equipment interaction |
| | POS interaction | General POS | | Place customer order or close out customer order on POS system. Modify customer order |
| | | Clock In/Out | | Employee is clocking in /out |
| | Clean | Wash dish/glassware | | Washing dishware/glassware by hand or machine; |
| | | Clear dishware | | Clear food from plates |
| | | Clean equipment | | Clean/wipe down equipment (refrigerator,tea machine, ice, coffee machine, etc..) |
| | | General cleaning | | General types of cleaning,includes vacuuming, sweeping, mopping in  customer area, server station and server alley |
| | | Clean Other | | Other cleaning |
| | Wash Hands | | | Employee is washing hands |

APPENDIX 2

**Activity for Darden Observation Study**

| Location | Primary Task | Sub Task 1 | Sub Task 2 | Description |
|---|---|---|---|---|
| | Cash Handling | | | Count out tips,count cash drawer etc.; Does NOT include customer order interaction |
| | In Cooler/Freezer | | | Employee has entered the cooler; freezer or liquor cabinet |
| | Other | | | Other back of house task |
| Office | Travel/Monitor | | | Travel, walk or wait on floor; Monitor guest |
| | Employee Interaction | General work interaction | | General restaurant interaction |
| | Telephone | Taking to go order | | Employee taking to go order |
| | | Work related | | Employee on phone |
| | | Non-Work related | | Personal call or text |
| | POS interaction | General POS | | Place customer order or close out customer order on POS system. Modify customer order |
| | | Clock In/Out | | Employee is clocking in /out |
| | Clean | General cleaning | | General types of cleaning,includes vacuuming, sweeping, mopping in  customer area, server station and server alley |
| | | Clean Other | | Other cleaning |
| | Cash Handling | | | Count out tips,count cash drawer etc.; Does NOT include customer order interaction |
| | Other | | | Other office task |
| Outside Restaurant | Other | | | Employee is outside restaurant |
| Employee Break | | | | Employee is on break,lunch,dinner,etc |
| Observer Break | | | | On break, lunch, dinner, etc |

**APPENDIX 2**

**Activity for Darden Observation Study**

| Location | Primary Task | Sub Task 1 | Sub Task 2 | Description | Designation-CUSTOMER | Designation-NO CUSTOMER |
|---|---|---|---|---|---|---|
| Front of House | Travel/Monitor | | | Travel, walk or wait on floor; Monitor guest | T | T |
| | Customer Interaction | Greet/Chat/Interact with customer | | Interact/chat/greet customers at table or other areas of the restaurant to ensure guest satisfaction; includes taking order | T | T |
| | Employee Interaction | | | General restaurant interaction | T | O |
| | Telephone | Taking to go order | | Employee taking to go order | T | T |
| | | Work related | | Employee on phone | R | R |
| | | Non-Work related | | Personal call or text | O | O |
| | Pre-Bussing | | | Remove plates/utensils/dirty napkins wipe down table or bar while customer is still present | T | T |
| | Bussing | | | Remove plates/utensils/dirty napkins/wipe down table after customers have left | T | T |
| | Prepare/set table | | | Prepare table by placing silverware/plates/napkins/condiments on table | T | R |
| | Food Interaction | Serve/carry food or bev | | Serve/carry food, beverage, or condiments to customers; carry food or beverage; fill beverages | T | T |
| | | Dish or plate food/prep drink | For Customer | Dish or plate food, soup ,salad, etc. or prepare drink | T | T |
| | | | Not for Customer | Dish or plate food, soup ,salad, etc. or prepare drink. Not for customer | T | O |
| | | Prepare condiments | | Check or refill salt, pepper, ketchup, mustard, hot sauce or other condiments | T | R |
| | | Garnish/arrange food | | Decorate food/drinks to make more visually appealing; add dressing to salads, cheese, pepper, etc. | T | T |
| | | Stock Food/ingredients | | Stock food supplies or other supplies; unpacking food or supplies; move or carry supplies; includes stocking beverages/liquor; stock ice | T | R |
| | | Stock Beverages/Ice | | Stock beverages/liquor; stock ice | T | R |
| | | Carry to go order | | Carry to go order to/for customer | T | T |
| | | Inventory | | Take inventory of liquor, food, etc | R | R |
| | | Other | | Other food supplies interaction task | T | O |
| | Object Interaction | Carry menu/check | | Carry menu or check to and from customer | T | T |
| | | Carry to go box/bag | | Carry to go box or bag to/from customer | T | T |
| | | Rolling silverware | | Rolling silverware into napkin | T | R |
| | | Carry/organize dishware or utensils | For Customer | Carry dishware/utensils to or for customer | T | T |
| | | | Not for Customer | Carry dishware/utensils. Stock dishware/utensils | T | R |
| | | Carry/organize furniture | For Customer | Carry/move/organize  tables/heat lamps/high chairs specifically for customers. | T | T |
| | | | Not for Customer | Carry/move/organize  tables/heat lamps/high chairs. Not specifically for customers. | R | R |
| | | Carry/set up equipment | | Carry/set up tea,coffee,ice, soda or other machines | T | R |
| | | Fix/maintain equipment | | Fix/maintain tea,coffee ice, soda or other machines | T | R |
| | | Review/Write Notes | | Review/ write notes.Perform paperwork. Does not include taking order | O | O |
| | | Other | | Other object/equipment interaction | O | O |
| | POS interaction | General POS | | Place customer order or close out customer order on POS system. Modify customer order | T | T |
| | | Clock In/Out | | Employee is clocking in /out | O | O |
| | Clean | Wash dish/glassware | | Washing dishware/glassware by hand or machine; | T | R |
| | | Clear dishware | | Clear food from plates | T | R |
| | | Clean equipment | | Clean/wipe down equipment (refrigerator,tea machine, ice, coffee machine, etc..) | R | R |
| | | General cleaning | | General types of cleaning,includes vacuuming, sweeping, mopping in  customer area, server station and server alley | R | R |
| | | Clean Other | | Other cleaning | R | R |
| | Wash Hands | | | Employee is washing hands | O | O |
| | Cash Handling | | | Count out tips,count cash drawer etc.; Does NOT include customer order interaction | O | O |

APPENDIX 3

Activity for Darden Observation Study

| Location | Primary Task | Sub Task 1 | Sub Task 2 | Description | Designation-CUSTOMER | Designation-NO CUSTOMER |
|---|---|---|---|---|---|---|
| | Other | | | Other front of house task | O | O |
| Back of House | Travel/Monitor | | | Travel, walk or wait on floor; Monitor guest | T | T |
| | Employee Interaction | General interaction | | General restaurant interaction | T | O |
| | Telephone | Taking to go order | | Employee taking to go order | T | T |
| | | Work related | | Employee on phone | R | R |
| | | Non-Work related | | Personal call or text | O | O |
| | Pre-Bussing | | | Remove plates/utensils/dirty napkins wipe down table or bar while customer is still present | T | T |
| | Bussing | | | Remove plates/utensils/dirty napkins/wipe down table after customers have left | T | T |
| | Food Interaction | Serve/carry food or bev | | Serve/carry food, beverage, or condiments to customers; carry food or beverage; fill beverages | T | T |
| | | Dish or plate food/prep drink | For Customer | Dish or plate food, soup ,salad, etc. or prepare drink | T | T |
| | | | Not for Customer | Dish or plate food, soup ,salad, etc. or prepare drink. Not for customer | T | O |
| | | Prepare condiments | | Check or refill salt, pepper, ketchup, mustard, hot sauce or other condiments | T | R |
| | | Garnish/arrange food | | Decorate food/drinks to make more visually appealing; add dressing to salads, cheese, pepper, etc. | T | T |
| | | Stock Food/ingredients | | Stock food supplies or other supplies; unpacking food or supplies; move or carry supplies; includes stocking beverages/liquor; stock ice | T | R |
| | | Stock Beverages/Ice | | Stock beverages/liquor; stock ice | T | R |
| | | Carry to go order | | Carry to go order to/for customer | T | T |
| | | Inventory | | Take inventory of liquor, food, etc | R | R |
| | | Other | | Other food supplies interaction task | T | O |
| | Object Interaction | Carry menu/check | | Carry menu or check to and from customer | T | T |
| | | Carry to go box/bag | | Carry to go box or bag to/from customer | T | T |
| | | Rolling silverware | | Rolling silverware into napkin | T | R |
| | | Carry/organize dishware or utensils | For Customer | Carry dishware/utensils to or for customer | T | T |
| | | | Not for Customer | Carry dishware/utensils. Stock dishware/utensils | T | R |
| | | Carry/organize furniture | For Customer | Carry/move/organize  tables/heat lamps/high chairs specifically for customers. | T | T |
| | | | Not for Customer | Carry/move/organize  tables/heat lamps/high chairs. Not specifically for customers. | R | R |
| | | Carry/set up equipment | | Carry/set up tea,coffee,ice, soda or other machines | T | R |
| | | Fix/maintain equipment | | Fix/maintain tea,coffee ice, soda or other machines | T | R |
| | | Review/ Write Notes | | Review/ Write notes.Perform paperwork. Does not include taking order | O | O |
| | | Other | | Other object/equipment interaction | O | O |
| | POS interaction | General POS | | Place customer order or close out customer order on POS system. Modify customer order | T | T |
| | | Clock In/Out | | Employee is clocking in /out | O | O |
| | Clean | Wash dish/glassware | | Washing dishware/glassware by hand or machine; | T | R |
| | | Clear dishware | | Clear food from plates | T | R |
| | | Clean equipment | | Clean/wipe down equipment (refrigerator,tea machine, ice, coffee machine, etc..) | R | R |
| | | General cleaning | | General types of cleaning,includes vacuuming, sweeping, mopping in  customer area, server station and server alley | R | R |
| | | Clean Other | | Other cleaning | R | R |
| | Wash Hands | | | Employee is washing hands | O | O |
| | Cash Handling | | | Count out tips,count cash drawer etc.; Does NOT include customer order interaction | O | O |
| | In Cooler/Freezer | | | Employee has entered the cooler; freezer or liquor cabinet | T | T |
| | Other | | | Other back of house task | O | O |
| Office | Travel/Monitor | | | Travel, walk or wait on floor; Monitor guest | T | T |
| | Employee Interaction | General work interaction | | General restaurant interaction | T | O |
| | Telephone | Taking to go order | | Employee taking to go order | T | T |
| | | Work related | | Employee on phone | R | R |
| | | Non-Work related | | Personal call or text | O | O |
| | POS interaction | General POS | | Place customer order or close out customer order on POS system. Modify customer order | T | T |
| | | Clock In/Out | | Employee is clocking in /out | O | O |
| | Clean | General cleaning | | General types of cleaning,includes vacuuming, sweeping, mopping in  customer area, server station and server alley | R | R |
| | | Clean Other | | Other cleaning | R | R |
| | Cash Handling | | | Count out tips,count cash drawer etc.; Does NOT include customer order interaction | O | O |
| | Other | | | Other office task | O | O |
| Outside Restaurant | Other | | | Employee is outside restaurant | O | O |
| Employee Break | | | | Employee is on break,lunch,dinner,etc | O | O |
| Observer Break | | | | On break, lunch, dinner, etc | O | O |

APPENDIX 3

- Data from Observation Study -
## Percentage of Observed <u>Bartender</u> Time Spent on Related Activities
- By Concept -
- Full Sample, All Observed Shifts -



**APPENDIX 4 (Ex. 1)**



**- Data from Observation Study -**

**Percentage of Observed <u>Server</u> Time Spent on Related Activities**

**- By Concept -**

**- Full Sample, All Observed Shifts -**



- Data from Observation Study -

Percentage of Observed <u>Bartender</u> Time Spent on Related Activities

- By Concept -

- Only Non-Opt-ins -

**APPENDIX 4 (Ex. 3)**

- Data from Observation Study -
## Percentage of Observed <u>Server</u> Time Spent on Related Activities
- By Concept -
- Only Non-Opt-ins -





- Data from Observation Study -
## Percentage of Observed <u>Bartender</u> Time Spent on Related Activities
### - By Concept -
### - Full Workweek Observations Only -

**- Data From Observation Study -**

## Percentage of Observed <u>Server</u> Time Spent on Related Activities
### - By Concept -
### - Full Workweek Observations Only -





- Data from Observation Study -

**Percentage of Observed <u>Bartender</u> Time Spent on Related Activities**

**- By Concept -**

**- Only Opt-ins -**

- Data from Observation Study -

## Percentage of Observed <u>Server</u> Time Spent on Related Activities
### - By Concept -
### - Only Opt-ins -



- Data from Observation Study -

## Percentage Breakdown of Shift Time by Category of Observed activity

### - Full Sample, All Observed Shifts -





- Data from Observation Study -

## Percentage Breakdown of Shift Time by Category of Observed activity
### - Non-Opt-ins Only -

**APPENDIX 4 (Ex. 10)**

**- Data from Observation Study -**

## Percentage Breakdown of Shift Time by Category of Observed activity

**- Full Week Observations Only -**



# - Data from Observation Study -

## Percentage Breakdown of Shift Time by Category of Observed activity

### - Only Opt ins -



**APPENDIX 4 (Ex. 12)**